```
 1                  IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                        JACKSONVILLE DIVISION

 3

      PAOLA CANAS, LINA POSADA,            Jacksonville, Florida
 4    JESSICA BURCIAGA, JAIME
      EDMONDSON, and ROSIE JONES,          Friday, July 26, 2019
 5

 6              Plaintiffs,                 Courtroom:  10D

 7    vs.                                   Case No.  3:16-cv-393-J-32JRK

 8    FLASH DANCERS, INC., and
      MICHAEL TOMKOVICH,
 9              Defendants.
10    _____

      BROOKE TAYLOR, LAURIE ANN YOUNG,
11    MALU LUND, SARA UNDERWOOD, and
      JAMIE EASON,
12              Plaintiffs,

13    vs.                                   Case No.  3:16-cv-394-J-32JRK

14    M.T. PRODUCTIONS IN
      JACKSONVILLE,INC., and
15    MICHAEL TOMKOVICH,

16              Defendants.
17    _____

18                     EXCERPT FROM JURY TRIAL
                (TESTIMONY OF MICHAEL TOMKOVICH, Continued)
19              BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                     UNITED STATES DISTRICT JUDGE
20

21

22    OFFICIAL COURT REPORTER:
      Cindy Packevicz Jarriel, RPR, FCRR
23    221 N. Hogan Street, #128
      Jacksonville, FL  32202
24    Telephone:  904.301.6843
      e-mail:  cindyrprfcrr@gmail.com
25         (Proceedings reported by stenography; transcript
      produced by computer.)
```

1

2                          A P P E A R A N C E S

3     PLAINTIFFS' COUNSEL:

4     **JOSEPH N. CASAS, ESQ.**
      The Casas Law Firm, P.C.
5     402 West Broadway, Suite 400
      San Diego, CA 92101
6
      **DENNIS C. POSTIGLIONE, ESQ.**
7     The Casas Law Firm, P.C.
      3801 North Capital of Texas Hwy
8     Suite E240 #445
      Austin, TX 78746
9
      **JOHN V. GOLASZEWSKI, ESQ.**
10    The Casas Law Firm, P.C.
      1745 Broadway, 17th Floor
11    New York, NY 10019

12    **LUDMILA KHOMIAK, ESQ.**
      The Casas Law Firm, PC
13    80 SW 8th Street, Suite 2000
      Miami, FL 33130
14

15    DEFENSE COUNSEL:

16    **LUKE CHARLES LIROT, ESQ.**
      Luke Charles Lirot, PA
17    2240 Bellair Road, Suite 190
      Clearwater, FL 33764
18

19    **ROBERT R. HEARN, ESQ.**
      Phelps Dunbar, LLP
20    100 South Ashley Drive, Suite 2000
      Tampa, FL 33602-5315
21

22    ALSO PRESENT:

23    **GABRIELLE IBANEZ-ALER**

24                              -  -  -

25

T A B L E   O F   C O N T E N T S

FOR THE PLAINTIFFS:

**MICHAEL TOMKOVICH** (Continued)

Direct Examination by Mr. Postiglione..........Page  4

Cross-Examination by Mr. Lirot.................Page 27

Redirect Examination by Mr. Postiglione........Page 50

E X H I B I T S   R E C E I V E D

Plaintiffs' Exhibits:                              Page

Exhibits 36 - 41...................................15

Exhibits 55 - 56...................................65

- - -

P R O C E E D I N G S

July 26, 2019                                    9:19 a.m.

* * * * *

THE COURT:  We are ready to resume the examination of Mr. Tomkovich.

Counsel, you may proceed.

BY MR. POSTIGLIONE:

Q    Good morning, Mr. Tomkovich.

A    Good morning.

Q    We had talked yesterday about your employee manual a little bit.

Do you recall that testimony?

A    Yes.

Q    And do you recall being asked several questions about it and having reviewed what's been marked as Exhibit 34, that was your employee manual?

A    Yes.

Q    I want to show you a portion of that and I want to ask you a couple questions.

I'll wait for it to come up there on the screen.

MR. LIROT:  That wasn't what I had in mind, Your Honor.

THE COURT:  Yeah, why don't you take it down.

MR. POSTIGLIONE:  All right.

THE COURT:  I just want you to ask him the questions.

1   BY MR. POSTIGLIONE:

2   Q    Let me ask you this, Mr. Tomkovich.  Would you agree with

3   me that part of your policies and procedures at Thee Officers

4   Club and at Flash Dancers is to portray an image of glamour?

5            You want -- the girls that work there, you want the

6   staff to appear glamorous?

7   A    Yes.

8   Q    And that's important.

9            Why is it important that you have a standard for

10  appearance at your clubs?

11  A    We're in show business.

12  Q    And how does that -- how does that add value to what

13  you're doing there?

14           It's a club.  You say it's show business.  How does

15  that add value?

16  A    Well, that's what people are looking for when they come

17  in, I imagine.

18  Q    Okay.  Is it also what you look for in your advertisements

19  for your club, to portray that same image?

20  A    Just a clean and respectful image, yes.

21  Q    Okay.  Now, we talked yesterday also about your belief

22  that Mr. Hopper created two of these images, Super Bowl ads.

23           Do you remember that testimony?

24  A    Yes.

25  Q    Okay.  And is there anything about what you've done

```
 1    overnight or any thoughts you've had in your head since then
 2    that would be inconsistent with that?
 3            In other words, you still believe that eight of those
 4    advertisements, you don't know where they came from, but the
 5    two that Mr. Hopper did were the two that Mr. Hopper did?
 6    A     The two that Mr. Hopper did, yes.
 7    Q     Do you remember answering interrogatories in this lawsuit?
 8            Those are questions that we send to you that you have
 9    to answer under oath.
10    A     Yes.
11    Q     And do you remember I showed you those yesterday and you
12    confirmed that your signature was on the document?
13    A     I've seen the signature on the back.  I never read the
14    questions, but...
15    Q     You never read the questions?
16    A     No.
17            MR. LIROT:  Judge, I object.  I think this is
18    improper impeachment.
19            THE COURT:  I don't think it's improper impeachment.
20    But let's be clear, what you mean is you didn't read the
21    questions yesterday, sir?
22            THE WITNESS:  That's correct.
23            THE COURT:  Okay.
24            MR. POSTIGLIONE:  I was getting there.
25    BY MR. POSTIGLIONE:
```

1   Q    Now, at a certain point in the lawsuit, you received those

2   questions; correct?

3   A    Yes.

4   Q    Okay.  And did you read them and go over them before you

5   signed the document under oath, swearing that they were true

6   and correct?

7   A    Yes.

8        MR. POSTIGLIONE:  One second, Your Honor.

9   BY MR. POSTIGLIONE:

10  Q    All right.  Now, we asked you a question, to state where

11  those images came from.

12        Do you remember that question?

13        In other words, the date that they were published by

14  you or your agent, what the website was, social media accounts,

15  print advertising, posters, wherever those images came from,

16  and you answered those questions.

17        Do you remember that?

18  A    Yes.

19  Q    Do you remember answering that you were unable to respond

20  to that question because Mr. Hopper was the only person who

21  would have personal knowledge about where those images came

22  from?

23  A    Yes.

24  Q    And isn't that different from what you've testified to

25  today?  In other words, when I asked you under oath, you told

1    me:  Mr. Hopper is the only person that knows.

2           And yesterday you told this jury that:  Well,

3    Mr. Hopper did two of them, but I just don't know where the

4    rest of them came from.

5           So which one is it?

6    A    Mr. Hopper created the advertising, and I don't know where

7    the other images came from.

8    Q    You answered questions under oath and told me that

9    Mr. Hopper was the only person who could tell us that.

10          And you signed it under oath.  Do you remember that?

11   A    Yes.

12   Q    Then why the different story today and yesterday?

13   A    I don't think it was different.

14   Q    Mr. Hopper is the only person with knowledge where those

15   ads came from?

16   A    From where the ads come from, yes.

17   Q    Right.

18          Now, you have personal knowledge that Mr. Hopper only

19   created two, and we don't know where the other eight came from?

20          That's the same statement?

21   A    The advertising.

22   Q    All right.  Can you clarify that?  I'm not sure I

23   understand you.

24   A    Well, the advertisement is where we were advertising an

25   event.  The other images, like I said yesterday, looked like

1    just FaceBook stuffing, you know, just placement.  No

2    advertisement.

3    Q    Stuffing -- filler, I think?

4    A    Filler, yes.  Excuse me.

5    Q    And so you don't believe that's inconsistent with the way

6    you answered these questions?

7    A    No, I do not.

8    Q    Okay.  Mr. Tomkovich, you testified -- or you saw my

9    clients throughout the week testify in the video and in person;

10   correct?

11   A    Yes.

12   Q    I've looked at your website on the clubs.

13            MR. LIROT:  Objection.  Assumes facts not in

14   evidence.

15            MR. POSTIGLIONE:  I haven't asked the question.

16            THE COURT:  Yeah, I'm not sure what -- why don't

17   you -- well, I'll let you ask the question, but let me -- don't

18   answer it until I hear it.  Go ahead.

19   BY MR. POSTIGLIONE:

20   Q    My understanding as to what goes on at a club is there is

21   totally nude friction dancers.

22            Is that something that you advertise for your clubs?

23   A    The ones that are legally allowed to do that, yes.

24   Q    Okay.  What is a totally nude friction dance?

25            MR. LIROT:  Objection.  Not these clubs.

1    We're in court for two clubs in Jacksonville and the

2    regulations governing those clubs.  My objection's under

3    Rule 403.

4         THE COURT:  Counsel, I'm just not sure if -- unless

5    these two clubs are part of that, I'm not sure the question is

6    appropriate.

7         MR. POSTIGLIONE:  Can we do sidebar?

8       (At sidebar, out of the hearing of the jury:)

9         MR. POSTIGLIONE:  This is an advertisement from that

10   club.  Totally nude friction dancers.

11        MR. LIROT:  That's Flash Dancers.

12        MR. POSTIGLIONE:  This is an advertisement:  Totally

13   nude girls on stage.

14        I want to ask him if he understands why my clients

15   are upset that they're associated with totally nude friction

16   dancers, and I'll move on.

17        MR. LIROT:  When are those ads from?

18        MR. POSTIGLIONE:  This is from -- from your website.

19   I don't know.

20        MR. LIROT:  When --

21        MR. POSTIGLIONE:  I mean, you can ask him, but...

22        MR. LIROT:  I'm not going to let you take that stuff

23   off your cell phone today when we're talking about images that

24   were posted in 2014.

25        THE COURT:  I don't know.  You dug up stuff the other

```
 1    day that you didn't have before, so -- right?

 2              So it is -- I mean, I guess -- I guess you can ask

 3    the witness if that's allowed at these two clubs.  And if his

 4    answer is yes, then I think -- I think then it's a fair

 5    question.

 6              MR. POSTIGLIONE:  I'll make it quick.

 7              THE COURT:  Yeah, I understand.  And you can follow

 8    up if you want to.

 9       (The following proceedings occurred in open court, in the

10    presence of the jury:)

11    BY MR. POSTIGLIONE:

12    Q    Are totally nude friction dances allowed at Flash Dancers?

13    A    No.

14    Q    Were they allowed in 2014, 2013, 2015?

15    A    No.

16    Q    Are they allowed at Thee Officers Club?

17    A    No.

18    Q    Did you ever advertise on your websites that those were

19    allowed?

20    A    No.

21    Q    My question is -- you saw my clients testify.  Do you

22    understand why they might be upset with being associated with

23    these types of clubs?

24    A    No.

25    Q    You don't?
```

1   A     No.

2   Q     The mother whose husband is a church minister, music

3   director, with two small children, you don't make any

4   connection between her being associated with your strip clubs

5   and being upset?

6   A     No.

7   Q     Okay.  Mr. Tomkovich, who is DeVry E. Dewan?

8   A     My former accountant.

9   Q     Okay.  So is that a man or a woman?  I'm sorry.

10  A     A man.

11  Q     A man.

12         So Mr. Dewan is your former CPA?

13  A     Yes.

14  Q     And was that person your CPA from 2013 to 2015?

15  A     Yes.

16  Q     Is that someone that helped M.T. Productions or Thee

17  Officers Club and Flash Dancers compile and file tax returns?

18  A     Yes.

19  Q     With your help?

20  A     Yes.

21  Q     How does that work?  Do you throw -- like I do -- do you

22  just throw everything in a box and hand it to the accountant

23  and say:  Do my taxes?

24  A     Pretty close to that.  And then a QuickBooks check

25  register that he'll -- that he'll reconcile as the people in

1  the office do.

2  Q    Okay.  So you have an office person that reconciles the

3  receipts and everything, but you ultimately sign off on those

4  tax returns?

5  A    Yes.

6  Q    Let me ask you -- let me go back really briefly just to

7  the point I made before.

8         I asked you if there was -- these clubs were fully

9  nude, and you answered no, you can't do that at Flash Dancers

10  or Thee Officers Club and you couldn't do it in 2013; right?

11  A    Yes.

12  Q    What about full friction?  I don't know what that is, but

13  is that legal at that club?

14  A    No.

15         MR. POSTIGLIONE:  Okay.  Your Honor, permission to

16  show the witness what has been marked -- or previously marked

17  as 39, 40, 41, 36, 37, and 38.

18         THE COURT:  Mr. Lirot -- show them to Mr. Lirot.

19         MR. LIROT:  I have copies, Your Honor.

20         THE COURT:  Okay.  So in numerical order, 36, 37, 38,

21  39, 40, and 41?

22         MR. POSTIGLIONE:  Yes.  I'm sorry.

23         THE COURT:  That's okay.  All right.

24  BY MR. POSTIGLIONE:

25  Q    Mr. Tomkovich, just take a brief look at those.  I want

1    you to confirm what those are.

2              What are those, Mr. Tomkovich?

3    A    Those are tax returns, federal tax returns, for M.T.

4    Productions and Flash Dancers, Inc.

5    Q    Are these tax returns 2013, 2014, 2015, for both clubs?

6    A    Yes.

7    Q    Okay.  You wouldn't intentionally file a fraudulent

8    document with the IRS, would you?

9    A    No.

10    Q    You wouldn't intentionally file a fraudulent document with

11    any Government entity, would you?

12    A    No.

13    Q    So as you looked at them, these are a fair and accurate

14    representation of what was filed with the IRS in 2013, 2014,

15    2015 for M.T. Productions, Thee Officers Club, and Flash

16    Dancers, Inc.; correct?

17    A    Yes.

18    Q    Are these gross receipts, the sales numbers, were they

19    accurate at the time you submitted them to your accountant?

20    A    Yes.

21    Q    2013, $459,258 for M.T. Productions; is that correct?

22    A    I believe so, if you're reading off paper.  I don't have

23    them in front of me.

24    Q    Okay.

25    A    I'll take your word for that.

1    Q    Okay.  2014, $214,172.  Does that sound about right?

2    A    Yes.

3    Q    2015, $649,473.  Does that sound about right?

4              MR. LIROT:  Can we identify the exhibit.

5              THE COURT:  Yeah, it's a little bit odd for you to be

6    reading these numbers of documents that aren't in evidence.

7              MR. POSTIGLIONE:  Can I move them into evidence?

8              THE COURT:  Any objection?

9              MR. LIROT:  No objection.

10             THE COURT:  They will be received.

11         (Plaintiffs' Exhibits 36 - 41 were received in evidence.)

12             THE COURT:  And I -- if you're going to read out the

13   numbers, you need to say what year and which company.

14             MR. POSTIGLIONE:  I was getting there.

15             MR. HEARN:  I'm not objecting, Your Honor.  For

16   the -- it would help for the record and for us to follow if he

17   would say what exhibit number it is.

18             MR. POSTIGLIONE:  I was doing it in reverse.  I

19   apologize.

20   BY MR. POSTIGLIONE:

21   Q    On Exhibit 41, 2015 tax returns for M.T. Productions, you

22   reported $649,473 in gross receipts and sales.  Does that sound

23   about right?

24   A    Yes.

25   Q    Exhibit 40, 2014 tax returns, you reported $214,172 in

1    gross receipts.  Does that sound about right?

2    A    Yes.

3    Q    In 2013, on Exhibit 39, you reported $459,258 in gross

4    receipts for M.T. Productions.  Does that sound about right?

5    A    Yes.

6    Q    2013, Exhibit 36, you reported $410,612 in gross receipts

7    for Flash Dancers.  Is that correct?

8    A    Yes.

9    Q    Exhibit 37, $480,276 in gross receipts.  Does that sound

10   about right?

11   A    Yes.

12   Q    And then finally, 2015, on Exhibit 38 for Flash Dancers,

13   Inc., you reported $428,895 in gross receipts.  Does that sound

14   about right?

15   A    Yes.

16   Q    Okay.  So for each club during the relevant period, you

17   reported approximately $1.2 million in gross receipts; is that

18   right?  Over the three-year period.

19   A    Combined.

20   Q    Yes.

21   A    If that's what it adds up, I'll take your word for that.

22   Q    All right.  Mr. Tomkovich, you heard Mr. Hopper's

23   testimony yesterday; correct?

24   A    Yes.

25   Q    And you realize that he filed a bankruptcy in connection

1    with the events leading to these lawsuits and then your

2    subsequent suit to him; correct?

3    A    Yes.

4    Q    Now, when you -- when someone files a bankruptcy and they

5    owe you money, you get notice; that's correct?

6    A    I believe so.  I'm not an expert on that.

7    Q    And then when you receive notice, if you have money, you

8    file documents with the court to tell the court that Mr. Hopper

9    owes you money.  Is that your understanding?

10   A    I don't know exactly how that works.

11           MR. LIROT:  Judge, can we have a sidebar here for a

12   minute?

13           (At sidebar, out of the hearing of the jury:)

14           MR. LIROT:  I believe I know where this is going.

15   When Mr. Hopper filed bankruptcy, proofs of claim were filed

16   for every entity that received a cease and desist letter.  With

17   no better evidence of the amount of that claim, the cease and

18   desist letter was used.

19           If they're trying to use that cease and desist letter

20   as some admission that that's a valid number, that would be

21   improper.  And I wanted to say up to date that half of those

22   have been either subject to amended proofs of claim, where when

23   we found out which images were Mr. Hopper's and which were not,

24   all of the proofs of claim were amended.  But the only numbers

25   used were those in the cease and desist letters.  That's not an

1    admission of the accuracy, it's simply a statement of what

2    potentially is out there that could be owed by the client

3    that's been sued by these guys.

4            So that's just not -- Your Honor, it's not --

5            MR. POSTIGLIONE:  Your Honor, this was prepared by

6    Mr. Lirot on behalf of both clubs in the amount of $350,000,

7    and filed with the bankruptcy court.

8            There's several of them that state the amount that

9    they're claiming Mr. Hopper owes under the bankruptcy.  He

10   filed it under oath, under penalty of perjury, with the

11   criminal statute right next to it, and I think I'm entitled to

12   ask him about it.

13           MR. LIROT:  It's not owed.  It's a potential claim.

14           MR. CASAS:  The amounts come from the valuation of

15   our expert on our demand letter, Your Honor.

16           MR. LIROT:  That's the only number we had, but it's

17   not a validation of that number.  We never give you that

18   number, but we had to file the claim based on the claim made by

19   them.  It's entirely misleading.

20           If an attorney uses it to say that we concede that

21   that number is valid, it would be total improper use of those

22   claims.

23           MR. CASAS:  It's an admission of party opponent.

24           MR. LIROT:  It's admission of nothing.  It's a claim

25   because you guys made a claim.

1           And, as I said, most of those had been amended.

2   After we had gotten with Mr. Hopper with the permission of his

3   bankruptcy counsel and verified which ones were his and which

4   ones were the so-called fill, they've all been amended.

5           MR. CASAS:  I think he can clean it up on --

6           MR. LIROT:  I don't have to clean it up if it's

7   prejudicial after the fact.

8           THE COURT:  You know, in a perfect world -- when I

9   asked at the pretrial conference or in innumerable other times

10  that we talked about this if there are evidentiary issues that

11  were going to be controversial or whatever, somebody would have

12  told me about this and we would have looked at it and --

13          MR. CASAS:  Your Honor, this is on our exhibit list.

14          THE COURT:  I understand.  I guess the world's not a

15  perfect place.

16          So each one of these is a claim --

17          MR. LIROT:  Every one of those entities received a

18  cease and desist letter and was sued.  The only basis for any

19  claim that would be even remotely accepted by the bankruptcy

20  court would have been the letters.  We can't make up our own

21  numbers, so we had to start with that.

22          MR. CASAS:  Oh, and to be clear, it's the letters

23  with the preliminary report of our expert attached to it with

24  the valuation of our claims.

25          THE COURT:  All right.  But that's not -- that's not

1    saying that they agree with you.  It's just saying that's the

2    claim that's been made against you so they're passing it on to

3    Mr. Hopper; right?

4              MR. LIROT:  That's it.

5              So they sued for a million dollars for a lawn-care

6    bill you didn't pay, you still have to make the claim for a

7    million dollars.  That doesn't mean the million dollars is what

8    you owe for lawn care.

9              MR. CASAS:  To the extent Your Honor thinks it's

10   prejudicial, at a minimum, we should be able to say that --

11             THE COURT:  Oh, I'm not -- I'm not saying it's

12   prejudicial.  I'm saying I'm not sure of the relevance.

13             MR. CASAS:  The relevance is that Mr. Tomkovich has

14   already undermined the amount of advertisements that he claims

15   Mr. Hopper made, but yet they're attributing the full value of

16   all the advertisements to Mr. Hopper.  So it's --

17             THE COURT:  All right.  Here's -- what else do you

18   have besides this?

19             MR. POSTIGLIONE:  That's it.  A few follow-up

20   questions and then this.  Maybe ten minutes after for his

21   claim.

22             THE COURT:  All right.

23             MR. LIROT:  I think that's --

24             THE COURT:  I understand.  I'm going to think about

25   it.  Finish the rest of your questions.

1          (The following proceedings occurred in open court, in the
2     presence of the jury:)
3     BY MR. POSTIGLIONE:
4     Q     Mr. Tomkovich, when -- you've testified that when you
5     found out about this lawsuit through a cease and -- or, I'm
6     sorry, you received a cease and desist letter and then realized
7     you had been sued; is that correct?
8     A     A cease-and-desist, which was a precursor to being sued.
9     Q     Okay.
10    A     So I complied, the best of my ability, with the
11    cease-and-desist.
12    Q     Tell me what steps you took.  What investigation did you
13    undertake to figure out what had gone on in your clubs?
14    A     First, I contacted Larry Walters in Orlando about the
15    cease-and-desist.  And he advised me get on FaceBook -- because
16    I don't know nothing, really, about FaceBook.
17          MR. LIROT:  Okay.  Judge, I'm a little cautious.
18    Mr. Walters is an attorney and I don't want Mr. Tomkovich to
19    intentionally blurt out attorney-client privileged
20    communications.
21          MR. POSTIGLIONE:  Let me do this.
22    BY MR. POSTIGLIONE:
23    Q     I don't want to know anything you talked about with
24    Mr. Walters.
25          MR. LIROT:  I don't mind what basic directions might

```
 1    have been given, but I don't want to get into the depth of any

 2    attorney-client communications.

 3              THE COURT:  I understand.  I think it's going to be

 4    fine.

 5              Mr. Tomkovich understands that, and I'm sure counsel

 6    is not going to ask him questions that will invade

 7    attorney-client privilege, so let's just see where it goes.

 8              Go ahead, sir.

 9    BY MR. POSTIGLIONE:

10    Q    Go ahead and finish your answer.

11    A    He advised me to take the pages and things down that were

12    in the cease-and-desist.  I investigated that and had no

13    control over the FaceBook pages of Flash Dancers and M.T.

14    Productions.

15              So my second thing was to do, I had to hire an

16    outside media company, which was 813 in Tampa, and then they

17    changed their name -- I guess their business got bigger -- and

18    became S3 Media, but essentially the same 813 company, if that

19    makes any sense.

20    Q    Well, I think, Mr. Tomkovich, you testified that you don't

21    believe you did anything wrong.  Is that -- my understanding

22    correct?

23    A    Correct.

24    Q    Then why would you need to take the images down?

25              I mean, if you had the right to use them, why take
```

1  them down?  Why hire --

2          MR. LIROT:  Objection.  Subsequent remedial measure.

3          MR. POSTIGLIONE:  I don't -- I don't agree with --

4          THE COURT:  I don't think that's it.  I'll allow him

5  to answer his understanding of why he took it down.

6          THE WITNESS:  Under the advice of Larry Walters, he

7  said:  Comply with the cease-and-desist, and that's why.

8          MR. POSTIGLIONE:  Okay.  Pending Your Honor's

9  decision on the issue.

10          THE COURT:  Okay.  That's fine.

11          So are you done -- are you done other than that?

12          MR. POSTIGLIONE:  Yes, sir.

13          THE COURT:  All right.  Ladies and gentlemen, if you

14  just -- we got something we need to talk about and it's going

15  to take a minute.

16          I know you just got out here, but give us five

17  minutes, if you'll just step back, and I'll get you right back

18  out.  If you need to use the restroom or whatever, feel free.

19  Thanks.

20          COURT SECURITY OFFICER:  All rise for the jury.

21      (Jury out at 9:51 a.m.)

22          COURT SECURITY OFFICER:  Please be seated.

23          THE COURT:  That's fine, you can walk around for a

24  few minutes while we're figuring this out.

25          So I guess, Counsel, I see what you're saying, but

1   isn't this just -- so first of all, the fortuity that

2   Mr. Hopper filed bankruptcy is -- is what it is.  If he hadn't

3   filed bankruptcy, you wouldn't have had these pieces of paper.

4          But isn't it just essentially passing through a claim

5   that's been made to a party that potentially could be liable as

6   a third party for it, or a -- liable as either in a

7   counterclaim or a crossclaim, without necessarily meaning to

8   agree that that's how much money is involved?

9          I mean, if it -- what's it evidence of?  Is it

10  evident that -- are you trying to suggest that this is evidence

11  that the defendants believed that these are the damages of the

12  plaintiffs in this case?

13         If that's what you're trying to suggest, I think

14  that's going a little far.

15         MR. POSTIGLIONE:  I'm not.

16         What I'm trying to say is that they're going to put

17  on testimony later in the day that these claims were worth

18  nothing, yet they filed documents in the bankruptcy saying

19  they're worth $350,000.

20         THE COURT:  Okay.  That's a fair point.  I tell you

21  what, let's do it this way.  I'm not going to say yes now, but

22  I'm not going to say no forever; in other words, let's see how

23  the evidence comes out.  And if I feel like this is fair

24  rebuttal, essentially, to what they're going to say, we'll

25  think about it.

1          Mr. Tomkovich isn't going anywhere.  We can always
2    bring him back up and talk to him.  Okay?
3          MR. POSTIGLIONE:  Okay.
4          THE COURT:  Let's do it that way.  All right.
5          And now that Mr. Lirot knows why you want to use them
6    that way -- who knows, but let's take it a step at a time.
7          MR. CASAS:  Well, to be clear on the point, Your
8    Honor, Mr. Lirot knew full well where we were going.  I
9    actually sent him messages about this many, many months ago.
10         THE COURT:  I'm not -- I'm not -- I don't mean it's a
11   surprise.
12         What I mean to suggest is I'm a little dubious about
13   introducing this, but I could be persuaded that it's
14   appropriate depending on the testimony that is elicited by the
15   defendants.
16         So if the case they put on convinces me that it would
17   be fair to let you do it, then I'll let you do it.
18         MR. CASAS:  Yes, Your Honor.  Just to be clear about
19   our basis, it's not just that he -- we expect the testimony
20   will show that they claim that there were zero.  Mr. Tomkovich
21   has testified that they're only responsible for two, ergo, the
22   value of the claim is full as opposed to just two ads.
23         So...
24         THE COURT:  I hear you.  I hear you.
25         All right.  I'm going to --

```
 1              MR. LIROT:  Judge, I'm going to clear this up.

 2              I'm not going to ask Mr. Tomkovich what these images

 3    are worth under any circumstances.

 4              THE COURT:  All right.  Well, we'll see.  I'm not --

 5    I want to be clear.  I will -- I am -- I will entertain a

 6    request to recall Mr. Tomkovich to address this issue or maybe

 7    even on rebuttal, it depends.  But right now, that's what we're

 8    doing on it.  All right.

 9              So are you done --

10              MR. POSTIGLIONE:  Yes.

11              THE COURT:  Are you done, then?

12              MR. POSTIGLIONE:  For now, yes.

13              THE COURT:  Okay.  All right.  Let's have the jury,

14    please.

15              COURT SECURITY OFFICER:  All rise for the jury.

16         (Jury in at 9:56 a.m.)

17              THE COURT:  Thank you.  Ladies and gentlemen,

18    Counsel.

19              MR. POSTIGLIONE:  Your Honor, that's all the

20    questions I have at this time.  I'll pass the witness.

21              THE COURT:  All right.  Mr. Lirot?

22              MR. LIROT:  May it please the Court.

23              And, Judge, what I intend to do is to ask

24    Mr. Tomkovich on cross-examination all of the questions related

25    to the answers elicited by Mr. Postiglione, then I intend to
```

1   talk to Mr. Tomkovich in direct examination.

2            So if it seems disjointed, I apologize, but I think

3   that's the best way to do it to make sure that we understand

4   the nature of the questions.

5            THE COURT:  That's fine.

6            And, ladies and gentlemen, I think we did this

7   yesterday with Mr. Hopper.

8            Rather than having Mr. Tomkovich get off the stand in

9   the plaintiffs' case and come back in the defendants' case,

10  we're just going to do it all at one time.

11           So you may proceed, Mr. Lirot.

12                      CROSS-EXAMINATION

13  BY MR. LIROT:

14  Q    Good morning, Mr. Tomkovich.

15  A    Good morning.

16  Q    How long have we known each other?

17  A    Probably close to ten years, maybe a little longer.

18  Q    All right.  And just to cut to the chase, yesterday you

19  gave testimony about all of the different entities involved in

20  Flash Dancers and Thee Officers Club?

21  A    Yes.

22  Q    Do you understand the distinction between you as a person

23  and the entities that own the business and the other entities

24  that own the properties for these two businesses?

25  A    Yes.

1   Q    Do you ever consider them to be one and the same?

2   A    No.

3   Q    Now, you talked a little bit about some of your marketing

4   skills, and you talked about TV and radio, that was -- I think

5   your testimony was that that was, even to this date, probably

6   the most effective marketing; radio, maybe not so much, but

7   television definitely?

8   A    Yes.

9   Q    And then we got into some of the issues about social

10  media.

11         Why did you get involved in social media?

12  A    Everyone around me said that's the way to go.  I just went

13  with the flow and that's when we hired someone outside to do

14  it.

15  Q    All right.  Did you have any expertise at all in FaceBook

16  or websites or anything of that nature?

17  A    No.

18  Q    Mr. Hopper talked about some of the admin.  I think we

19  looked at an e-mail dealing with some of the access to FaceBook

20  sites and the numbers and codes and passwords that you have to

21  put in to get access to them.

22         Did you ever yourself have any admin code, password,

23  or any access to either the FaceBook page for Thee Officers

24  Club or Flash Dancers?

25  A    No.

1    Q    Mr. Postiglione was suggesting that you'd like to have

2    glamorous girls in your club.

3             Was the intent ever to give the impression that any

4    of -- and I'll just talk about the two Super Bowl ads -- that

5    either of those two women in those Super Bowl ads, was it your

6    intent -- let me back that up.

7             Did you know anything about those ads?

8    A    I did not see those ads.

9    Q    Did you review them at all -- didn't see them; didn't

10   review them?

11   A    No.

12   Q    Didn't direct what should be in them?

13   A    No.

14   Q    We'll talk more about those later on direct, but when was

15   the first time you ever saw those?

16   A    I believe it was in the lawsuit.

17   Q    So before you got sued for those, you didn't even know

18   they existed?

19   A    That is correct.

20   Q    The issue that was brought up about the young lady who

21   testified and said that her husband was a pastor and was not

22   given a job or something because of some photograph.  You don't

23   recall that there was any testimony that it was anything to do

24   with the image of her alleged to be on your FaceBook page?

25             MR. POSTIGLIONE:  Objection.  Leading.

```
 1              THE COURT:  Overruled.
 2   A    No, I have no -- no inkling that it was about the FaceBook
 3   page.
 4   Q    All right.  What do you think her testimony involved,
 5   pictures that she voluntarily took of herself and put out?
 6              MR. POSTIGLIONE:  Objection.  Calls for speculation.
 7              THE COURT:  I'm not sure how this witness is going to
 8   be able to say what another witness was -- or why another
 9   witness said what she said.
10   BY MR. LIROT:
11   Q    All right.  What do you think about the suggestion that it
12   was somehow this FaceBook post that caused any harm to this
13   lovely lady's husband?
14   A    I don't think it caused anyone any harm.
15   Q    All right.  Let's talk about these tax returns, if we can.
16              And Mr. Hearn is going to help us on the Elmo.
17              So just by way of background.  I know that you've had
18   the opportunity to look at all of the images that are at the
19   basis of this suit; correct?
20   A    Yes.
21   Q    And the dates begin sometime in mid 2013 and continue to
22   sometime -- I think the last one is 2-17-2015.
23              And if my colleagues think my assessment of those
24   dates is wrong, I'm sure they can correct me.
25              Looking at all those images -- we start sometime in
```

```
 1  mid 2013 and we finish February of 2015.  Does that refresh

 2  your memory about the dates of these images?

 3  A    I thought they ended in '14, but okay.

 4  Q    I think the last one is February of '15.  I think that was

 5  the only one in 2015.  Okay?

 6            Let's take a look at the 2013 tax return.  I'll just

 7  go by exhibit number.  Let's look at Exhibit No. 36.

 8            MR. HEARN:  For Flash Dancers or M.T.?

 9            MR. LIROT:  I'll do Flash Dancers first.

10            MR. HEARN:  Okay.

11  BY MR. LIROT:

12  Q    So you're familiar with tax returns to some extent; yes?

13  A    Yes.

14  Q    Says what you made?

15  A    What the gross figure was, yes.

16  Q    Right.

17            The most important part is what you get to keep;

18  right?

19  A    That's important.

20  Q    How much money did you make or lose at this club in 2013?

21  A    I don't know where the number is.

22  Q    Maybe we can --

23  A    It's too far that way.

24  Q    Yeah.  Maybe we can make that a little bit smaller so we

25  can see what the designation is with the figures.
```

1          So your income or loss is on Line 21.

2    A    And that is a minus of $6,159.

3    Q    So in 2013, is there any evidence, based on this tax

4    return, that you did anything but lose money that year, whether

5    or not these images were on your FaceBook page?

6          MR. POSTIGLIONE:  Your Honor, I'm going to object to

7    this.  He's not an accountant and he's testified someone else

8    prepared this for him.  I don't think he can testify to this.

9          THE COURT:  I'm going to overrule that objection.

10         I mean, you put it in through him.  I think he's

11   allowed to say what he understands his tax return to mean and

12   you can ask him questions about it if you want to.

13         I agree that maybe it would be better to have an

14   accountant talking about all this, but I think this is the

15   evidence we have, so I'm going to allow it.  Go ahead.

16   BY MR. LIROT:

17   Q    So this year, you lost $6,159?

18   A    Yes.

19   Q    Let's look at the tax return for Exhibit No. 37.

20         And this is the tax return for Flash Dancers for

21   2014.  And you made $480,000.  Take a look at Line 21.

22         How much did you make for the whole year?

23   A    A profit of $3,372.

24   Q    And do you have any reason to believe that any of the

25   images at issue in this case, one, have any impact on your

1    income?

2    A    No.

3    Q    Do you have any reason to believe that the use of the

4    images at issue in this case provided any benefit to your

5    overall profit and loss?

6    A    No.

7    Q    And at the end of the year, you took home $3,372?

8    A    Yes.

9    Q    Let's look at Exhibit No. 38.

10        This is Flash Dancers for 2015.  And it looks like

11   you made $428,895.

12   A    Yes.

13   Q    Now, we've looked at three of these tax returns.

14        Generally speaking, do these look to be -- as income

15   and the operation of businesses go, pretty much the same, no

16   real --

17   A    Yes.

18   Q    -- bump, no real jump, no real decrease?  Pretty

19   consistent.

20   A    Yes.

21   Q    And at the end of the year, you made $17,107 profit?

22   A    Yes.

23   Q    Do you have any reason to believe that the one image of

24   Ms. Middleton on February 17, 2015, had any part to play in

25   that bottom line?

1    A    No.

2              MR. POSTIGLIONE:  Objection.  Speculative.

3              THE COURT:  Overruled.

4              THE WITNESS:  No.

5    BY MR. LIROT:

6    Q    Let's look at Exhibit No. 39, please.

7              This is the tax return from 2013 for M.T.

8    Productions, gross income $459 -- excuse me, $459,258; correct?

9    A    Correct.

10   Q    And down at the bottom in No. 21, you made $17,000.

11   A    Yes.

12   Q    Do you have any reason to believe that the one image of

13   Jessica Burciaga on June 16th or the one image of Rosie Jones

14   on April 26, 2013, had any impact or played any role in that

15   bottom line $17,000 profit?

16   A    No.

17   Q    Let's look at Exhibit No. 40, please.

18             This is M.T. Productions Flash Dancers for 2014.

19   Gross income, 214,000 -- excuse me, $214,172.

20   A    Yes.

21   Q    That's about 250,000 -- or, excuse me, about -- I want to

22   say $250,000 less than the year before.

23             Do you know why that is?

24   A    Yes.

25   Q    Why?

1    A    Closed for a remodeling.

2    Q    And that year you lost $11,541?

3    A    Yes.

4    Q    Do you think the one image of Ms. Posada on January 31,

5    2014, or the image of Ms. Lund, 2014, do you think that played

6    any role in the money you gained or lost that year?

7         And now we know you lost $11,000.

8    A    No.

9    Q    What are the variables in what you do to make money or

10   lose money in this type of business?

11   A    The variables are sort of enormous.  More outside forces.

12   Q    The weather?

13   A    Weather.

14   Q    The economy?

15   A    The economy, yes.

16        THE COURT:  Okay.  Well, why don't you let him say it

17   instead of you.

18        MR. LIROT:  Very good.  Okay.

19        THE WITNESS:  The economy, the weather, the newest

20   and best place that opens up near you.  And that's what

21   happened here, I had competition, and the place was very dated

22   at the time and it needed a facelift.

23        So to do a major facelift to get a building permit

24   and the like, it was easier to close, remodel, take my time,

25   and then reopen again and start '15.

1    Q    Do you remember the dates of the facelift?  Was the

2    business closed to the public while you were doing this

3    facelift?

4    A    Yes.

5    Q    So if, in fact, these images overlapped with that period,

6    would you have gained any benefit whatsoever from their use?

7    A    I didn't gain any -- the remodeling was basically all

8    through the summer and into, like, November.  And then reopened

9    somewhere mid-November, I'd say -- this has been a long time so

10   I don't have the dates in front of me.  I didn't realize I was

11   going to answer this question.  And the relaunch happened for

12   '15.

13   Q    Okay.  And let me ask you a basic question.  If the

14   business is closed, you don't get any benefit from advertising?

15   A    No.

16   Q    Let's look at Exhibit No. 41.  And this is M.T.

17   Productions for 2015.

18        It looks like the remodel had a beneficial impact,

19   $649,473.  Do you think that's why that number is so much

20   higher than the year before?

21   A    Absolutely.

22   Q    And let's take a look at your bottom line.  You made

23   $59,269.

24   A    Yes.

25   Q    Do you think the one image of Ms. Middleton from

```
1    February 17th, 2015, had any impact whatsoever --

2    A    No.

3    Q    -- on the profit or loss you enjoyed that year at that

4    club?

5    A    No.

6              MR. LIROT:  I think that's it for the tax returns.

7              Thank you, sir.

8    BY MR. LIROT:

9    Q    Now, Mr. Postiglione -- Postiglione, forgive me -- asked

10   you if you sued Mr. Hopper.

11   A    Yes.

12   Q    Why did you sue Mr. Hopper?

13   A    I felt as a third-party vendor, he was responsible for

14   this lawsuit that came my way.

15   Q    Had you not been sued by these folks, would you have ever

16   sued Mr. Hopper?

17   A    No.  At the time, our relationship with Mr. Hopper was

18   going in a positive direction.

19   Q    Was that just a fundamental business decision?

20   A    It was a big monetary decision because this has cost me

21   quite a bit also.

22   Q    Sometimes is it hard to make decisions based on business

23   realities that might be adverse to your friendship?

24   A    Yes, it is.

25             MR. LIROT:  I believe the rest of my questions will
```

1    be on direct, so I'm going to shift to that.

2              And, Judge, if we could take just a brief break, I

3    want to grab my notes so I can do that as efficiently as

4    possible.

5              THE COURT:  Sure.

6         (Pause in proceedings.)

7    BY MR. LIROT:

8    Q    I think that you've already testified as to the first club

9    you had was Crossroads, and that you later turned that into

10   Thee Officers Club, and you obtained that club around 1992,

11   1993.

12   A    Yes.

13   Q    All right.  Is that club next to a school?

14   A    Yes, it is.

15   Q    What was the alcoholic beverage status of the club?

16             If I can explain my question.  What kind of alcohol

17   was sold when you bought it?

18   A    It had only a beer and wine license.

19   Q    Did you later apply for what's called all 4COP, a full

20   liquor?

21   A    Yes, I did.

22   Q    And were you successful in getting that?

23   A    Yes.  And the school had to sign off on that.

24   Q    All right.  Is it your experience that if somebody doesn't

25   operate a business properly, that you're able to get that

1    increase in the type of alcoholic beverages that you can sell?

2    A    It was very difficult.

3    Q    But you got it?

4    A    Yes.

5    Q    And we've heard a lot of talk about your business model.

6    Let's establish that once and for all.

7              These businesses, both of them, are properly licensed

8    businesses in this jurisdiction?

9    A    Yes.

10   Q    And they comply with all of the proper zoning codes and

11   all of the other city codes that have to be followed in order

12   to operate these types of businesses?

13   A    Yes.

14   Q    Are you aware of the regulations in Jacksonville or Duval

15   County?

16   A    Yes.

17   Q    What regulations are applicable to the operation of these

18   two clubs?

19             MR. POSTIGLIONE:  Objection, Your Honor.  I don't

20   think he testified to this.  It's beyond the scope of his

21   knowledge.

22             THE COURT:  Well, he would -- he would be able to

23   testify to it because he runs the businesses.  I'm wondering a

24   little bit what the relevance of it is.

25             MR. LIROT:  Well, Judge, I think there's been all

1    kind of innuendo that things happen that do not.

2            I think he -- I think he should be given an

3    opportunity to describe what his business model is.

4            THE COURT:  All right.  I'll allow it.

5    BY MR. LIROT:

6    Q    What is the attire of the female entertainers at these

7    two clubs?

8    A    They are in a bikini-type dress.  They are not allowed to

9    take anything off.

10           So in reference in Jacksonville, they're more --

11   instead of strip clubs and things, they're referred to as

12   bikini bars here in Jacksonville.

13   Q    Is that because if you're topless, you can't sell alcohol?

14   A    Yes.

15   Q    If you sell alcohol, what are the restrictions, as you

16   understand them?

17   A    They have to be in bikinis and a -- basically a little bit

18   less than a three-quarter bottom.  Something in the ordinance

19   about the nape of the buttocks and then the showing of the

20   areola, goes into some -- things of this nature.

21   Q    Are you familiar with the ordinance, they defined all of

22   the specified anatomical areas that have to be covered --

23   A    That's the word I was looking for.

24   Q    -- so you can sell alcohol?

25   A    Yes.

1   Q     And is it your custom and policy to comply with those

2   regulations?

3   A     Yes.  And the police department here is quite vigilant on

4   those type things.

5   Q     What about contact between the entertainers and the

6   patrons, what are the regulations pertaining to that?

7   A     There is no touching.

8   Q     No lap dances, none of the things that Mr. Postiglione

9   asked you about?

10  A     There is no touching.

11  Q     Is it your custom and policy to follow those regulations?

12  A     Yes.

13  Q     If you don't follow the regulations, what happens?

14  A     Well, the vice cops come in with a whole bunch of ski

15  masks and arrest the girls for touching or exposing

16  anatomical -- anatomical areas.

17  Q     Are you familiar with the Responsible Vendor requirements

18  for alcoholic beverage facilities?

19  A     Yes.

20  Q     Do you subscribe to that?

21        Let me do this.  Let me ask you to explain that if

22  you would.  What are the responsible vendor qualifications or

23  services or policies at a given club?

24  A     When I was at the -- being part of the Responsible Vendor

25  organization, what happens is they send someone in about

1  four times a year, maybe five, goes over alcohol procedures,

2  knowing if someone is too drunk, knowing that -- the signs of

3  being too drunk, checking IDs, any type of enforcement IDs or

4  basically sting operations from the ADT, and then a general

5  awareness to keep public safety.

6          I mean, there's no reason that -- you have customers,

7  you don't want to have them hurt, have them drive off drunk and

8  get in trouble.  There's no reason for that or they'll never

9  come back.

10 Q    Are those businesses both certified Responsible Vendor

11 facilities?

12          MR. POSTIGLIONE:  Your Honor, I'm not sure what the

13 relevance of any of this is.

14          MR. LIROT:  Well, Judge, I'll tell you, if I may?

15          THE COURT:  Well --

16          MR. LIROT:  Throughout this case we've been accused

17 of being some sort of --

18          THE COURT:  You're not going to make an argument in

19 front of the jury.

20          MR. LIROT:  Fair enough.

21          THE COURT:  So I feel like -- I feel like you've kind

22 of made your point here, so let's talk about something else.

23          MR. LIROT:  All right.

24 BY MR. LIROT:

25 Q    Let's go back to Mr. Hopper.

1        So to lay the foundation.  No admin privileges, no
2   password, no nothing.  You hired Mr. Hopper to do your social
3   media?
4   A    Yes.
5   Q    Did you have an agreement or understanding with Mr. Hopper
6   about what his responsibilities were in the promotional
7   materials that he would create?
8   A    Yes.
9   Q    And what was that?
10  A    That he would use licensed images and -- I had a format
11  also, how the flyers are supposed to be done, the name of the
12  club, the event, and the address, phone number -- and a lot of
13  times it was a two-sided flyer.  I always wanted a map on the
14  back.
15  Q    Okay.  Until you got the cease and desist letter that was
16  the precursor to this lawsuit, did you have any knowledge
17  whatsoever that there was any issue about anything on your
18  FaceBook page?
19  A    No.
20  Q    Did you review the FaceBook page?
21  A    No.
22  Q    What do you think Mr. Hopper meant about you operating
23  from 50,000 feet?
24        MR. POSTIGLIONE:  Objection, Your Honor.
25  Speculation.

```
 1              THE COURT:  I'll let them answer.
 2   A    He believed that it -- and rightly so, that I was the
 3   owner and stuff, but I gave a lot of these duties out to the
 4   managers, especially during that time frame of '12 to '14.
 5   Q    Okay.  When you're the guy on top, is it normal to
 6   delegate the kind of tasks that are at issue in this case?
 7   A    Yes.  You can't do it all.
 8   Q    Did you do exactly that?
 9   A    Yes.
10   Q    All right.  Let's take a look at the Super Bowl ads that
11   we know Mr. Hopper created for you for your entities.
12              So you testified that you never saw this before it
13   went on FaceBook?
14   A    That is correct.
15   Q    And you testified you never saw it until you got a cease
16   and desist letter complaining about this image?
17   A    Yes.
18   Q    All right.  What is it invitation to?
19   A    A Super Bowl party.
20   Q    Had you reviewed that ad, what would pop into your mind?
21   A    The word "Super Bowl," the infringement of the Super Bowl
22   trophy.  And the reason I know about the Super Bowl is when the
23   Super Bowl was here in 2005, the NFL sent representatives out
24   and said you were not allowed to use the word "Super Bowl," the
25   image of the NFL or to use the NFL ticket.
```

```
 1              And I complied with that going forward.  And they
 2    suggested to use the term "big game."
 3    Q    All right.  So unless you paid the NFL, you can't use the
 4    word "Super Bowl"?
 5    A    They don't let anybody use the word "Super Bowl."
 6    Q    If you had seen this, what would you have done with this
 7    ad?
 8    A    I think it would have been in the garbage can and I
 9    probably would have fired Mr. Hopper then.
10    Q    Did you get a cease-and-desist from the NFL?
11    A    No.
12    Q    No.
13              Did they -- after they found this was floating
14    around -- not this one, but the one before that you testified
15    to, and you complied with their request, did they file any
16    lawsuits?
17    A    No.
18    Q    Let's look at the other one, if we may.
19              Same question.  If you had seen this ad, what would
20    you have done with it?
21    A    The thing that sticks out to me in this ad is back to
22    "Super Bowl."  Anything else -- and possibly the two teams on
23    there.  I don't know how the trademark works for the Seahawks
24    and the Broncos.  I don't think they'd really have too much
25    issue with that, but "Super Bowl," they're very -- they're on
```

1    it, to say the least.

2    Q    And, again, not to belabor the obvious, but you never saw

3    any of these images?

4    A    I would not have -- if I would have seen that image, it

5    wouldn't be here today.

6    Q    And you never saw any of the other images at issue in this

7    case?

8    A    No.

9    Q    So was it ever your intent to give anybody the impression

10   that the people in those images were going to appear at your

11   club?

12   A    No.

13   Q    Was it ever your intent to give anyone the impression that

14   the people in those images endorsed your club?

15   A    No.

16   Q    Now, Mr. Postiglione asked you a little bit about those

17   interrogatories.  Do you have them up there?

18          Do you remember when you reviewed those questions and

19   we worked together to try to come up with responses in accord

20   with our responsibilities to answer their questions?

21   A    Yes.

22   Q    Was it your belief at that time -- well, let me ask it as

23   a question.

24          What did you believe the source of all the images

25   were?

1   A    All the advertising images were Shawn Hopper.

2   Q    And was that what you understood the question to be

3   directed to?

4             MR. POSTIGLIONE:  Objection.  Leading.

5             THE COURT:  Overruled.

6   A    Yes.

7   Q    Did you ever say anything on those interrogatories that

8   was untruthful, to the best of your knowledge?

9   A    No.

10  Q    And you signed them under oath?

11  A    Yes, I did.

12  Q    And you understood what that meant?

13  A    Yes.

14  Q    And I think we've already talked about this, but I'd like

15  to have you go just a little bit greater depth.

16            Once you get the cease-and-desist, that's the first

17  time you've heard anything about these images, what was your

18  first course of action?

19  A    I called Larry Walters.

20  Q    Now, Mr. Postiglione asked you if you consistently paid

21  Mr. Hopper for doing this work.

22  A    Yes.

23  Q    In fact, we put a significant number of invoices already

24  into evidence in this case.

25  A    Yes.

1    Q    Once you found out about the problems with these images,

2    did you pay Mr. Hopper another penny?

3    A    No.

4    Q    Was he unhappy about that?

5    A    Yes.

6    Q    And what was your response?

7    A    Then the lawsuit came in.  But he had -- for all the

8    websites, he had all the passwords and stuff.  I owned the --

9    I -- the company owned dominions on GoDaddy where the host is,

10   not FaceBook, but the website, I'm talking about.  He had the

11   control of the content for the website, so he was the only one

12   that could put anything on there.

13        When I took back that content through Brian Colber,

14   who worked for me, he said:  Hey, all you got to do is take

15   this -- what Brian Colber didn't tell me when this all

16   happened, without the codes to change anything on the password,

17   nobody could take the website down, but you cannot change

18   anything on the website.

19        So I paid thousands of dollars per website to be out

20   there, but I couldn't change any of the content on the website.

21   Q    Let me try to clarify that.

22        You get the cease and desist letter.  It's directed

23   at two FaceBook pages.  The FaceBook pages have administrators.

24   We've talked about that.

25        When you try to comply with the cease-and-desist, did

```
 1   you even have the information necessary to get on there and
 2   pull all that stuff down?
 3   A    No.
 4   Q    What did you have to do to find that?
 5   A    I had asked Larry Walters how to do that.
 6             He said:  You're going to have to probably hire
 7   someone.
 8             I said:  Did you get it down?
 9             He said:  No, I'm not specialized in that area.
10   So...
11   Q    And you hired somebody?
12   A    I hired somebody that said they'd get it down.  And it
13   took them -- it wasn't overnight, but they did -- were able to
14   get ahold of the FaceBook page and then -- or subsequently then
15   deleted all those images.
16   Q    So this wasn't Hopper, this was somebody else.
17             Did you direct them immediately close down these
18   FaceBook pages?
19   A    After I found them.  It took me a week or two to find
20   someone that would be able to do it.  Because I went to the
21   people in my office, back to my --
22   Q    And you spent your own money to close those FaceBook pages
23   down?
24   A    Oh, yes.
25   Q    How much?
```

1    A    It was probably at least a thousand, maybe a little bit

2    more per FaceBook page.  And there were -- there were multiple.

3          And then in the midst of that, there were fake

4    FaceBook pages that weren't sued, that weren't my -- any kind

5    of official ones.  I can't even know where those came from.

6          But anyone can put a FaceBook page, like the -- like

7    one of the models have said, they had FaceBook pages of her and

8    it took her time to get it down.

9          MR. LIROT:  Judge, may I have a moment?

10         THE COURT:  Yes.

11         MR. LIROT:  We have no further questions.  Thank you.

12         MR. POSTIGLIONE:  Redirect, Your Honor?

13         THE COURT:  Yes.

14                    REDIRECT EXAMINATION

15   BY MR. POSTIGLIONE:

16   Q    Mr. Tomkovich, you testified a second ago that you never

17   saw these ads that are at issue in this lawsuit, is that

18   correct, until the cease-and-desist came in; correct?

19   A    Yes.

20   Q    Don't you think as the owner of the dirt and the building

21   and a person that operates these two clubs, the person that's

22   the president of the clubs, that you should know what goes on

23   with respect to advertising?

24   A    That's why I hired some other people.  I could not oversee

25   all the stuff geographically from Georgia to South Florida to

1    Tampa.  I'm good, but I'm not that good.

2    Q    Don't you think that the person you hired or the people

3    you hired should be competent to monitor it as well?

4         I mean, they're doing it on your behalf, aren't they?

5    A    I would like to think so.

6    Q    But you didn't -- you didn't -- that's not what happened

7    here; correct?

8    A    That is correct.

9    Q    And you just disown that.  You don't take any

10   responsibility for it because you didn't pay attention to it;

11   is that correct?

12   A    I wouldn't say it like that.

13   Q    How would you say it?

14   A    I do not know.

15            MR. LIROT:  I think that's argumentative.

16            THE COURT:  He's going to answer it, then we'll do

17   something else.

18            THE WITNESS:  I did not know about it.  And if I did,

19   those images of Super Bowl would definitely have not been up.

20   BY MR. POSTIGLIONE:

21   Q    What about the other ones?

22   A    I didn't know about the FaceBook pages.

23   Q    Your belief is you didn't have -- you didn't have

24   responsibility to know?

25   A    2012 to 2013 FaceBook, like I said earlier, I thought it

1   was going to go the way of MySpace has gone.

2   Q    Your belief is you didn't have an obligation to monitor

3   that because you delegated it to somebody else; correct?

4   A    Yes.

5   Q    You were asked some questions about your tax returns.  And

6   I think that when we read those, it appears that every year

7   your clubs, according to your testimony, either lose money or

8   they barely made money; is that a fair statement?

9            MR. LIROT:  Objection.  The tax returns speak for

10   themselves.

11           THE COURT:  Overruled.

12   BY MR. POSTIGLIONE:

13   Q    Go ahead and answer, Mr. Tomkovich.

14   A    The tax returns are what they are.

15   Q    Did clubs barely make money or lose money, is that your

16   understanding from reading those tax returns?

17           MR. LIROT:  Objection.  Relevance.

18           THE COURT:  Overruled.

19   A    Those two clubs barely get it done.

20   Q    Why keep them open?  If they're not profitable, why not

21   shut them down?

22   A    I did shut one down and then reopened it, remodeled.

23   Q    If the clubs make no money, how did you afford to shut one

24   down for half a year and pay for a major remodel?

25   A    I budget my money well.

1 Q   Do those clubs pay rent?

2 A   No.

3 Q   They don't pay rent to the entities that you own?  In

4 other words --

5 A   They don't make enough money.

6 Q   You don't charge those clubs a lease to lease the land and

7 the building from the companies you own?

8 A   Some leases are in place, but there's not enough money to

9 pay it.  So I can't throw myself out.

10 Q   Do you take a loss on your taxes for those other entities

11 because no lease money is paid to -- by the clubs?

12 A   I can't answer that because I don't know.

13 Q   Your accountant would know?

14 A   Yes.

15 Q   It's your testimony as well that your advertising doesn't

16 work; correct?

17    These FaceBook pages, these advertisements, they

18 don't do anything.  That's what you testified to; correct?

19    MR. LIROT:  That's not what he testified to.  He said

20 there's no evidence.

21    THE COURT:  I'll let him answer the question.

22 BY MR. POSTIGLIONE:

23 Q   Go ahead and answer it.

24 A   In 2012 to '13, I know nothing about FaceBook.  I didn't

25 believe it worked doing anything.

1   Q     Then why do it?  Why pay somebody to create this content

2   for your clubs, to monitor it, to do the website; why do it if

3   it doesn't work?

4   A     The website, I liked.  And if you look on the bills, he

5   statistically charged me very little money to do any social

6   media for those two clubs.

7   Q     That wasn't my question.

8         My question was:  Why pay Mr. Hopper, or anybody else

9   for that matter, for advertising if your testimony is it just

10  doesn't work?

11  A     Because everyone around me, all the new millennials, say

12  this is the wave of the future.  And when you go to the trade

13  shows, this is the wave of the future.  This is the wave of the

14  future.  Then they try and sell you these things for outrageous

15  pricing.

16        Now, the newest thing is geo-fencing.  I don't know

17  nothing about that one either.

18  Q     If the advertising -- you just testified, I think, you're

19  smart with your money; is that correct?

20  A     I try to be.

21  Q     Is it smart to pay for advertising that doesn't bring a

22  return?

23  A     It's the shotgun approach.  You try a little bit of

24  everything.  You believe this is better than that.  That's my

25  belief.

1    Q    You're still doing social media; you're still doing your

2    website, correct, for both clubs?

3    A    Yes.

4    Q    Do you believe it's working?

5    A    It's a place -- how you say it -- a placeholder for those

6    two places that are relatively not that profitable.

7    Q    Your opinion, I think, was that the ads don't bring much

8    return.  Is that what I'm hearing?

9    A    For those two places, that is correct.

10   Q    Okay.  Did you do any kind of survey?  Did you hire

11   anybody to do a marketing analysis?

12          Do you have any evidence to support that other than

13   your opinions?

14   A    The count through the door.  When I fly the plane up and

15   down the beach, it's a lot better than -- than this FaceBook

16   stuff.

17   Q    Do you use my clients images on your flyer over the beach?

18   A    No.

19   Q    Have you ever?

20   A    No.

21   Q    What is the address, the physical address, of Thee

22   Officers Club?

23   A    657 Wonderwood Drive.

24   Q    What is the address of Flash Dancers?

25   A    2003 Blanding Boulevard.

```
1   Q    Now, let me ask you something.  You maintain that -- or
2   you pay somebody to maintain those websites today; right?
3   A    Yes.
4   Q    Okay.  What are the -- do you know the website addresses?
5        If I told them to you, would you be able to confirm
6   that?
7   A    I guess.  I haven't been on the website in a while.  I'm
8   not happy with those people either.
9   Q    How about TheeOfficersClub.com, is that one of your --
10  does that sound about right?
11  A    I don't know.
12  Q    You don't know.
13       Okay.  What about FlashDancersFL.com?
14  A    Possibly.  I mean...
15  Q    Would you recognize the web page if I showed it to you?
16  A    Sure.
17  Q    Now, you testified that you made some changes since you've
18  been sued because you're more aware now of what can happen if
19  you don't monitor your website and your advertising.
20       Is that fair to say?
21  A    Yes.
22  Q    Is that something you do today, you monitor your websites,
23  you monitor the advertising, or you pay your managers or
24  somebody to do that to be conscious of what goes on the
25  websites?
```

1   A     On the websites today -- and then the websites have been

2   wrong, because when I changed over all the websites at one

3   time, which is recently, some of the information from Club B,

4   went on Club C, and C went on B, and it's been a little bit of

5   a struggle to get them to understand which Emperor is this.

6   Because there's four Emperors at one time.  There was three

7   Gold clubs.  So sometimes they took some information and moved

8   it around.  We're still fighting with some of that.

9   Q     I want to focus your attention to Flash Dancers and Thee

10  Officers Club.

11  A     Okay.

12  Q     You monitor those websites, is that your testimony?

13  A     Yes.

14  Q     Okay.  Does your website advertise:  We're, without a

15  doubt, the hottest gentleman's club in Duval County featuring

16  all nude dancers?

17  A     Well, it shouldn't say that.

18  Q     Does it say that?

19  A     I can't tell you that.  I haven't looked at it.

20  Q     Does it advertise backrooms for totally -- totally nude

21  friction dances?

22  A     That would be something that would have to be a South

23  Florida thing, because that is a term used in the South Florida

24  market.

25  Q     That's not my question.

1              My question is:  Does the Flash Dancers website

2     contain that language?

3     A    Well, if it does today, which it shouldn't --

4     Q    You don't know?

5     A    I don't know.  I'd have to call the company and find out.

6     Q    You still don't know?

7              You've been sued and we've been litigating this for

8     three and a half years --

9              MR. LIROT:  Objection.  That's not the nature of the

10    suit.

11    BY MR. POSTIGLIONE:

12    Q    Your testimony is that you've taken steps to eliminate

13    what happened in this lawsuit.

14              Is that your testimony?

15    A    Yes.

16    Q    You have no idea what's on your website, do you?

17    A    I went to -- who it is now is ICON Media who I'm using.

18    ICON Media went and changed all the websites and put all the

19    information out.

20              Now, some of the information, because it was an

21    overwhelming job as we went through this, I sat down with ICON

22    Media down there in South Florida to change it, and they

23    assured me that it was changed.

24              Then one day, I go down and say:  Hey, this is back

25    up there again.

1          And:  Oh, there was some sort of computer glitch.

2   We'll fix it.

3          So if that's on there today, my next trip is to

4   cancel their check.

5   Q    Are you through with your answer?

6   A    That's about all I got.

7   Q    Thee Officers Club -- does Thee Officers Club advertise:

8   Thee Officers Club is a dream come true, featuring 100 percent

9   nude, exotic dancers.  We are, without a doubt, the greatest

10  gentlemen's club in Duval County.  The number one place to be

11  in North Florida.

12         Does your website say that?

13  A    It shouldn't say that.

14  Q    Does it?

15  A    I don't know right this second.  But in 2013 and '14 and

16  '15, it didn't.

17  Q    I didn't ask you about that.

18         You testified today that you don't have totally nude,

19  you don't have full-friction dancers.

20         That's your testimony; right?

21  A    That's correct.

22         MR. POSTIGLIONE:  May I approach the witness and show

23  these documents, Your Honor?

24         THE COURT:  Yes.

25         You can show Mr. Lirot first.

1        MR. POSTIGLIONE:  Your Honor, these are new exhibits.

2   I'd like to have them marked as Exhibits 55 and 56.

3        THE WITNESS:  Is there a date on this?

4   BY MR. POSTIGLIONE:

5   Q    Look at the top left corner.

6        What is the date on those?

7   A    7-26-19.

8   Q    What's today?

9   A    Okay.  Same day.  That's absolutely -- I got issue with

10  those people, big time.

11       MR. POSTIGLIONE:  Your Honor, may I publish these to

12  the jury?

13       THE COURT:  I don't know.  I haven't seen them and

14  you haven't put them into evidence either.

15       MR. LIROT:  We need a sidebar, Your Honor.

16       THE COURT:  Okay.  Why don't y'all go ahead and take

17  your break.

18       We'll make it 15 minutes and see you back here.

19       Thanks.

20       COURT SECURITY OFFICER:  All rise.

21     (Jury out at 10:41 a.m.)

22       COURT SECURITY OFFICER:  Please be seated.

23       MR. POSTIGLIONE:  Your Honor, do you have a copy?

24       THE COURT:  I do.

25       MR. POSTIGLIONE:  I apologize.  I thought you were

1    handed exhibits.

2             THE COURT:  Just this little tiny print you're

3    talking about here?

4             MR. POSTIGLIONE:  I have a copy.

5             THE WITNESS:  Some of it's a little small for me too.

6             THE COURT:  I would have brought my glasses.

7             MR. CASAS:  We can show you from the website, Your

8    Honor.

9             THE COURT:  That's fine.  I can read it.

10            I just was trying to figure out what I'm supposed to

11   be looking at.

12            So is the representation that -- from counsel that

13   this is a printout from three officers -- or Thee Officers Club

14   and Flash Dancers Gentlemen's Club off of the website that's

15   currently --

16            MR. POSTIGLIONE:  Yes, Your Honor.  Those are -- the

17   ink is still hot on the documents.

18            THE WITNESS:  And the address is wrong here, too.

19            THE COURT:  Hold on.

20            Hold on.

21            Okay.

22            THE WITNESS:  I am not very happy now.

23            THE COURT:  All right.  So is there an objection,

24   Mr. Lirot, to the use of these documents?

25            MR. LIROT:  Yes, Your Honor.

```
1              THE COURT:  All right.  What's the objection?

2              MR. LIROT:  They're irrelevant in that they have

3    nothing to do with the time period in question, and I think

4    that's a sufficient basis.  They have nothing to do -- pardon

5    me?

6              THE COURT:  But didn't you -- I mean, I know it's

7    kind of --

8              MR. LIROT:  I don't know how we could authenticate

9    them either, quite honestly.

10             THE COURT:  Well, I'm sure if -- if Mr. Tomkovich

11   wants to say that this isn't on his website or on the company's

12   website, I guess he can say that.

13             I assume the best evidence would be to go online and

14   look at them, and I'm -- I guess I'm not really unwilling to

15   accept counsel's representation that they went to the website

16   today and this is what's on there.

17             So I'm not too worried about that, unless

18   Mr. Tomkovich, and he's willing -- of course, he can say

19   whatever he knows.  I guess what I'm -- I'm not sure who

20   started this, but, you did, I believe, Mr. Lirot, elicit from

21   Mr. Tomkovich --

22             MR. LIROT:  The business model.

23             THE COURT:  -- what the business model was.

24             MR. LIROT:  I did.

25             THE COURT:  And this is some evidence that the
```

1    business model's different than that.

2            Now, Mr. Tomkovich has already told the jury, and I'm

3    sure will tell them again, that this was not his doing or he

4    didn't -- but I do think it --

5            Counsel, what's your -- what are you trying to

6    accomplish and what is the -- why are these exhibits admissible

7    in this case?

8            MR. POSTIGLIONE:  Your Honor, for several reasons.

9            Number one, it's in direct contradiction to what he's

10   testified for the last 20 minutes, under my examination and

11   under Mr. Lirot's examination.  No nude friction.  We don't

12   advertise that.

13           We also have allegations of false advertising here.

14   Shows a pattern of conduct over an extended period of time.  I

15   don't think there is --

16           THE COURT:  Yeah, but I don't think you can -- the

17   thing that I kind of -- I'm kind of probably with you, except,

18   you know, this suit isn't about what the club's doing now, it's

19   about what was going on in 2013 to 2015.

20           And so how does that -- how does what is on their

21   website today -- and I understand there's been testimony and

22   that's why I'm leaning your way, but I -- but -- but what --

23   where does this -- what does this do for us in the actual

24   claims that are before the Court?

25           MR. POSTIGLIONE:  Well, I think it goes to

1   Mr. Tomkovich's credibility.  He's testified again -- over and

2   over again that he monitors the websites.  He's -- we don't do

3   this sort of thing anymore.  It goes to the -- it's a direct

4   contradiction to what he's been testifying to consistently this

5   morning.

6            I think I'm allowed to examine him about it.

7            THE COURT:  All right.  Mr. Lirot, you get the last

8   word.

9            MR. LIROT:  Judge, this is impeachment only.  It's

10  not substantive evidence.  It's just going to mislead the jury

11  into thinking that the business model maybe back then was

12  different than what Mr. Tomkovich testified to.  And I think

13  that's 403.  I think it's just really misleading, and I don't

14  want to go off in that direction and have to distract them with

15  this ancillary issue.

16           THE COURT:  All right.  I'm going to overrule the

17  objection.  I think it's fair enough.

18           I don't -- I mean, Mr. Tomkovich will have every

19  opportunity to explain why these are on his websites --

20  assuming they are his websites, and I'm accepting counsel's

21  representation.

22           If -- Mr. Lirot, if you want them to actually pull up

23  the computer and show it to him, I'll be happy to have them do

24  that, but I don't really have any real --

25           MR. LIROT:  Well, I just maintain my objection and

1     leave it at these documents.

2             THE COURT:  All right.

3             MR. CASAS:  Your Honor, just for the record, for

4     evidentiary basis, since he's maintaining his objection for the

5     record.

6             THE COURT:  Yes.

7             MR. CASAS:  613(b), prior inconsistent statement.

8     He's had an opportunity to explain, deny the same.  He's

9     allowed to be impeached.  It's also an admission of party

10    opponent, statement against interests.

11            So I think all the ways that it can get in are there

12    for those purposes, Your Honor.

13            THE COURT:  All right.  Okay.  I've overruled the

14    objection.

15            I will allow these exhibits into evidence.  I'll

16    allow Mr. Tomkovich to be examined on them.  I will then, of

17    course, permit Mr. Lirot, as he wishes to, to counteract that

18    in any way he chooses to do so.

19       (Plaintiffs' Exhibits 55 and 56 were received in

20    evidence.)

21            THE COURT:  I'm going to go ahead and take a break.

22    When I come back, I'll also have a ruling on the proof of

23    claim.

24            So the jury has given us a question that says:  Will

25    all the information presented on the screen to the jury be

1    available for our review at the end of the trial?  If not, can

2    we review -- basically they're looking for the tax returns.

3            And I'm going to tell the jury when they come out

4    they will have exhibits admitted into evidence available for

5    their review.

6            COURT SECURITY OFFICER:  All rise.

7        (Recess taken, 10:49 a.m. - 11:01 a.m.)

8            THE COURT:  So I'm -- before the jury comes out, I

9    want to finish on the proof of claims here.

10           Can I get -- can I get those exhibits back?

11           Mari, do you have them?

12           No, no, no, no.  That's not -- the proof of claims.

13   Do we have those or -- I'll keep these, so that's fine, but I'm

14   taking about -- no, you don't have them?

15           COURTROOM DEPUTY:  Which?

16           THE COURT:  The ones that we were talking about

17   before that.

18           Have you already tendered them?

19           MR. POSTIGLIONE:  I have not.

20           THE COURT:  Oh.

21           MR. POSTIGLIONE:  And those would be?

22           THE COURT:  So my question for you is -- and we're

23   trying to find one of the cease and desist letters, but is

24   it -- is it true, Counsel, that the amount of the claim is

25   directly tied to the cease and desist letter which attached the

```
1    Chamberlain report for each of the -- for each of the
2    relevant --
3              MR. POSTIGLIONE:  It's actually not true.
4              Mr. Chamberlin's initial damage analysis, I think,
5    was 410,000.  Those add up to 350.  165 and 30, I had them
6    written down, but I can't remember.
7              THE COURT:  So where did they come -- where did they
8    come from, Mr. Lirot?
9              MR. LIROT:  I filed them.
10             THE COURT:  Right.
11             MR. LIROT:  My recollection is I attached a copy of
12   the cease and desist letter to every one of the claims.
13             THE COURT:  Well...
14             MR. LIROT:  I would not have made up a number.
15             THE COURT:  Yeah.  Well, I'm --
16             MR. LIROT:  There were a bunch.
17             THE COURT:  I've got -- I mean, I'm looking at Flash
18   Dancers, Inc.  I'm not sure what -- why is there more than one
19   per customer here?
20             MR. LIROT:  Maybe they've got copies of the amended
21   ones.
22             MR. POSTIGLIONE:  That's the point, Your Honor.
23   There's multiple copies over a long period of time that state
24   the same number over and over.  They all add up to 350.
25             THE COURT:  All right.  But, Mr. Lirot, you're
```

1    telling me that you were -- you were attempting to tie it to

2    the demand that had been made?

3           MR. LIROT:  Absolutely.  That was -- from the

4    bankruptcy procedures, that's the only basis that I could use

5    to come up with a number.  Anything else would just be either

6    invalid or fraudulent.

7           MR. HEARN:  Your Honor, I can give you the demand

8    letters, if that helps.

9           THE COURT:  Yeah, that would be good.  Thank you.

10          MR. LIROT:  Is there one for 100 --

11          THE COURT:  All the ones here, at least the ones that

12   were handed to me just now, all of them are $165,000.

13          They don't -- I can't tell -- they're all for Flash

14   Dancers.  None of them are for the other one.

15          And I can't tell why there's multiple copies of a

16   claim for $165,000.  Doesn't even -- it's not even clear to me

17   these are -- I don't exactly know what I'm looking at here,

18   but...

19          MR. HEARN:  Well, here's why.  Okay.  So --

20          THE COURT:  Actually, there's one that was filed in

21   October of 2017 that's for 45,000.

22          MR. POSTIGLIONE:  There should be another one there

23   for 30, and there's several --

24          THE COURT:  110.  So that's -- there's only one -- a

25   couple that have a date on them.  The rest of them don't even

1  have dates on them.

2          There's one for 30,000.  And I'm not exactly sure

3  what I'm looking at here.

4          I do see, actually, now one for Thee Officers Club.

5  Okay.  The ones for Thee Officers Club are at the back here.

6          So I've got one, two, three, four for Flash

7  Dancers -- no, five for Flash Dancers; two for Thee Officers

8  Club.  I'm not really sure what I'm looking at.

9          So, Mr. Hearn, you said you had some helpful

10  information?

11          MR. HEARN:  Well, here's -- I have the demand letter,

12  if you want to look at them.

13          THE COURT:  Yeah.

14          MR. HEARN:  It's a little bit difficult to track all

15  of the numbers in them.  But there's -- I separated it just a

16  little bit because the one for Flash Dancers had a matrix in it

17  that identifies the alleged values of the claims of the

18  individual plaintiffs who have -- were going to assert claims

19  against them.

20          I kind of separated them there, Your Honor.  The

21  matrix that's sticking out of the bottom, that's the $165,000

22  figure.

23          THE COURT:  All right.  I --

24          MR. POSTIGLIONE:  Your Honor, if it will make it

25  easier --

 1            THE COURT:  Yeah.  Go ahead.

 2            MR. POSTIGLIONE:  Well, I was just going to say, if I

 3   can use one of each for each club or something, but the 165 to

 4   30, I won't use all seven of them.

 5            THE COURT:  Yeah, okay.

 6            I'm -- Mr. Hearn, did you have anything else?

 7            MR. HEARN:  This is the M.T. Productions/Officers

 8   Club demand letter.  It's a -- it's a little bit more difficult

 9   to track because of the way that it's organized, in my view.

10            It's harder to look at fairly quickly and determine

11   what the total value of the claims that are being asserted

12   are -- or is.

13            THE COURT:  Our firm has handled dozens of these

14   matters against some of the world's largest corporate

15   defendants and has some of the nation's most renowned experts

16   in the model and talent industry, ready to assist us in

17   litigating this matter.  We are prepared to litigate this to

18   the fullest extent of the law.

19            Well, that -- that turned out to be true.

20            MR. LIROT:  Clairvoyant.

21            MR. POSTIGLIONE:  I'm sure we meant it when we wrote

22   it, Your Honor.

23            THE COURT:  All right.  I'm going to sustain the

24   objection, and here's why.  I do not -- there's only

25   two reasons this could come in.

1         One is that it's actual evidence of the value of the

2    claim by -- by Mr. Tomkovich or his companies.  And I don't --

3    I don't have any reason to think that that's true.

4         Secondly, it would be to discount or dispute any

5    evidence that the defendants put on that the values of the

6    claims were not as advertised by the plaintiffs or to be

7    contended for by the plaintiffs.

8         But it -- I just don't think this is evidence of

9    that.  It -- all it is is essentially a pass-through of a

10    claim.  It would be, as my law clerk and I were talking, if

11    somebody makes a million-dollar claim against you and you think

12    it's nonsense, but you have a potential third party who would

13    be responsible for whatever the amount of the claim is, you

14    would likely make a million-dollar claim against that third

15    party, that doesn't mean you think the claim is worth a million

16    dollars, it just means you're passing through the potential

17    responsibility for it.

18         And so to whatever extent it's relevant, I don't -- I

19    think it would be minimally helpful to the jury and I think

20    under a 403 analysis, I think any -- let me get the rule so I

21    say it right.  I never remember how to -- which comes first.

22         But to the extent it could be considered potentially

23    relevant evidence, the court makes a finding that the probative

24    value of the evidence is very minimal and it's substantially

25    outweighed by the danger of confusing or misleading the jury.

```
 1              The Court sustains the objections to the proof of

 2    claim.

 3              But the Court has agreed to the admission of 55 and

 4    56, and counsel may examine on those.

 5              Are we ready to go?

 6              MR. POSTIGLIONE:  Ready, Your Honor.

 7              THE COURT:  Let's have the jury, please.

 8              COURT SECURITY OFFICER:  All rise for the jury.

 9         (Jury in at 11:11 a.m.)

10              COURT SECURITY OFFICER:  Please be seated.

11              THE COURT:  Thanks for your patience.  I promise I

12    won't get in the way of you and lunch when it comes that time.

13              You probably would be justified in thinking that I

14    have a pretty easy job, but, actually, I work -- I work the

15    hardest when you're not here.  So I just want y'all to know I'm

16    not -- I'm trying to earn my keep.

17              So we had some discussions about certain exhibits and

18    whether they were going to be admissible or not, and I've made

19    those rulings and we're going to -- we're going to proceed.

20              In the meantime, though, I did get a question which

21    asked if all of the information presented on the screen to the

22    jury, will that be available for your review, specifically

23    referencing the tax returns.

24              The answer to that question is yes.  You will have

25    the picture -- anything that's a piece of paper or something
```

1    like that, you'll have all that back with you.  The pictures,

2    the tax returns, anything else I've admitted, you'll have all

3    that back with you.  Okay?

4            All right.  You may proceed, Counsel.

5            MR. POSTIGLIONE:  Can we get the screen.

6    BY MR. POSTIGLIONE:

7    Q    Mr. Tomkovich, you had an opportunity to look at these

8    exhibits.  I want to draw your attention to the one on the

9    screen.  I believe Exhibit 55.

10           Is that a -- is that a picture of the front page of

11    Flash Dancers' website?

12    A    It looks like it.

13    Q    All right.  And the fact that the Jacksonville club, the

14    fact that the address is the same as what you testified to,

15    that's the website for the Flash Dancers here that we're

16    talking about; is that correct?

17    A    Yes, sir.

18    Q    And you see the website highlighted there in the bottom of

19    the corner, FlashDancersFL.com; that's the website, isn't it?

20    A    Yes.

21            MR. POSTIGLIONE:  Okay.  Next page, please.

22    BY MR. POSTIGLIONE:

23    Q    I want to draw your attention -- I believe you said --

24    testified earlier that there is no nude friction, there's no

25    complete nudity at these clubs.  Is that correct?

1    A    That is correct.

2    Q    On the website there you're advertising:  It's without a

3    doubt the hottest gentleman's club in all Duval County

4    featuring all nude and exotic dancers, in addition to backrooms

5    for totally nude friction dancers.

6              Is that what that says there?

7    A    That's what it says.

8    Q    And your testimony is that's not -- that's not what goes

9    on at that club there?

10   A    That is incorrect information.

11   Q    Well, can you explain that to the jury, please.

12   A    Yes.  In 2016, the end of 2016, I switched web hosting

13   people from the S3 Media, which was 813, I alluded to earlier,

14   and went to ICON Media -- or ICON Media Web Design.  They took

15   on 12 websites at the same time.  And subsequently doing that,

16   they had wrong information.

17             And there's more wrong information on this about the

18   address location of the property too.  Besides just a -- this

19   information of nude dances and friction dances.

20             I had a meeting with these people some months -- oh,

21   let's see.  '16, they got hired.  They put the websites up on

22   in '17.  So it's mid '18, I noticed some of this stuff was

23   wrong and, again, tried to get them to fix it.

24             They said it was some sort of computer glitch and it

25   won't happen again and we'll fix it.  I took it at what their

1    word was and I haven't looked at it again.

2              And here we are with the same problem and I -- that's

3    my explanation.

4              If I had nude dancers like that, I would be making

5    *beaucoup* money in Jacksonville, Florida.  And I know that for a

6    fact.

7    Q    Mr. Tomkovich, it's been wrong for three years, then?

8    A    No, it's not wrong for three years.  I started with them

9    to shift over in the end of '16.  So we get to '17, they start

10   putting them up.  It takes some time to build a website.

11             I don't know the exact time, but...

12   Q    Mr. Tomkovich, who -- I mean, look, you come in here and

13   your testimony is:  Mr. Hopper did it; Mr. Hopper did it;

14   Mr. Hopper did it.  Oh, by the way, I don't know who did it.

15             That's from 2013 -- I'm sorry, 2013 to 2015, that's

16   your testimony.  It's Hopper's fault; right?

17             Now, it's ICON Media's fault.

18             Where is your -- where does your responsibility

19   start?

20   A    It starts where --

21   Q    Where is your job -- when is it your job to monitor

22   backroom for totally nude friction dances on your own company

23   website?  You're 100 percent owner.

24             You own the real estate --

25             THE COURT:  I think the point of your question is

1    made.  Let him answer it, please.

2              MR. POSTIGLIONE:  Thank you, Your Honor.

3              THE WITNESS:  I did monitor it.  And I went and had a

4    meeting with them personally to fix this mess.  They said they

5    were going to fix it.  It was some sort of computer glitch.

6              Okay?  And I had someone with me at the meeting also

7    that can attest to that.

8              So I was taking issues with fixing this stuff.

9              Now, can I monitor it every day?  I don't get online

10   every day and look at this nonsense.

11   Q    Would you agree with me --

12   A    But this isn't even -- from the time this happened, this

13   was a different company that had the website.

14   Q    Would you agree with me that if language on its face on

15   its website is true, then you're breaking the law -- this club

16   is breaking the law here in town?

17   A    Yes.  As the law is today, yes.

18             MR. POSTIGLIONE:  Let me show you the next exhibit,

19   please.

20   BY MR. POSTIGLIONE:

21   Q    Do you recognize this to be the screenshot of the web --

22   or a printout of the web page of Thee Officers Club

23   Jacksonville?

24   A    It doesn't say Officers, it just says The Premier

25   Gentleman's Club on mine.

```
1    Q    Look up top there.

2    A    Oh, the top.

3    Q    I think there's something lost.  There's a printout.  I

4    think it's not showing on the screen.

5    A    You have a scrivener's error also?

6              MR. LIROT:  What exhibit is that?  Forgive me.

7              MR. POSTIGLIONE:  56.

8              THE WITNESS:  Okay.  I'll attest that that's Thee

9    Officers Club logo.  On here, I can't see it.

10   BY MR. POSTIGLIONE:

11   Q    Let's look at what this one says.

12             Let's see if we can find a computer glitch in this

13   one.

14   A    Uh-huh.

15   Q    Okay.  You got a dancer on the pole.

16             New and improved.

17             That's because you did those renovations; right?

18   A    But this isn't the current look of the place right now on

19   this -- on this picture.

20   Q    This website was printed -- this screenshot was taken

21   today you testified; right?

22   A    But it has not been updated either.

23   Q    Okay.

24   A    So this is not what it looks like today either.

25   Q    Let's read what it says.
```

1          The Officers Club is a dream come true.  Featuring

2    100 percent nude exotic dancers.  We are, without a doubt, the

3    greatest gentlemen's club in Duval County.  Thee Officers Club

4    is the number-one place to be in Northern Florida for nude

5    friction dances.

6          Is that what it says?

7    A   Yes, that's the terminology they use in South Florida and

8    I hired a South Florida company to do the website.

9          And in South Florida, it is nude and friction dances,

10   not in North Florida.

11   Q   The website says North Florida; correct?

12   A   That's correct.

13   Q   So, again, is this a computer glitch?

14   A   This is what they told me they were going to fix it.

15   Q   Is there anyone in your organization, for instance, your

16   managers at Thee Officers Club, the guy who works there, or at

17   Flash Dancers, the guy who works there, has the keys to the

18   place, is it that person's responsibility to monitor this

19   content?

20   A   That's how I had it set up, and I've asked them to do

21   that.  But obviously they're not as good as proofreaders as we

22   are today here.

23         But I went there to this ICON Media when I noticed

24   this and had a meeting with them to get this stuff down.  And

25   you caught me off guard when you showed to me it's still up.

1    So I have some other issues with them after this is over.

2    Q    You would agree with me that if this language is true, in

3    other words, if there are, in fact, full friction nude dances

4    in the backroom at Thee Officers Club here in Jacksonville,

5    then that's against the law; correct?

6    A    Yes, sir.

7    Q    Okay.  Mr. Tomkovich, I just -- you've given the same

8    answer that you just gave with respect to these websites.

9    A    I gave you the truth.

10   Q    You gave me the same answer you gave when you were asked

11   about what my clients are alleging here; would you agree with

12   me?

13          Somebody else's fault.  I didn't know about it.  I

14   didn't monitor it.

15          MR. LIROT:  Objection.  Argumentative.

16          THE COURT:  I'll -- is there a question?

17   BY MR. POSTIGLIONE:

18   Q    Was that your testimony?

19   A    That I didn't put this stuff up?  No, I did not.

20   Q    Your testimony or your answer would be the same or has

21   been the same since 2013 and 2016, the time period in this

22   lawsuit about these images on your social media; right,

23   somebody else's fault?

24   A    Yes.

25   Q    And you, as the owner of the club, the owner of the real

```
1    estate, completely disclaim any responsibility for any of your
2    employees' actions from 2013 to the present day with respect
3    to --
4            MR. LIROT:  Objection.  Assumes facts not in
5    evidence.  Not employees.
6            THE COURT:  Yeah.  Well, I'm going to sustain the
7    objection.  I think that's a legal argument.
8            What else you got?
9            MR. POSTIGLIONE:  Give me two seconds, Your Honor.
10   BY MR. POSTIGLIONE:
11   Q    Mr. Tomkovich, when was your meeting with ICON?
12   A    It was about eight, nine months ago on this issue.  And
13   not just on this issue.  It was also the issue of the SCO and
14   how they were charging the SCO, which I'm led to believe is how
15   you have your rankings higher.
16           And I was paying for SCO -- what do they call them,
17   like, Google ad words.  You pay money, then you click, and
18   every time somebody clicks, it's ten cents or something of this
19   nature.
20   Q    Mr. Tomkovich, I want to give you a chance to talk, but my
21   question was specific.  When was your meeting with ICON?
22   A    The last meeting with them about this issue was about
23   eight months ago.  And I took it for granted -- maybe not even
24   that long ago.
25   Q    Who did you meet --
```

1    A    I took it for granted that it was fixed.

2    Q    Who did you meet --

3    A    A lot of other things, not just this.  The address is

4    wrong -- not the address on there, but the location of the

5    address of the facility is wrong.

6              It says the corner of 295 or 275.  That's all the way

7    in Tampa.

8    Q    Who did you meet with?

9    A    Joe Whitebald and Mark -- Mark -- I don't remember what

10   his last name is -- in their office in Pompano Beach.

11   Q    Now, you saw this language on the website eight months

12   ago, and you met with them and told them to take it down but

13   it's still up?

14   A    I don't know if it was -- there was 12 websites we were

15   discussing.  And I gave them a list of wrong information.  Then

16   we went back again and they didn't fix it.  And again.  And

17   they assured me at the last meeting they were going to fix it,

18   and here we are today, you pulled it up -- which I appreciate,

19   because they just got fired today.

20   Q    You're a reasonable person --

21   A    Not when it comes to this.  That's wrong.

22   Q    Can you look at that ad and draw a reasonable conclusion

23   that if I went to Flash Dancers or Thee Officers Club, based on

24   these ads, that there would be totally nude dancing and totally

25   nude, full friction dances in the backroom?

1    Is that a reasonable conclusion from reading that

2  language?

3    MR. LIROT:  It speaks for itself and that's asking

4  him to speculate on what somebody else might think about that.

5    MR. POSTIGLIONE:  I'm asking what his opinion is,

6  Your Honor.

7    THE WITNESS:  In Jacksonville, Florida, there was --

8    THE COURT:  I'm going to let him answer this

9  question, and then I think we've really exhausted this topic.

10    I think we've exhausted this topic.

11    All right.  Do you understand the question, sir?

12    THE WITNESS:  Yes.

13    THE COURT:  All right.  You can answer the question.

14    THE WITNESS:  In Jacksonville, Florida, they would

15  know that was not correct advertising.

16  BY MR. POSTIGLIONE:

17  Q    I've got a final couple questions.

18    Based upon looking at this -- and your testimony is

19  it's wrong and you're clearly upset about it -- can you now

20  understand or can you revisit your earlier testimony that it's

21  not reasonable for my clients to be upset that they've been

22  associated with something like this?

23    MR. LIROT:  Objection.

24    THE COURT:  I think it's -- I'm going to overrule it.

25  He can answer it.

1    A    I can't change my answer.

2    Q    Even after seeing this, you aren't going to change your

3    testimony?

4    A    No.

5              MR. POSTIGLIONE:  Okay.  I'll pass the witness, Your

6    Honor.

7                        RECROSS-EXAMINATION

8    BY MR. LIROT:

9    Q    Mr. Tomkovich, this was the result of an error?

10   A    Yes, it's error.

11   Q    What did you do during the break?

12   A    I went out there and called ICON Media, told them I was in

13   federal court, and why is this back up there again.

14             And they said:  Well -- I said you are fired and

15   you'll be hearing from another attorney, and that's when I had

16   to walk back in here.

17   Q    And they ran like 12 different websites for 12 different

18   clubs that all have different business models based on where

19   they are?

20   A    Yes.

21   Q    Do any of those clubs advertise -- for that location, is

22   it your intent to advertise anything that's not lawful within

23   the jurisdiction where those clubs are located?

24   A    No.

25   Q    And as far as this website, what Mr. Postiglione asked

1    about his clients being upset, there's nothing in this case or

2    that anybody's been shown that shows any website as it was in

3    existence back in 2013, '14, and '15?

4    A    Totally different website, totally different language.

5              MR. POSTIGLIONE:  Objection.

6              THE COURT:  What's the objection?

7              MR. POSTIGLIONE:  Misstates testimony.

8              THE COURT:  Overruled.

9              THE WITNESS:  Totally different websites, totally

10   different information.  It would have never have had nude

11   dancing on there.

12   BY MR. LIROT:

13   Q    So you complied with cease-and-desist, their images come

14   down.

15             If there's something in error on a website today,

16   would they have any basis to be upset about that?

17   A    If I put their images on the new website, absolutely, but

18   I did not do anything like that.

19   Q    So their images aren't on this website?

20   A    Nowhere.

21   Q    The addresses are incorrect?

22   A    The addresses look correct, but the geographical

23   directions on how to get there are incorrect.

24   Q    275 is over on the west coast, Tampa?

25   A    Yes.

1    Q    The room descriptions are incorrect?

2    A    Yes.  They describe facilities in South Florida.

3    Q    Would you agree with me that this is ripe with error and

4    does not describe anything that occurs at Thee Officers Club or

5    Flash Dancers?

6    A    That is correct.

7              MR. LIROT:  That's all I have.

8              THE COURT:  All right.  Ladies and gentlemen, do you

9    have any questions at this time for Mr. Tomkovich?

10             All right, sir.  You may step down.  Thank you very

11   much.

12                              *    *    *

1

2

3                         C E R T I F I C A T E

4

5    UNITED STATES DISTRICT COURT)

6
     MIDDLE DISTRICT OF FLORIDA  )
7

8        I hereby certify that the foregoing transcript is a true

9    and correct computer-aided transcription of my stenotype notes

10   taken at the time and place indicated herein.

11

12

13           Dated this 12th day of August 2019.

14

15

16

17                  /s/Cindy Packevicz Jarriel

18                  Cindy Packevicz Jarriel, RPR, FCRR

19

20

21

22

23

24

25