```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3    PAOLA CANAS, LINA POSADA,
      JESSICA BURCIAGA, JAIME
 4    EDMONDSON, and ROSIE JONES,

 5          Plaintiffs,

 6          -vs-                        Case No. 3:16-cv-393-J-32JRK

 7    FLASH DANCERS, INC., and
      MICHAEL TOMKOVICH,
 8
                Defendants.
 9    _____

10    BROOKE TAYLOR, LAURIE ANN
      YOUNG, MALU LUND, SARA
11    UNDERWOOD, and JAMIE EASON,

12          Plaintiffs,

13          -vs-                        Case No. 3:16-cv-394-J-32JRK

14    M.T. PRODUCTIONS IN
      JACKSONVILLE, INC., and
15    MICHAEL TOMKOVICH,

16                Defendants.

17    _____

18

19                    EXCERPT OF JURY TRIAL
                   (TESTIMONY OF MARTIN BUNCHER)
20           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                   UNITED STATES DISTRICT JUDGE
21                   Jacksonville, Florida
                         July 24, 2019
22                         3:07 p.m.
                        Courtroom 10D
23

24

25
```

```
OFFICIAL COURT REPORTER:

        Shelli Kozachenko, RPR, CRR, CRC
        221 N. Hogan Street, #185
        Jacksonville, FL  32202
        Telephone:  (904) 301-6842

                            (Proceedings reported by stenography;
                               transcript produced by computer.)
```

1                    A P P E A R A N C E S

2

   COUNSEL FOR PLAINTIFFS:
3

4        **Joseph Casas, Esquire**
         The Casas Law Firm, PC
5        402 West Broadway, Suite 400
         San Diego, CA  92101

6        **John Golaszewski, Esquire**
         The Casas Law Firm, PC
7        1745 Broadway, 17th Floor
         New York, NY  10019

8

9        **Dennis Postiglione, Esquire**
         The Casas Law Firm, PC
10       3801 North Capital of Texas Highway
         Suite E240 #445
         Austin, TX  78746

11

12       **Ludmila Khomiak, Esquire**
         The Casas Law Firm, PC
         80 SW 8th Street, Suite 2000
13       Miami, FL  33130

14

15  COUNSEL FOR DEFENDANTS:

16       **Luke Lirot, Esquire**
         Luke Charles Lirot, PA
17       2240 Bellair Road, Suite 190
         Clearwater, FL  33764

18

19       **Robert Hearn, Esquire**
         Phelps Dunbar, LLP
         100 South Ashley Drive, Suite 2000
20       Tampa, FL  33602

21

22

23

24

25

T A B L E   O F   C O N T E N T S

**PLAINTIFFS' WITNESS:**                                    **Page No.**

  MARTIN BUNCHER

      DIRECT EXAMINATION BY MR. GOLASZEWSKI.....          6

      CROSS-EXAMINATION BY MR. HEARN............          47

      REDIRECT EXAMINATION BY MR. GOLASZEWSKI...          102

```
 1                    P R O C E E D I N G S

 2    July 24, 2019                              3:07 p.m.

 3                        *   *   *   *   *

 4        (In the presence of the jury:)

 5            THE COURT:  All right.  Welcome back, ladies and

 6    gentlemen.  We're going to -- we're going to go to a different

 7    kind of a witness now, and so let me just talk to you for a

 8    minute.

 9            This witness, who you'll meet in a moment, is

10    generally called an expert witness, so it's not -- not somebody

11    who is involved in the actual facts of the case but who is an

12    expert that's been employed to give opinions in the case.

13            And I'll be giving you the same instruction at the

14    end of the case, but just so you kind of can think about this,

15    the law says that when there's either scientific, technical, or

16    other specialized knowledge which might -- which might be

17    helpful to the jury, that a person who has special training or

18    experience in that field is allowed to state an opinion about

19    that matter.

20            But that doesn't mean you must accept the witness's

21    opinion.  As with any other witness's testimony, you must

22    decide for yourself whether to rely upon that opinion.

23            And, of course, the way that you do that is you

24    listen to the direct; you listen to the cross.  There's

25    probably going to be other experts and then you wait and hear
```

1    all that, and then you decide what you think based on all of

2    that, okay?

3            All right.  Ms. Diaz?

4            COURTROOM DEPUTY:  Do you solemnly swear that the

5    testimony you're about to give before this Court will be the

6    truth, the whole truth, and nothing but the truth, so help you

7    God?

8            THE WITNESS:  Yes, I do.

9            COURTROOM DEPUTY:  Please state your full name and

10   spell your last name for the record, sir.

11           THE WITNESS:  Martin Matthew Buncher, B, like in boy,

12   u-n-c-h-e-r.

13           COURTROOM DEPUTY:  Thank you, sir.

14            MARTIN BUNCHER, PLAINTIFFS' WITNESS, SWORN

15                     DIRECT EXAMINATION

16   BY MR. GOLASZEWSKI:

17   Q.   Good afternoon, Mr. Buncher.

18           Could you please state your name for the record.

19   A.   (No response.)

20   Q.   Can you please state your name for the record, sir.

21   A.   Martin Buncher.

22   Q.   Okay.  And what is your profession, sir?

23   A.   I'm a consumer industrial psychologist.

24   Q.   Okay.  How long have you been a consumer industrial

25   psychologist?

1    A.    50 years.

2    Q.    50 years, is that right?

3    A.    That's correct.

4    Q.    Okay.  And do you do that through a company or

5    independently?

6    A.    I'm -- I represent a corporation.  I'm a corporation, one

7    man.

8    Q.    Okay.  And what is the name of the corporation?

9    A.    Intercontinental Marketing Investigations.

10   Q.    Okay.  And can you describe for the jury your education,

11   please.

12   A.    Yes.  I did my undergraduate college degree at New York --

13   first at Cornell University, then at New York University where

14   I got my BA in psychology, minoring in sociology.

15         And then I went on to the University of Southern

16   California.  My parents did not buy me in; I got it honestly.

17   And I got my graduate degree there, a master's degree in

18   consumer and industrial psychology, and did some more

19   postgraduate work at UCLA.

20   Q.    In addition to your education, have you held any teaching

21   posts over the last 50 years?

22   A.    I've taught -- living in San Diego, I've taught at two

23   universities in San Diego, University of San Diego and San

24   Diego State University.  I've taught marketing, marketing

25   research.

1    Q.    Okay.  Can you describe just generally for the jury what

2    your job is day to day, what you generally do.

3    A.    Well, I -- what I do is I have -- my clients are very

4    diversified.  I have an international as well as domestic

5    practice.  I work in, like, 65 countries, but the mainstay of

6    my work right now is in the United States.  I did work

7    overseas.

8          And basically clients come to me because they have a

9    need to develop marketing intelligence, how are they going to

10   sell or promote their product or service.  And that can be

11   anything from a baking product to a bicycle to a bank to a

12   corporation itself.

13         And I meet with them and understand what their needs

14   are in terms of what information they need to have to make some

15   decisions with respect to their marketing work or operational

16   work.

17         And I design a study for them, usually what we call

18   primary research, which means going to the source to find out

19   how that source would react to whatever concept or product or

20   service they're going to market to those people.

21         And there are different ways in which we do that.  We

22   work on an ad hoc basis, meaning it's not a syndicated service,

23   like Gallup or some of the other poll studies that you may be

24   familiar with, where they have a syndicated service, and there

25   are so many questions, and you buy into that, and then they

1  give you the answers.

2      On an ad hoc basis, I work with the clients and

3  understand what they really need to know or what they think

4  they need to know, and I may add or modify that to help them

5  make the right decisions and gain the right insights.

6      And then my study is designed strictly on the basis

7  of what -- what that information needs to cover, what areas of

8  informational need there is.  And that could take many

9  different forms.

10      Basically, in marketing research, we have qualitative

11  research, and that's what you know as focus groups, although

12  probably what you know are not really good, honest, what I call

13  high-integrity focus groups.

14      The ones we do are somewhat different, and we look at

15  a lot of what we call the latent as well as the manifest

16  content of research, meaning what people say but why they say

17  it and what's behind that.

18      And we look at things like not just what they say but

19  what they don't say and what their body posture is and what the

20  atmosphere is and so on.

21      And then there's -- and those -- that research is

22  used to develop only hypotheses.  You can't really quantify

23  what comes out of a focus group because of the different errors

24  involved in that type of research.  Like the moderator is

25  leading them sometimes or pretending not to know things, and

1   then they're interacting, and their ideas are changing as they

2   learn from what other people say.

3          But that's really great insight for a qualitative

4   understanding of what people's perceptions and attitudes are,

5   how they're formed.

6          And what this case is really all about is what we

7   call quantitative studies, where we -- we generate a -- what we

8   call a representative sample of what we call a target

9   population.  That's who the company or the advertiser is

10  directing their messages to.

11         And we take a good sample of that and a large enough

12  sample so that we can get good reliability and validity when we

13  look at the data that comes back.

14         It's computerized and generated in the forms of

15  tabulations, and that includes both closed-end questions, where

16  we give you a response scale and you just pick which one you

17  agree with or like the best, and also open-end questions, where

18  we give you the chance to express yourself.

19         The open-end information is used to help us

20  understand --

21         THE COURT:  Is there a question that we --

22         MR. GOLASZEWSKI:  Yeah.  I was about to, Your Honor,

23  so --

24         THE WITNESS:  Okay.  So that's the basic --

25  BY MR. GOLASZEWSKI:

1    Q.    Understood.

2    A.    -- fundamental.

3    Q.    And I appreciate that, and it's very helpful.  I

4    appreciate you describing generally your work to the jury.

5              If we could just --

6    A.    Sure.

7    Q.    -- maybe go a little slower and --

8    A.    Okay.

9    Q.    -- we'll try to be responsive to you and I, and I think

10   the court reporter --

11   A.    All right.

12   Q.    -- would appreciate that.

13   A.    Oh, sorry.  Yes.

14   Q.    So the question I had asked was what do you do generally,

15   and it was a very broad question so I appreciate you describing

16   that for us.

17             In connection with your work generally -- I want to

18   put aside any work you do as an expert -- do you have occasion

19   to conduct consumer surveys?

20   A.    Yes.

21   Q.    Okay.  And describe, if you could, generally for the jury

22   what a consumer survey is.

23   A.    A consumer survey is when you go out to a designated

24   target group, and that's something that you have to define with

25   the aid of your client to find out who he's really trying to

1  reach with the product or service.

2         And that can happen in a lot of ways.  We can

3  actually buy samples from list houses that are -- that have

4  millions of people in the database just for the United States.

5  Some of them have 15 or 20 million worldwide.  But in the

6  United States, the largest field houses have maybe 5 or 8 or 10

7  million people that have opted into their panel.

8         And this is the most cost-effective way and an

9  excellent way for us to reach out and get efficient and

10 high-quality research done.

11 Q.    Mr. Buncher, if I may just interrupt you.

12        I take it -- and I appreciate --

13 A.    Okay.

14 Q.    -- your attempt at helpfulness to the jury, but I just

15 want to know generally, before we get into the details of it --

16 we're going to get there.

17 A.    Okay.

18 Q.    Before we get into it, just generally what a consumer

19 survey is, just as a general proposition.

20 A.    It's an attempt to canvass a population and find out what

21 their perceptions are with respect to whatever the problem

22 areas that we're investigating, how those perceptions form

23 attitudes, and then what attitudes drive the behavior that we

24 see happening.

25 Q.    Great.

1    A.    And that's what surveys do.  It's perceptions of people

2    that leads to the formation of attitudes that drives their

3    behavior.  And when we can understand that, we can become

4    marketing experts and help our clients understand whatever they

5    need to know about that -- those consumers.

6    Q.    Okay.  Thank you so much.

7          Is there a general approach to conducting a consumer

8    survey?

9    A.    Well, it's basically meeting with the client,

10   understanding what his needs are, and that really is going to

11   dictate what the approach is, because there are many different

12   approaches to conducting a survey.

13         You can do it by phone; you can do it in person; you

14   can do it on the Internet; even, in previous years, by mail,

15   but we don't do that so much anymore for some reasons I won't

16   go into.

17         But -- so we really need to understand each case as

18   its own self before we decide what methodology we're going to

19   use.

20   Q.    And just to put it in context, you have been retained by

21   the plaintiffs in this action to, among other things, conduct a

22   consumer survey.  Is that correct?

23   A.    That is correct.

24   Q.    Okay.  We're going to come back to that in a moment.

25         Approximately how many consumer surveys have you

1    overseen or conducted over the course of your career?

2    A.    Well, in 50 years, I've -- I've done literally thousands

3    of surveys, probably in the neighborhood -- quantitative

4    surveys alone, maybe 5-, 6,000 surveys.

5    Q.    Okay.  And when I asked you a little earlier about the

6    sort of work generally that you do, can you describe for me the

7    companies for whom you've been retained --

8    A.    Yeah.  If you --

9    Q.    -- through your career.

10   A.    If you were to look at my CV or my background and my

11   clients that I've had over the years, it would be easier to

12   talk about the industries that I haven't been involved in than

13   I have, because basically if companies have strategic planning

14   in mind, then they're going to be doing market research.

15         So I work for major companies like IBM in the United

16   States or Nike or Betty Crocker or Stouffer's, brands that

17   you're familiar with.  Real estate companies, banks.  You name

18   it, and I've probably been involved with it in my 50 years as a

19   profession.

20   Q.    And is it fair to say that you have done marketing

21   research for those companies, or you've also conducted consumer

22   surveys, or both?

23   A.    I've done -- well, a consumer survey is one aspect of

24   marketing research, yeah.  The qualitative stuff would not be a

25   survey type thing.

1          And some of it is just expertise, too, where I just
2    do marketing consulting based on what I've accumulated, if that
3    client represents an industry that I have a lot of background
4    and experience in.
5    Q.   Okay.  You testified earlier that you've done some
6    teaching over the course of your career.
7          Have you also published papers on marketing or
8    consumer surveys in general?
9    A.   Not really.  I've always been on the practitioner side.  I
10   have a colleague of mine that I work with frequently, and I
11   support him with inputs on articles and that, but I don't
12   publish under -- under my name.  I've done a couple of cover
13   evaluations for books and that type thing.
14   Q.   Okay.  As I asked you earlier, you have, in fact, been
15   retained by the plaintiffs in this action.  Is that right?
16   A.   That's correct.
17   Q.   And what were you hired to do, sir?
18   A.   I was -- in brief, I was hired to determine the role a
19   model plays in advertising which the clubs of the defendants
20   represent.
21   Q.   Okay.  Have you been retained by similarly situated models
22   who have alleged that their images have been misappropriated in
23   the past?
24   A.   I've done about 30 studies, all in the same vein, for
25   different clients, for this -- for different clubs but for --

1   very similar nature to the one in this -- this case.

2   Q.    Okay.  But putting aside any expert reports or surveys you

3   have conducted in what I'll call strip club misappropriation

4   matters, have you also conducted surveys and provided expert

5   testimony in other sorts of litigation?

6   A.    Yes, I have.

7   Q.    Okay.  Can you describe that for me?

8   A.    Well, they range from anything from a murder -- murder

9   trial case, where the Court actually asked me to come in and

10  work for the Court and do an evaluation of what their

11  marketing -- or their marketing insights were, to something as

12  more mundane as what we call trade dress infringement, where

13  somebody has a product and the question is does it look like

14  another product and consumers mistake it for that product.  And

15  then there are certain legalities involved in what you're

16  allowed to do in what they call trade dress.

17          And then patent infringement, which is more explicit:

18  Has somebody been using something that really is the same

19  patent as yours or the consumer understands it the same way?

20          Then I have insurance fraud claims where people

21  understand, or not really understand or misinterpret, like, an

22  insurance policy.  And we end up with people suing insurance

23  companies for, you know, the fraudulent claims or the

24  fraudulent coverage of the policy.

25          So it -- as I said, that's one of the things I enjoy

1   about my work is it covers so many different types of studies.

2   Q.    Understood.  I think I get the trade dress infringement

3   and the patent matters.

4         What sort of consumer marketing services did you

5   provide in the murder trial?

6   A.    Yeah.  It was a case in Imperial County, California, where

7   I live.  And there was a suspected arsonist involved in a fire

8   that involved killing, actually -- the fire killed five

9   firemen, and if he was convicted of arson, he would be a

10  murderer.

11        And the problem was we needed to determine if we

12  could select a jury that wouldn't already be biased because the

13  media coverage on this event was fantastic.  It was a

14  first-time event for something like that in Imperial County.

15        And the Court asked me to use my marketing expertise

16  to evaluate the impact of what media communications were.  And

17  also we took a sample of potential jurors out of the actual

18  jury pool that would have been called for the case, and I did a

19  quantitative survey amongst them to see what preexisting

20  attitudes they had about that case.

21        And then I had to report to the Court what I thought

22  the chances were for being able to generate a fair trial in

23  that particular venue or whether it should be moved elsewhere.

24  Q.    And you were asked to do this by a state court in

25  California?  Is that accurate?

1   A.   That's correct.

2   Q.   Okay.  Thank you.

3        Going back to your retention in this matter, if you

4   can put a date on it, prior to -- well, strike that.

5        Do you know when you issued your report in this

6   action?

7   A.   I think it was -- yeah, it was quite some time.  It was

8   like April of nineteen -- '17, 2017.

9   Q.   April of 2017, is that correct?

10  A.   Yes.

11  Q.   Okay.  And prior to April of 2017 -- and now I just want

12  to focus on misappropriation matters -- had you ever conducted

13  any surveys and issued any reports in such litigation?

14  A.   Uh . . .

15  Q.   Or just to be clear, prior to April 2017 when you issued

16  your report in this matter, had you engaged in surveys and

17  issued reports in other strip club misappropriation matters?

18  A.   Yes, I had.

19  Q.   You had.

20       Do you know how many prior to April 2017?

21  A.   Probably at least -- maybe 8 or 10 or something like

22  that --

23  Q.   Okay.

24  A.   -- to the best of my recollection.

25  Q.   And subsequent, somewhere in the neighborhood of 20.  Is

1    that fair?

2    A.    In addition, yes.

3    Q.    Okay.   Thank you.

4          And in each of these cases -- and I just want to

5    focus on these 30 or so matters here -- are you generally asked

6    to do the same inquiry?

7    A.    With this -- this particular type of case?

8    Q.    Yes.

9    A.    Yeah, they're all very similar.   They all involve the use

10   of models in the advertising of these clubs --

11   Q.    Okay.

12   A.    -- so --

13   Q.    Please.

14   A.    Well, in that respect, they're very similar.

15   Q.    Okay.   And what are you asked specifically to inquire

16   concerning?

17   A.    It's always the same issue, is what is the -- what is the

18   perceived role of the model in the advertising?   In other

19   words, it's a communication study.   What is she communicating?

20         And it's based on reactions to the advertising

21   itself, not on any other experiences or anything else.   We ask

22   the respondents to focus on the ad, which is the stimulus that

23   they react to, and then we measure communication based on what

24   perceptions they have of that ad and what attitudes are derived

25   from what the perception is.

1       And we try and ask them how that would affect their

2  subsequent behavior.  There you get, again, perception,

3  attitudes, and behavior.

4  Q.   And as a practical matter, in furtherance of that inquiry,

5  can you describe for the jury what steps you take.

6  A.   Yes.

7  Q.   That is, you were asked to inquire as to a specific topic,

8  and what steps do you take in order to make that inquiry?

9       MR. HEARN:  Your Honor, just let me object.  I think

10  we're getting pretty substantive on his opinions without him

11  having been qualified.

12      Are we going to ask for him to be qualified as an

13  expert?  I don't have an objection to that, but if we're still

14  doing qualification, I -- I don't have an objection to him

15  being certified as an expert for the purposes of consumer

16  survey studies.

17      THE COURT:  Okay.  Well, that's fine.  That's --

18  different jurisdictions handle this differently, and I don't

19  normally require a formal certification.

20      But I guess the question would be, Counsel, have you

21  finished the background questions that you wanted to ask for

22  qualification?

23      MR. GOLASZEWSKI:  I have, Your Honor.

24      THE COURT:  All right.  And what is -- what is the

25  area of expertise that you're offering the witness for?

1      MR. GOLASZEWSKI:  In consumer marketing and consumer

2  surveys, Judge.

3      THE COURT:  All right.  I'm allowing you to proceed

4  without objection.  Go ahead.

5      MR. GOLASZEWSKI:  Thank you, Your Honor.

6  BY MR. GOLASZEWSKI:

7  Q.   To go back just a moment, you were asked to conduct a

8  particular inquiry by the plaintiffs in this action, and my

9  question, if you could describe for the jury how you went about

10  conducting that inquiry.

11  A.   Well, we knew that the -- first, we work with the client

12  and understand what it is that we need to establish in the way

13  of data so that we can answer the major question which is

14  asked, which is what is this model in this ad communicating.

15      So I have to do some thinking and put together the

16  questions which will demonstrate what happens when people see

17  this advertisement.

18      And I design a questionnaire, and then I have to

19  decide who I'm going to ask that questionnaire -- or who I'm

20  going to deliver the questionnaire to.  Who are the people that

21  are most likely to be involved in this kind of a situation?

22  That's what we call the target group.

23      And when I -- when I determine that, then I go to a

24  list house, and I ask them to give me a representative sample

25  in a population in an area where the club is located, and

1    that's my base sample.

2         It is accurate with respect to representing census

3    data, the most current census data they have.  And these list

4    houses update their panel like that every day.  They, like, add

5    1500 people a day sometimes to their panel, and they keep

6    revitalizing it.

7         And when we use that, then I have to apply screening

8    questions which will narrow down the people that participate in

9    the study so that we get what we call the target group.  And in

10   this case it was people that go to the kind of club, that

11   patronize the kind of club that's involved in the case.

12   Q.   To be clear, you are told from the outset by counsel or by

13   the plaintiffs themselves that they did not consent to the use

14   of their images in these advertisements.  Is that accurate?

15   A.   That is accurate.

16   Q.   Okay.  Do you have an opinion on that one way or the

17   other?

18   A.   In terms of --

19   Q.   Whether, in fact, consent was ever given?

20   A.   I only know what counsel told me.

21   Q.   Fair enough.

22        You thereafter -- you review the complaint and the

23   exhibits to the complaint, which are the advertisements.  Is

24   that accurate?

25   A.   That's correct.

1  Q.    Okay.

2  A.    And I use that to construct the questionnaire which will

3  deal with the issues of is there confusion or misrepresentation

4  based on what the perceived role of the model is in the

5  advertisement.

6  Q.    Okay.  And is that -- if you had to boil it down, is that

7  your ultimate -- ultimate inquiry, the perceived role of the

8  model in the advertisement?

9  A.    Yes.  That's correct.

10 Q.    Okay.  And do you yourself -- you personally -- formulate

11 the questionnaire?

12 A.    Yes.

13 Q.    And about how long is the questionnaire that you

14 formulate?

15 A.    In terms of minutes, it's usually about 12 -- 10 to 12

16 minutes.  People take their time, different times, to go

17 through it.

18 Q.    It was an inartful question.

19        How many questions are in the questionnaire that you

20 create?

21 A.    Well, they're just -- there are both closed- and open-end

22 questions, and it goes -- I would say there are about 8 or 10

23 closed-end questions, about 4 or 5 open-end questions.

24 Q.    Okay.  In the other misappropriation matters for which

25 you've been retained, have you generally used the same

1    questions in those matters that you used here?

2    A.    In some cases the questions are actually identical, and in

3    some -- some cases they're very similar, modified somewhat.

4    Q.    Okay.  And can you remind me, please, the name of the

5    company that actually handled the survey?

6    A.    Huh?  Oh, yeah.  Well, the -- well, there were two

7    companies involved.  One was the sample provider, which is

8    CINC, C-I-N-C, I guess, or K [verbatim], and they're one of the

9    largest sample houses in the United States.  They have, like, 5

10    million people that participate in their panel.

11    Q.    And what sort of sample were you looking for in this

12    particular --

13    A.    We --

14    Q.    -- for this particular survey?

15    A.    People that have patronized a gentleman's club, a strip

16    club, bikini bar, that kind of a club, in the past two years.

17    Q.    And was that the body of respondents that you ultimately

18    got?

19    A.    Yes, it was.

20    Q.    For this survey in particular, correct?

21    A.    That's correct.

22    Q.    Let me just be clear.  Every survey respondent had

23    patronized a strip club or gentleman's club or bikini bar

24    within the past two years.  Is that accurate?

25    A.    That's correct.

1  Q.   Okay.  Do you know what ages they ranged from?

2  A.   Well, they defined themselves.  We set it -- of course,

3  you have to be mostly 21 to get into these clubs, and it was 21

4  and over.  And when we start with a representative sample of a

5  population and we ask screening questions, we end up with a

6  profile of who the target group is.

7          So we had -- and we knew, from my background in

8  looking into the clubs, that women as well as men participate,

9  and we wanted to see if there was a gender difference.  So we

10 set a quota on 50 percent males and females so that we could

11 look at gender as an independent variable.

12 Q.   Okay.

13 A.   But the age ranges were pretty much spread from, you know,

14 21 to -- on up to maybe 50 or so, a few people in their 60s,

15 but heavily in the 20- to 40-year-old category.

16 Q.   And to be clear, the question for the sample was not

17 whether they had seen a strip club advertisement in the past

18 two years but whether they had attended a strip club.  Is that

19 accurate?

20 A.   That's right, whether they had patronized the club.

21 Q.   Okay.

22 A.   And, of course, they didn't know that's what we were

23 looking for because we asked the question amongst other

24 questions, and they don't -- so if they wanted to be in the

25 survey, they would just answer yes, but they don't -- they

1    don't know that.

2           So we ask them about other -- other things that they

3    did, you know, go to concerts and things like that, so they

4    don't know really what we're after until we really get into the

5    heart of the survey.

6           So a lot of people are disqualified because they

7    didn't answer the question that they patronized the club.

8    Q.   Is that a standard approach in consumer survey

9    methodology?

10   A.   Yes.  You're -- in the beginning, the first thing you want

11   to do is not bias or presensitize, let the target -- let the

12   target group that you're after know what you're after so people

13   can't, you know, jump in and -- just because they want to do

14   the survey.

15   Q.   All right.  Were you also seeking out any particular

16   geographic component to the sample?

17   A.   Well, we want to get as close to the real people as we

18   can.  That's the whole purpose of research is get it as close

19   to reality as you can, although we know it's not reality; it's

20   a tool you're going to use to approximate reality.

21          So we go to the geographic areas where the clubs are

22   located.  And we drew a sample from the population from the

23   areas where the clubs are located.  And then, from within that

24   general sample which represented the demographics of that area,

25   we did our screening questions, and we ended up with a profile

1   of club patrons.

2   Q.   And so what was the geographic sample you used for this

3   survey?

4   A.   We -- for this survey we had originally three clubs

5   involved, and they were located in Tampa and Jacksonville.  And

6   we looked at the populations of those two cities, and we saw

7   that Jacksonville had three times the population as Tampa.  So

8   we divided our sample into one-third Tampa, two-thirds

9   Jacksonville to get an overall representation of that

10  geographic area.

11  Q.   And is that your general approach; that is, if you have a

12  strip club misappropriation matter in Colorado or Ohio, you

13  will look in that geographic region?

14  A.   Yeah.  Well, geography is a variable that comes into

15  marketing research sometimes as an issue and sometimes it's

16  not.

17         There are many cases in -- where a product is not

18  affected by geography.  If you're looking at air conditioning,

19  it's going to be -- you go to hot regions.  You don't go to the

20  Arctic to look at air conditioning.  But if you look at other

21  things, like tobacco or baking products, typically geography is

22  not an issue.

23         But nonetheless, if you know that there's a club in a

24  location, you want to get as close to where that club is

25  because it's going to draw from around its locations where the

1    audience is, so we get -- we get a better sample in terms of

2    its validity that way.

3    Q.    And is that fair, that you take that approach in both

4    litigation work for which you're retained and other standard

5    work --

6    A.    Oh, yes.

7    Q.    -- that you do?

8    A.    That's standard procedure in any -- in any research

9    project.

10   Q.    Okay.  And how many survey respondents did you test in

11   this particular survey?

12   A.    By -- actual number, we had 301.  It was targeted for 300.

13   We got an extra person, and we cut it off at 301.

14   Q.    Why was the target 300?

15   A.    Because we go to what we call statistical theory,

16   probability theory.  Most of you, you know, with high school

17   education learn a little bit about that.  But it pertains to

18   the reliability of the data and the validity of the data.

19          And if you have a very large population of thousands

20   of people and you interview 300, you know that the number that

21   you get -- the score that you get for a particular question is

22   going to be accurate -- in our case, 95 out of a hundred times

23   it's going to be accurate to within plus or minus 5 percent of

24   what that number would be, meaning it could be the real number

25   that you found or it's never going to be worse than 5 percent

1    higher or 5 percent lower.  So that's what we call the

2    reliability factor, and 300 is that.

3              Another example would be when we do a national study

4    and we want a national study in the United States, we have a

5    thousand people that we typically go to, and that, again, gives

6    us a very good reliability coefficient.

7    Q.   In each of the other strip club misappropriation matters

8    for which you've conducted surveys, have you always set a

9    target of 300 respondents?

10   A.   No.  It depends on how many ads we're going to test and

11   how many locations we have.  As I said, it's always an ad hoc

12   situation as to what determines the parameters of the research

13   that's done.

14   Q.   Have you ever, in any strip club misappropriation matter,

15   conducted a survey aimed at actual patrons of the defendant

16   strip club?

17   A.   We've tried to, but we found that the clubs very often are

18   unable to give us any information about their patrons because

19   they don't track it.  It's just a matter of how sophisticated

20   or how much money they invest in that type of practice as

21   opposed to their marketing campaign.

22             And then in some cases, and in this case in point,

23   where we asked for and were given a sample, we tried to work

24   with that sample, but we -- the first thing we have to do is

25   clean it.

1            They -- we got a bunch of e-mail addresses.  And to

2    clean it, we go through and we look for redundancies.  How many

3    times does that e-mail address pop up?  And we look at the

4    total number of names provided, and we look for the

5    verification of those addresses.

6            On the list we got in this case, there were too many

7    to be able to draw a large enough sample of 300 people with

8    because we knew that we were going to have redundancies.  We

9    had to clean the list first.  When we did that, it reduced the

10   sample that they gave us.

11           Then we didn't know how the names were collected,

12   whether there was a bias affecting the people that were

13   included in the sample.  We didn't know when the names were

14   collected.  So it might have represented people that came once

15   or never even came, just looked at a website.  So we really

16   couldn't define who -- who was represented by that sample.

17           And the research that I do, I really protect the

18   integrity and reliability of it.  And when I'm given something

19   like that, I -- we tried it.  We did a little pilot study, and

20   it just produced terrible results.  We weren't getting complete

21   interviews from it, and we didn't know really what those

22   completed interviews represent.

23           And I could not say that it was a valid

24   representative sample of the patronage that they had.  I just

25   didn't have the information.

1    Q.    To be clear, it was your understanding that the e-mail

2    list that you received had come directly from the defendants in

3    this action.

4    A.    That's --

5    Q.    Is that correct?

6    A.    -- correct, yeah.

7    Q.    Okay.  You used the term you received terrible results,

8    and I'm just wondering if you could explain that to me, what

9    you mean.

10   A.    Yeah.  Well -- well, we found that the list had redundant

11   Internet addresses.  We found that many of them didn't exist

12   when we tried to test them out and send communications to those

13   addresses.  That was just one functional aspect of it.

14          And then the other was we didn't have any information

15   from the club as to how they drew that list together, when they

16   drew it together --

17   Q.    Okay.

18   A.    -- where it came from.

19   Q.    Thank you.

20          The screening questions that you asked, to be clear,

21   did you create those screening questions, or is that something

22   that CINC handled?

23   A.    No.  I create the whole design, including the

24   questionnaires.

25   Q.    Okay.  How do you know that those are appropriate

1   screening questions to get to the sample that you want?

2   A.    Because they -- they involved deciding whether to go to a

3   particular place to participate in a certain event.  So I think

4   we asked -- I don't have the questionnaire in front of me, but

5   I think we asked, "Do you go to concerts?" and other special

6   kind of events like that.

7            And, you know, we threw in the gentleman's club type

8   thing as just one of, I think, five or six different options,

9   things that you do with your recreational activity.

10  Q.    As a practical matter, how -- how did survey respondents

11  take this survey?  That is, you created the screening

12  questions, you created the questions for the questionnaire, and

13  how did the screening respondents go about taking the

14  questionnaire?

15  A.    Well, it's -- they're -- they're a member of a panel, so

16  we have their addresses, and we're looking for certain people.

17           So we screen them first for gender, for geography,

18  and then we know they're there.  And then we start asking them

19  their -- you know, "What do you patronize?"  "What do you go

20  to?"  "What do you visit?" They're asked those questions.

21           So we have the basic demographics of location and

22  gender and then we go into the more targeted questions --

23  Q.    Right.  And --

24  A.    -- and they qualified that way.

25  Q.    I'm sorry.

1      As you sit here, do you recall what questions you

2  were asking the survey respondents?

3  A.   The specific -- the five specific questions?

4  Q.   Uh-huh.

5  A.   If I had them in front of me -- it would be easier to work

6  with my report.  It's been submitted as discovery, so --

7      MR. GOLASZEWSKI:  If I may, Your Honor, Plaintiffs'

8  Exhibit 26 is the report of Mr. Buncher dated April 28th, 2017.

9      And for the record, the actual report of Mr. Buncher,

10  with exhibits and survey responses, is about 1200 pages.  What

11  we are submitting is the body of the report and his CV, which

12  is about 22 pages.

13      May I?

14      THE COURT:  Yes.

15      THE WITNESS:  Thank you.

16      There've been a lot of studies in between this one

17  and the ones that followed, so I want to make sure I give the

18  exact information.

19      So the screening question -- there's possibly a

20  questionnaire in here.

21  BY MR. GOLASZEWSKI:

22  Q.   Before you get to the actual questions, I'd just like to

23  point out -- if you could turn to what is labeled page 3 under

24  subset 1, Summary of Assignment and Opinions [verbatim], the

25  second paragraph.

1   A.   I'm sorry?

2   Q.   On page 3, the second full paragraph.

3   A.   Yes.

4   Q.   It says, "I was asked to conduct marketing research to

5   explore possible confusion among consumers exposed to the

6   advertising of these four clubs in terms of what they

7   understood about the models' appearance in the material."

8        Was that pretty much your charge?  Is that fair?

9   A.   Yeah.   That's correct.

10  Q.   Okay.

11  A.   Unfortunately the questionnaire isn't in the summary, so

12  you wanted me to tell you what the five screening questions

13  were.

14  Q.   I'm sorry.  The screening questions I think we understood.

15  A.   Okay.

16  Q.   My question was moving on to the actual substance of the

17  survey --

18  A.   Oh.

19  Q.   -- that is, what questions were you asking the survey

20  respondents to answer --

21  A.   Okay.  Well --

22  Q.   -- in order to get to the ultimate --

23  A.   There were --

24  Q.   -- question?

25  A.   There were five questions that really focused on what the

1    role of the model was in communicating, and I think I remember

2    them quite well.

3            The first one was, "Did you agree to participate in

4    the advertising, to have your image appear in the ad?"

5            The other one was, "Did you agree to sponsor the

6    club?" meaning a sponsorship for you.

7            The other one was, "Did you actually participate in

8    activities at the club?"

9            The other one -- or, "Do you think the model

10   participated?"  These are communication questions.  "Do you

11   think the image that you saw in the ad, the model, actually

12   participated in the activities of the club?"

13           Then, "Do you think that represented the lifestyle

14   that that model enjoyed?"

15           And there was one more.

16   Q.   If I could direct you to page 9 of your report.

17   A.   Yeah.  It was --

18   Q.   Page 9, under --

19   A.   Yeah.

20   Q.   -- Section 5, analysis of results.

21   A.   Okay.

22   Q.   And this gives the results, but I think it sets forth the

23   questions towards the bottom, if you could take a look at

24   those.

25   A.   Yeah.  They probably enjoy -- they repre- -- that they

1  represent the lifestyle and that the women probably enjoy that

2  kind of lifestyle in their lives.

3  Q.    And to be clear, I think when you were talking and you

4  were focusing the question as directed to the model, but the

5  question you were asking respondents was, "Do you believe the

6  model represents?"

7  A.    That's right.

8  Q.    "Do you believe the model agreed?"

9  A.    Yeah.

10  Q.    Is that correct?

11  A.    That's correct.

12  Q.    It wasn't directed at the survey respondents.

13  A.    No.

14  Q.    Thank you.

15  A.    Okay.

16  Q.    And overall -- you can take a look at your report if you

17  like, but what was generally the results of this survey

18  questionnaire?

19  A.    Well, I was really surprised the first -- when these

20  results came back.  Actually, even before that, when we did

21  some similar studies, that the results of what people thought

22  was so far off base.

23        When we asked, for example, if you think that it's

24  likely that these models enjoy a lifestyle, 74 percent of the

25  people said, "Yeah, that's the lifestyle that they enjoy."

1          74 people [verbatim] said the models have agreed to

2    promote the club.  91 percent of the people thought the models

3    had agreed to appear in the advertising.

4          This -- these are -- these numbers are so high.  It's

5    not usual that we get those high of numbers when we're looking

6    for miscommunication in advertising.

7          We usually -- with other studies that I've done, we

8    get confusion levels of around 13, 14, 15 percent, like some of

9    the trade dress studies we do, that kind of thing.

10         These numbers were surprisingly high, showing me that

11   really there was a very high degree of confusion when you get

12   numbers in the 70, 80, and 90 percentiles that are showing you

13   that the communication is incorrect.

14         They're not -- they're misleading.  What message

15   they're getting from that ad, based on the material -- or the

16   information I had from counsel as to the use of those models'

17   images in that ad, the perceptions were totally inaccurate,

18   leading to wrong attitudes.

19   Q.   Leading to wrong attitudes among consumers.  Is that

20   accurate?

21   A.   Yes.

22   Q.   Let's take one example.

23         So you found on page 9, quote, "91 percent of the

24   survey sample felt the models used in the material had agreed

25   to be in the advertising."

1        Is that a question that you have asked in your 30 or

2   so other strip club misappropriation matters?

3   A.    Every one of them, yes.

4   Q.    And 91 percent, is that generally around the same

5   percentage that you find in most of these cases?

6   A.    Yes.  They're usually in the 80s or 90s.

7   Q.    Okay.  When you said earlier that 13, 14 percent in trade

8   dress infringement, those are other separate surveys that you

9   have conducted unrelated to these cases, correct?

10  A.    That's correct.

11  Q.    Okay.  You also found that 74 percent of the sample felt

12  the models had agreed to promote the clubs.

13        And how did you come up with that question?

14  A.    Well, it -- I was looking at the different aspects of

15  communication which would relate to the role the model was

16  perceived to play in the ad.

17        So did she agree to be there?  Did she agree to

18  promote the club?  Does she represent the lifestyle?  Does she

19  really -- do you expect to see her at the club participating in

20  those activities?  Those were all potential things that a

21  stimulus, such as models in the ad, can communicate.

22        And I don't know if we'll get to this or not, but the

23  open-end data that we ask, we ask open-end questions, and

24  they're very important in the study because they let the

25  respondent tell us in their own words what -- what they're

1   thinking, what is happening in their minds when they look at

2   this material.

3         And the open-end data was all focused on the models.

4   That was the key person, the key stimulus element in that ad

5   which was getting the message across.

6         The large majority of spontaneous comments that we

7   got -- and this -- the open-end questions were asked before we

8   got to the ones we were just discussing -- came out with, boy,

9   it's all about the model.  "This is a sexy model."  "She's

10  a" -- you know, "I'm getting turned on."  Those types of

11  comments made her obviously -- it reflected the importance of

12  her role in what the ad was communicating.

13        We also asked for emotions, because messages are --

14  have to be emotionally loaded to really have an impact.  So we

15  asked a question -- another question was, you know, "What was

16  the first" -- sorry, let me back up.

17        The first question we asked was we showed them the

18  models and we said, "What's the first thing that came into your

19  mind when you saw this ad?"  And they all talked about the

20  models and how sexy and how glamorous and so forth and how they

21  were being motivated to maybe go and see them in the club.

22        And the next question we said was, "What emotions did

23  you feel when you were looking at these ads?"  And we got very

24  strong emotionally oriented responses, as you might anticipate,

25  about the sexuality of the models.

1    So not only was there a message being communicated to

2    show us the importance the model played, it was a highly

3    emotional message as well.

4    Q.   So is it fair to say that the open-ended questions were,

5    in a sense, created to confirm the results from the

6    closed-ended questions?

7    A.   Not only just to confirm; show them how important they

8    were.

9          MR. HEARN:  Let me object as leading.  There's a lot

10   of leading, and I think that's --

11         THE COURT:  Anytime you start a question with "is it

12   fair to say," you're probably leading, so rephrase, please.

13         MR. GOLASZEWSKI:  Understood, Judge.

14   BY MR. GOLASZEWSKI:

15   Q.   What was the purpose of the open-ended questions vis-à-vis

16   the closed-ended questions?

17   A.   To learn more about what was communicated; to hear from

18   the respondents in their own words before they knew what the

19   intent of the study was or what the real focus was going to be;

20   to get spontaneous, unaided information from them, because they

21   had no idea where the questionnaire was leading at the

22   beginning, at the very onset.

23         And that's what we usually try and do.  We present a

24   stimulus and try and get your immediate reactions to it before

25   you really know what we're interested in so that we know what's

1    top of mind, what's making the big impression on you.

2            And that tells us a lot about what happens when we

3    get to that closed-end stuff that we can -- we can look at and

4    quantify.

5    Q.    Among the questions you asked -- and you found that 74

6    percent of the sample felt that models represent the lifestyle

7    to which the clubs are oriented, and I'm wondering why you

8    asked that question.

9    A.    Again, it was one aspect of miscommunication that would --

10   that we wanted to cover; if it were to be occurring, that we

11   wanted to know about.

12   Q.    And did you have a belief that the survey respondents

13   understood what you would mean when you said to which the clubs

14   are oriented?

15   A.    Yes.  These are people that go to those clubs.  They

16   understand what the lifestyle is involved in going to these

17   clubs and what happens when you go to these clubs.

18           So we always try and use language that our target

19   group is going to be understanding and familiar with.

20   Q.    Okay.

21   A.    So we don't always want to define it specifically because

22   it might not be exactly.  It's how they perceive it.

23           But in general, they'll associate a particular type

24   of, in this case, lifestyle at the club, and that's the term we

25   used to encompass whatever their -- their impression of

1   lifestyle is.

2   Q.   And to be clear, having designed and conducted

3   approximately 30 of these surveys, are the results that you

4   found in this survey for this action in accord with those other

5   results in other litigation?

6   A.   Very much so.  Every time we do --

7            MR. HEARN:  Let me object.  I think what he found in

8   other cases is irrelevant.

9            Is there an opinion in this case based on surveys

10  that he conducted in this case?

11           MR. GOLASZEWSKI:  Well, I think that they're going to

12  find various grounds to try to attack Mr. Buncher, and we'd

13  like to be clear that this is not a one-off situation.  He has

14  done this repeatedly.  He has found repeated extremely high

15  levels of --

16           THE COURT:  You know --

17           MR. GOLASZEWSKI:  I'm sorry.

18           THE COURT:  Let me see y'all at sidebar.

19      (At sidebar, out of the hearing of the jury:)

20           THE COURT:  So all I know is what's good for the

21  goose -- right? -- and so if -- if you want to -- I mean, I

22  think it's fair to ask him if he's done this in other cases.

23  That's fine.  But we'll probably leave it at that unless you're

24  going to be talking to him about other cases that you don't

25  like of his.

1          And so I don't want him to not be able to do it if

2    you're going to do it.

3          MR. GOLASZEWSKI:  I didn't have any intention of

4    going any further than that, Judge.

5          THE COURT:  Okay.

6          MR. HEARN:  Yeah, I --

7          THE COURT:  Well, let's --

8          MR. HEARN:  I think it's fine to ask him, too, if

9    he's done it --

10         MR. GOLASZEWSKI:  Uh-huh.  That's fine.

11         MR. HEARN:  -- in other -- if he's done it in other

12   cases --

13         MR. GOLASZEWSKI:  All right.

14         MR. HEARN:  -- but if we start getting into the

15   substance of what he found --

16         THE COURT:  Right.

17         MR. GOLASZEWSKI:  Fair enough.  Fair enough.

18         MR. HEARN:  -- that's going too far.

19         THE COURT:  Okay.

20      (End of discussion at sidebar.)

21   BY MR. GOLASZEWSKI:

22   Q.   I'm wondering, Mr. Buncher, if any of these questions that

23   you asked the survey respondents have any tie-in to potential

24   purchasing decisions of respondents.

25   A.   Yes, they do.  First of all, in the more general sense, we

1    know that advertising works.  That's -- when companies

2    advertise and they advertise -- and they do it well, it

3    enhances their sales.

4          I mean, that's a given, and I don't know if anybody

5    could contest that.  Otherwise I wouldn't be in business and

6    advertisers wouldn't be in -- or the advertising agencies

7    wouldn't be in business and so on.

8          But in this particular study, we did ask the question

9    whether or not the models in the ad contributed to the overall

10   effectiveness of the advertising in terms of motivating the

11   people that saw those ads or would motivate them to go to the

12   clubs.

13         And, again, we got a very high percentage of people

14   saying that, yeah, that's -- that's part of what's going on.

15   Q.   I'm looking at page 10 of your report.  Maybe this is what

16   you're referring to.  You can let me know.

17         Quote, "About one-third felt they were more likely to

18   have been motivated to consider the possibility of attending

19   the events if the ads showed the models instead of not showing

20   them."

21         Is that what you're referring to?

22   A.   Yeah.  It's kind of a control question that we show.

23   "Here's an -- picture in your mind the same ad.  Take the woman

24   out of it.  How much did the woman in that ad motivate you

25   versus seeing an ad without the woman in terms of going to the

1   club?"

2           And one-third of them said that it definitely was a

3   motivational factor for them.

4   Q.   And it's your opinion that you can tie that into potential

5   purchasing decisions generally.  Is that fair?

6   A.   Yeah.  I couldn't put a hard number on it because I'm not

7   an economist, but it shows me that the attitude was formed

8   that, "Yes, this is motivating me to consider going to the

9   club."

10  Q.   Okay.  Thank you.

11          Do you know how many women are plaintiffs in this

12  action as of today?

13  A.   Well, I believe there were ten in the complaint that I was

14  presented with --

15  Q.   Okay.

16  A.   -- then designed the study.

17  Q.   Did you conduct a survey concerning each of the

18  advertisements at issue in this litigation?

19  A.   No.

20  Q.   Okay.  Why not?

21  A.   Well, marketing research, one of the principles is that

22  you do -- you work with representative samples.  If we couldn't

23  work with a representative sample of consumers, we'd have to

24  interview every consumer there was, and, of course, you're not

25  going to go talk to millions of people.

1        The same principle applies to the representativeness
2    of the stimuli.  If I can get one, two, three, four, however
3    many representative samples of the stimulus that we're talking
4    about and test those, then I can get predictive results.
5        And, again, I have to say that we've done this with
6    now 30 cases, and the models in this case have sometimes been
7    involved in those other cases, and the results are the same.
8        We get a representative sample of the ads.  We don't
9    test all the ads.  There's no need to.  It would be very
10   redundant, and it would make for a huge questionnaire that most
11   people wouldn't want to complete because it takes too long.
12       And that's why we picked a representative sample
13   rather than every particular ad that was in the campaign.
14   Q.   Thank you.
15       MR. GOLASZEWSKI:  One moment, Your Honor.
16       I have nothing further at this time, Your Honor.
17       THE COURT:  All right.  Ladies and gentlemen, we've
18   got -- we've got about another hour or so today.
19       Do y'all want a short break, or you want to keep
20   going?  What do you want to do?
21    (Some jurors indicating.)
22       THE COURT:  You want to keep going?  All right.
23       I'll tell you what, while Mr. Hearn is getting set
24   up, you can at least kind of take a stretch.
25       Is there anybody that wanted a break?

```
 1        (Negative response.)

 2            THE COURT:  All right.  You can just stand up a

 3   minute.

 4        (Brief pause.)

 5            THE COURT:  Y'all okay?

 6        (Affirmative response.)

 7            THE COURT:  All right.  You can get ready to go, sir.

 8            MR. HEARN:  Yes, sir.

 9            THE COURT:  I've got your question.  We will -- I'll

10   wait and answer it at the end, okay?  Because you may get an

11   answer to it during cross.

12            Remind me.

13            COURTROOM DEPUTY:  I will, sir.

14            THE COURT:  You ready, sir?

15            MR. HEARN:  Just about, Your Honor.

16            THE COURT:  Okay.  You may proceed whenever you're

17   ready.

18            MR. HEARN:  Thank you.

19                         CROSS-EXAMINATION

20   BY MR. HEARN:

21   Q.   Good afternoon, Mr. Buncher.  How are you?

22   A.   Fine, thank you.

23   Q.   Good.

24            My name's Bob Hearn.  I'm one of the attorneys for

25   the defendants in this particular case, and I'm going to get to
```

1    talk to you about your opinions that you reached this afternoon

2    and how you reached them, okay?

3    A.    Fine.

4    Q.    If there's anything you don't understand about my

5    questions, please ask me, because I'm not a market researcher.

6    I'm going to do my best to communicate with you, though, okay?

7    A.    Thank you.

8    Q.    All right.  So I want to ask you a few questions, again,

9    just so we can frame up -- I'm going to start with framing up

10   sort of the primary purpose of your report.

11              I think you told plaintiffs' counsel that your report

12   and your study was done to help prove that there was consumer

13   confusion in this particular case.  Is that right?

14   A.    No.

15   Q.    How am I wrong about that?

16   A.    I don't set out to prove anything when I do marketing

17   research.  I set out to either test a hypothesis or investigate

18   an issue.

19              If I were to set out to prove something, I would be a

20   hired gun.  I'm not a hired gun.  I'm not an opinion maker.

21   I'm a researcher, and the data that I generate in my studies

22   comes from consumers, and it's factual information, and I draw

23   conclusions from those facts.

24              So I did not set out to prove anything with this

25   report.  In fact, I always discuss with my counsel and alert

1    them to the fact that "I don't know what results we're going to

2    get and they may not support your case."

3            And that was also the situation in -- involved in

4    this particular case.

5    Q.    Okay.  Fair enough.  I'll use your words, because I'm

6    really just trying to frame this up, again.

7    A.    I understand.

8    Q.    Your job is to explore possible confusion among consumers

9    of a particular group.  Is that correct?

10   A.    That's better phrasing, yes.

11   Q.    Okay.  The consumers thought plaintiffs were promoting the

12   defendants' clubs.  That's essentially the issue that you were

13   trying to explore.

14   A.    The consumers -- say again, please.

15   Q.    That consumers believed that the plaintiffs were promoting

16   or endorsing the defendants' gentlemen's clubs.  That's the

17   basic issue, correct?

18   A.    Well, the results show what their perception was of the

19   role of the models, and that shows that they reflected that

20   attitude after looking at the ads, yes.

21   Q.    Okay.  Now, you examined this consumer -- or potential

22   consumer confusion through conducting marketing surveys.  Is

23   that correct?

24   A.    Yes.

25   Q.    Did you make any --

1    A.    Marketing research surveys.

2    Q.    Yeah, marketing research surveys.

3    A.    Uh-huh.

4    Q.    Did you make any effort to get in touch with anyone who

5    actually attended any of the defendants' clubs?

6    A.    Well, we asked the club to provide us with a list of their

7    attendees.  Under ideal circumstances, again, trying to get as

8    close to reality as we can, we would have liked to look at

9    people that had -- somehow had some relationship with that club

10   and tested the ads amongst them.

11         Now, remember, this was a communication study, not a

12   recall study.  So we would say to them, as we did in this

13   study, you know, "Looking at just this ad, based on your

14   impressions, what does this ad communicate?"

15         As it turns out, we did have in our representative

16   sample some people that actually had patronized the club.  It

17   wasn't a great number, but it was enough.

18         And their results actually came out to the same as

19   people that hadn't attended the club because they're focused on

20   what the ads communicate, not on what experiences they had.

21   Q.    But it's true that you never communicated with anyone that

22   had ever been a patron of either of the two defendant

23   gentlemen's clubs.  Is that correct?  Never communicated with

24   anyone --

25   A.    Well, I never -- I didn't communicate with anybody

1    directly.  This was all done by the Internet.

2    Q.   And you never did it through the Internet in this

3    particular case.

4    A.   We tried to, and we couldn't.

5    Q.   Why is that?

6    A.   I explained that, because of the problems with the lists

7    that were given us.

8    Q.   Would you agree with me that you were given hundreds of

9    Internet e-mail addresses for patrons of not the defendants'

10   clubs but of another club in the Jacksonville area?

11   A.   I was given a list of e-mail addresses that reflected --

12   what I was told, reflected patrons of the clubs.  And I can't

13   tell you exactly what specific clubs were represented because

14   all I had were e-mail addresses to go by, to the best of my

15   recollection.

16   Q.   Okay.  Well, that actually raises a really interesting

17   issue, so let's back up for one second.

18        When you prepared your report and you conducted your

19   investigation initially, it related to four different clubs.

20   Is that correct?

21   A.   Three, I believe.

22   Q.   Well --

23   A.   Well, the one club was in maybe more than one location.

24   But the summary complaint, which is on the cover of my report,

25   lists three different defendants, Flash Dancers Jacksonville

1    and Officers.

2    Q.    Do you have your report there?  Is that your full report?

3    A.    Well, no.  It's the summary sections of it so no exhibits

4    but just the report, yeah.

5    Q.    Okay.  Well, let me get you to look at page 5.

6    A.    (Complies.)

7    Q.    Actually, we can look at page 1, okay, because it starts

8    there.

9    A.    Page 5?

10   Q.    We'll start with page 1.

11   A.    Oh, okay.

12   Q.    If I can get you to look at page 1, under the heading

13   Summary of Assignment and Options.

14   A.    Well, it's not -- it's page 3, but go ahead.

15   Q.    Yeah, page 3.  Excuse me.

16   A.    Uh-huh.

17   Q.    In the first paragraph of page 3 under Summary of

18   Assignment and Options, that states that you were asked to

19   conduct an investigation as to four clubs, correct?

20   A.    Yes.

21   Q.    Okay.  Not three, it's four, right?

22   A.    Oh, it says four clubs, yes.

23   Q.    Okay.  So your survey and your investigation related to

24   four different clubs -- correct? -- not three.

25   A.    Yeah, and I think it was because one of these clubs had

1   more than one location.

2   Q.   Well, and it --

3   A.   One of -- the ownership had more than one.

4   Q.   And your investigation included entities that aren't

5   defendants in this particular case, correct?

6   A.   I didn't understand that question.

7   Q.   Yeah.  The surveying that you did related to two clubs

8   that are not parties to the lawsuit that brings us here today.

9        MR. GOLASZEWSKI:  Your Honor, objection.  This matter

10  was originally consolidated with other cases.  To the extent

11  there was any issue about the list that we received or the

12  survey that was conducted, I believe it might be a little

13  prejudicial to be --

14       THE COURT:  Well, I'll let him ask the questions, and

15  you can clear it up on --

16       MR. GOLASZEWSKI:  Okay.

17       THE COURT:  -- your redirect if he's leading anybody

18  astray.  I'm sure he's not trying to.

19       Go ahead, sir.

20       MR. HEARN:  All right.

21  BY MR. HEARN:

22  Q.   Do you know how many e-mails you received for patrons of

23  one or more of the four clubs that were the subject of your

24  study?

25  A.   I -- to the best of my recollection, I received a list, as

1    you said, of hundreds of names, of e-mails, which we were going

2    to use as a sample to represent patrons of whatever clubs those

3    names came from.

4          Again, I didn't have sufficient information on how

5    that list was generated, how the people were contacted, when

6    they were contacted, to use that list.  So -- and that was the

7    only list that I got to use, and it was not a good list, so I

8    discarded it.

9    Q.    Did you make the decision not to use the list, or was that

10   CINC or one of the other survey entities?

11   A.    I gave it to my field operation.  They tried -- they

12   cleaned the list first, meaning they eliminated the

13   duplications, and they eliminated the names that were

14   nonexistent because they were either mistyped or somebody gave

15   false names to them.  I don't know how that happened.

16         And then we were left with a much smaller list,

17   and -- and it was -- knowing what the completion rate is of

18   contacts that we usually get, the numbers that we had left from

19   that list would not have allowed us to get a sample of 300.

20         And if you look at my report, at the end of my

21   report, it gives you a field report saying, what was the total

22   number of people we contacted?  How many of them started the

23   questionnaire?  How many of them completed the questionnaire?

24   How many of them dropped out?

25         And that rate on this case is typical of the rate we

1    had on 29 other cases.  And if I had tried to use the list that

2    I was given, aside from all the other problems with it, it was

3    an insufficient number of names to generate and complete 300

4    interviews.

5            So I couldn't use that -- that list.

6    Q.   Is it not possible to supplement the list that you

7    ultimately used with people who were from --

8    A.   Because of --

9    Q.   -- the --

10   A.   I'm sorry.  I interrupted you.

11   Q.   No problem.

12   A.   Because of the poor condition of the list, I was afraid to

13   use it because I couldn't attest to the quality and the source

14   of that list.

15           I don't -- didn't have enough information from the

16   defendants that delivered that list to me to have confidence in

17   using it to generate the quality and integrity of the list I

18   could produce using a survey panel, which I did.

19   Q.   It was your testimony on direct that you yourself created

20   the survey that was used to support your opinion.  Is that

21   right?

22   A.   Yes.

23   Q.   You drafted it.

24   A.   Yes.

25   Q.   You wrote the questions.

1   A.   Yes.

2   Q.   You assembled it.

3   A.   Yes.

4   Q.   And then it was sent out by your field staff, I assume?

5   A.   That's correct.

6   Q.   Did you take a look at it before it was sent out?

7   A.   Well, yeah.  We get an executable copy from them, which is

8   a computer version exactly showing me what a respondent is

9   going to look like [verbatim] when they look at this on their

10  computer, or whatever device they're looking at it on.

11          And I test that to make sure that it's programmed

12  correctly, that all the questions are there, there are no

13  misspellings, that the flow is there.  If they don't answer a

14  question, it makes them go back and answer the question, and so

15  on.

16          It's called an executable.  And only after I approve

17  that is the questionnaire allowed to go to field.

18  Q.   I think you testified that the summary consisted of a

19  series of closed- and open-ended questions that you wanted the

20  survey participants to answer.  Is that right?

21  A.   That is correct.

22  Q.   Okay.  You included four photographs in the survey.  Is

23  that right?

24  A.   Yes.

25  Q.   And the questions that you asked largely -- not

1    exclusively but largely related to those four photographs.  Is

2    that right?

3    A.    That's correct.

4    Q.    And as the author of the survey, you selected the

5    photographs that were to be used.

6    A.    That is correct.

7    Q.    Is that right?

8    A.    That is correct.

9    Q.    Okay.  Do you remember how you went about selecting those

10   photographs?

11   A.    Yes.

12   Q.    How did you do that?

13   A.    Well, I was given -- and they appear in the report -- a

14   number of different photographs of -- sometimes multiple

15   photographs of the same model or different models.

16          And I had to use my judgment to say, okay, here's

17   the -- I'm now looking at a lot more of the campaign, perhaps

18   not all of them but a good number of the ads that these clubs

19   were using.

20          And from them, I selected some that I thought had

21   good information, good visuals, readable, and were

22   representative of the other ads that appeared in the campaign.

23   And that's where my expertise comes in.

24   Q.    Okay.  And so ultimately you picked one photograph from

25   each of the four clubs that were the subject of your study,

1    correct?

2    A.    That's correct.

3    Q.    Okay.  So with regard to the two defendants that are at

4    issue in this particular case today --

5    A.    Uh-huh, yes.

6    Q.    -- there are ten plaintiffs, correct?

7    A.    Originally, yes.

8    Q.    Okay.  There still are ten plaintiffs.

9    A.    Uh-huh.

10   Q.    Are you aware of that?

11   A.    Well, I -- in the complaint there were ten plaintiffs,

12   yeah.

13   Q.    Okay.  So there are ten images at issue.

14   A.    Uh-huh.

15   Q.    Are you aware of that, that there are still ten images of

16   the plaintiff models that are at issue, as we sit here today?

17   Are you aware of that?

18   A.    I'm confused.

19   Q.    Okay.  Do you know how many photographs are at issue as we

20   sit here today, in front of this jury, that are being analyzed

21   for potential violations of various laws?

22   A.    Again, this goes back to something that is consistent with

23   the -- the requirements that the courts use to define good

24   research.  The Diamond's reference manual --

25             THE COURT:  Sir, you're not answering his question,

1   and it's a pretty straightforward question, so let's -- because

2   I think it's important.

3            THE WITNESS:  Okay.  Maybe I didn't understand it.

4            THE COURT:  I'm not saying what your answer should

5   be, but it's important that you be talking about the same

6   thing.

7            THE WITNESS:  Okay.

8            THE COURT:  He's asked you whether you're aware that

9   there are ten different individual models who are plaintiffs in

10  the case that's before the Court for trial.

11           THE WITNESS:  That's what was reflected in the

12  complaint.

13           THE COURT:  Okay.

14           THE WITNESS:  I guess the answer's yes.

15           THE COURT:  All right.  Now, what's your next

16  question?

17  BY MR. HEARN:

18  Q.    And you're aware that each one of those models is bringing

19  claims based on a single picture of them that was allegedly

20  misused by the defendants, correct?

21  A.    I don't know how many pictures are involved for a given

22  model in the complaint.  I haven't been in any -- I don't have

23  communication with those models.

24           Counsel gives me a copy of the complaint, and I take

25  it from there.  So I really can't -- I don't know.  I guess the

1   answer to your question is I don't know --

2   Q.   Well --

3   A.   -- that answer.

4   Q.   -- at some point in time you looked at all of the photos

5   that would have been subject to the plaintiffs' claims in this

6   particular case, correct?

7   A.   I looked at a batch of photos that were given to me by --

8   by counsel and was asked to select representative photos to

9   test.

10  Q.   And you picked four.

11  A.   I picked four.

12  Q.   And as you sit here today, are you aware that only two of

13  the photos that you picked are of models that are involved in

14  this case as plaintiffs?

15  A.   I understand that some have dropped out and that two

16  remain, yes.

17  Q.   Okay.  So only two of the model photos are subject of your

18  report and your opinion as you sit here today.

19  A.   By definition, yes.

20          MR. LIROT:  If I may?

21          THE COURT:  Please.

22  BY MR. HEARN:

23  Q.   Okay.  So your survey was founded upon four photographs,

24  only two of which are of models that are involved in this

25  particular case --

```
 1              THE COURT:  Do we need the --
 2    BY MR. HEARN:
 3    Q.    -- correct?
 4    A.    Correct.
 5              THE COURT:  Are you looking for the --
 6              MR. LIROT:  I'm trying to flip this on.  Looks like
 7    the power is on.
 8              If I may, Judge.
 9              MR. GOLASZEWSKI:  Your Honor, I'm confused as to why
10    this is being published to the jury.
11              THE COURT:  I'm not sure.
12              MR. HEARN:  We're going back to -- it's a mistake.
13    We're going back to exhibits that are already admitted.
14              THE COURT:  Okay.  All right.
15              Are you trying to show him the ones that are the two
16    that he did?  Is that what you're trying to show?
17              MR. HEARN:  Yes, Your Honor.
18              THE COURT:  Okay.  Well, that shouldn't be too hard.
19    They're in evidence, right?
20              MR. HEARN:  Exactly.
21              Super Bowl ad of Ms. Young.
22              THE COURT:  Okay.
23              MR. LIROT:  That's not it.  Let me --
24              THE COURT:  Well, take that off the screen, please,
25    and come on.  Let's get our act together here.
```

```
 1        (Brief pause.)
 2            THE COURT:  Mr. Hearn, if you can show him the two
 3    you need, I'm sure he'll put them up on the screen.
 4            MR. HEARN:  That's it.
 5            MR. LIROT:  Right.
 6            MR. HEARN:  That's No. 1.
 7            We're getting there.
 8            THE COURT:  Okay.
 9    BY MR. HEARN:
10    Q.   Okay.  Mr. Buncher, do you recognize what's on the screen
11    behind you as one of the images that you used as the subject of
12    your marketing survey in this case?
13    A.   I believe that is one.
14    Q.   Okay.
15            MR. HEARN:  Okay.  The next one?
16            THE WITNESS:  Of course, the name wasn't on the ad.
17    Just the ads were used.
18    BY MR. HEARN:
19    Q.   Yes.
20            And, Mr. Buncher, do you recognize that as one of the
21    photographs that you used?
22    A.   Yes.
23    Q.   Okay.  Do you recall that the other two photographs that
24    you used for the subject of your survey also were similar to
25    this in that they related to events or drink specials that were
```

1    occurring at the subject clubs?

2         MR. GOLASZEWSKI:  Objection.  I believe it's facts

3    not in evidence at the moment.

4         THE COURT:  Overruled.

5         THE WITNESS:  The -- yes.  The four -- I had a

6    variety of the ads in to represent the totality of the campaign

7    that I was addressing with all the -- all the clubs.

8    BY MR. HEARN:

9    Q.   Okay.

10   A.   And the other two did, I think, have something to do

11   with -- well, all the ads had to do with some kind of a

12   special, whether it was one type of event or another, free

13   drinks or relative to a football game or something else like

14   that.

15   Q.   All four were similar to this in that they had a

16   background around them and that they had some kind of language

17   that had been added to the image by the defendant club.  Is

18   that right?

19   A.   There -- yeah.  There was some information about the club,

20   and there was a model and some -- some typed comments on the

21   side, yeah.

22   Q.   Okay.  In looking through the images that you were going

23   to use for your particular -- for the survey that you

24   conducted, did you see images of women against white backdrops,

25   with no backgrounds?  Did you see images like that?

1    A.   I don't remember specifically, but when I was trying to

2    represent the campaign, there are differences between ads, and

3    I was looking at those that had not just the model and nothing

4    else in it.  I don't think that would have been a fair

5    evaluation of what the campaign was about.

6            Most of the ads in the campaign say something about

7    the club, and they have information and usually the club

8    address and something going on.  And -- and that's what I used

9    to try and develop a representative sample of the ads.

10   Q.   Okay.  Let me get you to look at a couple of the other

11   exhibits that we've been -- that have been marked in this case

12   that are photographs of the models that are the subject matters

13   of their claims.

14   A.   Uh-huh.

15   Q.   Let me get you to look at this picture of Ms. Underwood.

16           MR. HEARN:  It was there and now it's gone.

17           MR. LIROT:  Is this the one?

18           MR. HEARN:  Uh-huh.

19   BY MR. HEARN:

20   Q.   Do you see that picture?

21   A.   Yes.

22   Q.   Were you provided with that picture as a possible

23   photograph to explore as part of your developing your opinion

24   in this case?

25   A.   Yes.

1    Q.    And you excluded that.  You didn't use it in your survey,

2    correct?

3    A.    That's correct.

4    Q.    Right.

5          Because you didn't feel that it represented the

6    campaign that the defendants were putting on, to use your

7    words, correct?

8    A.    No.  I didn't use this because I thought it would be

9    unfair to you to use this ad, because that ad basically has

10   very little information to the right of it and nothing else in

11   the way of distraction or information on the ad itself.  It is

12   just the model.

13         And that ad, based on my expertise of 50 years, says,

14   "Hey, I'm looking at a model, and the whole communication of

15   that ad, nothing else is really there."  There's some kind of

16   background stuff, but the model is the ad, and that wouldn't

17   have been fair to you.

18         I wanted to look at the campaign material that was

19   more indicative of, you know, full-on context.  What are the --

20   what are the -- I doubt whether this ad says as much about

21   what's going on at the club and would attract people as all the

22   other information in all the other ads does.

23         So this -- this would be unfair and not be

24   representative of what I think their -- the campaign was all

25   about.  And that's why I excluded that ad and others like it

1    where you didn't have a lot of stuff on the right that could

2    communicate and give clues to what communication was occurring,

3    and it was just the model.

4              So I would have gotten higher scores than I did if

5    I'd have used that ad in my testing, and I didn't think that

6    was fair.

7    Q.   Well, you didn't -- you didn't test that hypothesis with

8    anyone, did you?  You didn't do that.

9    A.   I don't have to.  I've been doing this for 50 years.

10   Q.   You just know.

11   A.   Why am I accepted as an expert if I don't have a -- any

12   intuition as to what an ad can do?

13             Clients call on me to look at their ads and give

14   opinions, and I -- and they usually accept them because of my

15   background and expertise in the field of advertising

16   communications.

17             And I can sit here and tell you with the utmost

18   confidence that if I tested that ad, that -- and anybody

19   looking at that ad -- you don't have to be an expert to look

20   at -- I'm sure members of the jury, in seeing that, is that ad

21   not all about a woman?  And there's not much else to tell you

22   anything about the club in it.

23   Q.   Do you think that the ads that I showed you a moment ago

24   are representative of this photograph?

25   A.   They are more representative of what the club is about,

1    not about what the model is about.

2    Q.    Do the survey -- the surveys that you used, based on the

3    two photographs that I showed you a minute ago, adequately test

4    the hypotheses that you were seeking to test in the survey

5    relative to this photograph?

6    A.    Much more adequately test my hypothesis in a more fair

7    manner than to test an ad like this, which is what I'm telling

8    you.  That ad would generate higher scores contrary to what

9    your situation is in this case than the ads I tested.

10    Q.    Do you have any data that you could point to to justify

11    that or to --

12    A.    I can point to only my 50 years of experience.

13    Q.    Okay.  Were you given this photograph of Ms. Middleton as

14    a possible subject of your survey?

15    A.    Yes.

16    Q.    And you excluded this one too, correct?  This one was not

17    part of your survey, right?

18    A.    That's correct.  She was not part of my survey.

19    Q.    Okay.  And I assume if I ask you, you're going to tell me

20    that you excluded this photograph for the same reason that you

21    excluded the one of Ms. Underwood that we showed you just a

22    minute ago.  It would be --

23    A.    Well, when we --

24    Q.    -- unfair to the defendants to use this.

25    A.    Let me point out, for the jury's sake, when we test the

1  ad, we eliminate what -- what you see here, which is not part

2  of the ad, a lot of this is contributed to people who comment,

3  and we don't consider that part of the ad itself.  Those are

4  what the consumers put on the -- on the Facebook page or the --

5  whatever the page is.

6       We only test the -- what the advertiser has put up

7  there, so it's much cleaner than this when you see the final ad

8  that we tested.  And when you clean everything up, again, we

9  get to the same situation where I'm trying to do good research,

10  and I want to be fair to both sides, and I've already told my

11  client that.

12       And I will not test an ad where I know ahead of time

13  that the only major communicative element in that ad is that

14  model and her costume and nothing else in the background, no

15  other information about the club.

16       Of course, all the comments are going to be about the

17  model.  The -- in advertising we know that 80 percent of what

18  people take out of an ad is imagery and 20 percent is content,

19  and any marketing research expert will tell you that.

20       And in this particular situation, that, it's probably

21  going to be more than 80 percent because that's basically what

22  the attention-getter is.  What's going to involve people,

23  what's going to create an emotional response is the model in

24  that ad.

25       And I didn't want to test that ad or others like it

 1   because it was not a fair representation.

 2   Q.   And did you collect any data in this case to support that

 3   opinion?

 4   A.   I'm sitting here with my 50 years of experience telling

 5   you that that's why I do good research.

 6           MR. HEARN:   That is ipse dixit, Your Honor --

 7           THE WITNESS:   I do not have --

 8           MR. HEARN:   -- and I'd ask the Court to strike it.

 9           THE COURT:   I'll tell you what.

10           THE WITNESS:   (Unintelligible.)

11           THE COURT:   Tell you what.  We'll have that

12   discussion another time.  Ask a question.

13           MR. HEARN:   Okay.

14   BY MR. HEARN:

15   Q.   Let's look at another one.

16           Was this an image that you were provided as a

17   possible subject of the survey that you conducted in this case?

18   A.   It was a possible image, yes.

19   Q.   Okay.  And you excluded it.

20   A.   That's correct.

21   Q.   Didn't use it in the survey.

22   A.   That's correct.

23   Q.   Same reason you just explained to the jury.

24   A.   That's correct.

25   Q.   You don't have any data that would support that it would

1    be unfair to use this image, unfair to the defendants to use

2    this image as part of the survey.  No doubt it would support

3    that.  Just your own personal experience in the field of

4    marketing.

5    A.    My personal experience involves other research that I've

6    done in the other cases where we have had no choice but to use

7    an ad similar in its construct to this ad.

8            And when we show this ad and we take the woman out of

9    it, the data that we get clearly shows that the results would

10   be all focused on what the model was and that the ad doesn't

11   perform anything without the model in it.  And that's from

12   something like 25 other cases that I've done.

13           So that's my experience that I'm using to make this

14   judgment, and I had some of that experience preceding this

15   particular case, and it has been reinforced following this

16   case.

17           You don't take an ad where the major element in that

18   ad is just the female model and think that you're going to get

19   anything other than reactions to the female model.  There's

20   nothing else there to react to.  I don't understand how you

21   don't understand that.

22   Q.    That's your opinion.

23   A.    I mean, that's your opinion --

24   Q.    Okay.

25   A.    -- and that's why we're both here.  Thank you.

1  Q.    My opinions are not important, sir, for the purposes of
2  today.
3  A.    All right.  Well, you're not the researcher, and I am.
4  Q.    Okay.  You would also agree with me that two of the
5  photographs that were used in your survey were of women who are
6  not involved in this particular case, right?
7  A.    At the time I didn't know that, and that is correct.
8  Q.    Okay.  They're no longer involved in this proceeding.
9  A.    That's correct.
10 Q.    Okay.  What about this one?  Were you provided with that
11 image?
12 A.    Yes.
13 Q.    You didn't test it.
14 A.    That's correct.
15 Q.    Okay.  Same for this one?  You were provided with it and
16 you didn't test it in a survey.
17 A.    Correct.
18        Can you imagine what would happen to the question if
19 I said, "Imagine this ad without the woman in it.  How would
20 you be motivated to the club?"  And they wouldn't -- everybody
21 said, "What?"
22 Q.    Okay.  I believe this is -- yes, this is the next one.
23        You were provided with this, and you didn't use it.
24 A.    In all fairness to you, I did not use it.
25 Q.    Okay.  How about this one?

1    THE COURT:  We should almost be done with these,

2  aren't we?  How many are -- how many more do we have?

3  BY MR. HEARN:

4  Q.    You had this, and you didn't use it, right?

5  A.    Correct.

6  Q.    Okay.  And how about that one?

7  A.    Same thing.

8  Q.    Okay.

9    THE COURT:  Can I turn the lights back up?  Are you

10  done with the --

11    MR. HEARN:  Yes, Your Honor.  I'm done with the

12  screen.

13    THE COURT:  Okay.

14  BY MR. HEARN:

15  Q.    I want to ask you a few questions about some of the

16  specific inquiries or questions that were included in your

17  survey, okay?

18  A.    I think it's okay.

19  Q.    Well, it's okay for me to ask them, right?

20  A.    Yes.

21  Q.    All right.  Now, I think you discussed a little bit with

22  plaintiffs' counsel a question in the survey that related to

23  the putative lifestyle of people associated with or who go to

24  clubs.  Is that correct?

25  A.    That's correct.

1   Q.   Okay.  Specifically, do you recall, at paragraph -- or

2   Question 9 of your survey, you asked the following questions:

3          "The models depicted in the photographs represent the

4   lifestyle to which the clubs are oriented," and you gave the

5   counterpoint to that.  "The models do not represent the

6   lifestyle to which the clubs are oriented."

7   A.   That's correct.

8   Q.   Does the survey define the word "lifestyle" anywhere in

9   it?

10  A.   I think I've already covered that in my testimony, that

11  lifestyle is something that goes on at these clubs that is

12  representative of something that these people that have

13  patronized these clubs are familiar with.

14         Now, how specifically they describe lifestyle would

15  differ from person to person to person, but we're interested in

16  the general implication of lifestyle as life goes on,

17  represented by what occurs in these clubs.

18         A certain type of people like to go to these clubs.

19  Other people don't like to go.  That's part of the lifestyle.

20         What events happen at these clubs people enjoy?

21  That's one part of lifestyle.  Some people don't go there

22  because they wouldn't enjoy what happens at those clubs.

23         So lifestyle is a good general term to use to apply

24  to activities at the club and people that go there for those

25  activities.  And we've already -- I have been deposed on this

1    subject in some of the other cases, and it's been accepted that

2    that's really the best term to come up with to generalize.

3         You cannot break down something into so many pieces

4    that you don't cover the whole picture, and the term

5    "lifestyle" adequately covers and is understood by the people

6    that we -- we address it to.  And we know that from 30

7    different studies that are showing that result.

8    Q.   Well, in this particular study, you didn't define

9    lifestyle.  That's all I asked you.

10   A.   Intentionally, correct.

11   Q.   Did you -- you didn't define it.

12   A.   It defines itself because they're familiar with the term.

13   Q.   Did you ask any questions in the survey that were intended

14   to root out what people thought the lifestyle was at the

15   particular clubs at issue?

16   A.   What they thought the lifestyle was is self-evident in the

17   spontaneous data that we asked for in the open-end questions at

18   the beginning of the survey before they even knew what the

19   intention of the survey was to cover.

20   Q.   Do you know -- and I think you said also, Mr. Bucher --

21   Buncher, excuse me -- that you recycle a lot of these questions

22   over and over again in the various surveys that you do for

23   these kind of cases.  Is that right?

24   A.   Well, the objectives are largely the same, so we'd

25   obviously use the same types of questions that have been

1   accepted and proven useful and accepted by the courts.

2   Q.   Well, do you know if the lifestyles at all of the clubs

3   that you're asking about are the same?

4   A.   Doesn't make a difference because each respondent is

5   making -- addressing only the lifestyle represented in the club

6   ad that they're being tested on, so --

7   Q.   Do you know --

8   A.   -- different lifestyles from other clubs don't -- aren't

9   relevant from --

10  Q.   Did you do anything to try to figure out whether there was

11  an identifiable lifestyle associated with any of the

12  defendant -- either of the two defendant clubs?

13  A.   By definition, the lifestyle is reflected in the

14  activities that go on at the club and the people that go there

15  to enjoy those activities.

16  Q.   You know, would -- this question about lifestyle, was it

17  initially developed for surveys that were used in exploring

18  consumer confusion with respect to gentlemen's clubs, or was it

19  developed in another context?

20        Do you follow my question?

21  A.   You mean in other research that I've done, have I used the

22  term "lifestyle"?

23  Q.   I'm asking about this particular question, the question of

24  whether the models in the photographs in the survey were

25  associated with a particular lifestyle.

1        Was that question developed for the purposes of
2    studies intended to explore consumer confusion in the
3    gentlemen's club context?
4    A.   All of the questions in this study, including that
5    question, were aimed at understanding what the advertising
6    communicates, and I was trying to cover different facets of
7    communication.
8        And --
9        THE COURT:   I think what he's asking you is, have
10   you -- is that lifestyle question specific to the case at hand,
11   or is that a question that you've used in other surveys that
12   didn't have to do with gentlemen's clubs?
13       THE WITNESS:   Okay.  Well, that's -- and that's what
14   I asked him, I think.
15   BY MR. HEARN:
16   Q.   Yeah.
17   A.   I'm -- I have used lifestyle in other -- on other
18   research.  It's a very common term to use.
19   Q.   Is it your belief that there's an identifiable lifestyle
20   associated with gentlemen's clubs?
21   A.   I think that there's a difference in the lifestyle of
22   people that go to those clubs and people that don't go to those
23   clubs.
24       And I think that that's not relevant because what is
25   relevant is that people that go to these clubs understand that

1    it's part of their lifestyle to go to those clubs, just like if
2    I'm a baseball fan, it's part of my lifestyle to go watch a
3    baseball game.  And if I'm a football fan and I don't like
4    baseball, I go to football games, and that's part of my
5    lifestyle.
6              So is going to this club, you know, part of your
7    lifestyle, and does that woman, female model in the ad,
8    represent part of that lifestyle?  And everybody's saying, yes,
9    that is.
10             I don't really know what you're getting at --
11   Q.   Well --
12   A.   -- so I'm trying to help you.
13   Q.   What I'm trying to get at is the plaintiffs are concerned
14   in this particular case that the use of their image is being
15   associated with lifestyle, a lifestyle, to use your term --
16   A.   Yes.
17   Q.   -- that they are not comfortable with or would not choose
18   to be associated with if they were given the choice.
19   A.   That is correct.
20   Q.   Okay.  So I'm trying to understand what you think that
21   lifestyle is and whether it's something that's actually
22   definable.
23   A.   What I think it is is explained by the open-end data,
24   which, again, I'm repeating myself, is there.  It's evident
25   before they even know.

1    When they're saying, "I got aroused," "I feel horny,"

2    "The girls were this," or, "The girls were that," that's

3    depicting a lifestyle associated with sensuality and the

4    sensuality and the activities that go on at this club.

5    And if you meld that into the whole set of data that

6    we get that covers all of those communication issues from the

7    club, that gives you an impression of there's a lifestyle

8    association of going to these clubs.

9    I don't -- I don't know how you can refute that.  I

10   honestly don't.  It's self -- self-explanatory.

11   Q.   Is it a lifestyle that's defined essentially by, I guess,

12   people exploring their sensual desires or their physical

13   interests?

14   A.   Look at the verbatim comments that I've given you in my

15   report, and you will certainly see a lot alluding to that,

16   sometimes directly, sometimes indirectly.

17   Q.   Are there any other components of the lifestyle that you

18   think is associated with gentlemen's clubs that you want to

19   tell us about?

20   A.   It's not what I think.  It's what the data tells me and

21   what it shows me.

22   And if you look at the open-end data, that's where

23   the information comes from.

24   Q.   Okay.  Did you work on developing consumer surveys,

25   consumer marketing surveys, for cases similar to this that

1   involved clothing-optional clubs?

2   A.   You mean like nude --

3   Q.   Yeah, nudist resorts.

4   A.   No.  I've never worked in the field of nudity --

5   Q.   Okay.

6   A.   -- for anyone that did research there.  I don't know of

7   anyone that has done research there.

8   Q.   Okay.  I want to shift gears for a second, and I want to

9   ask you questions about the study sample that you sent your

10  survey to, okay?

11  A.   Yes.

12  Q.   The study sample was compiled by an entity called CINC, I

13  think you said.  Is that right?

14  A.   It's one of the largest sample houses in the United

15  States.

16  Q.   Okay.  And tell me a little bit about how they do that

17  again.  You kind of went over it, but -- well, let me back up.

18          I'll ask you some specific questions so we're not

19  here for too long.

20  A.   Okay.

21  Q.   You get in touch with CINC, and you tell them you're

22  getting ready to run a con- -- you know, a consumer study,

23  consumer survey --

24  A.   Uh-huh.

25  Q.   -- and that you need names from them for a particular

1  purpose, right?

2  A.    I give them a request to provide a representative sample

3  of a population which offers me certain demographic

4  characteristics.  They're very basic.  But they do not identify

5  the nature of the study for the screening questions.

6           They give me a representative sample of a population

7  based on what the census data closely reflected in the

8  metropolitan areas of Tampa, in this case, and Jacksonville.

9  Q.    So in this particular case, you would have just gone to

10  CINC and said, "I need X number of people, roughly half men,

11  half women, between the ages of . . ."

12  A.    21 and over.

13  Q.    21 and over.  21 and still alive --

14  A.    Yeah.

15  Q.    -- no matter how old they are.

16  A.    Yeah.

17  Q.    And that's what you would have asked CINC for.

18  A.    They provide me with that database, yes.  And they give

19  that to my -- to me, which I pass on to the field department.

20  It's just basically e-mail addresses.

21  Q.    Okay.  And once you get that database from CINC --

22  A.    Uh-huh.

23  Q.    -- do you send them -- do you send all of them the surveys

24  that you've prepared for potential responses, or do you --

25  A.    CINC doesn't do the survey.

1    Q.    Yeah.

2    A.    CINC is just a list house.  CINC sends me the data --

3    Q.    Correct.

4    A.    -- from their database house.  They sell -- in this case

5    they sell Internet addresses, which they've accumulated from a

6    number of different sources, but they're all current and

7    they're updated.  And they all -- they compare the information

8    to census data, and they can probably trim their sample so that

9    it always matches the census data.

10         And when I say, "I want a representative sample of

11   the population in Detroit," or Chicago or this or that or the

12   other place, they send me what, in effect, is census data for

13   that area.  But I can limit it because I don't want to get

14   people that I know are outside of my target group.  So I give

15   them the basic demographics, but I don't give them the

16   screening qualifications.

17         When I get that basic sample from them, which is

18   representative of my population, I give that to my field

19   department with my questionnaire.  And when they do the survey,

20   they take that whole list and they screen that people, and the

21   only people that get to be included in the survey are those

22   that pass the screening questions.

23         So that's how we know that we have a representative

24   sample of club patrons pulled from the general population.  And

25   those demographics that we end up with in our study define the

1    profile of people that go to the clubs.

2    Q.    Does the screening process with the database that you get

3    from CINC, the initial screening process -- is that part of

4    answering the survey that you do, or is there a step between

5    sending out the survey --

6    A.    We get --

7    Q.    -- getting the database and sending out the survey?

8    A.    We get the e-mail list from CINC, or from any other panel

9    or group, because that's the most cost-effective way to get a

10   good representative sample now --

11   Q.    Yeah.

12   A.    -- when they have that many millions of participants.

13          And we -- I give that to my field house and I say --

14   and I order enough names so that I know that we're going to be

15   able to complete our survey and get the number we want, number

16   of qualified people from it, because I have an idea of what the

17   incidence of qualification is going to be now because I've done

18   30 studies.

19          So I might want 10,000 basic names to begin with

20   of -- representative of this population of 21 and over, 50

21   percent male, 50 percent female.

22          And that's what I give to my field department along

23   with my questionnaire.  And then they screen, from that general

24   population sample, to get the target group, and that's how --

25   Q.    How do they do that?

1    A.    -- it works.

2    Q.    How do they do the screen?

3    A.    By administering those screening questions, which are

4    disguised so that the respondents don't know which one might or

5    might not qualify them to get into my research sample.

6    Q.    Are the screening questions part of the survey that you

7    prepare?

8    A.    Yes.  If you -- you have a copy of the questionnaire, and

9    if you have my complete report, it's one of the exhibits, which

10   is the questionnaire itself.

11   Q.    Yeah, yeah, I do, and that's why I'm -- that's why I'm so

12   interested in this line of questioning, because --

13   A.    Okay.

14   Q.    -- your testimony was that the survey includes screening

15   questions that are intended to identify strip club patrons,

16   right?

17   A.    Yes.

18   Q.    Okay.  The copy of the questionnaire that I have

19   supporting your report doesn't have any screening questions

20   like that.

21         You want to look at it?

22   A.    Yes.

23   Q.    Okay.

24         MR. HEARN:  May I approach, Your Honor?

25         THE COURT:  Yes.

1          MR. HEARN:  Okay.

2    BY MR. HEARN:

3    Q.   Look at a copy of that.  Take a look.  You can take a look

4    through it for a few minutes, then I'll take it back from you.

5    A.   Maybe . . .

6          MR. GOLASZEWSKI:  If we may just know what section of

7    the voluminous 1200-page report counsel is referring to.

8          THE WITNESS:  Oh, I see what you're saying.

9          MR. HEARN:  It was Exhibit 4, I believe.

10          THE COURT:  Tell you what.  Since it is so

11   voluminous, why don't -- why don't you show counsel what you're

12   looking at.

13          You can get it from the witness so you can make sure

14   he knows what . . .

15   BY MR. HEARN:

16   Q.   Take your time, Mr. Buncher.

17   A.   Yeah.  No.  You're correct.  That screening question is

18   not shown on this -- this version of the questionnaire, and

19   this is not an executable version that -- that was included.

20          What you should be seeing is the actual executable

21   version as it appeared to respondents, and that screening

22   question somehow got dropped from your copy.

23          And I apologize for that because that's misleading

24   you, but I can sit here and testify under oath that that

25   screening question was asked.

1    MR. HEARN:  Can we take a break and have a sidebar on

2  this, Your Honor?

3           THE COURT:  Sure.

4      (At sidebar, out of the hearing of the jury:)

5           MR. HEARN:  This that I'm holding in my hand, for the

6  record, is a copy of what purports to be the survey that he

7  relied on for purposes of developing his expert report,

8  Mr. Buncher.

9           It does not have those screening questions in there

10  at all.  If this is not the one that was actually set out, then

11  I need to see it, and I need to be given an opportunity to

12  cross-examine him on it.

13           If this is, in fact, what he sent out, great, I'll

14  cross-examine him on this.

15           THE COURT:  Counsel?

16           MR. HEARN:  I don't want to -- you know --

17           THE COURT:  I understand.

18           MR. HEARN:  -- I want to be fair.

19           MR. GOLASZEWSKI:  I understand counsel's position.

20  It's the first time, frankly, that it has been brought to our

21  attention.  I believe Mr. Buncher testified pretty clearly that

22  it did have a -- the question in it, but --

23           THE COURT:  Well, I know he did, but where's the

24  evidence of that?

25           MR. GOLASZEWSKI:  Right.

1      MR. HEARN:  He's done 30 of these things.  Maybe they

2  weren't in this one.

3      MR. GOLASZEWSKI:  Right.

4      THE COURT:  I mean, you would know.  You were

5  examining him, right?

6      MR. GOLASZEWSKI:  Right.

7      THE COURT:  You read his report.

8      MR. GOLASZEWSKI:  Of course.  I didn't notice that

9  either, candidly, Your Honor.

10     THE COURT:  Well, I don't know what to tell you, but,

11 I mean, if you can't -- if you can't -- I mean, I don't think

12 he can just say, "Well, I'm sure it was in there."

13     MR. GOLASZEWSKI:  Uh-huh.

14     THE COURT:  I would -- I mean, how were these -- I

15 mean, if this is the copy of the questionnaire that he attached

16 to his expert report, and it doesn't contain it, unless you can

17 tell me something different, I don't know how -- I don't know

18 how he can say that.

19     MR. GOLASZEWSKI:  Well --

20     MR. HEARN:  I'm giving you -- I'm being fair and

21 giving you an opportunity to put the right one in my hand.  But

22 I don't get it.  I'm going to -- it's -- it's fair game.

23     MR. CASAS:  Fair game to impeach him.

24     MR. HEARN:  Yeah.

25     MR. CASAS:  I think you've done a good job of that on

1    that issue.  It goes to weight, not admissibility.

2         THE COURT:  Well, we'll see about all that, but

3    anyway -- all right.

4         But I think you can ask him if he can produce -- I

5    mean, does he have any other questionnaire that he can show you

6    where it was asked, and if he can't then he can't and that's

7    the end of it.

8         MR. HEARN:  Thank you, Your Honor.

9       (End of discussion at sidebar.)

10   BY MR. HEARN:

11   Q.   Mr. Buncher, I just showed you a moment ago a copy of the

12   survey that was attached to your expert report in this

13   particular case.

14   A.   Yeah.

15   Q.   You had a moment to look through it, correct?  Is that

16   right?

17   A.   Yeah.  I think --

18   Q.   Do you have -- I'm sorry, but you're looking through

19   something right now.

20        Do you have -- are you looking at --

21   A.   It's another -- it's the same thing.  I was looking at the

22   copy that I had, and you're correct.

23        And I -- because this is two years old, I have to

24   correct my testimony because the -- in this situation -- what

25   I've been doing in more recent studies is including that in the

1    questionnaire copies.  And in this early study, the

2    specifications were given to CINC to screen out and deliver

3    that -- that sample because -- and that's what's explained

4    here, but it's not shown in this -- in this questionnaire.

5              So when I asked CINC for the sample, I included the

6    screening question, and they provided me with -- with that

7    sample, which had the screening question in it.

8    Q.   How am I to know that?

9    A.   You -- obviously you couldn't --

10   Q.   How am I to know --

11   A.   -- unless it was --

12             THE COURT:  Let me make sure I'm understanding.  Are

13   you saying the screening question is in a later version of your

14   surveys, but it was not --

15             THE WITNESS:  No.

16             THE COURT:  -- in this one?

17             THE WITNESS:  Your Honor, I'm saying that when I

18   requested the data from CINC, I said, "Deliver to me the

19   e-mails and have -- and screen -- do the screening for me," so

20   that I only get e-mails of the target group that I want.

21             Subsequent to that, I've been asking my database

22   companies to deliver to me the census data, and from that we

23   use the screening questions to get a profile of the sample.  So

24   in this case we had to use the -- we must have gotten that from

25   CINC.  They already provided the screened sample for me.

1        But there's no way that defendant -- that defendant

2   counsel would have known that.

3        THE COURT:  Okay.  Are you --

4        THE WITNESS:  Because I'm looking at the --

5        THE COURT:  Are you saying -- is there anything in

6   your report, sir, that shows that the screening question was

7   actually asked?

8        THE WITNESS:  (No response.)

9        THE COURT:  All right.  Well, I'll tell you what.

10   I'm going to let -- the answer right now is that the

11   questionnaire that was attached to your report does not include

12   that question.  If your lawyer wants to ask you some additional

13   questions, I'll let him do that.

14        But go ahead.  Finish up your exam, please.

15        MR. HEARN:  Thank you, Your Honor.  And I think I can

16   answer the Court's question with a couple of questions to

17   Mr. Buncher.

18   BY MR. HEARN:

19   Q.   Mr. Buncher, let me get you to look at page 6 of your

20   report.

21   A.   Yeah.

22   Q.   You've got a copy of it there, correct?

23   A.   (No response.)

24   Q.   Let me direct your attention to the first sentence under

25   the heading Study Sample, part C on page 6.

1      I'm going to read what that first sentence says.  It

2 says, "The study was completed with a random sample of

3 respondents in the Tampa and Jacksonville metropolitan areas,

4 ages 21 and over, with a 50 percent male/female split," period.

5      Correct?

6 A.   Uh-huh, yes.

7 Q.   That does not indicate that the sample that you received

8 from CINC was in any way tailored to strip club patrons,

9 correct?

10 A.   Correct.

11 Q.   Okay.  Does that refresh your recollection on whether CINC

12 actually tailored the sample to gentlemen's club patrons?

13 A.   No.  I'd have to go back and look at -- and contact CINC

14 to give you a definitive answer on that.

15 Q.   So they might have; they might not have.

16      Where -- where are we on this issue?

17 A.   Um . . .

18 Q.   It looks to me from your report as though CINC did nothing

19 to try to tailor its study sample to gentlemen's club patrons.

20      Would you agree with me --

21 A.   Yes.

22 Q.   -- that your report does not --

23 A.   My report looks --

24 Q.   -- reflect that?

25 A.   -- that way.  Yes, I do.

1   Q.   And there's nothing in the survey that would reflect that

2   it did anything to try to screen out or to focus the

3   respondents that you relied on from a group of gentlemen's club

4   patrons.  Is that right?

5   A.   That's correct.

6   Q.   Okay.  When you got the database that you used from CINC,

7   did you use it for studies in cases other than this one?

8   A.   No.

9   Q.   Just to wrap up on the demographics issue, there are three

10  questions in the questionnaire, as I understand it, that are

11  designed to delineate or define the parameters of the study

12  sample, Question A which asks for the age --

13  A.   Correct.

14  Q.   -- of the respondent.

15  A.   Correct.

16  Q.   Okay.  Question B, which asks for the gender of the

17  respondent.

18  A.   Correct.

19  Q.   And Question C, which asks for which metropolitan area in

20  Florida the respondent lives.

21  A.   Correct.

22  Q.   And that's it.  Is --

23  A.   Correct.

24  Q.   -- that right?  Okay.

25          So would you agree with me that there's nothing about

1  the survey that you conducted that was designed to receive

2  responses from people who were likely patrons of gentlemen's

3  clubs?

4  A.   At this point, correct.

5  Q.   It's just a catchall.  It was a huge net.  That was it.

6        Okay.  Now, let me ask you some questions about the

7  people that actually responded --

8  A.   Yes.

9  Q.   -- to the survey.

10        You had 301 people respond.

11  A.   Yes.

12  Q.   Of the 301 people that responded, you did get a roughly

13  50/50 split between men and women.

14  A.   Yes.

15  Q.   Okay.  Now, I know you said on direct testimony that

16  you -- it was your understanding that you had some kind of

17  reason for asking for 50 percent men and 50 percent women from

18  CINC.  Is that right?

19  A.   Yes.

20  Q.   And that's because you had some belief that women and men

21  both attend gentlemen's clubs.  Is that right?

22  A.   That's correct.

23  Q.   Do you have any information that would suggest that women

24  attend gentlemen's clubs with the same frequency as men do?

25  A.   No.

1  Q.   So 50/50's probably not a very good split if you're really

2  trying to target the demographic of people who attend

3  gentlemen's clubs.

4  A.   No, that -- you're misrepresenting what the 50/50 split is

5  intended to do.  It's enabling us to see if there's any

6  difference between what is communicated by -- to men and to

7  women when they look at the ad.  It's not representative of

8  the -- it's not intended to do the profile.

9  Q.   Why is that important, if you're testing consumer

10  confusion?  Why does the way men respond versus the way women

11  respond -- what does that have to do with consumer confusion?

12  A.   It's basically to confirm whether it communicates any

13  differently to males or females, and it doesn't.

14  Q.   Now, you had some data -- you explained to the jury that

15  you got data back on some basic demographic information

16  relating to the people that responded, like their age and their

17  gender, right?

18  A.   Yes.

19  Q.   So we just talked about 50 percent men, 50 percent women.

20  A.   Uh-huh.

21  Q.   As you sit here today, do you remember that the largest

22  age group responding to the survey reported themselves as being

23  between the ages of 50 and 64?  That was the single largest age

24  group that --

25  A.   I don't have the --

1  Q.    -- responded to the survey.

2  A.    -- whole report in front of me.

3  Q.    Does that sound about right?

4  A.    I don't have the whole report in front of me to recall.

5  Q.    Any reason to think I'm wrong about that?

6  A.    I can't comment until I look at my report.  It's two years

7  ago.

8  Q.    Okay.  So there were 301 people, according to the data

9  that you appended to your report.  We can show you if you want

10  to take a look.

11        102 people -- of the 301 people that responded, 102

12  were between the ages of 50 and 64.  Does that sound right?

13  A.    Again, I can't testify to something that I can't recall.

14  Q.    The average -- according to the data that was attached to

15  your report, the average age of the people responding from that

16  age group, from the 50 to 64 age group, was 58.

17        Do you have any data or any information that would

18  suggest that 58-year-old people are representative of strip

19  club patronage, especially, specifically, with regard to the

20  two defendant clubs?

21  A.    No.

22  Q.    The second largest group, according to the data that was

23  attached to your complaint [verbatim], were 65 and over.  Of

24  the 301 people that you got to respond to the complaint, 67

25  self-reported as being at least 65 years old.

1           Does that sound right?

2   A.    No.

3   Q.    That doesn't sound right?

4   A.    Again, I don't -- I don't have the data in front of me to

5   look at.

6   Q.    But no reason to think I'm wrong.  I mean, I'm -- nothing

7   that would suggest that I'm misrepresenting your data to you.

8           MR. GOLASZEWSKI:  Your Honor, if I may.  Due respect,

9   I don't want to get into testimony from counsel here.  If he'd

10  like to show Mr. Buncher his survey in order to confirm certain

11  percentages and demographics, he can do so.

12          THE COURT:  You don't have your report with you, sir?

13          THE WITNESS:  No.  I don't have the complete report

14  with me, Judge.

15          MR. HEARN:  Traveling light.

16          THE WITNESS:  I may have it.

17      (Brief pause.)

18          THE WITNESS:  No, I don't have it.

19          MR. HEARN:  Oh, I'm sorry.  I forgot to ask, Your

20  Honor.  May I approach --

21          THE COURT:  Yeah, that's fine.

22          MR. HEARN:  -- to give him Exhibit 5 to his report?

23  Excuse me.

24  BY MR. HEARN:

25  Q.    Let me get you to look at the document that I just handed

1    you, Mr. Buncher.

2         Is that the tabulated data that you got back relating

3    to the responses to your expert witness report?

4    A.    Yes.  It looks like it is.

5    Q.    Okay.

6    A.    It's 20.6 percent 21 to 35; 23 percent 36 to 49; 33

7    percent 30 to 54; 22 percent 65 and over.

8    Q.    Okay.  And the average age of the respondent from the

9    group that fell into the 65 and older category was 72.5.  Is

10   that right?

11   A.    The mean average age is 51, yes.

12   Q.    Okay.

13   A.    Middle -- middle was 52.

14   Q.    Overall.

15   A.    Yeah.

16   Q.    Now, I'm focusing for a second on the 65-and-over age

17   group, of which 67 -- of which there were 67 respondents.

18        In that group, the average age of the respondent was

19   72.5.  Is that right?

20   A.    Uh-huh.

21   Q.    So in the 65-and-over group, the average age was 72.5.

22   A.    That's the cumulative number.  That's, you know, if you

23   add . . .

24        43, 60 -- the percentages that you go by in analyzing

25   the data are the percentages of the people in each of the age

1    categories, which I just read out.

2            So, again, the table reads 20.6 percent of the people

3    that responded were 21 to 35; 23 percent were 34 to 49.  That's

4    a -- cumulative would be forty -- 43 percent of the sample were

5    49 or younger.  And then 33 percent were 50 to 64 and another

6    22 percent were 65 and over.  So those cumulations would be 52

7    percent.

8            So with the error factor built in to the data, plus

9    or minus 5 percent, you're looking at basically 50 percent were

10   under 49 and 50 percent were over.

11   Q.   Okay.  Would you agree with me that that data doesn't

12   reflect that there was really any screening to tailor the

13   survey respondents to likely gentlemen's clubs?

14   A.   Do you have data to support that it doesn't?

15   Q.   I'm asking you.

16   A.   I'm --

17   Q.   I get to ask the questions.

18   A.   I don't have the data to support what you're saying.  I

19   only have the data --

20   Q.   Okay.

21   A.   -- that was collected from the sample.

22   Q.   It's true that you didn't make any effort to try to

23   identify a control group in this particular case to which you

24   would compare the results that you got in response to your

25   survey.  Is that right?

1    A.    That is correct, according -- that is correct, as far as

2    it goes, yeah, your question goes.

3    Q.    Okay.

4    A.    Communication studies don't call for a control group,

5    which is consistent with the -- the standard set for the court

6    in Diamond's Reference Guide.

7    Q.    If you had made an effort -- well, if you were able to

8    identify a control group and test the results that you got in

9    response to your survey against the control group, that would

10   have helped the accuracy --

11   A.    It's not possible.  What you're saying is impossible, and

12   it's not called for in a communication study, and it's not

13   consistent with the court standards to evaluate this kind of

14   research.

15          A control group would not be possible because you

16   can't measure the role of a model in a study if you take the

17   model out of the study.

18          If you go by what the court standard is, it's to ask

19   a control question, which is the only thing that's possible

20   when you have a communication study.  And the control question

21   in this study was "If you took the model out, what does the ad

22   communicate?"  And that's a control question.

23          But you can't have a control group because a control

24   group would never see the stimulus that you're measuring, which

25   was the model.

1  Q.   I think we're talking past each other a little bit, and I

2  was worried about that.

3          When I say -- when I say a control group, what I mean

4  is that you didn't make any effort to take a small group of

5  individuals that we knew for a fact had been patrons of a

6  gentlemen's club, or even a more specific form of control group

7  would be a group of people that we knew had been patrons of one

8  of the defendant clubs, gotten them to respond to the survey,

9  and then compared their results to the results that you got in

10 response to the --

11 A.   I'm --

12 Q.   -- random survey that you did.

13 A.   I'm confused as to what you're calling the control group.

14 Q.   Well, that's how I'm referring to it, so let's just use my

15 definition for the purpose of today.

16          You didn't make any effort to do that.  It's just a

17 simple yes or no question.

18 A.   I don't understand what you're asking me, so I can't --

19 Q.   Did you -- did you try to -- did you try to establish or

20 comprise a group of people that you knew had been to one of the

21 defendants' gentlemen's clubs, give them the survey to

22 establish sort of baseline or control result to compare your

23 results to, to test the potential accuracy of your survey

24 results?

25 A.   That would not be feasible because we didn't have access

1  to any search which would provide us with that -- with that

2  data.

3  Q.    That didn't happen.  That's my only question.

4  A.    We asked -- we asked for that information.  It wasn't

5  given to us.

6  Q.    You had hundreds and hundreds of e-mails, right?

7  A.    That were no good to use, as I've explained.

8  Q.    You've testified -- you've explained a little bit about

9  the number of cases that you're working on that are similar to

10  the one that brings you here today, right?

11  A.    That's correct.

12  Q.    How many of the cases that you're working on that are

13  similar to the one you have here today are with plaintiffs'

14  counsel in this case?

15  A.    That would be reflected in my report.  As of this case,

16  with the number of -- oh, no, it wouldn't -- I'm sorry --

17  because it's postdated.

18        Offhand, I would say a dozen.  I really can't tell

19  you.  I can -- I know who some of the other counsels are, and

20  how many each one of them has done is not at the top of my

21  head.

22  Q.    How many do you -- do you think you're working for

23  Mr. Casas's firm?

24  A.    I'm -- I'm remembering the names of the different

25  contracts that I have with the different law firms, and I would

1    say this is maybe a third of the cases.

2    Q.    Which translates to roughly how many?

3    A.    10, 12, something like that.

4    Q.    And you came here from California, correct?

5    A.    Yes.

6    Q.    Okay.  Can you tell us how you're being compensated for

7    coming here today?  Are you being paid a daily rate?  Are you

8    being paid by the hour?

9    A.    There's a fixed price for the research end of it, and then

10   there's the letter of engagement for my testimony --

11   Q.    And --

12   A.    -- and that -- and that's a -- that's a different

13   contract.

14   Q.    Okay.  And the testimonial part is what's controlling --

15   A.    Yeah.  Consultant is one -- one letter of engagement, and

16   then the research is a fixed price.

17   Q.    So putting aside the research, how much are you being

18   paid -- are you being paid by the hour to be here today?

19   A.    That's -- in my report, my fee is a thousand dollars an

20   hour for court testimony.

21   Q.    And that's how much you're being paid here?

22   A.    With a cap of 8,000 a day.

23           MR. HEARN:  All right.  I don't have any other

24   questions.

25           THE COURT:  Redirect?

```
1          MR. HEARN:  Thank you for your time.
2          MR. GOLASZEWSKI:  Thank you, Judge.
3          THE COURT:  Ladies and gentlemen, if you would
4    indulge us, I'd really like to complete this witness.  I'm sure
5    that this will not be very long.
6          MR. GOLASZEWSKI:  It will not, Judge.
7                        REDIRECT EXAMINATION
8    BY MR. GOLASZEWSKI:
9    Q.   Mr. Buncher, would you turn to the first page of your
10   report, please, that is, the cover page.
11   A.   Yes, sir.
12   Q.   And it's dated April the 28th, 2017.  Is that accurate?
13   A.   Yes.
14   Q.   Okay.  And I'm going to spare the jury, and I'm not going
15   to read them, but you can see four separate captions on that
16   page.  Is that correct?
17   A.   Yes.
18   Q.   Was it your understanding at the time, April 28th, 2017,
19   that there were four separate cases that had been consolidated
20   into one case in this action?
21   A.   Yes.
22   Q.   Okay.  Do you have an understanding as of today, yes or
23   no, whether those four defendants are still in this action?
24   A.   I understand that most of them are not.
25   Q.   Okay.  Do you have an understanding as to how many
```

1  defendants are left as of today?

2  A.   Two.

3  Q.   Okay.   Thank you.

4         I take your testimony concerning your screening

5  question with CINT -- the jury has heard it.

6         My question is, are you aware of any rule that says

7  that a survey of strip club misappropriation has to be directed

8  at strip club patrons?

9  A.   No.

10  Q.   Okay.

11  A.   A communication study is based on what any particular

12  stimulus communicates to anybody.

13  Q.   Thank you.

14         Again, I don't want to belabor the point, but the

15  reason, if you could explain once again, why you used --

16  decided on two as opposed to ten separate advertisements for

17  this study, if you could explain it, please.

18  A.   You mean four -- well, four versus ten.

19  Q.   Correct.   Let's be clear --

20  A.   Again, it's standard procedure in many marketing research

21  designs to use a representative sample of both the respondents

22  and the stimuli, because nobody has the time and money and

23  feasibility to conduct a study like that because you can't hold

24  respondents' attention that long.

25  Q.   Turn to page 9 of your survey, please.

1  A.    Okay.

2  Q.    You found that, quote -- three paragraphs from the

3  bottom -- "91 percent of the sample felt the models used in the

4  material had agreed to be in the advertising."

5        Is that your finding?

6  A.    Yes.

7  Q.    Next paragraph, "74 percent of the sample felt the models

8  had agreed to promote the clubs."

9        Was that your finding?

10       MR. HEARN:  Objection, Your Honor.  It's leading, and

11 it's asked and answered.  We're starting to retread at 5:10.

12       THE COURT:  I'll let him ask two more questions or

13 whatever and let's go.

14       MR. GOLASZEWSKI:  Thank you, Judge.

15 BY MR. GOLASZEWSKI:

16 Q.    You can answer, sir.

17 A.    Sorry?

18 Q.    My question --

19 A.    Yes.

20 Q.    -- is "74 percent of the sample felt the models had agreed

21 to" --

22 A.    Yes.

23 Q.    -- "promote the club," correct?

24 A.    Yes.

25 Q.    To the extent that this survey was directed only at

1    residents of the Jacksonville or Tampa area as opposed to strip

2    club attendees in the Jacksonville and Tampa area, do those

3    numbers change at all?

4    A.    No.    There's no reason to believe that the communication

5    would change to anybody seeing these ads because the people

6    that don't go to these clubs have an impression of the

7    lifestyle that goes on at those clubs versus the people that

8    do.

9    Q.    Thank you.

10            MR. GOLASZEWSKI:   One moment, Your Honor?

11            THE COURT:   Yeah.

12   BY MR. GOLASZEWSKI:

13   Q.    If you could, explain generally to the jury what a control

14   group is.

15   A.    The control group has to be identical to a test group in

16   every sense of the word, meaning the demographics match and the

17   behavioral attributes match and all other characteristics of

18   the two groups are the same.

19            So if I were to take you as a jury and split you in

20   half, I'd have to have equal men and equal women, equal

21   proportions of age, and so forth and so on, anything that was

22   relevant to the stimulus.

23            For a control -- the other part of the control group

24   is that the stimulus has to be there for one group but not

25   there for another group.   And that's done when we have a causal

1    study where we want to approve the -- where we want to prove

2    the effect of the stimulus, in this case what a stimulus would

3    communicate.

4            Then in our study, and consistent with the court

5    standards, you can't have a control group in a communication

6    study because when the stimulus, in this case the model, is not

7    present, how can you tell me what the model communicates?

8            I have to ask the same questions to both the test

9    group and the control group, and it would not make sense to ask

10   you, "Look at this ad and tell me what the model communicates,"

11   but there's no model in the ad.

12           So what the comeback is, and it's consistent with

13   this -- this court standard which exists, which is -- I know

14   about it but obviously the laypeople don't, is that you ask a

15   control question.

16           So I've shown the test group the ads.  Now I take the

17   model out of the thing and say, "What do you see is the

18   difference in terms of what is communicated when the model's

19   not there?"  And that's how I can determine the difference in

20   terms of what the model communicates and doesn't communicate,

21   not with a control group, but with the same test group, just

22   taking the stimulus out and asking the same question twice.

23   Q.   Mr. Buncher, did you consider using a control group in

24   this study, regarding this lawsuit that we're here today for?

25   A.   Did I consider using it?

1    Q.    Yes.

2    A.    Well, you consider everything when you look at the study,

3    and when I find out what it is, it's -- I see that it's

4    obviously impossible and not appropriate to use it and would be

5    inconsistent with the standards set.

6    Q.    Thank you.

7          And in your opinion, it would be inappropriate to use

8    a control group in this study.  Is that accurate?

9    A.    That's correct.

10         MR. GOLASZEWSKI:  Okay.  I have no further questions,

11   Your Honor.

12         THE COURT:  Anything else?

13         MR. HEARN:  Nothing from me, Your Honor.

14         THE COURT:  All right.  I do have one question.

15   Here's another one.

16         I think juror No. 4, this was your question as well?

17         A JUROR:  Yes.

18         THE COURT:  And I think that was answered earlier,

19   about which ads were used for the representative sample.

20         Have you had that question answered?

21         A JUROR:  Yes, Your Honor --

22         THE COURT:  Okay.

23         A JUROR: -- but I had a couple of follow-up

24   questions.

25         THE COURT:  Okay.  That's fine.

1          (Brief pause.)

2               THE COURT:  All right.  Let me see counsel, and

3     I'll . . .

4          (At sidebar, out of the hearing of the jury:)

5               THE COURT:  The first question is, "Can we briefly

6     redisplay the two representative ads pertinent to this case?"

7     and I think I'll allow you to put that up.

8               MR. GOLASZEWSKI:  No objection from the plaintiffs.

9               MR. HEARN:  No objection.

10              THE COURT:  "When listed person's e-mails were

11    determined to be bad, how were those e-mail addresses

12    determined to be nonusable?"

13              He wants me to ask the expert that.  I think that's a

14    perfectly fair question.

15              MR. GOLASZEWSKI:  No objection from plaintiffs.

16    That's fine.

17              THE COURT:  All right.

18         (End of discussion at sidebar.)

19              THE COURT:  So counsel's going to get ready -- there

20    were two questions.  One was to redisplay the representative

21    ads that the expert used in his survey in this case.  Counsel's

22    going to get that done in a moment.

23              But I'll go ahead and ask the second question while

24    we're waiting to get that put up on the screen, and make sure

25    y'all are in accord.

1          Sir, the question is, "When the list of persons" --

2    "When the list of the patron e-mails were determined to be bad,

3    how were those e-mail addresses determined to be nonusable?"

4    What's the --

5          THE WITNESS:  Okay.  It was addressed to -- to be

6    more explicit, they gave us a list of -- I don't know how many

7    hundreds of names it was.  Defendant counsel might tell us

8    that.  And the first thing we have to do is what we call clean

9    the list.

10         So I give it to my list people, and they go through

11   it, and it's very tedious.  They have to eliminate

12   duplications.  And we found that an e-mail name appeared many,

13   many times in that list, so we have to take it out so that it

14   would only appear once.

15         And then as we start to look at and try and send out

16   e-mails -- we take a sample of maybe 500 or something like that

17   or a thousand, and we send them out -- we find out that a large

18   percentage of them don't exist, for whatever reason.  They were

19   misspelled.  They were made up by whoever provided the e-mail

20   to the club and so on.

21         So we have the quality of the list that they provide

22   us was bad because the numbers shrink, and we know that we're

23   not getting reliable information from whatever source they got,

24   which then begs the question of how did they ask people for

25   this information.  When did they ask it, because if they

1   were -- you know, how many years back does it go?  We didn't

2   know that.  They didn't tell us that.

3           Where were they located?  Were they visitors?  Were

4   they just on the Internet?  Were they cruising?  Were they

5   anywhere near the clubs?  Was it realistic to say that?

6           And it just -- I want to know what my sample is when

7   I do research, and that's why I want to go to a list house that

8   can provide me with quality information, quality lists, and a

9   reputable one, and I only use the best ones.

10           And that's why we disposed of the list.  We tried to

11   use it, but it just generated so many problems and fell apart

12   in so many different ways that we could not trust it, and I

13   could not, in good faith, use it to do research and testify

14   that I had confidence in the fact that I had a valid and

15   reliable sample to work with.

16           THE COURT:  Thank you, sir.

17           Any questions, Counsel, very briefly, based on the

18   response?

19           MR. GOLASZEWSKI:  Nothing from plaintiffs, Judge.

20           MR. HEARN:  I do have the list of e-mails, Your

21   Honor, if it's something that would be pertinent to the jurors'

22   consideration.

23           THE COURT:  Well, I'll tell you what.  We can have

24   that discussion outside -- we don't need -- we don't need

25   Mr. Buncher to be here for that.

1          Do you have any question on follow-up to what he just

2   said?  We can have the discussion about that outside the

3   presence of the jury, okay?

4          MR. HEARN:  Yes.  Yes on this and no on further

5   questions.

6          THE COURT:  Okay.  All right.

7          So I think that covers the questions, and now we're

8   going to put up -- Ms. Diaz -- put up the two -- the question

9   was, "Which ads were used" -- "Which ads were used to the

10  representative sample?"

11         Are these -- these are ones that are in evidence.  Is

12  that right?

13         MR. LIROT:  Yes, sir.

14         THE COURT:  All right.

15         COURTROOM DEPUTY:  It's not, Judge.

16         THE COURT:  All right.  Well, let me understand what

17  we're doing here.  Let me understand what we're doing here.

18         MR. LIROT:  All right.  Judge --

19         THE COURT:  So there were four used, right?

20         MR. GOLASZEWSKI:  Correct.

21         THE COURT:  There were four, correct?

22         Two of them are in the cases that are not before us.

23         MR. GOLASZEWSKI:  Correct.

24         THE COURT:  Two of them are models, plaintiffs, that

25  are before us.  Is that correct?

1          MR. LIROT:  That is correct.

2          THE COURT:  Okay.

3          MR. GOLASZEWSKI:  Your Honor, if I may, I think the

4    confusion is one of the images in the survey was that of

5    Ms. Posada.  Ms. Posada's testimony has not been given yet.

6    Her actual advertisement containing her has not been admitted

7    into evidence, so I believe that's where the confusion is.

8          MR. LIROT:  Exactly correct.

9          THE COURT:  Okay.  All right.  Well, but those were

10   the ones he used, correct?

11         MR. GOLASZEWSKI:  And we have no objection --

12         THE COURT:  All right.

13         MR. GOLASZEWSKI:  -- to the extent they get

14   published --

15         THE COURT:  Okay.

16         MR. GOLASZEWSKI:  -- with the understanding they'll

17   come in.

18         MR. HEARN:  I apologize for lending to that

19   confusion.  Being out this afternoon, I --

20         THE COURT:  Okay.  Okay.  All right.

21         So you're putting up -- which ones are you putting

22   up, the two that are still in this case --

23         MR. LIROT:  The two for these clubs in this case.

24         THE COURT:  Okay.

25         Is that clear enough, ladies and gentlemen?

1          (Affirmative response.)

2                    THE COURT:  Sorry about that.  Okay.  All right.

3                    All right.  That's one.  Go ahead.

4                    That's two.

5                    And you're saying the first woman is -- we have not

6      heard from yet.

7                    MR. LIROT:  That's the last videotape deposition,

8      Your Honor.

9                    THE COURT:  Okay.  So we'll hear from her later.

10                    All right.  Has everybody got that?

11          (Affirmative response.)

12                    THE COURT:  Okay.  All right.  I'm going to send

13      y'all home for the day.  Thank you for indulging us, but I

14      really wanted to go ahead and get that done so we didn't have

15      to hold over.

16                    So -- all right.  We're going to go back tomorrow --

17      because I've got to attend to a matter in the morning, we'll go

18      back to having you here at 9:15.  So if you're here at 9:15,

19      we'll get you out here at 9:30.

20                    Please remember all my instructions.  Just forget

21      about the case.  Don't do anything.  We'll see you back here at

22      9:15 tomorrow.

23                    Thank you, ladies and gentlemen.

24                    COURT SECURITY OFFICER:  All rise for the jury.

25                    THE COURT:  You may step down, sir.  Thank you.

1            THE WITNESS:  Thank you, Your Honor.

2        (Witness excused.)

3                         *   *   *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA   )

6

7             I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11            DATED this 13th day of August, 2019.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25