UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PAOLA CANAS, LINA POSADA,
JESSICA BURCIAGA, JAIME
EDMONDSON, and ROSIE JONES,

     Plaintiffs,

v.                                                       Case No.: 3:16-cv-00393-TJC-JRK

FLASH DANCERS, INC. d/b/a
FLASH DANCERS, and MICHAEL
TOMKOVICH,

     Defendants,

_____/

BROOKE TAYLOR a/k/a BROOKE
JOHNSON, LAURIE ANN YOUNG,
MALU LUND, SARA UNDERWOOD,
and JAMIE EASON a/k/a JAIME
MIDDLETON,

     Plaintiffs,

v.                                                       Case No.: 3:16-cv-00394-TJC-JRK

M.T. PRODUCTIONS IN JACKSONVILLE,
INC., d/b/a THEE OFFICERS CLUB,
and MICHAEL TOMKOVICH,

     Defendants,

_____/

**DEFENDANTS FLASH DANCERS, INC.
AND M.T. PRODUCTIONS IN JACKSONVILE, INC.'S
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

     Defendants, Flash Dancers, Inc. ("Flash Dancers") and M.T. Productions in Jacksonville,

Inc. (the "Officers Club", collectively "Defendants"), pursuant to Fed. R. Civ. P. 50(b), move for

judgment as a matter of law on all of Plaintiffs' claims based on alleged violations of the

Lanham Act (Counts I (False Advertising) and II (False Endorsement), Second Amended and

Consolidated Complaint (Doc. 30)).  The proof at trial failed to establish sufficient evidentiary

basis that would allow a reasonable jury to find for any Plaintiff on the merits of Counts I and II.

Flash Dancers further moves for judgment as a matter of law as to all claims of Lina Posada asserted against it, and the Officers Club moves for judgment as a matter of law as to all claims of Laurie Ann Young asserted against it (Counts I-IV and VII) because the proof at trial failed to establish a sufficient evidentiary basis that would allow a reasonable jury to find that Defendants were vicariously liable for any actionable misuse of Plaintiffs Posada and Young's images by non-party Shawn Hopper, whether under federal or Florida law. The specific grounds supporting this motion are set forth in the incorporated Memorandum of Law.[1]

## MEMORANUDM OF LAW

### I.  INTRODUCTION

The primary takeaway from the trial of this matter is that Plaintiffs do not have actionable Lanham Act claims, notwithstanding the jury's award of nominal damages under the Act. These claims were a stretch from the beginning, propped up by unsound expert testimony and likely made only to set up arguments for enhanced damages, such as disgorgement of profits (which failed), and for attorneys' fees (now requested in an amount far exceeding Plaintiffs' damages). At its core, this matter is a low-dollar, state-law image misappropriation cases. Several identical Lanham Act cases, brought by the same Plaintiffs and based on the same shoddy expert testimony, have failed *on summary judgment* in various federal district courts, including this one, because it was manifest before trial that Plaintiffs could not prove the consumer deception that lies at the heart of both Plaintiffs' Lanham Act theories.[2] After a six-day trial in this case, the lack of consumer confusion and deception evidence is even more apparent.

---

[1]     To the extent required by the Court's ruling on this motion, Defendants further move for modification of the relevant judgments pursuant to Fed. R. Civ. P. 59(e).

[2]     *See, e.g., Edmondson v. 2001Live*, Case No. 8:16-cv-03243-T-17AEP, 2019 U.S. Dist. LEXIS 41028 (M.D. Fla. Jan. 15, 2019); *see also Toth v. 59 Murray Enters.*, 2019 U.S. Dist. LEXIS 1355 (S.D.N.Y. Jan. 3, 2019); *Gibson v. SCE Grp., Inc.*, No. 15 Civ. 08168 (ER), 2019 U.S. Dist. LEXIS 119325 (S.D.N.Y. July 17, 2019).

In this case, there was no evidence that even one likely consumer of Defendants' products saw, and was actually confused or mislead by, Defendants' use of Plaintiffs' images. Not one. There was no evidence that a single person made a buying decision, or actually believed that Plaintiffs would appear at or had endorsed Defendants' gentlemen's clubs, due to Defendants' use of Plaintiffs' images. With no evidence of actual consumer confusion or deception, Plaintiffs turned to their oft-used expert Martin Buncher to fill the hole with survey evidence of likely consumer confusion.

On direct, Buncher's testimony regarding the survey he administered bore no factual relationship to the substance of his study or the way in which it was conducted in several critical respects. In order to bolster the validity of his survey, Buncher repeatedly hammered home on direct that he screened his survey respondents in order to obtain results only from people who had been to strip clubs in the past two years. On cross examination, however, he admitted that he had not, in fact, done any such screening and that the survey respondents were simply 301 random people from Tampa and Jacksonville, half men and half women, with an average age of over 50—hardly the demographic of typical gentlemen's club patrons.

Consequently, because the survey was not tailored to gentlemen's club clients, survey questions based on respondents having been to a club became completely illegitimate. Moreover, Buncher admitted that his survey did not test seven of the nine images at issue in this case for consumer confusion and that he had no facts or data that allowed him to apply the survey results for the images he tested to those he did not.

In the end, not only was the methodology of Buncher's survey proven completely unsound, but his credibility as a witness was so damaged by his repeated misrepresentations to the jury on foundational issue that his opinions should be give no credence.

Further, Plaintiffs failed to bring forth any evidence that Defendants acted in bad faith when using Plaintiffs' images on their Facebook pages. That is, there was no evidence that Defendants intended to leverage Plaintiffs' goodwill. In fact, there is no evidence that anyone involved in the use of Plaintiffs' images had any idea who Plaintiffs were or that they possibly had a valuable brand to exploit. Of course, this is consistent with the lack of evidence of the strength of Plaintiffs' respective marks. These evidentiary omissions further undermine Plaintiffs' false endorsement claims.

Likewise, the claims asserted by Plaintiffs Posada and Young fail in their entirety because they did not bring forth sufficient evidence establishing that non-party Shawn Hopper was acting as Defendants' agent when he created and posted advertisements for two Superbowl parties at Defendants' clubs featuring their images. Based on the trial evidence, there is no dispute that Hopper was the active infringer of Posada and Young's marks, and there is no question that he was acting as independent contractor with virtually no oversight by Defendants when he created and posted the relevant advertisements in which these two Plaintiffs appeared.

## II.   ARGUMENT

### A.  Standard for assessing motions for judgment as a matter of law after trial.

Federal Rule of Civil Procedure 50 allows a district court to enter judgment against a party as a matter of law after she "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a)(1). Parties who make a timely motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(2) which is not granted at trial may renew the motion under Rule 50(b) after a verdict is returned and a judgment is entered. *Id.* R. 50(b).

The United States Court of Appeals for the Eleventh Circuit has frequently explained the standard district courts are to apply in assessing motions under Rule 50:

> The standard for judgment as a matter of law mirrors that of summary judgment in that the non-movant must do more than raise some doubt as to the existence of facts but must produce evidence that would be sufficient to require submission of the issue to a jury. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Although we look at the evidence in the light most favorable to the non-moving party, "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). Therefore, *a substantial conflict in the evidence is required before a matter will be sent to the jury*, and the grant of a Rule 50 motion is proper when the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law. *Id.*

*Thorne v. All Restoration Servs.*, 448 F.3d 1264, 1266 (11th Cir. 2006) (emphasis added).

### B.  Why judgment is appropriate for Defendants on Plaintiffs' Lanham Act claims.

Plaintiffs all attempted to prove at trial that Defendants violated the Lanham Act's prohibitions against false advertising and false endorsement by using their images on Defendants' Facebook page. Both claims arise under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a) (2018)), and both theories of liability rely on the same or related proof, particularly as asserted in this case. Although many evidentiary shortcomings existed in Plaintiffs' trial case, Plaintiffs' proof was most glaring deficient with regard to consumer confusion or deception, which Plaintiffs must show to satisfy multiple elements of both of their Lanham Act claims.

### 1.  Plaintiffs' false advertising claims fail on several elements of proof.

To prove a false advertising claim under the Lanham Act, "a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and

(5) the [plaintiff] has been—or is likely to be—injured as a result of the false advertising."

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Johnson &*

*Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

> a. *Martin Buncher's testimony is insufficient evidence that the relevant advertisements were misleading.*

With regard to the first element of their false advertising claims, Plaintiffs proceeded at

trial on a theory that Defendants' use of their images was misleading, as opposed to literally

false. (Renewed Joint Pretrial Statement (Doc. 70), at p. 3) ("Defendants' conduct is therefore

misleading and deceptive . . . .").[3]  By attempting to prove that Defendants' advertisements were

misleading, Plaintiffs *had* "to present evidence of deception in the form of consumer surveys,

market research, expert testimony, or other evidence." *Hickson Corp.*, 357 F.3d at 1261 (citing *1-*

*800 Contacts*, 299 F.3d at 1247). "Consumer survey research often is a key part of a Lanham Act

claim alleging that an advertisement is misleading or deceptive." *Id.* (citing *Johnson & Johnson*

*v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("The success of a plaintiff's

implied falsity claim usually turns on the persuasiveness of a consumer survey.")); *accord*

*Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *14 (citing *Suntree Techs., Inc. v. Ecosense Int'l,*

*Inc.*, 802 F. Supp. 2d 1273, 1288 (M.D. Fla. 2011)).

---

[3]   As this Court has explained in a related case:

> In considering nearly identical Lanham Act claims by entertainers against various entertainment industry entities, multiple courts, including this one, have ruled that the unauthorized use of a photograph is not a literally false statement, even if the image has been altered. *Gibson v. BTS N., Inc.*, 2018 U.S. Dist. LEXIS 24132 (S.D. Fla. Feb. 14, 2018) (citing *Edmonson v. Velvet Lifestyles, L.L.C.*, CASE NO. 15-24442-CIV-LENARD/GOODMAN, 2017 U.S. Dist. LEXIS 219419 (S.D. Fla. July 28, 2017) ("[T]he Court has found no authority (and Plaintiffs have cited none) holding that the unauthorized use of a photograph to advertise a product or business constitutes a 'literally false' advertisement.");*Gibson v. Resort at Paradise Lakes, L.L.C.*, No. Case No: 8:16-cv-791-T-36AAS, 2018 U.S. Dist. LEXIS 80471 (M.D. Fla. Feb. 2, 2018) ("The images are not literally false just because the Defendants slightly altered the Plaintiffs' photographs to include them in the advertisements.")).

*Edmondson*, 2019 U.S. Dist. LEXIS 41028 at *12.

To be clear, Plaintiffs could not meet their burden of proof at trial by relying on the finder of fact (the jury in this case) to determine whether Defendants' use of Plaintiffs' images was misleading or confusing simply by looking at the relevant advertisement. As the court in *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) explained:

> [w]here, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers. It is not for the [finder of fact] to determine, based solely on his or her own intuitive reaction, whether the advertisement is deceptive. Rather, as we have reiterated in the past, *'the question in such cases is—what does the person to whom the advertisement is addressed find to be the message?'*"

In other words, the jury in this case was not empaneled as a focus group of likely club patrons to assess the deceptiveness of the advertisements at issue, it was empaneled to judge whether there was *extrinsic evidence* of confusion in the relevant consumer market sufficient to find for Plaintiffs.

Plaintiffs presented zero evidence of actual consumer confusion or deception stemming from Defendants' use of their images. They did not put one actual consumer on the stand, or even offer a Facebook post, attesting to confusion over the relevant advertisements. To establish that the advertisements at issue were misleading, Plaintiffs relied exclusively on the expert testimony of Martin Buncher, whose opinions were grounded on results of a consumer survey he developed and administered. However, Buncher's survey was so riddled with defects that it cannot be the basis of a reasonable jury's finding of Lanham Act false advertising liability. Moreover, Buncher's flagrant mischaracterizations of his work to the jury, although addressed on cross-examination, so undermined his credibility that his opinion cannot reasonably be relied upon to support a verdict for Plaintiffs.

### i.    Buncher's surveys did not test relevant consumers.

First, Buncher's consumer survey results, and his resulting opinion, are fundamentally

and irreparably flawed because the survey target audience was *not* comprised of gentlemen's club patrons, or even likely patrons. Indeed, common sense dictates that consumer surveys are persuasive evidence of whether an ad is misleading or confusing only if they test the appropriate consumers. *See, e.g., Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) ("In an infringement action, 'the appropriate universe [of a consumer survey] should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.'") (quoting A*mstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)); *see also You Fit, Inc. v. Pleasanton Fitness, L.L.C.*, No. 8:12-CV-1917-T-27EAJ, 2013 U.S. Dist. LEXIS 18106, at *20 (M.D. Fla. Feb. 8, 2013) ("The ultimate question remains whether *relevant* consumers are likely to believe that the produces or services offered by the parties are affiliated in some way.") (emphasis added) (citing *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 649 (11th Cir. 2007)).

Knowing it was critically important to the fundamental relevance and persuasiveness of his opinion, Buncher testified repeatedly on direct examination that his survey contained screening questions which weeded out respondents who had *not* been to a gentlemen's club in the past two years. These putative screening questions allegedly caused the survey results to reflect the views of a target audience fairly tailored to judge whether the subject advertisements were misleading or confusing. (Exhibit A, Trial Testimony of Martin Buncher, 22:7-11; 24:11-25; 25:16-20; 26:6-7). The following is a specific exemplar exchange between Plaintiffs' counsel and Buncher on this point:

Q:	And what sort of sample were you looking for in this particular . . . survey?

A:	People that have patronized a gentlemen's club, a strip club, bikini bar, that kind of club in the past two years.

Q:	And that was the body of respondents that you ultimately got?

A:	Yes it was.

****

> Q:    Let me just be clear. Every survey respondent had patronized a strip club or
>       a gentlemen's club or bikini bar within the past two years. Is that accurate?
>
> A:    That's correct.

(*Id.* at 24:11-25).

As shown on cross-examination, however, Buncher's survey did not contain a single question designed to weed out persons who had not been to a gentlemen's club in the last two year—or ever. (*Id.* at 89:5-13; 91:25-92:11). Rather, the survey data that he relied upon came from 301 survey participants whose only qualifications were being over 21 years old and living in Tampa or Jacksonville (*Id.* at 91:9-23). Of these participants, half were women. (*Id.* at 92:12-14). The average age was over 50 years. (*Id.* at 96:11-15). Sixty-seven survey participants were over the age of 65. (*Id.* at 96:16-20). Another 102 participants were between age 50 and 64. (*Id.* at 94:11-13; 96:6-7).[4]

Plainly, not only was Buncher's survey *not* directed to actual gentlemen's club customers, but it also was not administered to a demographic that any reasonable person would accept as representative of actual or likely gentlemen's club patrons. On cross-examination, Buncher agreed with this assessment without qualification. Specifically, Buncher testified:

> Q:    So you would agree with me that there's nothing about the survey that you
>       conducted that was designed to receive responses from people who were
>       likely patrons of gentlemen's clubs?
>
> A:    At this point, correct.

(*Id.* at 93:25- 96:4).

Compounding the unbelievability of Buncher's testimony is the fact that he attempted to lie his way out of the problems with his survey. First, he told the jury that a draft copy of the

---

[4]    Indeed, further undermining Buncher's credibility is the fact that he actually testified on direct that his survey respondents were "heavily" in the 20-to-40 year-old age group with a "few people in their 60's" (Ex. A, 25:13-15). Yet another flagrant mischaracterization of his study sample.

survey without the screening questions must have been inadvertently supplied to Defendants'

counsel, and that he was confident that he really did ask survey participants the screening

questions he touted on direct examination. (*Id.* at 83:6-84:25). When that effort failed, Buncher

tried to assert that the third-party vendor which had supplied the list of potential survey subjects

(CINQ) made sure all the subjects were recent gentlemen's patrons. (*Id.* at 88:17-89:2). This also

to turned out to be false. (*Id.* at 89:19-91:5).

    The fact that Buncher tested consumer confusion by surveying random respondents also

calls into question his testimony regarding why he failed to use Defendants' guest e-mail list,

which was provided to Plaintiffs via discovery, at least as a starting point to populate his study.

Buncher claimed it was because many of the e-mails turned out to be bad. (*Id.* at 29:14-31:18). In

reality, it was likely because Buncher knew he would get more favorable results using his own

gerrymandered sample.[5] This is yet another reason the jury cannot credit Buncher's testimony or

the underlying surveys.  Buncher had access to an actual patrons of the Defendants' club but he

never surveyed one of them.

    Because Buncher's survey did not test confusion among patrons or likely patrons of

gentlemen's clubs, it was wholly irrelevant and cannot support a jury verdict under a Lanham

Act false advertising theory. *See Scott Fetzer*, 381 F.3d at 487-88 (affirming grant of summary

judgment in Lanham Act infringement and unfair competition case because the plaintiff's survey

was defective due, in great part, to the fact that it did not test a relevant sample). At a minimum,

Buncher should have used the e-mail list provided by Defendants to question a smaller control

group against which he could have compared the results from his broader survey to test the

---

[5]    Shawn Hopper, a non-party witness who had used the e-mail list supplied to Buncher for marketing purposes testified that he had very few "bounce backs" when sending e-mails to the addressees on the list. (Exhibit B, 41:14-42:11 and 48:11-49:3).

validity of the latter, but he did not do this. *See Edmondson*, 2019 U.S. Dist. LEXIS 41028 at *17-18 (criticizing Buncher for not using patron e-mails for this purpose).

Ultimately, Buncher's trial testimony about his survey respondents was so fundamentally inaccurate, whether because he just "winged it" or flat-out lied in hopes he would not get caught, that it would be unreasonable for a jury to credit his testimony on consumer confusion at all.

### ii. Buncher's survey questions were flawed.

Second, the specific questions propounded to survey participants were profoundly defective. For example, Buncher asked survey participants whether they believed the models depicted in the ads attached to the survey "represent the lifestyle to which the clubs are oriented." (Ex. A, 73:1-7). The survey did not, however, define the term "lifestyle." (*Id.* at 73:8-74:10). Instead, Buncher relied on the fact that survey participants had putatively been to some gentlemen's club—or maybe a bikini bar—somewhere to inform them on what "lifestyle" meant. (*Id.*, 41:5-19). Of course, there is no indication that any of the survey respondents had actually been to a gentlemen's club in their entire life. As such, the question was vague, confusing, and failed to achieve its purpose, which renders the survey useless as evidence of deception or confusion. "A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 591 (3rd Cir. 2002).

Similarly, the questions included in Buncher's survey did not allow respondents to opt out of answering if they did not understand a question or had no opinion in response. The questions were worded to elicit only agreement or disagreement. (*See* Ex. A, 34:25-36:15; 73:1-

7).[6] Consumer surveys fail to test confusion or deception when they ask questions that do not allow participants either to express no opinion on a subject or to express confusion on a tested topic. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (criticizing consumer survey because "the interviewers conducted the survey…in a way that effectively required the respondents to express a specific opinion, even if they did not have an opinion, by specifically not offering the respondents the opportunity to give 'not sure' as a response."); *see also, Toth*, U.S. Dist. 2019 LEXIS 1355, at *22 ("More importantly, however, Buncher failed to provide survey takers with an opportunity to indicate lack of knowledge or an instruction for participants not to guess—fatal defects where the questions themselves are confusing and misleading.") (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007).

### iii.    Buncher's survey did not test all the relevant images.

Finally, at a minimum, Buncher's testimony provides no evidence that Defendants' Facebook posts featuring Plaintiffs Canas, Burciaga, Jones, Taylor, Lund, Underwood, and Eason were misleading or confusing, because no images of these Plaintiffs were included in the survey underlying Buncher's opinion. It is undisputed that Bunchers' survey contained and asked questions only about ads featuring images of Plaintiffs Posada and Young embedded in digital invitations for separate Superbowl parties hosted by Defendants. (Ex. A, 60:7-61:4; 62:6-22; Ex. C).

Significantly, the Facebook posts in which the images of Plaintiffs Canas, Burciaga,

---

[6]     Plaintiffs' Trial Exhibit 26 purported to be Buncher's complete report, including the underlying survey, but it was only an excerpted version. A copy of the survey or questionnaire underlying Buncher's opinion is attached hereto as Exhibit C. It was previously submitted to court as part of Exhibit A to Plaintiffs' Response in Opposition to Defendants' Motion to Exclude Plaintiffs' Experts Chamberlin and Buncher (Doc. 43-1), which was Mr. Buncher entire report with supporting materials.

Jones, Taylor, Lund, Underwood, and Eason appeared were substantially different from the two Buncher tested, inasmuch as the untested posts depicted free-floating images of Plaintiffs with limited associated text, as compared to the elaborate Superbowl party advertisements featuring Plaintiffs Posada and Young, which also included borders, NFL team logos, the Vince Lombardi trophy, and drink promotions. (*cf.* Super Bowl ads, Plaintiffs' Trial Exs. 7 and 25 to Non-Super Bowl Posts, Plaintiffs' Trial Exs. 2, 5, 10, 12, 14, 17 and 23). Buncher acknowledged that the Superbowl ads were, in fact, different from the untested images because the latter were poor exemplars of Defendants' advertising campaigns and contained very little information other than Plaintiffs' images. (Ex A, 63:22-p.66, l.6).

In order to apply his survey results to the untested advertisements, Buncher had to ignore the marked differences between the advertisements and extrapolate consumer confusion from the responses given about ads attached to the survey. Remarkably, on cross examination Buncher opined that the untested images, if included in his survey, would have proven *more* misleading than the two ads he tested. (*Id.* at 63:22-67:9). When pushed for any facts or data that supported this hypothetical leap, Buncher could only point to his 50 years of experience in the marketing industry—pure, inadmissible *ipse dixit*. (*Id.* at 66:7-69, l.5; 69:15-70:21).[7]

Accordingly, there is no direct evidence that seven of the nine images underlying Plaintiffs' false advertising claims were misleading to consumers as required by the Lanham Act. The only evidence that the untested advertisements were misleading is Buncher's factually unsupported effort to apply survey results relating to two completely different ads to the untested posts. This testimony is worthy of no weight. *See Toth*, 2019 LEXIS 1355, at *21-22.

---

[7]    Buncher's testimony purporting to tie his survey results to the untested images, and why he did not test certain images in his survey, was, respectfully, totally inadmissible under Fed. R. Evid. 702 and interpretive case law, including the seminal case of *General Electric v. Joiner*, 552 U.S. 136 (1997). It was unsupported *ipse dixit* testimony. Having been allowed over objection, this testimony should endow with no weight.

Consequently, at a minimum, the Lanham Act claims of Plaintiffs whose images were not subject to consumer survey testing (Plaintiffs Canas, Burciaga, Jones, Taylor, Lund, Underwood, and Eason) should fail in this case and judgment should be awarded to Defendants.

Overall, Buncher's testimony and the survey upon which it was based are insufficient evidence of consumer confusion or deception.

> The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself. This objectivity, in turn, depends upon many factors, such as whether the survey is properly filtered to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive.

*Novartis*, 290 F.3d at 591 (internal citations omitted). Here, Buncher's report lacks all the badges of scientific objectivity and, thus, does not show Defendants' use of Plaintiffs' images were misleading.

> b. *Plaintiffs failed to present evidence that the ads influenced consumers' purchasing decisions or had the capacity to deceive consumers.*

For the same reasons Buncher's survey evidence does not show that Defendants' advertisements were misleading, it also fails to prove that the ads likely influenced consumer purchasing decisions or had the capacity to deceive consumers. As such, Defendants adopt by reference the arguments in section II. B. 1. a., above, as further grounds for granting judgment as a matter of law on Plaintiffs' Lanham Act false advertising claims.

Additionally, even accepting that Buncher's survey was given to an appropriate target audience, which it was not, at least two district courts have concluded that virtually identical surveys administered by Buncher fell short of proving that the social medial postings at issue in those cases caused a material effect on purchasing decisions because the survey did not ask the right questions. *See Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *18-19 ("that '[j]ust over 90%' of the survey participants were more likely to be interested in patronizing Defendants'

establishments after seeing the advertisements that contained images of Plaintiffs when compared to advertisements without Plaintiffs does not indicate that consumers are *actually* more likely to frequent Defendants' establishments; thus, such result does not demonstrate a material effect on purchasing decisions.") (quoting *Gibson*, 2018 U.S. Dist. LEXIS 24132, at \*5). Here, as in *Edmondson* and *Gibson*, the record contains no evidence that any consumers attended Defendants' establishments as a result of Defendants' posts, and Bucher's report fails to fill that hole.

2. Plaintiffs' false endorsement claims fail because they did not present sufficient evidence of consumer confusion.

Under Section 43(a) of the Lanham Act, "false endorsement occurs when a defendant uses the name or likeness of a celebrity in a manner that is likely to cause confusion among consumers as to the affiliation, connection, or association between the celebrity and the defendant's goods or as to the celebrity's sponsorship or approval of defendant's goods." *Thoroughbred Legends, L.L.C. v. Walt Disney Co.*, Civil Action File No. 1:07-CV-1275-BBM, 2008 U.S. Dist. LEXIS 19960, at \*16-17 (N.D. Ga. Feb. 12, 2008). To prove a false endorsement claim, Plaintiffs "must show (1) [they] had trademark rights in the mark or name at issue and (2) that [Defendants] had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)).

In this matter, the viability of Plaintiffs' Lanham Act False endorsement claim turns primarily on whether Defendants' use of Plaintiffs' images caused consumer confusion. The Eleventh Circuit has identified seven-factors that trial courts may consider in evaluating the likelihood of confusion in false endorsement claim: (1) Strength of the mark alleged to have been

infringed; (2) Similarity of the infringed and infringing marks; (3) Similarity between the goods and services offered under each mark; (4) Similarity of the actual sales methods used by each holder of the mark, such as the holder's sales outlets and customer base; (5) Similarity of advertising methods; (6) Intent of the alleged infringer to misappropriate goodwill of the proprietor; and (7) The existence and extent of actual consumer confusion. *Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010) (citing *Welding Services, Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007)).

Courts have emphasized the extent of actual confusion and the strength of the mark as the most important factors in analyzing consumer confusion. *See Id.* at 779 ("[A]ctual confusion in the consuming public is the most persuasive evidence in assessing a likelihood of confusion."); *Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *22; *Toth*, 2019 U.S. Dist. LEXIS 1355, at *14-15 ("It is well settled that the crucial determinant in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.") (citing *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990)); *see also Land's End at Sunset Beach Cmty. Ass'n v. Land's End Acquisition Corp.*, 2016 U.S. Dist. LEXIS 191616 (M.D. Fla. Nov. 7, 2016); *Intertape Polymer Corp. v. Inspired Techs., Inc.*, 725 F. Supp. 2d 1319, 1329 (M.D. Fla. 2010). Moreover, courts have recognized the need for flexibility in applying the factors indicative of consumer confusion to the unique factual contexts of actual cases. *See Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir. 1986). For instance, courts have recognized that certain factors are inapplicable in a celebrity false endorsement case and that the most relevant factors include strength of mark, the existence of actual confusion, and Defendants' intent to misappropriate Plaintiffs' goodwill. *See, e.g., Gibson v. Resort at Paradise*

*Lakes, LLC*, U.S. Dist. LEXIS 80471, at *25 (M.D. Fla. Feb. 2, 2018).

Here, the evidence relating to the most relevant confusion factors do not support a judgment for Plaintiffs on their false endorsement claims.

### a. *Actual Confusion*

As explained above, Plaintiffs made no effort to present any evidence of actual consumer confusions, despite having nearly 500 e-mail addresses of persons who had attended Defendants' clubs. Rather, Plaintiffs relied on the consumer surveys performed by Buncher as proof of confusion. For the same reasons the surveys do not show the "advertisements" featuring Plaintiffs were misleading, they also fail to establish consumer confusion. *See, e.g., Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *25-26. Accordingly, Defendants adopt by reference sections II. B. 1. a. above herein.

### b. *Strength of Mark*

In cases such as this one, assessing strength of mark focuses largely on a consideration of evidence showing that Plaintiffs' images (the mark) were recognizable in the relevant market. *See Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *22-24; *Gibson*, 2019 U.S. Dist. LEXIS 119325, at *24-26; *Toth*, 2019 U.S. Dist. LEXIS 1355, at *18-19. As with the confusion factor, there is no hard, direct evidence supporting the notion that Plaintiffs had strong respective marks. Plaintiffs presented no evidence that any likely consumer of Defendants' clubs who saw their images relative to this case, whether as a result of Defendants' posts or through Buncher's survey, recognized Plaintiffs in them.

Plaintiffs only evidence of the strength of their respective marks came in the form of their verbal resumes, which included, depending on the Plaintiff, appearances on or in various magazines, including *Playboy*, *Maxim*, and *Oxygen*, television commercials, such as for K-Mart

and Karl's, Jr., print and electronic media ads, and, in some instances, on their own social media pages, which were followed by varying numbers of people at different times. There was no effort to show that Plaintiffs were recognizable to Defendants' customers, or to link the putative strength of their respective marks to the time at which their images were posted on Defendants' Facebook pages. Moreover, the evidence showed that the alleged strength of some of Plaintiffs' marks were regionalized outside of the United States, including those of Ms. Jones (in the U.K.) and Ms. Posada (in Latin America).

One thing is certain, there was a wide disparity in the evidence relating to the claimed strength of Plaintiffs' individual marks. For example, any strength that the marks of Ms. Burciaga or Ms. Eason may have plainly is not the same as the strength of Ms. Taylor's, and this issue must be assessed individually. Notwithstanding, none of Plaintiffs' marks was shown to be strong enough to support a jury finding of consumer confusion. Indeed, other courts considering the strength of the marks of either the same Plaintiffs or similarly situated models have concluded that their marks are not strong enough to support false endorsement claims. *See, e.g., Edmondson*, 2019 U.S. Dist. LEXIS 41028, at *22-24 (finding that the strength of mark factor weighed in favor of defendants on Jessica Burciaga's false endorsement claim and granting summary judgment to defendants); *Gibson*, 2019 U.S. Dist. LEXIS 119325, at *24-26 (finding that the strength of mark factor favored defendants in false endorsement claims brought by plaintiffs, *including Plaintiffs Underwood, Burciaga, and Canas*, and granting summary judgment to defendants) (emphasis added); *Toth,* 2019 U.S. Dist. LEXIS 1355, at *18-19 (finding that plaintiffs other than Carmen Electra, and *including Plaintiffs Posada and Taylor*, did not present evidence of a recognizable mark in the relevant market and granting summary judgment for defendants).

As the district court explained in *Toth*, in which two Plaintiffs from this case (Ms. Posada and Ms. Taylor) were also plaintiffs:

> [W]hile these other plaintiffs have participated in promotional campaigns for a wide variety of brands and appeared in magazines, TV shows, and movies, their resumes are devoid of evidence that they actually garnered recognition for any of their appearances. *Simply listing brands or magazine titles is insufficient. See Pelton[v. Rexall Sundown, Inc.]*, 2001 U.S. Dist. LEXIS 3825, ("One appearance in a Sports Illustrated Swimsuit Issue in 1984 and some advertising work for well-known consumer products does not deliver celebrity status."). Plaintiffs' recitations of their social media following as of May 2018 are equally unavailing, in large part due to the fact that there is no evidence in the record as to what plaintiffs' social media followings were at the time of the publishing of the images at issue—the operative inquiry. The bottom line is that regardless of the plaintiffs' presence on social media, they have failed to cite even one example of actual recognition (other than the single response out of 636 correctly identifying Electra in image 01, <u>see infra</u> n.10).
>
> For these reasons, while plaintiff Electra has demonstrated that she has a strong mark, the other ten plaintiffs have failed to do so.

*Toth*, 2019 U.S. Dist. LEXIS 1355, at *18-19 (emphasis added).

### c. *Intent to Misappropriate Goodwill*

Finally, there was no evidence that Defendants were attempting to leverage or capitalize on Plaintiffs' goodwill by using their images in Facebook posts. Non-party Shawn Hopper's testimony on this point was clear as to Plaintiffs Posada and Young. Hopper, who made and posted the ads featuring Ms. Posada and Ms. Young, did not recognize either of them; he found their images through generic searches, like "sexy girl with football" and was not trying to convey that either was appearing at Defendants' clubs by using their images. (Ex. B, 36:8-37:12; 37:20-38:4; 39:24-40:21; 41:2-9).

With regard to the balance of the Plaintiffs, Hopper was not involved with the identification or use of their images (*Id.* at 23:2-21), and Tomkovich was the only Defendant officer or employee called to offer testimony at trial, and he knew nothing about the selection and use of *any* Plaintiffs' images on Defendants' Facebook pages. (Testimony of Michael

Tomkovich, Vol. 1, Exhibit D, 34:25-35:4; Vol. 2, Exhibit E, 29:3-19). There was no other evidence of any kind offered about why or how the images of Plaintiffs, other than Ms. Posada and Ms. Young, came to be associated with Defendants' Facebook pages. Thus, the trial evidence does not even come close to establishing that Defendants were trying to capitalize on Plaintiffs' goodwill.

### d.  Other confusion factors

Even if all of the other factors used to evaluate consumer confusion were to tip to Plaintiffs, judgment as a matter of law for Defendants is still appropriate because the most important factors noted above so dramatically favor Defendants. *See, e.g., Edmondson, Toth, and Gibson, passim.* Indeed, other courts, including one judge in the Middle District of Florida, did not struggle to grant judgment in favor of the defendants on *summary judgment* in similar cases, including some involving Plaintiffs from this case. The trial in this matter has made the defects in Plaintiffs' case clearer and judgment as a matter of law more apt.

### C.  Judgment as a matter of law is warranted on all of the claims asserted by Plaintiffs Posada and Young.

At trial, Plaintiffs generally took a lackadaisical approach to proving that the corporate defendants were responsible for the actual misuse of their images by the relevant individual infringers/misappropriators. They seemed to take for granted that Defendants would be liable for the posting of Plaintiffs' images on their Facebook pages if doing so violated Florida or federal law. In reality, Plaintiffs' burden in this case included proving that Defendants were responsible under some cognizable legal theory for the actions of the person who committed the alleged wrongdoing.[8]

---

[8]     As argued in opposition to Plaintiffs' Rule 50 motion on the Florida misappropriation claims, there was no direct evidence that explained how the images of Plaintiffs, other than the images of Ms. Posada and Ms. Young, landed on Defendants' Facebook pages. The evidence on this point was simply that Hopper gave Defendants'

With respect to the use of the images of Plaintiffs Posada and Young in the relevant Superbowl advertisements, it was proved that non-party Shawn Hopper was the sole animating force behind this activity. Hopper admitted unequivocally that he obtained Ms. Posada's and Ms. Young's images from the internet, created the ads featuring them, and posted those ads to Defendants' Facebook pages. (Ex. B, 36:8-37:12; 39:23). The undisputed evidence at trial also established that Hopper was not Defendants' employee, but rather was an independent contractor. (*See* Ex. B, 52:22-25; 56:11-24; Ex. D, 33:13-18). Thus, Defendants are not liable for Hopper's allegedly improper actions in this instance unless Plaintiffs presented facts that connected Hopper and his actions to Defendants in a way that made the latter responsible under the law, which Ms. Posada and Ms. Young failed to do.

It is axiomatic that corporations act through their employees and agents. *Jacksonville Electric Co. v. Sloan*, 52 Fla. 257, 272 (Fla. 1906). As a general rule, Florida law holds that while an employer may be liable for the actions of an employee done within the scope of his employment, a principal is typically *not* liable for the acts of its independent contractor, subject to certain well-recognized exceptions. See *Burch v. Strange*, 126 So. 2d 898, 899 (Fla. 1st DCA 1961). One such exception is where the principal controls the acts of the independent contractor. *Id.*; *see also Nazworth v. Swire Fla., Inc.*, 486 So. 2d 637, 638 (Fla. 1st DCA 1986) (explaining test for determining whether independent contractor is an agent of principal for which it is liable is one of control).

"'If the employer's right to control the activities of an employee extends to the manner in

---

Facebook page passwords to club managers from time to time, but he knew of no other details relating to the posting of Plaintiffs' images other than the Superbowl ads. (Ex. B, 13:5-12;14:2-15:5). Tomkovich was equally uninformed about how posts other than the Superbowl ads were posted on Facebook. (Ex. D, 34:25-35:4). Significantly, Plaintiffs did not offer testimony from any of Defendants' employees that they posted the images or even knew anything about how images were posted. Hopper also raised the possibility that unknown, third party promoters could have posted the images. (Ex. B, 14:11-15:2). Further, there were no stipulations or agreements on this issue.

which a task is to be performed, then the employee is not an independent contractor,' but rather is an agent for whose negligence the principal is vicariously liable." *Del Pilar v. DHL Glob. Customer Sols., Inc.*, 993 So. 2d 142, 146 (Fla. 1st DCA 2008) (quoting *Parker v. Domino's Pizza*, 629 So. 2d 1026, 1027 (Fla. 4th DCA 1993)).[9]

> Elements of control that tend to suggest a relationship in which the principal is vicariously liable for the agent's negligence include, but are not limited to, (1) the principal's right to control the agent's use of the principal's trademarks, (2) reservation to the principal of the unilateral right to prohibit the agent from working on behalf of competitors, (3) a requirement that the agent's employees must undergo training before they work on the principal's behalf, (4) a requirement that the agent perform services using only equipment selected pursuant to the principal's specifications, (5) a requirement that the agent, when working on behalf of the principal, use a vehicle with the principal's logo, placed according to parameters established by the principal, (6) a requirement that the agent adhere to customer-service procedures established by the principal, (7) a requirement that the agent submit to inspections conducted at the principal's discretion.

*Id.* (internal citations omitted).

With regard to alleged violations of Section 43(a) of the Lanham Act, courts apply traditional rules of agency law to determine whether employers or principals should be liable for the acts of individuals associated with them. *See, e.g., P&G Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003); *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1433-39 (3d Cir. 1994) (remanding to district court for consideration of agency liability issues with lengthy discussion re the application of the control test for the imposition of corporate liability for putative agents' conduct); *Phoenix Entm't Partners, L.L.C. v. Orlando Beer Garden, Inc.*, Case No: 6:16-cv-80-Orl-31DAB, 2016 U.S. Dist. LEXIS 144168 (M.D. Fla. Sept. 16, 2016) (recommending denial of a motion for default judgment because plaintiff's Lanham Act claims did not establish grounds for vicarious liability on an agency theory); *Michael Kors, L.L.C. v. Hernandez Int'l Inc.*, 2016

---

[9]   The rules and factors applicable to determining whether a principal is liable for the negligence of an independent contract are consistent with and generally applicable to intentional torts, such as trespass. *See Burch*, 126 So.2d at 900.

U.S. Dist. LEXIS 149247, at *71-74 (S.D. Tex. Oct. 27, 2016); *UPS Store, Inc. v. Hagan*, 2015 U.S. Dist. LEXIS 168332, at *19-20 (S.D.N.Y. Nov. 18, 2015).

Here, the only plausible theory of liability under which Defendants could be responsible for Hopper's wrongdoing is that Defendants controlled his actions to such an extent that he became their agent; however, Plaintiffs failed to present sufficient evidence for a reasonable jury to reach this conclusion.[10] Not surprisingly, there was no formal written agreement between Defendants and Hopper delineating his relationship with Defendants, but it is clear Hopper was hired to establish a social media presence for Defendants from whole cloth. (*See* Ex. D, 12:4-13:23).

In fact, Hopper took the lead in encouraging Defendants to create a digital advertising presence by "coaching" Tomkovich on its importance and Defendants' need to use it. (Ex. B, 34:8-18). Tomkovich, Defendants' controlling officer, largely gave Hopper *carte blanche* over Defendants social media advertising. (Ex. D, 21:15-22:5; Ex. B, 36:5-7). Indeed, Hopper testified that it was his "job *to manage* the Facebook pages." (Ex. B, 13:5-6) (emphasis added). Tomkovich took a 50,000 foot approach to overseeing Hopper and did not expect Hopper to obtain approval for social media posts like those involving Plaintiffs Posada and Young. (Ex. B, 35:12-36:4; Ex. E, 43:22-44:9).

Hopper took only minimal instruction from Defendants. Occasionally he would meet with Tomkovich or Defendants' managers to learn about the drink promotions or events they wanted to advertise. (Ex. B, 11:17-12:7). Clearly, Tomkovich had no real ability to direct Hopper

---

[10]    Plaintiffs cannot proceed on a theory that Defendants are liable for Hopper's actions as their apparent agent because apparent agency is dependent on proof of a representation by the putative principal and resulting reliance by a third party to his or her detriment. *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) (citing, *Sapp v. Tallahassee*, 348 So. 2d 363, 367 (Fla. 1st DCA), *cert. denied*, 354 So. 2d 985 (Fla. 1977); *Cawthon v. Phillips Petroleum Co.*, 124 So. 2d 517 (Fla. 2d DCA 1960)).  There is no evidence in the case of Defendants making representations about Hopper's connection to them or anyone relying on such representations.

in any meaningful way, because he had no real knowledge of social media or advertising on it. (Ex. D., 13:18-23; Ex. E, 28:9-17).

Significantly, Hopper controlled access to Defendants' social media pages. When Defendants' club managers needed access to one of the Facebook pages, they had to request it from Hopper. (Ex. B, 13:7-14:1). Tomkovich never had the passwords to the club Facebook pages (Ex. E, 28:22-25) and he never saw the Super Bowl ads Hopper created before they were posted (*Id.*, 28:3-19; 44:10-17). In fact, when Tomkovich received the cease and desist letter relating to this case, he had to hire another IT contractor to undue Hopper's work because Defendants had no control over the Facebook pages or their content absent assistance from Hopper, who had been terminated by that time. (*Id.*, 21:14-22:19).

There was no evidence presented that Tomkovich ever reserved the right to inspect Hopper's work or the equipment or methods he used to produce it. Hopper worked at his home in New Port Richey, Florida, hundreds of miles away from Defendants' physical locations, using his own equipment. (Ex. B, 7:8-9; 56:13-17). Further, there was no evidence that Tomkovich, or anyone else associated with Defendants, required Hopper to undergo any training or follow any corporate procedures. Finally, Hopper's work for Defendants was non-exclusive, as he was providing contract advertising services to multiple businesses at the time he was working with Defendants. (Ex. B, 8:23-9:1; 55:23-24).

If Plaintiffs proved anything about the relationship between Defendants and Hopper, it was that Defendants did not exert enough control over Hopper. Of course, this cuts strongly against the recognition of a *de facto* agency relationship. For the foregoing reasons, there are insufficient grounds upon which a reasonable jury could conclude Hopper was Defendants' agent such that they were responsible for Hopper's use of Plaintiffs' images, whether under Florida or

federal law. Accordingly, all of the claims asserted by Plaintiffs Posada and Young are subject to judgment as a matter of law for Defendants.

## III.   CONCLUSION

For the reasons set forth herein, and on the record at trial, Defendants are entitled to the entry of judgment as a matter of law in their favor with regard to: (a) all of Plaintiffs' Lanham Act claims and (b) all claims asserted by Plaintiffs Posada and Young, including those asserted under Florida law. Alternatively, and at a minimum, Defendants are entitled to judgment as a matter of law on the Lanham Act claims asserted by Plaintiffs Canas, Burciaga, Jones, Taylor, Lund, Underwood, and Eason.

## LOCAL RULE 3.01(g) CERTIFICATION

The undersigned conferred with counsel for Plaintiffs regarding the relief sought in this motion and the parties were unable to resolve any of issues raised herein.

Dated: August 30, 2019

Respectfully Submitted,

/s/ Robert R. Hearn
Robert R. Hearn, Esquire
Florida Bar No. 0067687
**PHELPS DUNBAR LLP**
100 South Ashley Drive, Suite 2000
Tampa, Florida 33602-5311
Telephone: 813.472.7550
Facsimile: 813-472-7570
Email:  Robert.hearn@phelps.com

And

Luke Lirot, Esq.
Law Offices of Luke Lirot, P.A.

2240 Bellair Road, Suite 190
Clearwater, FL 33764
Email: luke2@lirotlaw.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 30, 2019, a true copy of the foregoing was filed electronically with the Clerk of the Court which by operation of the Court's electronic filing system will serve all parties registered to receive notices via CM/ECF for this case.

*/s/  Robert R. Hearn*

Attorney

PD.26878020.1