```
1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                      JACKSONVILLE DIVISION

3
     PAOLA CANAS, LINA POSADA,        Jacksonville, Florida
4    JESSICA BURCIAGA, JAIME
     EDMONDSON, and ROSIE JONES,      Friday, July 26, 2019
5
6              Plaintiffs,            Courtroom:  10D

7    vs.                             Case No. 3:16-cv-393-J-32JRK

8    FLASH DANCERS, INC., and
     MICHAEL TOMKOVICH,
9              Defendants.
     _____
10
     BROOKE TAYLOR, LAURIE ANN YOUNG,
11   MALU LUND, SARA UNDERWOOD, and
     JAMIE EASON,
12             Plaintiffs,

13   vs.                             Case No. 3:16-cv-394-J-32JRK

14   M.T. PRODUCTIONS IN
     JACKSONVILLE,INC., and
15   MICHAEL TOMKOVICH,

16             Defendants.
     _____
17
18              JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
19             UNITED STATES DISTRICT JUDGE

20
21
22
23   OFFICIAL COURT REPORTER:
     Cindy Packevicz Jarriel, RPR, FCRR
24   221 N. Hogan Street, #128
     Jacksonville, FL  32202
25   Telephone:  904.301.6843
     e-mail:  cindyrprfcrr@gmail.com
```

1    (Proceedings reported by stenography; transcript
produced by computer.)

2

3              A P P E A R A N C E S

4    PLAINTIFFS' COUNSEL:

5    JOSEPH N. CASAS, ESQ.
     The Casas Law Firm, P.C.
6    402 West Broadway, Suite 400
     San Diego, CA 92101

7

     DENNIS C. POSTIGLIONE, ESQ.
8    The Casas Law Firm, P.C.
     3801 North Capital of Texas Hwy
9    Suite E240 #445
     Austin, TX 78746

10

     JOHN V. GOLASZEWSKI, ESQ.
11   The Casas Law Firm, P.C.
     1745 Broadway, 17th Floor
12   New York, NY 10019

13   LUDMILA KHOMIAK, ESQ.
     The Casas Law Firm, PC
14   80 SW 8th Street, Suite 2000
     Miami, FL 33130

15

16   DEFENSE COUNSEL:

17   LUKE CHARLES LIROT, ESQ.
     Luke Charles Lirot, PA
18   2240 Bellair Road, Suite 190
     Clearwater, FL 33764

19

20   ROBERT R. HEARN, ESQ.
     Phelps Dunbar, LLP
21   100 South Ashley Drive, Suite 2000
     Tampa, FL 33602-5315

22

23   ALSO PRESENT:

24   GABRIELLE IBANEZ-ALER

25                        -  -  -

# T A B L E   O F   C O N T E N T S

<u>FOR THE PLAINTIFFS:</u>

**MICHAEL TOMKOVICH**

Cross-Examination by Mr. Lirot..................Page  31
Redirect Examination by Mr. Postiglione.........Page  33

**STEPHEN CHAMBERLIN**

Direct Examination by Mr. Casas.................Page  90
Cross-Examination by Mr. Lirot..................Page 150
Redirect Examination by Mr. Casas...............Page 233

<u>FOR THE DEFENDANTS:</u>

**MARK ZABLOW**

Direct Examination by Mr. Lirot.................Page 247
Cross-Examination by Mr. Golaszewski............Page 258
Redirect Examination by Mr. Lirot...............Page 276
Recross-Examination by Mr. Golaszewski..........Page 278

- - -

# E X H I B I T S

<u>Received in Evidence</u>                              <u>Page</u>

Court Exhibit 3..............................244

Jury Exhibit 4..............................244

- - -

```
 1                    P R O C E E D I N G S
 2    July 26, 2019                                9:19 a.m.
 3                         -   -   -
 4               COURT SECURITY OFFICER:  The United States District
 5    Court, in and for the Middle District of Florida, is now in
 6    session.  The Honorable Timothy J. Corrigan presiding.
 7               Please be seated.
 8               THE COURT:  All right.  So we're going to finish up
 9    Mr. Tomkovich and then Mr. Chamberlin; right?
10               MR. CASAS:  Yes, sir.
11               THE COURT:  Okay.  And then you're resting?
12               MR. CASAS:  That's right.
13               THE COURT:  Okay.  And then what are you going to do?
14               MR. LIROT:  We're going to call Mr. Zablow since
15    we'll be finished with -- we've already finished with
16    Mr. Hopper; we'll be finished with Mr. Tomkovich.
17               And I've spoken to my colleagues and they agreed that
18    it's fine to have Mr. Zablow sit in to watch Mr. Chamberlin
19    testify.
20               THE COURT:  That's fine.
21               So -- okay.  I think all that's fine.
22               And we will -- I probably -- I think there's some
23    things to talk about on motion practice at the close, but I
24    think I'd prefer to do that at the close of all the evidence.
25               So I think maybe as a -- maybe as a legal matter, you
```

1  need to make your motions at the close of the plaintiffs' case

2  and then also at the close of the evidence.

3          But I'm not going to entertain prolonged argument --

4  as a matter of fact, I'm not really going to entertain argument

5  at the close of the plaintiffs' case.  I'm going to go ahead

6  and hear from the defendant, have the evidence closed, and then

7  we'll have whatever discussions on motions that we need to

8  have.  Okay.

9          MR. LIROT:  Very good.

10          THE COURT:  Is the jury ready?

11          MR. POSTIGLIONE:  Your Honor, before -- there is one

12  matter I think we left pending yesterday.  That's part of the

13  employee manual that shows --

14          THE COURT:  Yeah, let me -- I had trouble -- can you

15  hand up the portion to Ms. Diaz, the portion you want to --

16          MR. POSTIGLIONE:  Certainly.

17          THE COURT:  -- talk about.

18          MR. POSTIGLIONE:  I have the middle portion here.

19  You know, just as I stated yesterday, what I'm trying to show

20  is what the theme is at the club, what image they're trying to

21  portray, how it's consistent with what they've done with the

22  images.  I don't have very many questions on that, but I want

23  to go over it with Mr. Tomkovich.

24          MR. LIROT:  Judge, I think that would be alien to

25  Rule 403.  I just don't see any reason that some handbook that

1   there's no proof anybody ever read, looked at -- there's no

2   proof anybody did follow whatever format is described in that.

3           I looked at it, it looks like it's from the '50s.

4   It's just I don't think it adds anything but distraction and

5   another effort on the part of the plaintiffs to disparage this

6   club.

7           THE COURT:  What questions did you want to ask?

8           Give me a proffer of your questions.

9           MR. POSTIGLIONE:  Your Honor, basically what I'm

10  going to ask him is -- is -- this image that they're trying to

11  portray, isn't it consistent with what -- the look my clients

12  have, aren't they physically fit, you know, aren't they

13  glamorous, don't they have -- or don't they comport with this,

14  to establish that's the reason why they picked the images.

15          MR. LIROT:  Mr. Tomkovich wouldn't know how glamorous

16  his clients are.

17          MR. POSTIGLIONE:  Well, he should.  He owns

18  nine strip clubs.

19          THE COURT:  Well, I kind of agree this doesn't have a

20  whole lot to do with anything, except I think I would let you

21  ask Mr. Tomkovich, without getting into the specifics of how

22  long your fingernails can be and all that -- I think I would

23  let you ask him:  Isn't it true that the image that his clubs

24  are trying to portray is one of glamour and whatever, sexiness,

25  whatever you want to ask him, without getting into the

```
 1   specifics of what's in the -- in the manual.

 2            And unless he answers those questions differently

 3   than I expect he will, I think we'll leave it at that.

 4            MR. POSTIGLIONE:  Fair enough.

 5            THE COURT:  All right.

 6            MR. POSTIGLIONE:  One more thing, Your Honor.

 7            THE COURT:  Yeah.

 8            MR. POSTIGLIONE:  It's been a long week.  I want to

 9   apologize to the Court for fumbling around yesterday with those

10   exhibits at the end of the day.

11            THE COURT:  It's all right.  I understand.  It's been

12   a long time, but I used to be a trial lawyer.  I know -- and I

13   know things happen.  And I think we're all doing all right.

14            We've had a couple of moments, but not very many.  So

15   I've had -- believe me, I've had trials with more moments,

16   so -- so I think we're all doing fine.

17            MR. LIROT:  The day is young.

18            MR. POSTIGLIONE:  Exactly.

19            THE COURT:  Y'all ready?

20            MR. POSTIGLIONE:  Yes.

21            THE COURT:  Let's do it.

22            I guess I felt like maybe it was a good time to stop.

23            MR. POSTIGLIONE:  No, you did me a favor, so, yeah.

24            COURT SECURITY OFFICER:  All rise for the jury.

25        (Jury in at 9:25 a.m.)
```

```
 1              COURT SECURITY OFFICER:  Please be seated.
 2              THE COURT:  Good morning, ladies and gentlemen.  I
 3   hope you're impressed that we're actually going to start early
 4   this morning, but that's also a tribute to y'all for getting us
 5   ready, and we are ready to resume the examination of
 6   Mr. Tomkovich.
 7              Counsel, you may proceed.
 8   BY MR. POSTIGLIONE:
 9   Q    Good morning, Mr. Tomkovich.
10   A    Good morning.
11   Q    We had talked yesterday about your employee manual a
12   little bit.  Do you recall that testimony?
13   A    Yes.
14   Q    And do you recall being asked several questions about it
15   and having reviewed what's been marked as Exhibit 34, that was
16   your employee manual?
17   A    Yes.
18   Q    I want to show you a portion of that and I want to ask you
19   a couple questions.
20              I'll wait for it to come up there on the screen.
21              MR. LIROT:  That wasn't what I had in mind, Your
22   Honor.
23              THE COURT:  Yeah, why don't you take it down.
24              MR. POSTIGLIONE:  All right.
25              THE COURT:  I just want you to ask him the questions.
```

1   BY MR. POSTIGLIONE:

2   Q    Let me ask you this, Mr. Tomkovich.  Would you agree with

3   me that part of your policies and procedures at Thee Officers

4   Club and at Flash Dancers is to portray an image of glamour?

5           You want -- the girls that work there, you want the

6   staff to appear glamorous?

7   A    Yes.

8   Q    And that's important.

9           Why is it important that you have a standard for

10  appearance at your clubs?

11  A    We're in show business.

12  Q    And how does that -- how does that add value to what

13  you're doing there?

14          It's a club.  You say it's show business.  How does

15  that add value?

16  A    Well, that's what people are looking for when they come

17  in, I imagine.

18  Q    Okay.  Is it also what you look for in your advertisements

19  for your club, to portray that same image?

20  A    Just a clean and respectful image, yes.

21  Q    Okay.  Now, we talked yesterday also about your belief

22  that Mr. Hopper created two of these images, Super Bowl ads.

23          Do you remember that testimony?

24  A    Yes.

25  Q    Okay.  And is there anything about what you've done

1    overnight or any thoughts you've had in your head since then

2    that would be inconsistent with that?

3            In other words, you still believe that eight of those

4    advertisements, you don't know where they came from, but the

5    two that Mr. Hopper did were the two that Mr. Hopper did?

6    A    The two that Mr. Hopper did, yes.

7    Q    Do you remember answering interrogatories in this lawsuit?

8            Those are questions that we send to you that you have

9    to answer under oath.

10   A    Yes.

11   Q    And do you remember I showed you those yesterday and you

12   confirmed that your signature was on the document?

13   A    I've seen the signature on the back.  I never read the

14   questions, but...

15   Q    You never read the questions?

16   A    No.

17           MR. LIROT:  Judge, I object.  I think this is

18   improper impeachment.

19           THE COURT:  I don't think it's improper impeachment.

20   But let's be clear, what you mean is you didn't read the

21   questions yesterday, sir?

22           THE WITNESS:  That's correct.

23           THE COURT:  Okay.

24           MR. POSTIGLIONE:  I was getting there.

25   BY MR. POSTIGLIONE:

1   Q    Now, at a certain point in the lawsuit, you received those

2   questions; correct?

3   A    Yes.

4   Q    Okay.  And did you read them and go over them before you

5   signed the document under oath, swearing that they were true

6   and correct?

7   A    Yes.

8        MR. POSTIGLIONE:  One second, Your Honor.

9   BY MR. POSTIGLIONE:

10  Q    All right.  Now, we asked you a question, to state where

11  those images came from.

12       Do you remember that question?

13       In other words, the date that they were published by

14  you or your agent, what the website was, social media accounts,

15  print advertising, posters, wherever those images came from,

16  and you answered those questions.

17       Do you remember that?

18  A    Yes.

19  Q    Do you remember answering that you were unable to respond

20  to that question because Mr. Hopper was the only person who

21  would have personal knowledge about where those images came

22  from?

23  A    Yes.

24  Q    And isn't that different from what you've testified to

25  today?  In other words, when I asked you under oath, you told

1    me:  Mr. Hopper is the only person that knows.

2            And yesterday you told this jury that:  Well,

3    Mr. Hopper did two of them, but I just don't know where the

4    rest of them came from.

5            So which one is it?

6    A    Mr. Hopper created the advertising, and I don't know where

7    the other images came from.

8    Q    You answered questions under oath and told me that

9    Mr. Hopper was the only person who could tell us that.

10           And you signed it under oath.  Do you remember that?

11   A    Yes.

12   Q    Then why the different story today and yesterday?

13   A    I don't think it was different.

14   Q    Mr. Hopper is the only person with knowledge where those

15   ads came from?

16   A    From where the ads come from, yes.

17   Q    Right.

18           Now, you have personal knowledge that Mr. Hopper only

19   created two, and we don't know where the other eight came from?

20           That's the same statement?

21   A    The advertising.

22   Q    All right.  Can you clarify that?  I'm not sure I

23   understand you.

24   A    Well, the advertisement is where we were advertising an

25   event.  The other images, like I said yesterday, looked like

1    just FaceBook stuffing, you know, just placement.  No

2    advertisement.

3    Q    Stuffing -- filler, I think?

4    A    Filler, yes.  Excuse me.

5    Q    And so you don't believe that's inconsistent with the way

6    you answered these questions?

7    A    No, I do not.

8    Q    Okay.  Mr. Tomkovich, you testified -- or you saw my

9    clients throughout the week testify in the video and in person;

10   correct?

11   A    Yes.

12   Q    I've looked at your website on the clubs.

13          MR. LIROT:  Objection.  Assumes facts not in

14   evidence.

15          MR. POSTIGLIONE:  I haven't asked the question.

16          THE COURT:  Yeah, I'm not sure what -- why don't

17   you -- well, I'll let you ask the question, but let me -- don't

18   answer it until I hear it.  Go ahead.

19   BY MR. POSTIGLIONE:

20   Q    My understanding as to what goes on at a club is there is

21   totally nude friction dancers.

22          Is that something that you advertise for your clubs?

23   A    The ones that are legally allowed to do that, yes.

24   Q    Okay.  What is a totally nude friction dance?

25          MR. LIROT:  Objection.  Not these clubs.

1          We're in court for two clubs in Jacksonville and the

2     regulations governing those clubs.  My objection's under

3     Rule 403.

4          THE COURT:  Counsel, I'm just not sure if -- unless

5     these two clubs are part of that, I'm not sure the question is

6     appropriate.

7          MR. POSTIGLIONE:  Can we do sidebar?

8       (At sidebar, out of the hearing of the jury:)

9          MR. POSTIGLIONE:  This is an advertisement from that

10    club.  Totally nude friction dancers.

11         MR. LIROT:  That's Flash Dancers.

12         MR. POSTIGLIONE:  This is an advertisement:  Totally

13    nude girls on stage.

14         I want to ask him if he understands why my clients

15    are upset that they're associated with totally nude friction

16    dancers, and I'll move on.

17         MR. LIROT:  When are those ads from?

18         MR. POSTIGLIONE:  This is from -- from your website.

19    I don't know.

20         MR. LIROT:  When --

21         MR. POSTIGLIONE:  I mean, you can ask him, but...

22         MR. LIROT:  I'm not going to let you take that stuff

23    off your cell phone today when we're talking about images that

24    were posted in 2014.

25         THE COURT:  I don't know.  You dug up stuff the other

1    day that you didn't have before, so -- right?

2           So it is -- I mean, I guess -- I guess you can ask

3    the witness if that's allowed at these two clubs.  And if his

4    answer is yes, then I think -- I think then it's a fair

5    question.

6           MR. POSTIGLIONE:  I'll make it quick.

7           THE COURT:  Yeah, I understand.  And you can follow

8    up if you want to.

9       (End of sidebar.)

10   BY MR. POSTIGLIONE:

11   Q    Are totally nude friction dances allowed at Flash Dancers?

12   A    No.

13   Q    Were they allowed in 2014, 2013, 2015?

14   A    No.

15   Q    Are they allowed at Thee Officers Club?

16   A    No.

17   Q    Did you ever advertise on your websites that those were

18   allowed?

19   A    No.

20   Q    My question is -- you saw my clients testify.  Do you

21   understand why they might be upset with being associated with

22   these types of clubs?

23   A    No.

24   Q    You don't?

25   A    No.

1    Q    The mother whose husband is a church minister, music

2    director, with two small children, you don't make any

3    connection between her being associated with your strip clubs

4    and being upset?

5    A    No.

6    Q    Okay.  Mr. Tomkovich, who is DeVry E. Dewan?

7    A    My former accountant.

8    Q    Okay.  So is that a man or a woman?  I'm sorry.

9    A    A man.

10   Q    A man.

11              So Mr. Dewan is your former CPA?

12   A    Yes.

13   Q    And was that person your CPA from 2013 to 2015?

14   A    Yes.

15   Q    Is that someone that helped M.T. Productions or Thee

16   Officers Club and Flash Dancers compile and file tax returns?

17   A    Yes.

18   Q    With your help?

19   A    Yes.

20   Q    How does that work?  Do you throw -- like I do -- do you

21   just throw everything in a box and hand it to the accountant

22   and say:  Do my taxes?

23   A    Pretty close to that.  And then a QuickBooks check

24   register that he'll -- that he'll reconcile as the people in

25   the office do.

1   Q    Okay.  So you have an office person that reconciles the

2   receipts and everything, but you ultimately sign off on those

3   tax returns?

4   A    Yes.

5   Q    Let me ask you -- let me go back really briefly just to

6   the point I made before.

7            I asked you if there was -- these clubs were fully

8   nude, and you answered no, you can't do that at Flash Dancers

9   or Thee Officers Club and you couldn't do it in 2013; right?

10  A    Yes.

11  Q    What about full friction?  I don't know what that is, but

12  is that legal at that club?

13  A    No.

14            MR. POSTIGLIONE:  Okay.  Your Honor, permission to

15  show the witness what has been marked -- or previously marked

16  as 39, 40, 41, 36, 37, and 38.

17            THE COURT:  Mr. Lirot -- show them to Mr. Lirot.

18            MR. LIROT:  I have copies, Your Honor.

19            THE COURT:  Okay.  So in numerical order, 36, 37, 38,

20  39, 40, and 41?

21            MR. POSTIGLIONE:  Yes.  I'm sorry.

22            THE COURT:  That's okay.  All right.

23  BY MR. POSTIGLIONE:

24  Q    Mr. Tomkovich, just take a brief look at those.  I want

25  you to confirm what those are.

```
 1              What are those, Mr. Tomkovich?
 2    A    Those are tax returns, federal tax returns, for M.T.
 3    Productions and Flash Dancers, Inc.
 4    Q    Are these tax returns 2013, 2014, 2015, for both clubs?
 5    A    Yes.
 6    Q    Okay.  You wouldn't intentionally file a fraudulent
 7    document with the IRS, would you?
 8    A    No.
 9    Q    You wouldn't intentionally file a fraudulent document with
10    any Government entity, would you?
11    A    No.
12    Q    So as you looked at them, these are a fair and accurate
13    representation of what was filed with the IRS in 2013, 2014,
14    2015 for M.T. Productions, Thee Officers Club, and Flash
15    Dancers, Inc.; correct?
16    A    Yes.
17    Q    Are these gross receipts, the sales numbers, were they
18    accurate at the time you submitted them to your accountant?
19    A    Yes.
20    Q    2013, $459,258 for M.T. Productions; is that correct?
21    A    I believe so, if you're reading off paper.  I don't have
22    them in front of me.
23    Q    Okay.
24    A    I'll take your word for that.
25    Q    Okay.  2014, $214,172.  Does that sound about right?
```

1    A    Yes.

2    Q    2015, $649,473.  Does that sound about right?

3              MR. LIROT:  Can we identify the exhibit.

4              THE COURT:  Yeah, it's a little bit odd for you to be

5    reading these numbers of documents that aren't in evidence.

6              MR. POSTIGLIONE:  Can I move them into evidence?

7              THE COURT:  Any objection?

8              MR. LIROT:  No objection.

9              THE COURT:  They will be received.  And I -- if

10   you're going to read out the numbers, you need to say what year

11   and which company.

12             MR. POSTIGLIONE:  I was getting there.

13             MR. HEARN:  I'm not objecting, Your Honor.  For

14   the -- it would help for the record and for us to follow if he

15   would say what exhibit number it is.

16             MR. POSTIGLIONE:  I was doing it in reverse.  I

17   apologize.

18   BY MR. POSTIGLIONE:

19   Q    On Exhibit 41, 2015 tax returns for M.T. Productions, you

20   reported $649,473 in gross receipts and sales.  Does that sound

21   about right?

22   A    Yes.

23   Q    Exhibit 40, 2014 tax returns, you reported $214,172 in

24   gross receipts.  Does that sound about right?

25   A    Yes.

1    Q    In 2013, on Exhibit 39, you reported $459,258 in gross

2    receipts for M.T. Productions.  Does that sound about right?

3    A    Yes.

4    Q    2013, Exhibit 36, you reported $410,612 in gross receipts

5    for Flash Dancers.  Is that correct?

6    A    Yes.

7    Q    Exhibit 37, $480,276 in gross receipts.  Does that sound

8    about right?

9    A    Yes.

10   Q    And then finally, 2015, on Exhibit 38 for Flash Dancers,

11   Inc., you reported $428,895 in gross receipts.  Does that sound

12   about right?

13   A    Yes.

14   Q    Okay.  So for each club during the relevant period, you

15   reported approximately $1.2 million in gross receipts; is that

16   right?  Over the three-year period.

17   A    Combined.

18   Q    Yes.

19   A    If that's what it adds up, I'll take your word for that.

20   Q    All right.  Mr. Tomkovich, you heard Mr. Hopper's

21   testimony yesterday; correct?

22   A    Yes.

23   Q    And you realize that he filed a bankruptcy in connection

24   with the events leading to these lawsuits and then your

25   subsequent suit to him; correct?

1    A    Yes.

2    Q    Now, when you -- when someone files a bankruptcy and they

3    owe you money, you get notice; that's correct?

4    A    I believe so.  I'm not an expert on that.

5    Q    And then when you receive notice, if you have money, you

6    file documents with the court to tell the court that Mr. Hopper

7    owes you money.  Is that your understanding?

8    A    I don't know exactly how that works.

9         MR. LIROT:  Judge, can we have a sidebar here for a

10   minute?

11        (At sidebar, out of the hearing of the jury:)

12        MR. LIROT:  I believe I know where this is going.

13   When Mr. Hopper filed bankruptcy, proofs of claim were filed

14   for every entity that received a cease and desist letter.  With

15   no better evidence of the amount of that claim, the cease and

16   desist letter was used.

17        If they're trying to use that cease and desist letter

18   as some admission that that's a valid number, that would be

19   improper.  And I wanted to say up to date that half of those

20   have been either subject to amended proofs of claim, where when

21   we found out which images were Mr. Hopper's and which were not,

22   all of the proofs of claim were amended.  But the only numbers

23   used were those in the cease and desist letters.  That's not an

24   admission of the accuracy, it's simply a statement of what

25   potentially is out there that could be owed by the client

1    that's been sued by these guys.

2           So that's just not -- Your Honor, it's not --

3           MR. POSTIGLIONE:  Your Honor, this was prepared by

4    Mr. Lirot on behalf of both clubs in the amount of $350,000,

5    and filed with the bankruptcy court.

6           There's several of them that state the amount that

7    they're claiming Mr. Hopper owes under the bankruptcy.  He

8    filed it under oath, under penalty of perjury, with the

9    criminal statute right next to it, and I think I'm entitled to

10   ask him about it.

11          MR. LIROT:  It's not owed.  It's a potential claim.

12          MR. CASAS:  The amounts come from the valuation of

13   our expert on our demand letter, Your Honor.

14          MR. LIROT:  That's the only number we had, but it's

15   not a validation of that number.  We never give you that

16   number, but we had to file the claim based on the claim made by

17   them.  It's entirely misleading.

18          If an attorney uses it to say that we concede that

19   that number is valid, it would be total improper use of those

20   claims.

21          MR. CASAS:  It's an admission of party opponent.

22          MR. LIROT:  It's admission of nothing.  It's a claim

23   because you guys made a claim.

24          And, as I said, most of those had been amended.

25   After we had gotten with Mr. Hopper with the permission of his

1  bankruptcy counsel and verified which ones were his and which

2  ones were the so-called fill, they've all been amended.

3           MR. CASAS:  I think he can clean it up on --

4           MR. LIROT:  I don't have to clean it up if it's

5  prejudicial after the fact.

6           THE COURT:  You know, in a perfect world -- when I

7  asked at the pretrial conference or in innumerable other times

8  that we talked about this if there are evidentiary issues that

9  were going to be controversial or whatever, somebody would have

10  told me about this and we would have looked at it and --

11           MR. CASAS:  Your Honor, this is on our exhibit list.

12           THE COURT:  I understand.  I guess the world's not a

13  perfect place.

14           So each one of these is a claim --

15           MR. LIROT:  Every one of those entities received a

16  cease and desist letter and was sued.  The only basis for any

17  claim that would be even remotely accepted by the bankruptcy

18  court would have been the letters.  We can't make up our own

19  numbers, so we had to start with that.

20           MR. CASAS:  Oh, and to be clear, it's the letters

21  with the preliminary report of our expert attached to it with

22  the valuation of our claims.

23           THE COURT:  All right.  But that's not -- that's not

24  saying that they agree with you.  It's just saying that's the

25  claim that's been made against you so they're passing it on to

1    Mr. Hopper; right?

2            MR. LIROT:  That's it.

3            So they sued for a million dollars for a lawn-care

4    bill you didn't pay, you still have to make the claim for a

5    million dollars.  That doesn't mean the million dollars is what

6    you owe for lawn care.

7            MR. CASAS:  To the extent Your Honor thinks it's

8    prejudicial, at a minimum, we should be able to say that --

9            THE COURT:  Oh, I'm not -- I'm not saying it's

10   prejudicial.  I'm saying I'm not sure of the relevance.

11           MR. CASAS:  The relevance is that Mr. Tomkovich has

12   already undermined the amount of advertisements that he claims

13   Mr. Hopper made, but yet they're attributing the full value of

14   all the advertisements to Mr. Hopper.  So it's --

15           THE COURT:  All right.  Here's -- what else do you

16   have besides this?

17           MR. POSTIGLIONE:  That's it.  A few follow-up

18   questions and then this.  Maybe ten minutes after for his

19   claim.

20           THE COURT:  All right.

21           MR. LIROT:  I think that's --

22           THE COURT:  I understand.  I'm going to think about

23   it.  Finish the rest of your questions.

24       (End of sidebar.)

25   BY MR. POSTIGLIONE:

1   Q    Mr. Tomkovich, when -- you've testified that when you
2   found out about this lawsuit through a cease and -- or, I'm
3   sorry, you received a cease and desist letter and then realized
4   you had been sued; is that correct?
5   A    A cease-and-desist, which was a precursor to being sued.
6   Q    Okay.
7   A    So I complied, the best of my ability, with the
8   cease-and-desist.
9   Q    Tell me what steps you took.  What investigation did you
10  undertake to figure out what had gone on in your clubs?
11  A    First, I contacted Larry Walters in Orlando about the
12  cease-and-desist.  And he advised me get on FaceBook -- because
13  I don't know nothing, really, about FaceBook.
14          MR. LIROT:  Okay.  Judge, I'm a little cautious.
15  Mr. Walters is an attorney and I don't want Mr. Tomkovich to
16  intentionally blurt out attorney-client privileged
17  communications.
18          MR. POSTIGLIONE:  Let me do this.
19  BY MR. POSTIGLIONE:
20  Q    I don't want to know anything you talked about with
21  Mr. Walters.
22          MR. LIROT:  I don't mind what basic directions might
23  have been given, but I don't want to get into the depth of any
24  attorney-client communications.
25          THE COURT:  I understand.  I think it's going to be

1    fine.

2              Mr. Tomkovich understands that, and I'm sure counsel

3    is not going to ask him questions that will invade

4    attorney-client privilege, so let's just see where it goes.

5              Go ahead, sir.

6    BY MR. POSTIGLIONE:

7    Q    Go ahead and finish your answer.

8    A    He advised me to take the pages and things down that were

9    in the cease-and-desist.  I investigated that and had no

10   control over the FaceBook pages of Flash Dancers and M.T.

11   Productions.

12             So my second thing was to do, I had to hire an

13   outside media company, which was 813 in Tampa, and then they

14   changed their name -- I guess their business got bigger -- and

15   became S3 Media, but essentially the same 813 company, if that

16   makes any sense.

17   Q    Well, I think, Mr. Tomkovich, you testified that you don't

18   believe you did anything wrong.  Is that -- my understanding

19   correct?

20   A    Correct.

21   Q    Then why would you need to take the images down?

22             I mean, if you had the right to use them, why take

23   them down?  Why hire --

24             MR. LIROT:  Objection.  Subsequent remedial measure.

25             MR. POSTIGLIONE:  I don't -- I don't agree with --

```
 1              THE COURT:  I don't think that's it.  I'll allow him
 2   to answer his understanding of why he took it down.
 3              THE WITNESS:  Under the advice of Larry Walters, he
 4   said:  Comply with the cease-and-desist, and that's why.
 5              MR. POSTIGLIONE:  Okay.  Pending Your Honor's
 6   decision on the issue.
 7              THE COURT:  Okay.  That's fine.
 8              So are you done -- are you done other than that?
 9              MR. POSTIGLIONE:  Yes, sir.
10              THE COURT:  All right.  Ladies and gentlemen, if you
11   just -- we got something we need to talk about and it's going
12   to take a minute.
13              I know you just got out here, but give us five
14   minutes, if you'll just step back, and I'll get you right back
15   out.  If you need to use the restroom or whatever, feel free.
16   Thanks.
17              COURT SECURITY OFFICER:  All rise for the jury.
18         (Jury out at 9:51 a.m.)
19              COURT SECURITY OFFICER:  Please be seated.
20              THE COURT:  That's fine, you can walk around for a
21   few minutes while we're figuring this out.
22              So I guess, Counsel, I see what you're saying, but
23   isn't this just -- so first of all, the fortuity that
24   Mr. Hopper filed bankruptcy is -- is what it is.  If he hadn't
25   filed bankruptcy, you wouldn't have had these pieces of paper.
```

```
 1              But isn't it just essentially passing through a claim
 2     that's been made to a party that potentially could be liable as
 3     a third party for it, or a -- liable as either in a
 4     counterclaim or a crossclaim, without necessarily meaning to
 5     agree that that's how much money is involved?
 6              I mean, if it -- what's it evidence of?  Is it
 7     evident that -- are you trying to suggest that this is evidence
 8     that the defendants believed that these are the damages of the
 9     plaintiffs in this case?
10              If that's what you're trying to suggest, I think
11     that's going a little far.
12              MR. POSTIGLIONE:  I'm not.
13              What I'm trying to say is that they're going to put
14     on testimony later in the day that these claims were worth
15     nothing, yet they filed documents in the bankruptcy saying
16     they're worth $350,000.
17              THE COURT:  Okay.  That's a fair point.  I tell you
18     what, let's do it this way.  I'm not going to say yes now, but
19     I'm not going to say no forever; in other words, let's see how
20     the evidence comes out.  And if I feel like this is fair
21     rebuttal, essentially, to what they're going to say, we'll
22     think about it.
23              Mr. Tomkovich isn't going anywhere.  We can always
24     bring him back up and talk to him.  Okay?
25              MR. POSTIGLIONE:  Okay.
```

1          THE COURT:  Let's do it that way.  All right.

2          And now that Mr. Lirot knows why you want to use them

3    that way -- who knows, but let's take it a step at a time.

4          MR. CASAS:  Well, to be clear on the point, Your

5    Honor, Mr. Lirot knew full well where we were going.  I

6    actually sent him messages about this many, many months ago.

7          THE COURT:  I'm not -- I'm not -- I don't mean it's a

8    surprise.

9          What I mean to suggest is I'm a little dubious about

10   introducing this, but I could be persuaded that it's

11   appropriate depending on the testimony that is elicited by the

12   defendants.

13         So if the case they put on convinces me that it would

14   be fair to let you do it, then I'll let you do it.

15         MR. CASAS:  Yes, Your Honor.  Just to be clear about

16   our basis, it's not just that he -- we expect the testimony

17   will show that they claim that there were zero.  Mr. Tomkovich

18   has testified that they're only responsible for two, ergo, the

19   value of the claim is full as opposed to just two ads.

20         So...

21         THE COURT:  I hear you.  I hear you.

22         All right.  I'm going to --

23         MR. LIROT:  Judge, I'm going to clear this up.

24         I'm not going to ask Mr. Tomkovich what these images

25   are worth under any circumstances.

 1          THE COURT:  All right.  Well, we'll see.  I'm not --

 2  I want to be clear.  I will -- I am -- I will entertain a

 3  request to recall Mr. Tomkovich to address this issue or maybe

 4  even on rebuttal, it depends.  But right now, that's what we're

 5  doing on it.  All right.

 6          So are you done --

 7          MR. POSTIGLIONE:  Yes.

 8          THE COURT:  Are you done, then?

 9          MR. POSTIGLIONE:  For now, yes.

10          THE COURT:  Okay.  All right.  Let's have the jury,

11  please.

12          COURT SECURITY OFFICER:  All rise for the jury.

13      (Jury in at 9:56 a.m.)

14          THE COURT:  Thank you.  Ladies and gentlemen,

15  Counsel.

16          MR. POSTIGLIONE:  Your Honor, that's all the

17  questions I have at this time.  I'll pass the witness.

18          THE COURT:  All right.  Mr. Lirot?

19          MR. LIROT:  May it please the Court.

20          And, Judge, what I intend to do is to ask

21  Mr. Tomkovich on cross-examination all of the questions related

22  to the answers elicited by Mr. Postiglione, then I intend to

23  talk to Mr. Tomkovich in direct examination.

24          So if it seems disjointed, I apologize, but I think

25  that's the best way to do it to make sure that we understand

1    the nature of the questions.

2              THE COURT:  That's fine.

3              And, ladies and gentlemen, I think we did this

4    yesterday with Mr. Hopper.

5              Rather than having Mr. Tomkovich get off the stand in

6    the plaintiffs' case and come back in the defendants' case,

7    we're just going to do it all at one time.

8              So you may proceed, Mr. Lirot.

9                        CROSS-EXAMINATION

10   BY MR. LIROT:

11   Q    Good morning, Mr. Tomkovich.

12   A    Good morning.

13   Q    How long have we known each other?

14   A    Probably close to ten years, maybe a little longer.

15   Q    All right.  And just to cut to the chase, yesterday you

16   gave testimony about all of the different entities involved in

17   Flash Dancers and Thee Officers Club?

18   A    Yes.

19   Q    Do you understand the distinction between you as a person

20   and the entities that own the business and the other entities

21   that own the properties for these two businesses?

22   A    Yes.

23   Q    Do you ever consider them to be one and the same?

24   A    No.

25   Q    Now, you talked a little bit about some of your marketing

1  skills, and you talked about TV and radio, that was -- I think

2  your testimony was that that was, even to this date, probably

3  the most effective marketing; radio, maybe not so much, but

4  television definitely?

5  A    Yes.

6  Q    And then we got into some of the issues about social

7  media.

8         Why did you get involved in social media?

9  A    Everyone around me said that's the way to go.  I just went

10  with the flow and that's when we hired someone outside to do

11  it.

12  Q    All right.  Did you have any expertise at all in FaceBook

13  or websites or anything of that nature?

14  A    No.

15  Q    Mr. Hopper talked about some of the admin.  I think we

16  looked at an e-mail dealing with some of the access to FaceBook

17  sites and the numbers and codes and passwords that you have to

18  put in to get access to them.

19         Did you ever yourself have any admin code, password,

20  or any access to either the FaceBook page for Thee Officers

21  Club or Flash Dancers?

22  A    No.

23  Q    Mr. Postiglione was suggesting that you'd like to have

24  glamorous girls in your club.

25         Was the intent ever to give the impression that any

1    of -- and I'll just talk about the two Super Bowl ads -- that

2    either of those two women in those Super Bowl ads, was it your

3    intent -- let me back that up.

4                Did you know anything about those ads?

5    A    I did not see those ads.

6    Q    Did you review them at all -- didn't see them; didn't

7    review them?

8    A    No.

9    Q    Didn't direct what should be in them?

10   A    No.

11   Q    We'll talk more about those later on direct, but when was

12   the first time you ever saw those?

13   A    I believe it was in the lawsuit.

14   Q    So before you got sued for those, you didn't even know

15   they existed?

16   A    That is correct.

17   Q    The issue that was brought up about the young lady who

18   testified and said that her husband was a pastor and was not

19   given a job or something because of some photograph.  You don't

20   recall that there was any testimony that it was anything to do

21   with the image of her alleged to be on your FaceBook page?

22               MR. POSTIGLIONE:  Objection.  Leading.

23               THE COURT:  Overruled.

24   A    No, I have no -- no inkling that it was about the FaceBook

25   page.

Q    All right.  What do you think her testimony involved,
pictures that she voluntarily took of herself and put out?

          MR. POSTIGLIONE:  Objection.  Calls for speculation.

          THE COURT:  I'm not sure how this witness is going to
be able to say what another witness was -- or why another
witness said what she said.

BY MR. LIROT:

Q    All right.  What do you think about the suggestion that it
was somehow this FaceBook post that caused any harm to this
lovely lady's husband?

A    I don't think it caused anyone any harm.

Q    All right.  Let's talk about these tax returns, if we can.

          And Mr. Hearn is going to help us on the Elmo.

          So just by way of background.  I know that you've had
the opportunity to look at all of the images that are at the
basis of this suit; correct?

A    Yes.

Q    And the dates begin sometime in mid 2013 and continue to
sometime -- I think the last one is 2-17-2015.

          And if my colleagues think my assessment of those
dates is wrong, I'm sure they can correct me.

          Looking at all those images -- we start sometime in
mid 2013 and we finish February of 2015.  Does that refresh
your memory about the dates of these images?

A    I thought they ended in '14, but okay.

1    Q    I think the last one is February of '15.  I think that was

2    the only one in 2015.  Okay?

3              Let's take a look at the 2013 tax return.  I'll just

4    go by exhibit number.  Let's look at Exhibit No. 36.

5              MR. HEARN:  For Flash Dancers or M.T.?

6              MR. LIROT:  I'll do Flash Dancers first.

7              MR. HEARN:  Okay.

8    BY MR. LIROT:

9    Q    So you're familiar with tax returns to some extent; yes?

10   A    Yes.

11   Q    Says what you made?

12   A    What the gross figure was, yes.

13   Q    Right.

14             The most important part is what you get to keep;

15   right?

16   A    That's important.

17   Q    How much money did you make or lose at this club in 2013?

18   A    I don't know where the number is.

19   Q    Maybe we can --

20   A    It's too far that way.

21   Q    Yeah.  Maybe we can make that a little bit smaller so we

22   can see what the designation is with the figures.

23             So your income or loss is on Line 21.

24   A    And that is a minus of $6,159.

25   Q    So in 2013, is there any evidence, based on this tax

1  return, that you did anything but lose money that year, whether

2  or not these images were on your FaceBook page?

3           MR. POSTIGLIONE:  Your Honor, I'm going to object to

4  this.  He's not an accountant and he's testified someone else

5  prepared this for him.  I don't think he can testify to this.

6           THE COURT:  I'm going to overrule that objection.

7           I mean, you put it in through him.  I think he's

8  allowed to say what he understands his tax return to mean and

9  you can ask him questions about it if you want to.

10          I agree that maybe it would be better to have an

11 accountant talking about all this, but I think this is the

12 evidence we have, so I'm going to allow it.  Go ahead.

13 BY MR. LIROT:

14 Q    So this year, you lost $6,159?

15 A    Yes.

16 Q    Let's look at the tax return for Exhibit No. 37.

17          And this is the tax return for Flash Dancers for

18 2014.  And you made $480,000.  Take a look at Line 21.

19          How much did you make for the whole year?

20 A    A profit of $3,372.

21 Q    And do you have any reason to believe that any of the

22 images at issue in this case, one, have any impact on your

23 income?

24 A    No.

25 Q    Do you have any reason to believe that the use of the

1    images at issue in this case provided any benefit to your

2    overall profit and loss?

3    A    No.

4    Q    And at the end of the year, you took home $3,372?

5    A    Yes.

6    Q    Let's look at Exhibit No. 38.

7              This is Flash Dancers for 2015.  And it looks like

8    you made $428,895.

9    A    Yes.

10   Q    Now, we've looked at three of these tax returns.

11             Generally speaking, do these look to be -- as income

12   and the operation of businesses go, pretty much the same, no

13   real --

14   A    Yes.

15   Q    -- bump, no real jump, no real decrease?  Pretty

16   consistent.

17   A    Yes.

18   Q    And at the end of the year, you made $17,107 profit?

19   A    Yes.

20   Q    Do you have any reason to believe that the one image of

21   Ms. Middleton on February 17, 2015, had any part to play in

22   that bottom line?

23   A    No.

24             MR. POSTIGLIONE:  Objection.  Speculative.

25             THE COURT:  Overruled.

```
 1              THE WITNESS:  No.
 2    BY MR. LIROT:
 3    Q    Let's look at Exhibit No. 39, please.
 4              This is the tax return from 2013 for M.T.
 5    Productions, gross income $459 -- excuse me, $459,258; correct?
 6    A    Correct.
 7    Q    And down at the bottom in No. 21, you made $17,000.
 8    A    Yes.
 9    Q    Do you have any reason to believe that the one image of
10    Jessica Burciaga on June 16th or the one image of Rosie Jones
11    on April 26, 2013, had any impact or played any role in that
12    bottom line $17,000 profit?
13    A    No.
14    Q    Let's look at Exhibit No. 40, please.
15              This is M.T. Productions Flash Dancers for 2014.
16    Gross income, 214,000 -- excuse me, $214,172.
17    A    Yes.
18    Q    That's about 250,000 -- or, excuse me, about -- I want to
19    say $250,000 less than the year before.
20              Do you know why that is?
21    A    Yes.
22    Q    Why?
23    A    Closed for a remodeling.
24    Q    And that year you lost $11,541?
25    A    Yes.
```

```
 1   Q    Do you think the one image of Ms. Posada on January 31,
 2   2014, or the image of Ms. Lund, 2014, do you think that played
 3   any role in the money you gained or lost that year?
 4            And now we know you lost $11,000.
 5   A    No.
 6   Q    What are the variables in what you do to make money or
 7   lose money in this type of business?
 8   A    The variables are sort of enormous.  More outside forces.
 9   Q    The weather?
10   A    Weather.
11   Q    The economy?
12   A    The economy, yes.
13            THE COURT:  Okay.  Well, why don't you let him say it
14   instead of you.
15            MR. LIROT:  Very good.  Okay.
16            THE WITNESS:  The economy, the weather, the newest
17   and best place that opens up near you.  And that's what
18   happened here, I had competition, and the place was very dated
19   at the time and it needed a facelift.
20            So to do a major facelift to get a building permit
21   and the like, it was easier to close, remodel, take my time,
22   and then reopen again and start '15.
23   Q    Do you remember the dates of the facelift?  Was the
24   business closed to the public while you were doing this
25   facelift?
```

1    A    Yes.

2    Q    So if, in fact, these images overlapped with that period,

3    would you have gained any benefit whatsoever from their use?

4    A    I didn't gain any -- the remodeling was basically all

5    through the summer and into, like, November.  And then reopened

6    somewhere mid-November, I'd say -- this has been a long time so

7    I don't have the dates in front of me.  I didn't realize I was

8    going to answer this question.  And the relaunch happened for

9    '15.

10   Q    Okay.  And let me ask you a basic question.  If the

11   business is closed, you don't get any benefit from advertising?

12   A    No.

13   Q    Let's look at Exhibit No. 41.  And this is M.T.

14   Productions for 2015.

15        It looks like the remodel had a beneficial impact,

16   $649,473.  Do you think that's why that number is so much

17   higher than the year before?

18   A    Absolutely.

19   Q    And let's take a look at your bottom line.  You made

20   $59,269.

21   A    Yes.

22   Q    Do you think the one image of Ms. Middleton from

23   February 17th, 2015, had any impact whatsoever --

24   A    No.

25   Q    -- on the profit or loss you enjoyed that year at that

1    club?

2    A    No.

3         MR. LIROT:  I think that's it for the tax returns.

4         Thank you, sir.

5    BY MR. LIROT:

6    Q    Now, Mr. Postiglione -- Postiglione, forgive me -- asked

7    you if you sued Mr. Hopper.

8    A    Yes.

9    Q    Why did you sue Mr. Hopper?

10   A    I felt as a third-party vendor, he was responsible for

11   this lawsuit that came my way.

12   Q    Had you not been sued by these folks, would you have ever

13   sued Mr. Hopper?

14   A    No.  At the time, our relationship with Mr. Hopper was

15   going in a positive direction.

16   Q    Was that just a fundamental business decision?

17   A    It was a big monetary decision because this has cost me

18   quite a bit also.

19   Q    Sometimes is it hard to make decisions based on business

20   realities that might be adverse to your friendship?

21   A    Yes, it is.

22        MR. LIROT:  I believe the rest of my questions will

23   be on direct, so I'm going to shift to that.

24        And, Judge, if we could take just a brief break, I

25   want to grab my notes so I can do that as efficiently as

1    possible.

2              THE COURT:  Sure.

3         (Pause in proceedings.)

4    BY MR. LIROT:

5    Q    I think that you've already testified as to the first club

6    you had was Crossroads, and that you later turned that into

7    Thee Officers Club, and you obtained that club around 1992,

8    1993.

9    A    Yes.

10   Q    All right.  Is that club next to a school?

11   A    Yes, it is.

12   Q    What was the alcoholic beverage status of the club?

13             If I can explain my question.  What kind of alcohol

14   was sold when you bought it?

15   A    It had only a beer and wine license.

16   Q    Did you later apply for what's called all 4COP, a full

17   liquor?

18   A    Yes, I did.

19   Q    And were you successful in getting that?

20   A    Yes.  And the school had to sign off on that.

21   Q    All right.  Is it your experience that if somebody doesn't

22   operate a business properly, that you're able to get that

23   increase in the type of alcoholic beverages that you can sell?

24   A    It was very difficult.

25   Q    But you got it?

1   A      Yes.

2   Q      And we've heard a lot of talk about your business model.

3   Let's establish that once and for all.

4           These businesses, both of them, are properly licensed

5   businesses in this jurisdiction?

6   A      Yes.

7   Q      And they comply with all of the proper zoning codes and

8   all of the other city codes that have to be followed in order

9   to operate these types of businesses?

10  A      Yes.

11  Q      Are you aware of the regulations in Jacksonville or Duval

12  County?

13  A      Yes.

14  Q      What regulations are applicable to the operation of these

15  two clubs?

16          MR. POSTIGLIONE:  Objection, Your Honor.  I don't

17  think he testified to this.  It's beyond the scope of his

18  knowledge.

19          THE COURT:  Well, he would -- he would be able to

20  testify to it because he runs the businesses.  I'm wondering a

21  little bit what the relevance of it is.

22          MR. LIROT:  Well, Judge, I think there's been all

23  kind of innuendo that things happen that do not.

24          I think he -- I think he should be given an

25  opportunity to describe what his business model is.

1          THE COURT:  All right.  I'll allow it.

2     BY MR. LIROT:

3     Q    What is the attire of the female entertainers at these

4     two clubs?

5     A    They are in a bikini-type dress.  They are not allowed to

6     take anything off.

7               So in reference in Jacksonville, they're more --

8     instead of strip clubs and things, they're referred to as

9     bikini bars here in Jacksonville.

10    Q    Is that because if you're topless, you can't sell alcohol?

11    A    Yes.

12    Q    If you sell alcohol, what are the restrictions, as you

13    understand them?

14    A    They have to be in bikinis and a -- basically a little bit

15    less than a three-quarter bottom.  Something in the ordinance

16    about the nape of the buttocks and then the showing of the

17    areola, goes into some -- things of this nature.

18    Q    Are you familiar with the ordinance, they defined all of

19    the specified anatomical areas that have to be covered --

20    A    That's the word I was looking for.

21    Q    -- so you can sell alcohol?

22    A    Yes.

23    Q    And is it your custom and policy to comply with those

24    regulations?

25    A    Yes.  And the police department here is quite vigilant on

1   those type things.

2   Q    What about contact between the entertainers and the

3   patrons, what are the regulations pertaining to that?

4   A    There is no touching.

5   Q    No lap dances, none of the things that Mr. Postiglione

6   asked you about?

7   A    There is no touching.

8   Q    Is it your custom and policy to follow those regulations?

9   A    Yes.

10  Q    If you don't follow the regulations, what happens?

11  A    Well, the vice cops come in with a whole bunch of ski

12  masks and arrest the girls for touching or exposing

13  anatomical -- anatomical areas.

14  Q    Are you familiar with the Responsible Vendor requirements

15  for alcoholic beverage facilities?

16  A    Yes.

17  Q    Do you subscribe to that?

18       Let me do this.  Let me ask you to explain that if

19  you would.  What are the responsible vendor qualifications or

20  services or policies at a given club?

21  A    When I was at the -- being part of the Responsible Vendor

22  organization, what happens is they send someone in about

23  four times a year, maybe five, goes over alcohol procedures,

24  knowing if someone is too drunk, knowing that -- the signs of

25  being too drunk, checking IDs, any type of enforcement IDs or

1    basically sting operations from the ADT, and then a general

2    awareness to keep public safety.

3            I mean, there's no reason that -- you have customers,

4    you don't want to have them hurt, have them drive off drunk and

5    get in trouble.  There's no reason for that or they'll never

6    come back.

7    Q    Are those businesses both certified Responsible Vendor

8    facilities?

9            MR. POSTIGLIONE:  Your Honor, I'm not sure what the

10   relevance of any of this is.

11           MR. LIROT:  Well, Judge, I'll tell you, if I may?

12           THE COURT:  Well --

13           MR. LIROT:  Throughout this case we've been accused

14   of being some sort of --

15           THE COURT:  You're not going to make an argument in

16   front of the jury.

17           MR. LIROT:  Fair enough.

18           THE COURT:  So I feel like -- I feel like you've kind

19   of made your point here, so let's talk about something else.

20           MR. LIROT:  All right.

21   BY MR. LIROT:

22   Q    Let's go back to Mr. Hopper.

23           So to lay the foundation.  No admin privileges, no

24   password, no nothing.  You hired Mr. Hopper to do your social

25   media?

```
1    A    Yes.

2    Q    Did you have an agreement or understanding with Mr. Hopper

3    about what his responsibilities were in the promotional

4    materials that he would create?

5    A    Yes.

6    Q    And what was that?

7    A    That he would use licensed images and -- I had a format

8    also, how the flyers are supposed to be done, the name of the

9    club, the event, and the address, phone number -- and a lot of

10   times it was a two-sided flyer.  I always wanted a map on the

11   back.

12   Q    Okay.  Until you got the cease and desist letter that was

13   the precursor to this lawsuit, did you have any knowledge

14   whatsoever that there was any issue about anything on your

15   FaceBook page?

16   A    No.

17   Q    Did you review the FaceBook page?

18   A    No.

19   Q    What do you think Mr. Hopper meant about you operating

20   from 50,000 feet?

21        MR. POSTIGLIONE:  Objection, Your Honor.

22   Speculation.

23        THE COURT:  I'll let them answer.

24   A    He believed that it -- and rightly so, that I was the

25   owner and stuff, but I gave a lot of these duties out to the
```

1    managers, especially during that time frame of '12 to '14.

2    Q    Okay.  When you're the guy on top, is it normal to

3    delegate the kind of tasks that are at issue in this case?

4    A    Yes.  You can't do it all.

5    Q    Did you do exactly that?

6    A    Yes.

7    Q    All right.  Let's take a look at the Super Bowl ads that

8    we know Mr. Hopper created for you for your entities.

9            So you testified that you never saw this before it

10   went on FaceBook?

11   A    That is correct.

12   Q    And you testified you never saw it until you got a cease

13   and desist letter complaining about this image?

14   A    Yes.

15   Q    All right.  What is it invitation to?

16   A    A Super Bowl party.

17   Q    Had you reviewed that ad, what would pop into your mind?

18   A    The word "Super Bowl," the infringement of the Super Bowl

19   trophy.  And the reason I know about the Super Bowl is when the

20   Super Bowl was here in 2005, the NFL sent representatives out

21   and said you were not allowed to use the word "Super Bowl," the

22   image of the NFL or to use the NFL ticket.

23           And I complied with that going forward.  And they

24   suggested to use the term "big game."

25   Q    All right.  So unless you paid the NFL, you can't use the

1    word "Super Bowl"?

2    A    They don't let anybody use the word "Super Bowl."

3    Q    If you had seen this, what would you have done with this

4    ad?

5    A    I think it would have been in the garbage can and I

6    probably would have fired Mr. Hopper then.

7    Q    Did you get a cease-and-desist from the NFL?

8    A    No.

9    Q    No.

10        Did they -- after they found this was floating

11   around -- not this one, but the one before that you testified

12   to, and you complied with their request, did they file any

13   lawsuits?

14   A    No.

15   Q    Let's look at the other one, if we may.

16        Same question.  If you had seen this ad, what would

17   you have done with it?

18   A    The thing that sticks out to me in this ad is back to

19   "Super Bowl."  Anything else -- and possibly the two teams on

20   there.  I don't know how the trademark works for the Seahawks

21   and the Broncos.  I don't think they'd really have too much

22   issue with that, but "Super Bowl," they're very -- they're on

23   it, to say the least.

24   Q    And, again, not to belabor the obvious, but you never saw

25   any of these images?

1   A    I would not have -- if I would have seen that image, it

2   wouldn't be here today.

3   Q    And you never saw any of the other images at issue in this

4   case?

5   A    No.

6   Q    So was it ever your intent to give anybody the impression

7   that the people in those images were going to appear at your

8   club?

9   A    No.

10  Q    Was it ever your intent to give anyone the impression that

11  the people in those images endorsed your club?

12  A    No.

13  Q    Now, Mr. Postiglione asked you a little bit about those

14  interrogatories.  Do you have them up there?

15       Do you remember when you reviewed those questions and

16  we worked together to try to come up with responses in accord

17  with our responsibilities to answer their questions?

18  A    Yes.

19  Q    Was it your belief at that time -- well, let me ask it as

20  a question.

21       What did you believe the source of all the images

22  were?

23  A    All the advertising images were Shawn Hopper.

24  Q    And was that what you understood the question to be

25  directed to?

1          MR. POSTIGLIONE:  Objection.  Leading.

2          THE COURT:  Overruled.

3   A    Yes.

4   Q    Did you ever say anything on those interrogatories that

5   was untruthful, to the best of your knowledge?

6   A    No.

7   Q    And you signed them under oath?

8   A    Yes, I did.

9   Q    And you understood what that meant?

10  A    Yes.

11  Q    And I think we've already talked about this, but I'd like

12  to have you go just a little bit greater depth.

13          Once you get the cease-and-desist, that's the first

14  time you've heard anything about these images, what was your

15  first course of action?

16  A    I called Larry Walters.

17  Q    Now, Mr. Postiglione asked you if you consistently paid

18  Mr. Hopper for doing this work.

19  A    Yes.

20  Q    In fact, we put a significant number of invoices already

21  into evidence in this case.

22  A    Yes.

23  Q    Once you found out about the problems with these images,

24  did you pay Mr. Hopper another penny?

25  A    No.

1    Q    Was he unhappy about that?

2    A    Yes.

3    Q    And what was your response?

4    A    Then the lawsuit came in.  But he had -- for all the

5    websites, he had all the passwords and stuff.  I owned the --

6    I -- the company owned dominions on GoDaddy where the host is,

7    not FaceBook, but the website, I'm talking about.  He had the

8    control of the content for the website, so he was the only one

9    that could put anything on there.

10         When I took back that content through Brian Colber,

11   who worked for me, he said:  Hey, all you got to do is take

12   this -- what Brian Colber didn't tell me when this all

13   happened, without the codes to change anything on the password,

14   nobody could take the website down, but you cannot change

15   anything on the website.

16         So I paid thousands of dollars per website to be out

17   there, but I couldn't change any of the content on the website.

18   Q    Let me try to clarify that.

19         You get the cease and desist letter.  It's directed

20   at two FaceBook pages.  The FaceBook pages have administrators.

21   We've talked about that.

22         When you try to comply with the cease-and-desist, did

23   you even have the information necessary to get on there and

24   pull all that stuff down?

25   A    No.

```
1    Q    What did you have to do to find that?

2    A    I had asked Larry Walters how to do that.

3              He said:  You're going to have to probably hire

4    someone.

5              I said:  Did you get it down?

6              He said:  No, I'm not specialized in that area.

7    So...

8    Q    And you hired somebody?

9    A    I hired somebody that said they'd get it down.  And it

10   took them -- it wasn't overnight, but they did -- were able to

11   get ahold of the FaceBook page and then -- or subsequently then

12   deleted all those images.

13   Q    So this wasn't Hopper, this was somebody else.

14             Did you direct them immediately close down these

15   FaceBook pages?

16   A    After I found them.  It took me a week or two to find

17   someone that would be able to do it.  Because I went to the

18   people in my office, back to my --

19   Q    And you spent your own money to close those FaceBook pages

20   down?

21   A    Oh, yes.

22   Q    How much?

23   A    It was probably at least a thousand, maybe a little bit

24   more per FaceBook page.  And there were -- there were multiple.

25             And then in the midst of that, there were fake
```

1   FaceBook pages that weren't sued, that weren't my -- any kind

2   of official ones.  I can't even know where those came from.

3            But anyone can put a FaceBook page, like the -- like

4   one of the models have said, they had FaceBook pages of her and

5   it took her time to get it down.

6            MR. LIROT:  Judge, may I have a moment?

7            THE COURT:  Yes.

8            MR. LIROT:  We have no further questions.  Thank you.

9            MR. POSTIGLIONE:  Redirect, Your Honor?

10           THE COURT:  Yes.

11                     REDIRECT EXAMINATION

12  BY MR. POSTIGLIONE:

13  Q    Mr. Tomkovich, you testified a second ago that you never

14  saw these ads that are at issue in this lawsuit, is that

15  correct, until the cease-and-desist came in; correct?

16  A    Yes.

17  Q    Don't you think as the owner of the dirt and the building

18  and a person that operates these two clubs, the person that's

19  the president of the clubs, that you should know what goes on

20  with respect to advertising?

21  A    That's why I hired some other people.  I could not oversee

22  all the stuff geographically from Georgia to South Florida to

23  Tampa.  I'm good, but I'm not that good.

24  Q    Don't you think that the person you hired or the people

25  you hired should be competent to monitor it as well?

1          I mean, they're doing it on your behalf, aren't they?

2     A     I would like to think so.

3     Q     But you didn't -- you didn't -- that's not what happened

4     here; correct?

5     A     That is correct.

6     Q     And you just disown that.  You don't take any

7     responsibility for it because you didn't pay attention to it;

8     is that correct?

9     A     I wouldn't say it like that.

10    Q     How would you say it?

11    A     I do not know.

12          MR. LIROT:  I think that's argumentative.

13          THE COURT:  He's going to answer it, then we'll do

14    something else.

15          THE WITNESS:  I did not know about it.  And if I did,

16    those images of Super Bowl would definitely have not been up.

17    BY MR. POSTIGLIONE:

18    Q     What about the other ones?

19    A     I didn't know about the FaceBook pages.

20    Q     Your belief is you didn't have -- you didn't have

21    responsibility to know?

22    A     2012 to 2013 FaceBook, like I said earlier, I thought it

23    was going to go the way of MySpace has gone.

24    Q     Your belief is you didn't have an obligation to monitor

25    that because you delegated it to somebody else; correct?

1  A    Yes.

2  Q    You were asked some questions about your tax returns.  And

3  I think that when we read those, it appears that every year

4  your clubs, according to your testimony, either lose money or

5  they barely made money; is that a fair statement?

6          MR. LIROT:  Objection.  The tax returns speak for

7  themselves.

8          THE COURT:  Overruled.

9  BY MR. POSTIGLIONE:

10 Q    Go ahead and answer, Mr. Tomkovich.

11 A    The tax returns are what they are.

12 Q    Did clubs barely make money or lose money, is that your

13 understanding from reading those tax returns?

14          MR. LIROT:  Objection.  Relevance.

15          THE COURT:  Overruled.

16 A    Those two clubs barely get it done.

17 Q    Why keep them open?  If they're not profitable, why not

18 shut them down?

19 A    I did shut one down and then reopened it, remodeled.

20 Q    If the clubs make no money, how did you afford to shut one

21 down for half a year and pay for a major remodel?

22 A    I budget my money well.

23 Q    Do those clubs pay rent?

24 A    No.

25 Q    They don't pay rent to the entities that you own?  In

1    other words --

2    A    They don't make enough money.

3    Q    You don't charge those clubs a lease to lease the land and

4    the building from the companies you own?

5    A    Some leases are in place, but there's not enough money to

6    pay it.  So I can't throw myself out.

7    Q    Do you take a loss on your taxes for those other entities

8    because no lease money is paid to -- by the clubs?

9    A    I can't answer that because I don't know.

10   Q    Your accountant would know?

11   A    Yes.

12   Q    It's your testimony as well that your advertising doesn't

13   work; correct?

14           These FaceBook pages, these advertisements, they

15   don't do anything.  That's what you testified to; correct?

16           MR. LIROT:  That's not what he testified to.  He said

17   there's no evidence.

18           THE COURT:  I'll let him answer the question.

19   BY MR. POSTIGLIONE:

20   Q    Go ahead and answer it.

21   A    In 2012 to '13, I know nothing about FaceBook.  I didn't

22   believe it worked doing anything.

23   Q    Then why do it?  Why pay somebody to create this content

24   for your clubs, to monitor it, to do the website; why do it if

25   it doesn't work?

A     The website, I liked.  And if you look on the bills, he
statistically charged me very little money to do any social
media for those two clubs.

Q     That wasn't my question.

      My question was:  Why pay Mr. Hopper, or anybody else
for that matter, for advertising if your testimony is it just
doesn't work?

A     Because everyone around me, all the new millennials, say
this is the wave of the future.  And when you go to the trade
shows, this is the wave of the future.  This is the wave of the
future.  Then they try and sell you these things for outrageous
pricing.

      Now, the newest thing is geo-fencing.  I don't know
nothing about that one either.

Q     If the advertising -- you just testified, I think, you're
smart with your money; is that correct?

A     I try to be.

Q     Is it smart to pay for advertising that doesn't bring a
return?

A     It's the shotgun approach.  You try a little bit of
everything.  You believe this is better than that.  That's my
belief.

Q     You're still doing social media; you're still doing your
website, correct, for both clubs?

A     Yes.

```
1    Q    Do you believe it's working?

2    A    It's a place -- how you say it -- a placeholder for those

3    two places that are relatively not that profitable.

4    Q    Your opinion, I think, was that the ads don't bring much

5    return.  Is that what I'm hearing?

6    A    For those two places, that is correct.

7    Q    Okay.  Did you do any kind of survey?  Did you hire

8    anybody to do a marketing analysis?

9         Do you have any evidence to support that other than

10   your opinions?

11   A    The count through the door.  When I fly the plane up and

12   down the beach, it's a lot better than -- than this FaceBook

13   stuff.

14   Q    Do you use my clients images on your flyer over the beach?

15   A    No.

16   Q    Have you ever?

17   A    No.

18   Q    What is the address, the physical address, of Thee

19   Officers Club?

20   A    657 Wonderwood Drive.

21   Q    What is the address of Flash Dancers?

22   A    2003 Blanding Boulevard.

23   Q    Now, let me ask you something.  You maintain that -- or

24   you pay somebody to maintain those websites today; right?

25   A    Yes.
```

```
1    Q     Okay.   What are the -- do you know the website addresses?

2          If I told them to you, would you be able to confirm

3    that?

4    A     I guess.   I haven't been on the website in a while.   I'm

5    not happy with those people either.

6    Q     How about TheeOfficersClub.com, is that one of your --

7    does that sound about right?

8    A     I don't know.

9    Q     You don't know.

10         Okay.   What about FlashDancersFL.com?

11   A     Possibly.   I mean...

12   Q     Would you recognize the web page if I showed it to you?

13   A     Sure.

14   Q     Now, you testified that you made some changes since you've

15   been sued because you're more aware now of what can happen if

16   you don't monitor your website and your advertising.

17         Is that fair to say?

18   A     Yes.

19   Q     Is that something you do today, you monitor your websites,

20   you monitor the advertising, or you pay your managers or

21   somebody to do that to be conscious of what goes on the

22   websites?

23   A     On the websites today -- and then the websites have been

24   wrong, because when I changed over all the websites at one

25   time, which is recently, some of the information from Club B,
```

1    went on Club C, and C went on B, and it's been a little bit of

2    a struggle to get them to understand which Emperor is this.

3    Because there's four Emperors at one time.  There was three

4    Gold clubs.  So sometimes they took some information and moved

5    it around.  We're still fighting with some of that.

6    Q    I want to focus your attention to Flash Dancers and Thee

7    Officers Club.

8    A    Okay.

9    Q    You monitor those websites, is that your testimony?

10   A    Yes.

11   Q    Okay.  Does your website advertise:  We're, without a

12   doubt, the hottest gentleman's club in Duval County featuring

13   all nude dancers?

14   A    Well, it shouldn't say that.

15   Q    Does it say that?

16   A    I can't tell you that.  I haven't looked at it.

17   Q    Does it advertise backrooms for totally -- totally nude

18   friction dances?

19   A    That would be something that would have to be a South

20   Florida thing, because that is a term used in the South Florida

21   market.

22   Q    That's not my question.

23         My question is:  Does the Flash Dancers website

24   contain that language?

25   A    Well, if it does today, which it shouldn't --

```
1    Q    You don't know?

2    A    I don't know.  I'd have to call the company and find out.

3    Q    You still don't know?

4         You've been sued and we've been litigating this for

5    three and a half years --

6         MR. LIROT:  Objection.  That's not the nature of the

7    suit.

8    BY MR. POSTIGLIONE:

9    Q    Your testimony is that you've taken steps to eliminate

10   what happened in this lawsuit.

11        Is that your testimony?

12   A    Yes.

13   Q    You have no idea what's on your website, do you?

14   A    I went to -- who it is now is ICON Media who I'm using.

15   ICON Media went and changed all the websites and put all the

16   information out.

17        Now, some of the information, because it was an

18   overwhelming job as we went through this, I sat down with ICON

19   Media down there in South Florida to change it, and they

20   assured me that it was changed.

21        Then one day, I go down and say:  Hey, this is back

22   up there again.

23        And:  Oh, there was some sort of computer glitch.

24   We'll fix it.

25        So if that's on there today, my next trip is to
```

1    cancel their check.

2    Q    Are you through with your answer?

3    A    That's about all I got.

4    Q    Thee Officers Club -- does Thee Officers Club advertise:

5    Thee Officers Club is a dream come true, featuring 100 percent

6    nude, exotic dancers.  We are, without a doubt, the greatest

7    gentlemen's club in Duval County.  The number one place to be

8    in North Florida.

9             Does your website say that?

10   A    It shouldn't say that.

11   Q    Does it?

12   A    I don't know right this second.  But in 2013 and '14 and

13   '15, it didn't.

14   Q    I didn't ask you about that.

15            You testified today that you don't have totally nude,

16   you don't have full-friction dancers.

17            That's your testimony; right?

18   A    That's correct.

19            MR. POSTIGLIONE:  May I approach the witness and show

20   these documents, Your Honor?

21            THE COURT:  Yes.

22            You can show Mr. Lirot first.

23            MR. POSTIGLIONE:  Your Honor, these are new exhibits.

24   I'd like to have them marked as Exhibits 55 and 56.

25            THE WITNESS:  Is there a date on this?

```
1    BY MR. POSTIGLIONE:

2    Q    Look at the top left corner.

3         What is the date on those?

4    A    7-26-19.

5    Q    What's today?

6    A    Okay.  Same day.  That's absolutely -- I got issue with

7    those people, big time.

8         MR. POSTIGLIONE:  Your Honor, may I publish these to

9    the jury?

10        THE COURT:  I don't know.  I haven't seen them and

11   you haven't put them into evidence either.

12        MR. LIROT:  We need a sidebar, Your Honor.

13        THE COURT:  Okay.  Why don't y'all go ahead and take

14   your break.

15        We'll make it 15 minutes and see you back here.

16        Thanks.

17        COURT SECURITY OFFICER:  All rise.

18    (Jury out at 10:41 a.m.)

19        COURT SECURITY OFFICER:  Please be seated.

20        MR. POSTIGLIONE:  Your Honor, do you have a copy?

21        THE COURT:  I do.

22        MR. POSTIGLIONE:  I apologize.  I thought you were

23   handed exhibits.

24        THE COURT:  Just this little tiny print you're

25   talking about here?
```

```
 1              MR. POSTIGLIONE:  I have a copy.

 2              THE WITNESS:  Some of it's a little small for me too.

 3              THE COURT:  I would have brought my glasses.

 4              MR. CASAS:  We can show you from the website, Your

 5   Honor.

 6              THE COURT:  That's fine.  I can read it.

 7              I just was trying to figure out what I'm supposed to

 8   be looking at.

 9              So is the representation that -- from counsel that

10   this is a printout from three officers -- or Thee Officers Club

11   and Flash Dancers Gentlemen's Club off of the website that's

12   currently --

13              MR. POSTIGLIONE:  Yes, Your Honor.  Those are -- the

14   ink is still hot on the documents.

15              THE WITNESS:  And the address is wrong here, too.

16              THE COURT:  Hold on.

17              Hold on.

18              Okay.

19              THE WITNESS:  I am not very happy now.

20              THE COURT:  All right.  So is there an objection,

21   Mr. Lirot, to the use of these documents?

22              MR. LIROT:  Yes, Your Honor.

23              THE COURT:  All right.  What's the objection?

24              MR. LIROT:  They're irrelevant in that they have

25   nothing to do with the time period in question, and I think
```

 1  that's a sufficient basis.  They have nothing to do -- pardon

 2  me?

 3          THE COURT:  But didn't you -- I mean, I know it's

 4  kind of --

 5          MR. LIROT:  I don't know how we could authenticate

 6  them either, quite honestly.

 7          THE COURT:  Well, I'm sure if -- if Mr. Tomkovich

 8  wants to say that this isn't on his website or on the company's

 9  website, I guess he can say that.

10          I assume the best evidence would be to go online and

11  look at them, and I'm -- I guess I'm not really unwilling to

12  accept counsel's representation that they went to the website

13  today and this is what's on there.

14          So I'm not too worried about that, unless

15  Mr. Tomkovich, and he's willing -- of course, he can say

16  whatever he knows.  I guess what I'm -- I'm not sure who

17  started this, but, you did, I believe, Mr. Lirot, elicit from

18  Mr. Tomkovich --

19          MR. LIROT:  The business model.

20          THE COURT:  -- what the business model was.

21          MR. LIROT:  I did.

22          THE COURT:  And this is some evidence that the

23  business model's different than that.

24          Now, Mr. Tomkovich has already told the jury, and I'm

25  sure will tell them again, that this was not his doing or he

1  didn't -- but I do think it --

2         Counsel, what's your -- what are you trying to

3  accomplish and what is the -- why are these exhibits admissible

4  in this case?

5         MR. POSTIGLIONE:  Your Honor, for several reasons.

6         Number one, it's in direct contradiction to what he's

7  testified for the last 20 minutes, under my examination and

8  under Mr. Lirot's examination.  No nude friction.  We don't

9  advertise that.

10         We also have allegations of false advertising here.

11  Shows a pattern of conduct over an extended period of time.  I

12  don't think there is --

13         THE COURT:  Yeah, but I don't think you can -- the

14  thing that I kind of -- I'm kind of probably with you, except,

15  you know, this suit isn't about what the club's doing now, it's

16  about what was going on in 2013 to 2015.

17         And so how does that -- how does what is on their

18  website today -- and I understand there's been testimony and

19  that's why I'm leaning your way, but I -- but -- but what --

20  where does this -- what does this do for us in the actual

21  claims that are before the Court?

22         MR. POSTIGLIONE:  Well, I think it goes to

23  Mr. Tomkovich's credibility.  He's testified again -- over and

24  over again that he monitors the websites.  He's -- we don't do

25  this sort of thing anymore.  It goes to the -- it's a direct

1   contradiction to what he's been testifying to consistently this
2   morning.

3           I think I'm allowed to examine him about it.

4           THE COURT:  All right.  Mr. Lirot, you get the last
5   word.

6           MR. LIROT:  Judge, this is impeachment only.  It's
7   not substantive evidence.  It's just going to mislead the jury
8   into thinking that the business model maybe back then was
9   different than what Mr. Tomkovich testified to.  And I think
10  that's 403.  I think it's just really misleading, and I don't
11  want to go off in that direction and have to distract them with
12  this ancillary issue.

13          THE COURT:  All right.  I'm going to overrule the
14  objection.  I think it's fair enough.

15          I don't -- I mean, Mr. Tomkovich will have every
16  opportunity to explain why these are on his websites --
17  assuming they are his websites, and I'm accepting counsel's
18  representation.

19          If -- Mr. Lirot, if you want them to actually pull up
20  the computer and show it to him, I'll be happy to have them do
21  that, but I don't really have any real --

22          MR. LIROT:  Well, I just maintain my objection and
23  leave it at these documents.

24          THE COURT:  All right.

25          MR. CASAS:  Your Honor, just for the record, for

1    evidentiary basis, since he's maintaining his objection for the

2    record.

3                THE COURT:  Yes.

4                MR. CASAS:  613(b), prior inconsistent statement.

5    He's had an opportunity to explain, deny the same.  He's

6    allowed to be impeached.  It's also an admission of party

7    opponent, statement against interests.

8                So I think all the ways that it can get in are there

9    for those purposes, Your Honor.

10               THE COURT:  All right.  Okay.  I've overruled the

11   objection.

12               I will allow these exhibits into evidence.  I'll

13   allow Mr. Tomkovich to be examined on them.  I will then, of

14   course, permit Mr. Lirot, as he wishes to, to counteract that

15   in any way he chooses to do so.

16       (Plaintiffs' Exhibits 55 and 56 were received in

17   evidence.)

18               THE COURT:  I'm going to go ahead and take a break.

19   When I come back, I'll also have a ruling on the proof of

20   claim.

21               So the jury has given us a question that says:  Will

22   all the information presented on the screen to the jury be

23   available for our review at the end of the trial?  If not, can

24   we review -- basically they're looking for the tax returns.

25               And I'm going to tell the jury when they come out

1    they will have exhibits admitted into evidence available for

2    their review.

3              COURT SECURITY OFFICER:  All rise.

4         (Recess taken, 10:49 a.m. - 11:01 a.m.)

5              THE COURT:  So I'm -- before the jury comes out, I

6    want to finish on the proof of claims here.

7              Can I get -- can I get those exhibits back?

8              Mari, do you have them?

9              No, no, no, no.  That's not -- the proof of claims.

10   Do we have those or -- I'll keep these, so that's fine, but I'm

11   taking about -- no, you don't have them?

12             COURTROOM DEPUTY:  Which?

13             THE COURT:  The ones that we were talking about

14   before that.

15             Have you already tendered them?

16             MR. POSTIGLIONE:  I have not.

17             THE COURT:  Oh.

18             MR. POSTIGLIONE:  And those would be?

19             THE COURT:  So my question for you is -- and we're

20   trying to find one of the cease and desist letters, but is

21   it -- is it true, Counsel, that the amount of the claim is

22   directly tied to the cease and desist letter which attached the

23   Chamberlain report for each of the -- for each of the

24   relevant --

25             MR. POSTIGLIONE:  It's actually not true.

1    Mr. Chamberlin's initial damage analysis, I think,

2    was 410,000.  Those add up to 350.  165 and 30, I had them

3    written down, but I can't remember.

4         THE COURT:  So where did they come -- where did they

5    come from, Mr. Lirot?

6         MR. LIROT:  I filed them.

7         THE COURT:  Right.

8         MR. LIROT:  My recollection is I attached a copy of

9    the cease and desist letter to every one of the claims.

10        THE COURT:  Well...

11        MR. LIROT:  I would not have made up a number.

12        THE COURT:  Yeah.  Well, I'm --

13        MR. LIROT:  There were a bunch.

14        THE COURT:  I've got -- I mean, I'm looking at Flash

15   Dancers, Inc.  I'm not sure what -- why is there more than one

16   per customer here?

17        MR. LIROT:  Maybe they've got copies of the amended

18   ones.

19        MR. POSTIGLIONE:  That's the point, Your Honor.

20   There's multiple copies over a long period of time that state

21   the same number over and over.  They all add up to 350.

22        THE COURT:  All right.  But, Mr. Lirot, you're

23   telling me that you were -- you were attempting to tie it to

24   the demand that had been made?

25        MR. LIROT:  Absolutely.  That was -- from the

1    bankruptcy procedures, that's the only basis that I could use

2    to come up with a number.  Anything else would just be either

3    invalid or fraudulent.

4              MR. HEARN:  Your Honor, I can give you the demand

5    letters, if that helps.

6              THE COURT:  Yeah, that would be good.  Thank you.

7              MR. LIROT:  Is there one for 100 --

8              THE COURT:  All the ones here, at least the ones that

9    were handed to me just now, all of them are $165,000.

10             They don't -- I can't tell -- they're all for Flash

11   Dancers.  None of them are for the other one.

12             And I can't tell why there's multiple copies of a

13   claim for $165,000.  Doesn't even -- it's not even clear to me

14   these are -- I don't exactly know what I'm looking at here,

15   but...

16             MR. HEARN:  Well, here's why.  Okay.  So --

17             THE COURT:  Actually, there's one that was filed in

18   October of 2017 that's for 45,000.

19             MR. POSTIGLIONE:  There should be another one there

20   for 30, and there's several --

21             THE COURT:   110.  So that's -- there's only one -- a

22   couple that have a date on them.  The rest of them don't even

23   have dates on them.

24             There's one for 30,000.  And I'm not exactly sure

25   what I'm looking at here.

```
 1              I do see, actually, now one for Thee Officers Club.
 2   Okay.  The ones for Thee Officers Club are at the back here.
 3              So I've got one, two, three, four for Flash
 4   Dancers -- no, five for Flash Dancers; two for Thee Officers
 5   Club.  I'm not really sure what I'm looking at.
 6              So, Mr. Hearn, you said you had some helpful
 7   information?
 8              MR. HEARN:  Well, here's -- I have the demand letter,
 9   if you want to look at them.
10              THE COURT:  Yeah.
11              MR. HEARN:  It's a little bit difficult to track all
12   of the numbers in them.  But there's -- I separated it just a
13   little bit because the one for Flash Dancers had a matrix in it
14   that identifies the alleged values of the claims of the
15   individual plaintiffs who have -- were going to assert claims
16   against them.
17              I kind of separated them there, Your Honor.  The
18   matrix that's sticking out of the bottom, that's the $165,000
19   figure.
20              THE COURT:  All right.  I --
21              MR. POSTIGLIONE:  Your Honor, if it will make it
22   easier --
23              THE COURT:  Yeah.  Go ahead.
24              MR. POSTIGLIONE:  Well, I was just going to say, if I
25   can use one of each for each club or something, but the 165 to
```

1  30, I won't use all seven of them.

2          THE COURT:  Yeah, okay.

3          I'm -- Mr. Hearn, did you have anything else?

4          MR. HEARN:  This is the M.T. Productions/Officers

5  Club demand letter.  It's a -- it's a little bit more difficult

6  to track because of the way that it's organized, in my view.

7          It's harder to look at fairly quickly and determine

8  what the total value of the claims that are being asserted

9  are -- or is.

10          THE COURT:  Our firm has handled dozens of these

11  matters against some of the world's largest corporate

12  defendants and has some of the nation's most renowned experts

13  in the model and talent industry, ready to assist us in

14  litigating this matter.  We are prepared to litigate this to

15  the fullest extent of the law.

16          Well, that -- that turned out to be true.

17          MR. LIROT:  Clairvoyant.

18          MR. POSTIGLIONE:  I'm sure we meant it when we wrote

19  it, Your Honor.

20          THE COURT:  All right.  I'm going to sustain the

21  objection, and here's why.  I do not -- there's only

22  two reasons this could come in.

23          One is that it's actual evidence of the value of the

24  claim by -- by Mr. Tomkovich or his companies.  And I don't --

25  I don't have any reason to think that that's true.

1          Secondly, it would be to discount or dispute any

2    evidence that the defendants put on that the values of the

3    claims were not as advertised by the plaintiffs or to be

4    contended for by the plaintiffs.

5          But it -- I just don't think this is evidence of

6    that.  It -- all it is is essentially a pass-through of a

7    claim.  It would be, as my law clerk and I were talking, if

8    somebody makes a million-dollar claim against you and you think

9    it's nonsense, but you have a potential third party who would

10   be responsible for whatever the amount of the claim is, you

11   would likely make a million-dollar claim against that third

12   party, that doesn't mean you think the claim is worth a million

13   dollars, it just means you're passing through the potential

14   responsibility for it.

15         And so to whatever extent it's relevant, I don't -- I

16   think it would be minimally helpful to the jury and I think

17   under a 403 analysis, I think any -- let me get the rule so I

18   say it right.  I never remember how to -- which comes first.

19         But to the extent it could be considered potentially

20   relevant evidence, the court makes a finding that the probative

21   value of the evidence is very minimal and it's substantially

22   outweighed by the danger of confusing or misleading the jury.

23         The Court sustains the objections to the proof of

24   claim.

25         But the Court has agreed to the admission of 55 and

1   56, and counsel may examine on those.

2           Are we ready to go?

3           MR. POSTIGLIONE:  Ready, Your Honor.

4           THE COURT:  Let's have the jury, please.

5           COURT SECURITY OFFICER:  All rise for the jury.

6       (Jury in at 11:11 a.m.)

7           COURT SECURITY OFFICER:  Please be seated.

8           THE COURT:  Thanks for your patience.  I promise I

9   won't get in the way of you and lunch when it comes that time.

10          You probably would be justified in thinking that I

11  have a pretty easy job, but, actually, I work -- I work the

12  hardest when you're not here.  So I just want y'all to know I'm

13  not -- I'm trying to earn my keep.

14          So we had some discussions about certain exhibits and

15  whether they were going to be admissible or not, and I've made

16  those rulings and we're going to -- we're going to proceed.

17          In the meantime, though, I did get a question which

18  asked if all of the information presented on the screen to the

19  jury, will that be available for your review, specifically

20  referencing the tax returns.

21          The answer to that question is yes.  You will have

22  the picture -- anything that's a piece of paper or something

23  like that, you'll have all that back with you.  The pictures,

24  the tax returns, anything else I've admitted, you'll have all

25  that back with you.  Okay?

```
1              All right.  You may proceed, Counsel.
2              MR. POSTIGLIONE:  Can we get the screen.
3    BY MR. POSTIGLIONE:
4    Q    Mr. Tomkovich, you had an opportunity to look at these
5    exhibits.  I want to draw your attention to the one on the
6    screen.  I believe Exhibit 55.
7              Is that a -- is that a picture of the front page of
8    Flash Dancers' website?
9    A    It looks like it.
10   Q    All right.  And the fact that the Jacksonville club, the
11   fact that the address is the same as what you testified to,
12   that's the website for the Flash Dancers here that we're
13   talking about; is that correct?
14   A    Yes, sir.
15   Q    And you see the website highlighted there in the bottom of
16   the corner, FlashDancersFL.com; that's the website, isn't it?
17   A    Yes.
18             MR. POSTIGLIONE:  Okay.  Next page, please.
19   BY MR. POSTIGLIONE:
20   Q    I want to draw your attention -- I believe you said --
21   testified earlier that there is no nude friction, there's no
22   complete nudity at these clubs.  Is that correct?
23   A    That is correct.
24   Q    On the website there you're advertising:  It's without a
25   doubt the hottest gentleman's club in all Duval County
```

1   featuring all nude and exotic dancers, in addition to backrooms

2   for totally nude friction dancers.

3           Is that what that says there?

4   A    That's what it says.

5   Q    And your testimony is that's not -- that's not what goes

6   on at that club there?

7   A    That is incorrect information.

8   Q    Well, can you explain that to the jury, please.

9   A    Yes.  In 2016, the end of 2016, I switched web hosting

10  people from the S3 Media, which was 813, I alluded to earlier,

11  and went to ICON Media -- or ICON Media Web Design.  They took

12  on 12 websites at the same time.  And subsequently doing that,

13  they had wrong information.

14          And there's more wrong information on this about the

15  address location of the property too.  Besides just a -- this

16  information of nude dances and friction dances.

17          I had a meeting with these people some months -- oh,

18  let's see.  '16, they got hired.  They put the websites up on

19  in '17.  So it's mid '18, I noticed some of this stuff was

20  wrong and, again, tried to get them to fix it.

21          They said it was some sort of computer glitch and it

22  won't happen again and we'll fix it.  I took it at what their

23  word was and I haven't looked at it again.

24          And here we are with the same problem and I -- that's

25  my explanation.

```
 1              If I had nude dancers like that, I would be making
 2    beaucoup money in Jacksonville, Florida.  And I know that for a
 3    fact.
 4    Q    Mr. Tomkovich, it's been wrong for three years, then?
 5    A    No, it's not wrong for three years.  I started with them
 6    to shift over in the end of '16.  So we get to '17, they start
 7    putting them up.  It takes some time to build a website.
 8              I don't know the exact time, but...
 9    Q    Mr. Tomkovich, who -- I mean, look, you come in here and
10    your testimony is:  Mr. Hopper did it; Mr. Hopper did it;
11    Mr. Hopper did it.  Oh, by the way, I don't know who did it.
12              That's from 2013 -- I'm sorry, 2013 to 2015, that's
13    your testimony.  It's Hopper's fault; right?
14              Now, it's ICON Media's fault.
15              Where is your -- where does your responsibility
16    start?
17    A    It starts where --
18    Q    Where is your job -- when is it your job to monitor
19    backroom for totally nude friction dances on your own company
20    website?  You're 100 percent owner.
21              You own the real estate --
22              THE COURT:  I think the point of your question is
23    made.  Let him answer it, please.
24              MR. POSTIGLIONE:  Thank you, Your Honor.
25              THE WITNESS:  I did monitor it.  And I went and had a
```

1    meeting with them personally to fix this mess.  They said they

2    were going to fix it.  It was some sort of computer glitch.

3            Okay?  And I had someone with me at the meeting also

4    that can attest to that.

5            So I was taking issues with fixing this stuff.

6            Now, can I monitor it every day?  I don't get online

7    every day and look at this nonsense.

8    Q    Would you agree with me --

9    A    But this isn't even -- from the time this happened, this

10   was a different company that had the website.

11   Q    Would you agree with me that if language on its face on

12   its website is true, then you're breaking the law -- this club

13   is breaking the law here in town?

14   A    Yes.  As the law is today, yes.

15           MR. POSTIGLIONE:  Let me show you the next exhibit,

16   please.

17   BY MR. POSTIGLIONE:

18   Q    Do you recognize this to be the screenshot of the web --

19   or a printout of the web page of Thee Officers Club

20   Jacksonville?

21   A    It doesn't say Officers, it just says The Premier

22   Gentleman's Club on mine.

23   Q    Look up top there.

24   A    Oh, the top.

25   Q    I think there's something lost.  There's a printout.  I

1    think it's not showing on the screen.

2    A     You have a scrivener's error also?

3               MR. LIROT:  What exhibit is that?  Forgive me.

4               MR. POSTIGLIONE:  56.

5               THE WITNESS:  Okay.  I'll attest that that's Thee

6    Officers Club logo.  On here, I can't see it.

7    BY MR. POSTIGLIONE:

8    Q     Let's look at what this one says.

9               Let's see if we can find a computer glitch in this

10   one.

11   A     Uh-huh.

12   Q     Okay.  You got a dancer on the pole.

13              New and improved.

14              That's because you did those renovations; right?

15   A     But this isn't the current look of the place right now on

16   this -- on this picture.

17   Q     This website was printed -- this screenshot was taken

18   today you testified; right?

19   A     But it has not been updated either.

20   Q     Okay.

21   A     So this is not what it looks like today either.

22   Q     Let's read what it says.

23              The Officers Club is a dream come true.  Featuring

24   100 percent nude exotic dancers.  We are, without a doubt, the

25   greatest gentlemen's club in Duval County.  Thee Officers Club

1  is the number-one place to be in Northern Florida for nude

2  friction dances.

3          Is that what it says?

4  A    Yes, that's the terminology they use in South Florida and

5  I hired a South Florida company to do the website.

6          And in South Florida, it is nude and friction dances,

7  not in North Florida.

8  Q    The website says North Florida; correct?

9  A    That's correct.

10  Q    So, again, is this a computer glitch?

11  A    This is what they told me they were going to fix it.

12  Q    Is there anyone in your organization, for instance, your

13  managers at Thee Officers Club, the guy who works there, or at

14  Flash Dancers, the guy who works there, has the keys to the

15  place, is it that person's responsibility to monitor this

16  content?

17  A    That's how I had it set up, and I've asked them to do

18  that.  But obviously they're not as good as proofreaders as we

19  are today here.

20          But I went there to this ICON Media when I noticed

21  this and had a meeting with them to get this stuff down.  And

22  you caught me off guard when you showed to me it's still up.

23  So I have some other issues with them after this is over.

24  Q    You would agree with me that if this language is true, in

25  other words, if there are, in fact, full friction nude dances

1   in the backroom at Thee Officers Club here in Jacksonville,

2   then that's against the law; correct?

3   A     Yes, sir.

4   Q     Okay.  Mr. Tomkovich, I just -- you've given the same

5   answer that you just gave with respect to these websites.

6   A     I gave you the truth.

7   Q     You gave me the same answer you gave when you were asked

8   about what my clients are alleging here; would you agree with

9   me?

10          Somebody else's fault.  I didn't know about it.  I

11   didn't monitor it.

12          MR. LIROT:  Objection.  Argumentative.

13          THE COURT:  I'll -- is there a question?

14   BY MR. POSTIGLIONE:

15   Q     Was that your testimony?

16   A     That I didn't put this stuff up?  No, I did not.

17   Q     Your testimony or your answer would be the same or has

18   been the same since 2013 and 2016, the time period in this

19   lawsuit about these images on your social media; right,

20   somebody else's fault?

21   A     Yes.

22   Q     And you, as the owner of the club, the owner of the real

23   estate, completely disclaim any responsibility for any of your

24   employees' actions from 2013 to the present day with respect

25   to --

1           MR. LIROT:  Objection.  Assumes facts not in

2     evidence.  Not employees.

3           THE COURT:  Yeah.  Well, I'm going to sustain the

4     objection.  I think that's a legal argument.

5           What else you got?

6           MR. POSTIGLIONE:  Give me two seconds, Your Honor.

7     BY MR. POSTIGLIONE:

8     Q    Mr. Tomkovich, when was your meeting with ICON?

9     A    It was about eight, nine months ago on this issue.  And

10    not just on this issue.  It was also the issue of the SCO and

11    how they were charging the SCO, which I'm led to believe is how

12    you have your rankings higher.

13          And I was paying for SCO -- what do they call them,

14    like, Google ad words.  You pay money, then you click, and

15    every time somebody clicks, it's ten cents or something of this

16    nature.

17    Q    Mr. Tomkovich, I want to give you a chance to talk, but my

18    question was specific.  When was your meeting with ICON?

19    A    The last meeting with them about this issue was about

20    eight months ago.  And I took it for granted -- maybe not even

21    that long ago.

22    Q    Who did you meet --

23    A    I took it for granted that it was fixed.

24    Q    Who did you meet --

25    A    A lot of other things, not just this.  The address is

1   wrong -- not the address on there, but the location of the

2   address of the facility is wrong.

3           It says the corner of 295 or 275.  That's all the way

4   in Tampa.

5   Q    Who did you meet with?

6   A    Joe Whitebald and Mark -- Mark -- I don't remember what

7   his last name is -- in their office in Pompano Beach.

8   Q    Now, you saw this language on the website eight months

9   ago, and you met with them and told them to take it down but

10  it's still up?

11  A    I don't know if it was -- there was 12 websites we were

12  discussing.  And I gave them a list of wrong information.  Then

13  we went back again and they didn't fix it.  And again.  And

14  they assured me at the last meeting they were going to fix it,

15  and here we are today, you pulled it up -- which I appreciate,

16  because they just got fired today.

17  Q    You're a reasonable person --

18  A    Not when it comes to this.  That's wrong.

19  Q    Can you look at that ad and draw a reasonable conclusion

20  that if I went to Flash Dancers or Thee Officers Club, based on

21  these ads, that there would be totally nude dancing and totally

22  nude, full friction dances in the backroom?

23          Is that a reasonable conclusion from reading that

24  language?

25              MR. LIROT:  It speaks for itself and that's asking

1   him to speculate on what somebody else might think about that.

2          MR. POSTIGLIONE:  I'm asking what his opinion is,

3   Your Honor.

4          THE WITNESS:  In Jacksonville, Florida, there was --

5          THE COURT:  I'm going to let him answer this

6   question, and then I think we've really exhausted this topic.

7          I think we've exhausted this topic.

8          All right.  Do you understand the question, sir?

9          THE WITNESS:  Yes.

10         THE COURT:  All right.  You can answer the question.

11         THE WITNESS:  In Jacksonville, Florida, they would

12  know that was not correct advertising.

13  BY MR. POSTIGLIONE:

14  Q   I've got a final couple questions.

15         Based upon looking at this -- and your testimony is

16  it's wrong and you're clearly upset about it -- can you now

17  understand or can you revisit your earlier testimony that it's

18  not reasonable for my clients to be upset that they've been

19  associated with something like this?

20         MR. LIROT:  Objection.

21         THE COURT:  I think it's -- I'm going to overrule it.

22  He can answer it.

23  A   I can't change my answer.

24  Q   Even after seeing this, you aren't going to change your

25  testimony?

1    A    No.

2            MR. POSTIGLIONE:  Okay.  I'll pass the witness, Your

3    Honor.

4                        RECROSS-EXAMINATION

5    BY MR. LIROT:

6    Q    Mr. Tomkovich, this was the result of an error?

7    A    Yes, it's error.

8    Q    What did you do during the break?

9    A    I went out there and called ICON Media, told them I was in

10   federal court, and why is this back up there again.

11           And they said:  Well -- I said you are fired and

12   you'll be hearing from another attorney, and that's when I had

13   to walk back in here.

14   Q    And they ran like 12 different websites for 12 different

15   clubs that all have different business models based on where

16   they are?

17   A    Yes.

18   Q    Do any of those clubs advertise -- for that location, is

19   it your intent to advertise anything that's not lawful within

20   the jurisdiction where those clubs are located?

21   A    No.

22   Q    And as far as this website, what Mr. Postiglione asked

23   about his clients being upset, there's nothing in this case or

24   that anybody's been shown that shows any website as it was in

25   existence back in 2013, '14, and '15?

1   A     Totally different website, totally different language.

2              MR. POSTIGLIONE:  Objection.

3              THE COURT:  What's the objection?

4              MR. POSTIGLIONE:  Misstates testimony.

5              THE COURT:  Overruled.

6              THE WITNESS:  Totally different websites, totally

7   different information.  It would have never have had nude

8   dancing on there.

9   BY MR. LIROT:

10  Q    So you complied with cease-and-desist, their images come

11  down.

12             If there's something in error on a website today,

13  would they have any basis to be upset about that?

14  A     If I put their images on the new website, absolutely, but

15  I did not do anything like that.

16  Q    So their images aren't on this website?

17  A    Nowhere.

18  Q    The addresses are incorrect?

19  A    The addresses look correct, but the geographical

20  directions on how to get there are incorrect.

21  Q    275 is over on the west coast, Tampa?

22  A    Yes.

23  Q    The room descriptions are incorrect?

24  A    Yes.  They describe facilities in South Florida.

25  Q    Would you agree with me that this is ripe with error and

1  does not describe anything that occurs at Thee Officers Club or

2  Flash Dancers?

3  A    That is correct.

4         MR. LIROT:  That's all I have.

5         THE COURT:  All right.  Ladies and gentlemen, do you

6  have any questions at this time for Mr. Tomkovich?

7         All right, sir.  You may step down.  Thank you very

8  much.

9         Who's the plaintiffs' next witness, please?

10        MR. CASAS:  Mr. Chamberlin, sir.

11        MR. LIROT:  You can't keep those.

12        Give those back to this lovely lady.

13        THE COURT:  We'll make copies.

14        Good morning.  How are you, sir?

15        THE WITNESS:  Good morning.

16        COURTROOM DEPUTY:  Would you raise your right hand,

17  please.

18        Do you solemnly swear that the testimony you are

19  about to give before this Court will be the truth, the whole

20  truth, and nothing but the truth, so help you God?

21        THE WITNESS:  I do.

22        COURTROOM DEPUTY:  Please state your full name and

23  spell your last name for the record, sir.

24        THE WITNESS:  It's Stephen Mark Chamberlin.  It's

25  Chamberlin, C-h-a-m-b-e-r-l-i-n.

```
 1              THE COURT:  He's waiting for me to tell him it's
 2   okay.
 3              It's okay.
 4         STEPHEN CHAMBERLIN, PLAINTIFFS' WITNESS, SWORN
 5                      DIRECT EXAMINATION
 6   BY MR. CASAS:
 7   Q    Good morning, sir.  How are you?
 8   A    Doing good.  A little nervous.
 9   Q    Please state your occupation for the record.
10   A    Sir, I'm a model agent.
11   Q    And how long have you been a model agent?
12   A    30 years now.
13   Q    Please describe your educational background for the jury.
14   A    I graduated from the University of New South Wales in
15   Sidney with a dual degree in economics and law.
16   Q    And when was that?
17   A    I graduated in 1985.
18   Q    You said you had a degree in economics?
19   A    It's economics law, yes, sir.
20   Q    And law?
21   A    Yes, sir.
22   Q    Are you an attorney?
23   A    No, sir.
24   Q    So you never had a license to practice law?
25   A    No, sir.
```

1   Q    I detect a slight accent.  When did you move to the United

2   States?

3   A    1989, I believe.

4   Q    '89?

5   A    Yes, sir.

6   Q    And where have you primarily lived, sir?

7   A    For the -- primarily Los Angeles.  I was in New York for a

8   number of years, and now I'm based in Miami.

9   Q    Okay.  Please describe for the jury generally what your

10  experience is in the modeling industry.

11  A    I represent models worldwide.  I started out at an agency

12  in Australia.  I had the opportunity to work -- to move to

13  Los Angeles and work in what is -- what was or is the most

14  established agency in Los Angeles.  It's called LA Models.

15          It's still in operation today and probably is the

16  largest and most successful agency in Los Angeles.  I was

17  brought in as an agent there.  Within a year or so I was the

18  director of the women's department.

19          I worked there for approximately, like, five years.

20  I moved to New York on behalf of the company to open what is

21  New York Models.  It's still in operation today.  I worked

22  there for a couple years between there and Los Angeles, between

23  the two agencies.

24          And then I started my own agency.  Started out just

25  one employee, that was myself, and grew it into a company.  We

1    had over 30 employees and -- for ten years.

2    Q    Let me ask you about that.  You said you started your own

3    agency.  What was the name of that agency?

4    A    It was called Warning Management.

5    Q    And you said you started it from one employee and grew to

6    how much, sir?

7    A    We had close to 40 employees.  Turn over -- it was one of

8    the first model agencies to become a public company.

9    Q    And when did it become a public company?

10   A    2006/2007, I believe.

11   Q    And at some point, did you end up leaving that agency?

12   A    I did, sir.  About 2008/2009.

13        As a lot of public companies do, they took a

14   different direction from where I was at, and left.  I

15   started -- I had my own management company called Rumble Storm,

16   which doesn't -- it works -- operates worldwide.  It doesn't

17   have a physical address, but I represent 30 or so models, a

18   number of celebrities, and I have these models placed in

19   agencies all around the world, and I earn a commission from

20   those agencies.

21   Q    Let me ask you a question about -- Rumble Storm, you said?

22   A    Yes, sir.

23   Q    How long has Rumble Storm been in operation?

24   A    Now, it's been since the end of -- since I left Warning,

25   so it's ten years.

1    Q    And are you still an owner of that company?

2    A    I am, sir.

3    Q    And you said that you have at present 30 models that you

4    manage; is that correct?

5    A    30 to 35, yes, sir.

6    Q    So that is currently; correct?

7    A    Currently.

8    Q    So is that to say that you are a current model agent?

9    A    I'm an agent also for an agency in Miami called Michele

10   Pommier's.  Michele is one of the grande dames of modeling.

11   She's been in the industry for over 40 years, and I've been

12   working with her for the last three years.

13   Q    Now, throughout the course of this trial, we've heard the

14   term "model agent," several times, and now you're using it, but

15   please explain to us what does a model agent do.

16   A    A number of things, but primarily we find work for the

17   models.  Legitimate agencies, the only way we make money is if

18   the models make money.

19        We take a commission from the work that they do.  I

20   also -- very responsible for the development and the career of

21   models.  It's not just like a temp employment agency.  From

22   their first shoot to how they're marketed to where they travel

23   to their career development is -- is part of my responsibility.

24   Q    And you mentioned that you've been doing this for 30

25   years.  As you sit here today, what are some of the most

1  memorable models that you've represented as an agent?

2  A    It's been a lot.  I've had -- some of the most memorable

3  experiences, I think, also, I've had is, first million-dollar

4  booking was with a model called Claudia Schiffer.  I negotiated

5  a number of million-dollar deals for Paris Hilton.  I was Paris

6  Hilton's agent.

7        But it's not always about money.  I started a model

8  called Jessica Biel.  I booked her first job, I think it was

9  Teen magazine, to the cover.

10       Jennifer Garner was a model that I found on the

11  street and started.

12  Q    Did you say Jennifer Garner?

13  A    Jennifer Garner, yes.

14       It's been a number -- I negotiated the deal for the

15  Dalai Lama to tour through Latin America.

16  Q    Let me ask you this.  Also through the course of this

17  trial we've heard testimony from the models about the different

18  types of models that are out there in the model industry.

19       Could you explain to the jury, in your training and

20  experience, the different categories of model.

21  A    Categories and types of models, it blends.  An agency --

22  often if you go to an agency website -- sorry, sir, I feel like

23  I have my back to you.

24       THE COURT:  That's the way it works.  You can either

25  face Mr. Casas or the jury.  I'm fine.

1          THE WITNESS:  Yes, sir.

2          If you go to an agency website, they'll be broken

3    down, usually, like, new face models to models that are just

4    beginning.

5          We have a division which is often labeled Editorial,

6    which are the models you'll see in the major campaigns for

7    products.

8          We have fashion models.  And some of the models can

9    be in more than one category.  But often when a client is

10   looking for it, we have commercial models, you know, the smiley

11   friendly girl you see next door with the big teeth, the Pepsi

12   Cola ad or the toothpaste ad or those type of ads.

13         Social media influencers, the type of models that you

14   more work with their websites and their social media followers.

15   BY MR. CASAS:

16   Q    So thank you for ending on that topic of social media

17   influencers.

18         How long has that really been a new thing in the

19   modeling industry?

20   A    Social media influencers, I think, have been around for

21   probably the last sort of, I believe, eight, ten years --

22   eight years, I guess.

23         In the modeling industry, it was something that came

24   on that traditionally an advertiser would employ a model, book

25   her for a photo shoot, promote the products that they're trying

1    to sell.  Social media models then have been gathering or

2    growing their followers, the people that look at their constant

3    feed.

4         It's -- and so then they'll actually advertise the

5    products themselves.  So they'll bring a product on, they'll

6    go:  Hey, I use this breakfast thing every morning or I wear

7    these swimsuits or I use this hair gel, and that goes directly

8    to their followers, which is the same as -- you know, you have

9    to look at -- sorry for going on, but *Vogue* magazine has a

10   subscription base, I think, of 1.2 million subscribers, but I

11   know some of the plaintiffs in this case have ten times that

12   amount of followers.

13        So you look at $100,000 for a single page for an

14   advertisement in *Vogue* that goes out to a million people, and

15   I'm sure the statistics that more people might read that

16   magazine in the dentist office or somewhere along those lines,

17   but you've got a social media influencer that puts out there a

18   post or advertisement that goes to multi-millions of followers.

19   Q    Let me ask you a follow-up to that.  So now with the

20   advent of social media, Instagram, Snapchat, Twitter, all those

21   types of platforms, how important is it to have a following or

22   what factor is it to have a following when a model is being

23   considered for a particular job, as an agent?

24   A    I've seen the trend in the last few years where it really

25   started with the major fashion shows.  So the models would go

1   to a casting -- you know, there can be hundreds of models there

2   to a casting and -- I try to make everything personal.  I think

3   about myself, how I'd do it.

4           Okay.  I'm an advertiser.  The model walks in, they

5   ask now:  How many followers do you have on social media?

6           And if I'm an advertiser, I think:  Well, if she's

7   working for me or he's working for me and they put out a post

8   that goes to their followers because of something they're

9   doing, that's increased advertising for me.

10          But also if I'm using a model in a runway show or

11  something like that and they have a lot of followers, there's

12  going to be recognition of those followers, where those people

13  will be following a similar kind of thing.  So they'll see --

14  they'll see it.  Traditional modeling school continues.

15  Q    Let's go back to you a little bit.

16          What are some of the major brands that you've

17  negotiated deals for?

18  A    I've worked right across the board.  You know, publishing

19  houses, all the major magazines worldwide, *Condé Nast*, the

20  *Vogue*s, the *Elle*, *Ws*, I could go on.  I believe I've worked

21  with all the magazines.

22          Major brands, from Apple to Coca-Cola, right away

23  across board, all those.  And all the advertising agencies that

24  hold these -- that hold these clients as if out of the base

25  level, they'll call.  I've booked fashion brands, Chanel, Louis

1    Vuitton, on and on.  I'm sorry.

2    Q    Thank you.

3         Now that we've had a chance to learn a little bit

4    about you, can you describe generally what the negotiation

5    process is when an agent is trying to book a model for a

6    particular job.

7    A    There's a number of steps, and it starts out with asking

8    the client -- it's a number of questions you have to ask.

9         First you want to know what the product is.

10        You want to know the type of advertiser, who they

11   are, what they do, what are the sort of advertisements, where

12   they sit in the market.  And then how long are they using it;

13   how are they going to use the image.

14        What's the shoot going to look like?  Because -- and

15   then we look at -- we look at the different types of models and

16   the different rates and apply that to the industry -- or to the

17   negotiations.

18   Q    Let's break that down a little bit, sir, please.

19        You mentioned that one of the first things you look

20   at is what the product is.  Explain that.

21   A    You have advertisers that have certain products.  So it is

22   what is the model going to be endorsing or promoting?

23        Product can vary, right the way from swimsuits to

24   Coca-Cola to all the different -- anything you see in

25   advertisements.

1    Q    And why is analyzing or looking at the product important

2    to you as a model agent?

3    A    You're associating a model with that product.

4         It's important -- it's important in the development

5    of her career, important in the development of her rates as a

6    model.  The type of work that a model does is very important.

7    Q    And do you take a look at the potential negativity that

8    could be associated with any particular product as a factor in

9    the negotiation process?

10   A    I try to consider every factor.  We look at -- we look at

11   everything, the type of client, the -- definitely what the

12   product is.

13        There's a number of easy-to -- easy-to-understand

14   kind of products.  If it's a personal hygiene product, if

15   you're putting a model to a personal hygiene product, to a

16   sexually -- condoms, those sort of products, anything along

17   those lines, there's a certain -- because you have to look at

18   going forward, all right, what other clients are going to be

19   working with this model or what direction you're taking that

20   model in and what type of clients do you want to associate the

21   model with.

22   Q    Okay.  You mentioned the term about "usage."  What is

23   "usage"?

24   A    Usage is a number of things, but usually it's the way

25   that -- once the advertiser has the images they want to use is

1    how they're going to get them out to people.

2           Would you like me to break down sort of how that

3    works?

4    Q    No, not yet.

5           Now, you also mentioned the "term of use," what is

6    that?

7    A    The term of use is how long are they going to use it for.

8           30 years of being an agent, I've never written a

9    contract that says you can use it forever and ever.  It's

10   always a period of time.

11          It could be the season, you know, a spring collection

12   of clothing, or summer.  It could be for a year.  Very rarely

13   do I have contracts that go for more than a year.  Because

14   then -- otherwise they're going to be out there forever.  The

15   model wants to work for different clients, other clients, and

16   you get a chance to renegotiate it and -- for further usage.

17          Most clients know that period of use is limited.

18   Q    Let me ask you another question about day rate.  You used

19   the term "day rate."  Explain to the jury what a day rate is.

20   A    Day rate is a basis for all negotiations.  It is for the

21   model's time on set.  When she gets there and works, that's her

22   working day.  That's the rate -- for that, you're really

23   saying:  Okay, the advertiser can use an image to advertise.

24   It's to associate their name with the images.

25          But different models, different rates, depending upon

1    a whole number of factors that -- of what the day rate is.

2              It applies right across all industries, how much do

3    you get paid for a days' work.

4    Q    And you said that the day rate depends on a bunch of

5    factors.  What type of factors does it depend on?

6    A    There's a number of factors.  It depends on the experience

7    of the model, her work history, the type of clients she's

8    worked with before, her position in the market.  There's a

9    number of factors along those lines.

10   Q    And is there any one factor that always applies or does it

11   vary from job to job, from negotiation to negotiation?

12   A    If -- no, it -- it varies depending upon all the questions

13   that you need to ask.  Every job is different and needs to be

14   negotiated.

15   Q    All right.  Taking you back to the term "usage."

16             What are the different types of standard usages in

17   the industry, the modeling industry?

18   A    As I mentioned before, usage is a sort of -- you have the

19   images.  How are you going to get them to the people that you

20   want to promote your product to?

21             In -- not into the old days, but when I started, you

22   looked at catalogs, you looked at flyers, you looked at

23   newspaper advertisements, magazine advertisements.  Things have

24   changed slightly now, you're looking at the website of the

25   client that's using it.  Social media goes worldwide.  Anyone

1    can access social media.  The numbers are incredible.

2            You're looking at posters, billboards, the hangtags

3    you see when you buy clothes, the little hangtags, the photo,

4    the model wearing the clothes.  Flyers, coupons.

5            Then there's other usages where sometimes clients

6    want to advertise a third party, not just their own industry.

7    They may advertise another company or something else on there

8    as well on the advertisements or tie the image into another

9    advertisement.

10           Branding.  Branding is a little more complicated.

11   It's really like a personal endorsement.

12           Like models wear clothes or a product, and if there's

13   dialogue that goes with it, the dialogue is about the product,

14   about the shoes, or about the top, or about the -- whatever.

15   The Coca-Cola or the product.

16           When you start getting into where a model is like,

17   you know, I use or I do this, that becomes branding, or someone

18   speaking about the model, that becomes branding.

19   Q    Thank you.  So focusing on that branding aspect, when

20   branding is a part of the usage, does that command a higher

21   premium?

22   A    Yes, sir.

23           It becomes a usage that you negotiate like all the

24   other usages.

25           We apply a day rate to that usage and we negotiate.

1   Q     These factors that you've described, including the term

2   "day rate," "usage," are they used in all model negotiations?

3   Is that something you analyze as part of the negotiations

4   process?

5   A     It's the way the industry works.  All those things are

6   part of the rate.  You look at all those things, yes.

7   Q     How long have you personally, as a modeling agent, used

8   this process you're describing to negotiate model deals?

9   A     It was taught and drummed into me from the first day I sat

10  at a booking desk.  So it's 30 years now.

11  Q     When you first started out, sir, as a modeling agent --

12  pour yourself water.

13  A     Do you mind?

14  Q     Was there some sort of a mentorship program, a training

15  program, a school or anything that you went through?

16  A     No, sir.  I sat at a desk with some experienced agents,

17  and I wasn't allowed to negotiate right from the start.

18         My job was to learn the process, to learn -- you had

19  to ask the questions.  That's the basis of any contract is you

20  go through and you ask the questions, the product usage and all

21  the other factors.

22         And then from there, the other agents would talk and

23  go say:  What models are you interested in?

24         You'd send out different models in each of those

25  categories that we spoke about earlier, and depending upon

1   their experience, there would be different day rates depending
2   upon what the product was.

3         You weren't allowed to start right with that, but you
4   learn as you go.

5   Q   Is there, like, a model agent university or a school?

6   A   My mom kept asking that, but no, no, there wasn't, sir.

7   Q   So in the Navy we used to call it OJT, on-the-job
8   training.  Is that what you had to do, sir?

9   A   Yes, sir.

10  Q   Throughout the course of your career and in negotiating
11  the types of deals you're discussing about, what type of
12  interactions did you have with other agents that you would work
13  with?

14  A   Worked in two ways, once -- working at LA Models, which
15  was an independent agency -- it wasn't a part of a network,
16  like the Elite group where they had an agency in every -- so I
17  traveled quite a lot worldwide to see the shows, Paris, Milan,
18  London.  And in each -- each major city, there'd be anywhere up
19  to 15 or more agencies.

20       And it's a strange industry in that we share the
21  models.  So I'll send models to agencies that I work with.

22       So being an independent agency and one of the big
23  ones, I was welcomed in all those agencies and I spent a lot of
24  time traveling.  So you'd spend time talking to agents, talking
25  about what sort of rates.

1        And if I was going to take one of your models -- if
2   it was your model, and you developed her and grown her in your
3   market in London, you're going to send her to me in London,
4   we're going to talk about her rates and what sort of work she's
5   done and what direction and those things.

6        So I have that interaction.  And also, when booking
7   with a lot of the major clients, especially the big department
8   stores, Macy's, Nordstroms, all of those sort of agencies,
9   they'd employ probably an ex-agent that would negotiate with
10   the model agencies because they were constantly booking.  We
11   did bookings all day, many, many bookings a day, a week for
12   these big -- we used to advertise constantly.  And these guys
13   knew the jobs, they knew the rates, but they still had to
14   negotiate with us.

15   Q    Thank you, Mr. Chamberlin.

16        Now, sir, you -- as part of your world of modeling,
17   as a modeling agent, okay, you had interactions with other
18   agents; is that right?

19   A    Yes, sir.

20   Q    Now, the negotiation process that you've described here
21   for how you negotiate, in your opinion, is that widely accepted
22   in the industry, in the modeling industry?

23   A    Yes, sir.

24   Q    As a modeling agent, do you negotiate on behalf of the
25   model or on behalf of the company you're trying to sell the

1    image or image and likeness to?

2    A    No, on behalf of the model.

3    Q    Have you ever had a situation where a company comes to you

4    and says:  Listen, Mr. Chamberlin, all I've got is $10,000.

5    That's my budget, and I want Model X.  How would you negotiate

6    that deal?

7    A    Often they won't ask -- or they may ask for Model X, but

8    usually they say -- it happens quite often:  Here's our budget.

9    You still go through the exact same process.

10         What's your product?  What are you -- how are you

11   going to distribute these?  You ask all the same questions.

12   And then you break it down.

13         So if I gave them a model whose day rate was 10,000,

14   then she wouldn't be getting paid for putting it up on a poster

15   or a billboard in a store.  So you have to work back.

16         You know, you may not -- you know, you don't have to

17   explain the process and -- I'm sorry to go through all this

18   with you, but you don't -- you wouldn't do this with a client,

19   and say:  Okay, 10,000, great.

20         These girls, you know, once I know what the usage is

21   and terms and all the questions that we normally ask, I'd say

22   here, these are the models that we could -- you know, that

23   would work for that rate.

24   Q    So even in that situation where the other party isn't

25   necessarily negotiating with you, but telling you that's all

1   they're going to pay, you, as the modeling agent, would still

2   use all those factors to analyze what they get for $10,000?

3   A    Yes, sir.

4   Q    Okay.  Now, we talked about that there's no university or

5   formal schooling for this type of stuff.

6          In your world, is there some sort of a, like, a

7   guidebook or publication or anything that helps you learn how

8   to do these deals?

9   A    There was a book that came out a number of years ago,

10  pretty much in response to that change I mentioned earlier

11  where old-school bookers that were used to booking catalogs and

12  flyers and leaflets, the traditional what was advertising, as

13  social media and these things became more prevalent, a lot of

14  advertisers who were using Facebook, using Instagram as their

15  major form of advertising, as their distributorship worldwide.

16          So they'd need to become aware.  And we'd say:  Well,

17  you have to pay for that.

18          And they're like:  No, it's only this.  It's only

19  that.

20          But it got to a point agencies were talking about it

21  all around the world, how do we deal with this.  A guide came

22  out -- it was put out by the European Models Association,

23  called *The White Book Guide to Modeling Fees*.  It actually

24  listed everything right through.

25  Q    Everything that you're talking about today?

```
1    A     Yes, sir.

2    Q     And you've read this publication?

3    A     Yes, sir.

4    Q     And is there anything in that publication that goes

5    against what we're talking about right now?

6    A     It's a general guide.  And it was -- again, it was written

7    a little while ago.

8          If anything, the usages of -- from when they first

9    wrote it, the usages of and the incidents of social media usage

10   has grown.

11         I think everyone's seen the rise in social media.  So

12   it's applicable.  And then we modify it.  It was a guide.  It

13   wasn't -- it wasn't:  Here's -- this is how you do it.  It was

14   a guide to it and explaining it to a lot of different markets.

15   Q     So you're here today in your capacity as what's called an

16   expert to assist the jury in making a determination.

17         Prior to taking the stand, did you happen to talk

18   with anybody else in your industry to determine if your

19   methodology and approach to the negotiation process was sound,

20   that you're right?

21   A     I work with agencies -- as mentioned, I'm talking to

22   agencies every day.

23         Michele Pommier, like I said, is a famous name that's

24   been around for 40 years in Miami.  Her experience is -- I've

25   often spoken to her about this, but I have a couple other
```

1    peers, agents, that I've worked with over the years.  A

2    gentleman called Chris Forberg.  Chris is probably going on 40

3    years of work now.  He was director of IMG men's agency in New

4    York, and DNA, and then he came out after I had left and became

5    a director of LA Models.

6              I've often sat and, you know, there's always

7    questions.  I know how to do it.  But it's always good to have

8    someone else to bounce off and there's often many different

9    circumstances.

10   Q    And just to be clear that you answered my question --

11   A    I'm sorry.

12   Q    -- did you go over with them the process that you're using

13   as a modeling agent to make sure that it is indeed the standard

14   in the industry?

15   A    Yes, sir.  Yes, sir.  I know it's the standard.  I've

16   worked in many different agencies with a lot of different --

17   agents move from agency to agency.  When you come in with an

18   experienced agent, you're not going to sit down and go:  Okay,

19   well -- because things happen, you know, you'd end up with a

20   girl not getting paid her fair rate for the work that was done.

21             MR. CASAS:  Your Honor, because there was an

22   objection to this the other day, I'd like to tender the witness

23   as a qualified image and likeness valuation expert.

24             THE COURT:  All right.

25             MR. LIROT:  We'll just maintain our challenge for the

```
 1    record.
 2                THE COURT:  That's fine.
 3                All right.  You may proceed.
 4    BY MR. CASAS:
 5    Q    Sir, what's your experience as an expert in the field of
 6    image evaluation in other matters?  How many times have you
 7    done it?
 8    A    Sat here in trial?  I think this is my fourth time, first
 9    time with a jury.
10    Q    Are you a little nervous today?
11    A    Yes.
12    Q    What got you started in the path of serving as an expert
13    as a modeling agent?
14    A    It's a -- it's a reach.  I believe, actually, I think your
15    law firm was one of the first to reach out to me.  There was a
16    number of models that I knew were being affected by a
17    proliferation of image misuse.  And I actually -- I had
18    inquiries from a few different law firms that models had
19    mentioned my name and said:  Listen, reach out to him.
20    Q    Okay.  And what type of cases have you been involved with
21    as an image valuation expert?
22    A    I've done -- I've done quite a few of gentleman's clubs,
23    strip clubs, if the name's appropriate, swing clubs, adult --
24    adult lifestyle clubs.
25                I've worked for -- I've worked for cases involving
```

1    plastic surgeons, dentists, restaurants, bars, clubs.  I think

2    that's sort of along the list.

3    Q    When this lawsuit was brought, what was the nature of your

4    experience in the -- as an expert as an image valuation expert?

5    A    I believe this is only the second or the third report that

6    I've been asked to write.

7    Q    Now, I'm using the term "image valuation expert."

8         How do you interpret that?  How do you define that?

9    A    It's my experience looking at an image and reverse

10   engineering it back to working out what would be a fair -- a

11   fair valuation or a rate that models should have been paid to

12   do that job.

13   Q    So in performing the services that's this image valuation

14   expert, what documents do you review as part of this process?

15   A    I usually start with the images, the images of the models

16   that have been misused.

17        I review then -- because these are not models I

18   represent, I need to review as much as I can about them, learn

19   their history.  Normal process I do with a new model coming in.

20        Speak to them about the type of work, what records

21   they have, earning documents, that's -- along those lines.

22   Q    When you use the term "earning documents," what do you

23   mean?

24   A    There's a number of earning documents.  So there would be

25   contracts that are written up that describe the terms and the

1  outline of the contract, payment stubs, 1099s, anything that

2  shows the -- the details of the job and the payments made.

3  Q    And when you're talking about the details of the job,

4  you're talking about past jobs that a particular model has

5  done; is that correct?

6  A    Yes, sir.

7  Q    All right.  And as you sit here today, what's your thought

8  on whether models are good bookkeepers?

9  A    It's difficult.  It's a -- it's -- and what's even more

10  annoying is that a lot of the clients, they can sit and tell me

11  about the work they've done, and more -- more times than not --

12  very rarely will I come across a client that I haven't worked

13  with.

14          And if it's a client that I've worked with, I'm

15  usually very familiar with the rates that they would have been

16  paid for the jobs that the model describes, they're talking

17  about.

18          And I see the rates.  I know the rates they would

19  have been paid.  They confirm they're the rates they're paid.

20  But empirical proof is a term I've learned from some of these

21  cases.

22  Q    Let me ask you this question.  You said you take a look at

23  the image that was stolen.  I'm assuming you're talking about

24  the actual advertisement at issue in this particular case; is

25  that correct?

```
1   A     Yes, sir.

2   Q     And what do you look at that for?

3   A     That's the basis of where I need to -- it's like the --

4   it's the end result of the contract.  The image is being used.

5   The usages are there be seen.  I -- it's the result of what

6   should have been a contract on the model's day rate and the

7   type of usages and how it's being used.

8           So I need to look at that because that's what I'm

9   being asked to do.

10  Q     When you say what you're being asked to do, as part of

11  learning how to help the trier of fact, have you looked into

12  guidance from the legal system to help you understand what you

13  should do to try to get to that fair market value for the theft

14  of an image?

15  A     Yes, sir.

16  Q     And what have you learned?

17  A     I've learned that to create -- to come to a fair market

18  value, they have a -- it's called a hypothetical negotiation.

19  I need to recreate how -- I've described how I -- we do the job

20  in the industry.  I have to recreate a negotiation that didn't

21  take place, but the end result is there's the job.

22          The model is -- worked the job, they've used it the

23  way they want to use it, so I've just got to reverse-engineer

24  it.  I've got to get backwards.  Okay?

25          I can work out the rate on the past history of that
```

1  model, the type of jobs she's done, if there's anything

2  straight-line kind of relevance.  And I look at how they've

3  used it.  I look at the usages.  I look at any other factors

4  that are in that image that I can see.

5  Q    Now, in the testimony of the models that are at issue in

6  this case, they've often told the jury that they would not have

7  allowed their image to be used by a strip club ever, at least

8  most of them.

9         So I'm sure they told you that; is that right?

10 A    Yes, sir.

11 Q    So how does that factor into this hypothetical

12 negotiation?

13        How can you have a hypothetical negotiation when a

14 model is telling you she wouldn't have done it in the first

15 place?

16 A    It's something I -- I do consider it, and it's a question

17 I ask all the models.  You know, is this an assignment you'd

18 accept?  Because that would also give me a clue to sort of

19 rates and things that they'd accept to do the job.

20        But I've been asked to do a job, and I do it as an

21 agent.  The job has been done.  It's there.  The evidence is

22 there.  There's the model, there's the image, there's the

23 usage.  I can still reverse back on what I believe the rates

24 and things should be.

25 Q    So irrespective of what the model is telling you, that she

1   wouldn't have done it, your job as an expert in this field is

2   to engage in the hypothetical negotiation; is that right?

3   A    Yes, sir.

4   Q    And you've been retained as an expert in this consolidated

5   case; is that correct?

6   A    Yes, sir.

7   Q    And what were you retained to do?

8   A    I was retained to analyze a number of things: analyze the

9   images, look at the usages, look at the product, analyze the

10  plaintiffs' work history.

11          I feel like I'm repeating some of these, but just

12  this is what I was asked to do.  Analyze the plaintiffs' work

13  history.  Look at their past -- the type of clients that

14  they've worked for, their position in the market, social media

15  presence, web presence.  There's a lot of factors that go into

16  a rate.  Some things you can give a numerical value to and some

17  things you can't.  You know, current fame, certain things like

18  that that -- you have to consider everything.

19  Q    And that's what you were asked to do in this case;

20  correct?

21  A    Yes, sir.

22  Q    And you were also asked to look at the advertisements at

23  issue in this case; right?

24  A    Yes, sir.

25  Q    And to be specific, the advertisements that were generated

1    by the defendants, Flash Dancers and Thee Officers Club; is

2    that correct?

3    A    Correct.

4    Q    And did you do so?

5    A    I did so.

6    Q    Okay.  What, if anything, were you asked not to look into?

7    A    Things I didn't look into and -- was -- I didn't look at

8    the term of usage.  I'm not sure -- I did ask, trying to find

9    out when the images were -- you can see when the images were

10   posted, because there's a date there.  I wasn't given the dates

11   that they were removed or that time period, or if they had been

12   removed.

13   Q    So to be clear, you did not consider the extended use of

14   the images for purposes of arriving at a valuation for damages

15   in this case; is that correct?

16   A    It's correct.

17   Q    And what about reputational harm, did you look into that?

18   A    I considered, but I didn't assign or I didn't -- I didn't

19   assign a value to reputation harm.

20   Q    So later on, obviously, I'm going to get to the point

21   where you tell the jury in your opinion what you think the

22   image theft to each plaintiff is worth, but to be clear, in

23   that valuation, you do not include potential reputational

24   damage or anything like that; right?

25   A    No, sir, I don't.

1    Q    Okay.  Now, were you asked to provide a report in this
2    case?
3    A    Yes, sir.
4    Q    And did you?
5    A    I did, sir.
6    Q    And as part of your participation in this lawsuit, you had
7    an opportunity to review the complaint?
8    A    I did.
9    Q    And the allegations that the plaintiffs are making?
10   A    Yes, sir.
11   Q    And have you spoken to the models in this case?
12   A    On a number of times, yes, sir.
13   Q    Generally speaking, what is your overall opinion as to
14   whether or not the plaintiffs suffered a quantifiable harm in
15   this case?
16   A    As an expert in the -- in the industry, and after
17   reviewing the images, after reviewing all of the models'
18   history, their position, their experience, I believe that they
19   have -- each plaintiff has suffered just quantifiable harm and
20   injury due to the use by the defendants' advertising.
21   Q    So let's go back in time a little bit to when you were
22   first retained in this case.
23           Was it before the lawsuit was filed or after?
24   A    It was before the lawsuit was filed.
25   Q    And what was your involvement in the case prior to the

1  lawsuit was filed?

2  A    I was asked to do a preliminary report, come up with a

3  fair market value for the use by the defendants of the

4  plaintiffs' images.  That's what I was asked to do.

5  Q    Were you also asked to actually go on to the defendants'

6  website and social media sites?

7  A    I don't believe I was asked, but I did -- I needed to

8  see -- that's part of my research is that I need to see what

9  type of advertiser the people are, what the product is they're

10 advertising, what other advertisements look like, what sort

11 of -- what is the model going to be associated with with the

12 use of these -- these images.

13 Q    And when you did that, your own search on the website and

14 social media, were you also doing it in preparation to assist

15 us with a demand letter or a cease and desist letter?

16 A    Yes, sir.  I believe that was -- I was told that my report

17 would be attached to a demand letter.

18              MR. CASAS:  Permission to approach, Your Honor.

19              THE COURT:  Please.

20              MR. CASAS:  Handing the witness what has been

21 previously marked as Exhibits 2, 7, 4, 10, 12, 14, 17, 23, and

22 24.

23              And I'll submit that these are the exhibits of the

24 alleged false advertisements in this case, Your Honor.

25              THE COURT:  All right.

1    BY MR. CASAS:

2    Q     Please take a look at those.

3    A     Yes, sir.

4            THE COURT:  So these are the same images of the

5    models that we've been discussing throughout the trial?

6            MR. CASAS:  Yes, Your Honor.

7            THE WITNESS:  Yes, sir.

8    BY MR. CASAS:

9    Q     Do you recognize those?

10   A     Yes, sir.

11   Q     How do you recognize them?

12   A     These are the images I was given and are subject of my

13   report.

14   Q     And in addition to seeing those images, were you also able

15   to verify that they were on their actual social media and

16   website; is that right?

17   A     Yes, sir.

18   Q     And whose specific websites and social media were they on?

19   A     I went to both the websites of Thee Officers Club and

20   Flash Dancers.

21           I Googled the others, but there was also links on

22   those sites to the social media pages, so I followed those

23   links.

24   Q     In your standard practice of evaluating these types of

25   cases, what do you do first, do you go to social media or do

1    you go to the website?

2    A    Usually website first, and then -- and then there will be

3    links.  It makes it easier.  But I'll also Google the name.

4    I'll Google other references.

5              There's often a number of police reports, a number of

6    other -- anywhere the club or the identity was mentioned on

7    social media, it gives you an understanding of what the

8    images -- how you're associating with an advertiser.  How the

9    models are going to be associated.

10   Q    Explain to the jury why specifically you were looking at

11   the defendants' website and social media.

12   A    One, that was where the images were used.  Again, just the

13   style of images.  If you have your photo up against there and

14   all the photos around it, you're going to be judged as part of

15   the -- part of the whole.  So it's -- you need to see what type

16   of advertisements.

17             They have a tone.  They have a theme.  They have a

18   style.  It's all part of my -- I consider everything.

19   Q    So in review of their -- well, I'm sorry.  When did you

20   actually take a look at their social media and websites?

21   A    As soon as you sent me the -- you sent me these images.

22   Q    Do you remember the time frame?

23   A    I believe it was late 2015.

24   Q    All right.  And was there anything in particular that

25   gained your attention or really stuck out at you about these

1    particular defendants at that time?

2    A    There's a lot of -- there's a lot of hyperbole that is

3    common in advertising.  You know, it's the greatest club in the

4    world.  It's known nationwide.  It's, you know, bigger and

5    better and the parties are fun.

6            The girls -- they advertise the girls would be nude

7    and full friction.

8            There was -- there was alcohol, I think.  You know

9    what, I don't remember that part.  But -- just the images of --

10   the way they -- the way they promoted the -- the girls that

11   worked there.

12   Q    Now, you said you -- you testified that you saw at the

13   time that you first went on to the social media and the

14   websites in late 2015, I believe is what you said, that they

15   were full nude and full friction; is that correct?

16   A    Yes, sir.

17           MR. LIROT:  Objection.

18   Q    And you're sure about that?

19           MR. LIROT:  Best evidence.

20           THE COURT:  Are we sure we're talking about the

21   two that are involved in this case?

22           MR. CASAS:  I'll ask the judge's inquiry.

23   BY MR. CASAS:

24   Q    Are you sure you're talking about the two that are

25   involved in this case, that's Flash Dancers in Jacksonville and

```
1    Thee Officers Clubs in Jacksonville?
2    A     Yes, sir.
3              MR. CASAS:  Permission to approach, Your Honor.
4              THE COURT:  Yes.
5              MR. CASAS:  Withdrawing the exhibits for this moment.
6    BY MR. CASAS:
7    Q    Now, in a moment I'm going to ask you about your
8    individual findings for each of the plaintiffs in this case.
9              Before we do so, can you confirm whether you applied
10   the same industry standard and methodology that you used
11   throughout the course of your 30 years of experience in
12   analyzing the plaintiffs in this case?
13   A     Yes, sir.
14   Q    Let's talk first with Ms. Canas, Paola Canas, one of our
15   Colombian models.
16             What documents or research did you rely on as part of
17   your analysis of her case?
18   A    I looked at everything I could find.  I researched online.
19   I spoke to Ms. Canas.  I looked online at her agency in
20   Colombia.  I looked at all the work I could find of hers.
21             She supplied me a number of documents of earnings.
22   She was just -- she'd worked for the major brands in Colombia.
23             Again, that's one market I haven't booked into, but
24   I've seen a number of models come to the States, and I've
25   represented models that have done the major catalogs there, the
```

1    *Espiro*, the *Beseme*.  She was -- she had a really high profile

2    in Colombia.  And she'd moved to the States a number of years,

3    and she's -- over the last few years, I've seen her profile

4    grow in Miami.

5    Q    So did you use a translator to talk to her?

6    A    No.  But she struggled on.  My son -- my son is Latino

7    born and his Spanish is very strong.  I've been learning.  I'm

8    definitely not skilled, but we had enough words to get through,

9    and a lot of it is brand names, jobs, and the records that she

10   had.

11   Q    So you spoke to her, did the best you could.  And then

12   after that, you went and verified what you found with your

13   research; correct?

14   A    Yes, sir.

15   Q    What assessment do you have as to her overall status and

16   career as a model?

17   A    I think I told you a little bit of that.  But I was

18   surprised Ms. Canas wasn't as tall as other models that I've

19   had work for runway work.  Usually they have the height because

20   clothes are made in sample size, and that's why they have --

21   girls are a certain height because they just had one.

22            But Ms. Canas had actually done quite a bit of runway

23   work throughout Latin America, but also Paris, Milan, Canada.

24   She'd worked in a number of markets.

25            She's extremely fit and she's developed a really nice

1  niche in the market.  Done a number of covers -- actually,

2  quite a few covers, and covers of those major catalogs out of

3  Colombia.  So she was...

4  Q    As part of your analysis and research regarding Ms. Canas,

5  do you have an opinion as to whether or not she has developed

6  an established day rate?

7  A    She has.

8  Q    And what is that opinion, sir?

9  A    For the use by the clients, by the defendants here, I

10  believe to be -- no, I don't believe -- I established a day

11  rate of $10,000.

12  Q    Okay.  So you established a day rate for her of $10,000.

13         Do you have an opinion as to what types of usages

14  apply to the defendants' usage of Ms. Canas' image?

15  A    So that $10,000 day rate, which would be for her time on

16  set, which included advertising, advertising is a usage, but

17  then it was also distributed worldwide on social media on

18  their -- I believe on their Facebook page.

19         MR. CASAS:  Your Honor, permission to approach the

20  witness.

21  BY MR. CASAS:

22  Q    I'm handing you what's been marked as Plaintiffs'

23  Exhibit 10.

24         What is that?

25  A    That's the image of Ms. Canas on the Flash Dancers'

1    Facebook page.

2    Q    Is that the same image that you used and evaluated to

3    determine her fair market value?

4    A    Yes, sir.

5    Q    What about that particular image helped you determine the

6    usage as it applies for determining the fair market value rate

7    you apportioned to her?

8    A    The attachment of the name Flash Dancers to her image,

9    that's the definition of advertising.  So it's Flash Dancers'

10   advertising.

11         The product in this advertisement is Ms. Canas

12   herself.

13   Q    All right.  Explain that for us, because I was just about

14   to ask you, I don't see any other advertisements about drinks

15   or specials or any other product.

16         It's just her on there; correct?

17   A    Yes, sir.

18   Q    What does that mean to you as a modeling agent?

19   A    You need to look at the advertiser.  The advertiser is a

20   gentleman's club.  The main product at a gentleman's club is

21   women entitled Strippers.  I don't know if there's a more

22   polite word -- or entertainers, but it's strippers.  That's the

23   product they're advertising.

24         You take away the girls, the strippers, it's a bar.

25   And that's a different -- it would be a different rate.

1   Advertising a bar is a different rate than advertising a

2   gentleman's club where the product is the model herself.

3           MR. CASAS:  Withdrawing the exhibit from the witness.

4   BY MR. CASAS:

5   Q    So your established day rate for Ms. Canas is $10,000.

6           Do you have an opinion as to what Ms. Canas'

7   reasonable royalty should be for defendants' unauthorized usage

8   of her image?

9   A    The rate is 20,000 total.

10  Q    And how did you arrive at that number, sir?

11  A    That's the usage of her day rate of $10,000 for

12  advertising, and the usage on social media of $10,000, the

13  distribution of the image worldwide.

14  Q    All right, sir.  Let's -- just because they're both

15  Colombian, no particular order, but let's go with Ms. Lina

16  Posada.

17          Did you have an opportunity to analyze her claim?

18  A    I did, sir.

19          Ms. Posada --

20  Q    Hold on.  Let me ask a question.

21          Handing the witness what's been marked as Plaintiffs'

22  Exhibit 24.  What is that, sir?

23  A    That's the image I was given to -- to work with.

24  Q    To what, sir?

25  A    To work with, to assess.

1    Q    Okay.  And what documents or other research did you rely

2    on as part of your analysis of determining a fair market value

3    for Ms. Posada's claim?

4    A    I went through the exact same process that we always do.

5         I had discussions with Ms. Posada.  She gave me a

6    number of documents outlining work history.

7         We talked about her development, her position in the

8    industry, the direction she was taking her career.

9         I researched online.  I looked at -- I looked at the

10   catalogs and the work history she'd done, everything I could

11   research.

12        There's a number of websites listing -- even her own

13   social media I looked at.  I looked at all the images that she

14   used in those social media.

15        You get a full picture, because that's been my job

16   for all this time is to represent the model and understand

17   where she is in the market.

18   Q    So in assessing all that, was there anything specific that

19   stood out about Ms. Posada that perhaps made her stand out from

20   the rest?  There doesn't need to be a correct answer to that.

21   I'm just curious.

22   A    I think that, you know, Ms. Posada had been in the

23   industry for 15 years.  She was really experienced.  It's

24   always difficult for models to change countries, you know, you

25   started out again.  You've got to build up brand awareness,

1   build up people and clients that want to use you.

2           She did -- she did the Wonder Bra campaign, which is

3   for Colombia.  It's known worldwide.  Maybe not the Colombian

4   one, but Wonder Bra is a product that is known worldwide.

5           And she is -- she is a lovely woman that I knew

6   clients would enjoy working with.

7   Q    How often have you spoken to Ms. Posada over time?

8   A    At least seven or eight times.  I've met with her, I

9   think, three times.

10  Q    And do you have an opinion as to what Ms. Posada's

11  established day rate is?

12  A    I established a day rate for the use by the defendants of

13  her image of 15,000.

14  Q    Okay.  And you had an opportunity to analyze the usages

15  that defendants employed and how they advertised her image?

16  A    I did.

17  Q    And so you have that in front of you.  Is there anything

18  in particular that stood out as part of your analysis that got

19  your attention?

20  A    Yes, sir.  It was used -- she was -- it was used on social

21  media.  It was used to promote her as the product available.

22           It's a beautiful woman at a gentleman's club.  It was

23  used to promote a party, the Super Bowl party.

24           Flash Dancers gentleman's club is across the image,

25  the heading, the title on social media and their website.  It

1    was also used to advertise alcohol.

2    Q     What does that mean to you?

3    A     Alcohol is a major client that models have to be 25 or

4    more, you know, well above what appears to be the drinking age.

5    And advertisers pay a lot of money for models to advertise

6    alcohol.

7              The rates things are good because usually, you know,

8    it takes you out of the market for -- you can't be popping up

9    on the Coors and the Budweiser and all these.

10             Once you do one, you get paid for that and that's

11   what it is.

12             Multiple uses of the image.  So advertising

13   discounted drink, discounted alcohol, it all goes to the

14   association with the model, and this needs to be looked at.

15             MR. CASAS:  All right.  And counsel is approaching

16   the witness briefly retrieving the exhibit.

17             THE COURT:  Mr. Casas, do you -- I think for some

18   reason y'all have that as Exhibit 24.  I believe it's actually

19   25.

20             MR. CASAS:  As I was, that would be correct.  My

21   sticky's wrong.

22             THE WITNESS:  That was good noticing, sir.

23             THE COURT:  Ms. Diaz was the one that told me.  I

24   didn't know it.

25             I think maybe y'all did that yesterday, too.  For

1    some reason you got -- anyway, it is 25.

2              MR. CASAS:  On it, sir.

3              Thank you, Ms. Diaz.

4    BY MR. CASAS:

5    Q    The last page of the exhibit, sir, what is that?

6              Handing it back to you.

7    A    This is Ms. Posada's image used on the Flash Dancers'

8    calendar and events page on their website.

9    Q    And is that, as you recall it, to look at the time that

10   you went on their website, sir?

11   A    Yes, sir.

12   Q    And are there any social media links on that website?

13   A    Yes, sir.

14   Q    What are they?

15   A    Facebook and Twitter.

16             MR. CASAS:  Retrieving the document.

17             THE WITNESS:  Also, just on this, there was an -- SES

18   Clubs is a group of other clubs as well.

19   BY MR. CASAS:

20   Q    All right.  Hold on a second.  Make sure there's a

21   question pending.

22   A    I'm sorry, sir.

23   Q    There's what?

24   A    A link in the bottom corner there to SES Clubs.

25   Q    What does that mean to you, sir?

```
 1   A     I remember it's a group of -- I don't know if they are

 2   singly owned, it was just another group of strip clubs.

 3   Q     And what was your -- after reviewing the use on social

 4   media and website and analyzing that they were promoting --

 5   advertising alcohol, what was your opinion as to the fair

 6   market amount she should be entitled to as part of her damages?

 7   A     It was 45,000.

 8             MR. CASAS:  Your Honor, it's 12:26.

 9             THE COURT:  Yes, I think it's probably a good

10   stopping point.

11             All right, ladies and gentlemen, let's go ahead and

12   take our lunch break.

13             We will -- let's hold it to an hour and five, so

14   let's be back in the jury room at 1:30.

15             Please remember all my instructions.  And, you know,

16   I remembered the other day, I usually say this to juries, but I

17   assume y'all know this by now.  When I told you you couldn't

18   talk to each other about the case, I certainly didn't mean you

19   couldn't talk to each other about anything else, and I hope

20   that's been true.

21             So -- but have a nice lunch, remember my

22   instructions, be back in at 1:30, okay?  Thanks.

23             Oh, I'm sorry, we have a note.

24             All right.  We will deal with this on the get-go.

25             Thanks.
```

```
 1              COURT SECURITY OFFICER:  All rise for the jury.
 2         (Jury out at 12:27 p.m.)
 3              COURT SECURITY OFFICER:  Please be seated.
 4              THE COURT:  I've got a -- no, you're good.
 5              So I have a criminal law matter I need to go deal
 6    with, and so I'm going to leave.
 7              But I'm going to just -- I'll let Ms. Diaz pass the
 8    question to both of you and then just put it on the clerk's
 9    table when you're done with it.  We'll deal with it when I get
10    back.  Okay?
11              MR. LIROT:  Very good, Judge.
12              COURT SECURITY OFFICER:  All rise.
13         (Recess taken, 12:28 p.m. - 1:30 p.m.)
14              COURT SECURITY OFFICER:  This Honorable Court is back
15    in session.
16              THE COURT:  Is everybody ready?
17              Let me ask you about this, the -- I want to make sure
18    that -- because, you know, we had so much of this in the -- in
19    Mr. Tomkovich's.
20              So Mr. Chamberlin testified, I believe, that he
21    looked at the websites of these two institutions during the
22    relevant period and saw references to fully nude and so forth,
23    the same ones we talked about earlier this morning, and the
24    jury wants to know about that, too.
25              Is that --
```

```
 1              MR. LIROT:  We're ready for that.
 2              THE COURT:  You are?
 3              MR. LIROT:  We're ready for that.
 4              THE COURT:  Okay.
 5              MR. LIROT:  We can go right ahead.
 6              THE COURT:  Fair enough.  Okay.
 7         All right.  Let's have the jury, then.
 8         And I'm just going to tell the juror that we'll wait
 9    till the end and see if his question has not been answered.
10              COURT SECURITY OFFICER:  All rise for the jury.
11         (Jury in at 1:33 p.m.)
12              THE COURT:  All right.  Welcome back.  Before the
13    lunch break, one of the jurors left me with a question.
14         I've talked to the lawyers.  I think what I'd prefer
15    to do is let the examination finish out and you may get an
16    answer to your question.  If you don't, we'll deal with it at
17    the end of the testimony.  Okay?
18         You may proceed, sir.
19              MR. CASAS:  Thank you, sir.
20    BY MR. CASAS:
21    Q    Good afternoon.
22    A    Good afternoon, sir.
23    Q    Prior to the break, I had asked you some questions about
24    your investigation and analyzing and researching defendants
25    prior to drafting reports and coming up with your opinions.
```

1   And I believe you testified that you had actually visited their

2   website and their social media accounts; is that correct?

3   A    Yes, sir.

4   Q    And do you remember the time frame that you did that, sir?

5   A    It was late 2015, September/October, somewhere around

6   there.

7   Q    Do you recall if it was prior to or after the firm sent

8   their cease and desist letter?  If you know.

9   A    It was before.

10  Q    And why do you say that?

11  A    I was told that I needed to finish the report to be

12  attached to the cease and desist letter.

13  Q    Now, I showed you all the images that appear in the

14  advertisements.  You went through all of them, correct, today

15  in court?

16  A    Yes, sir.

17  Q    And at the time those images were up on the defendants'

18  respective websites, is that when you saw that there was full

19  friction and nudity in the website?

20  A    Yes, sir.

21  Q    And why was that relevant to you?

22  A    It went to the type of establishment that it was.  To

23  mention that full nude, full friction, that takes it to another

24  whole level, I believe.  That's where the models are being

25  promoted as the product and the product is going to be fully

1  nude and engaging in full friction.

2  Q    All right.  Now, what was your understanding of the term

3  "full friction" then?

4          THE COURT:  Do we really have to?

5  BY MR. CASAS:

6  Q    Well, let me just ask this as a phrased question without

7  getting an answer.

8          Did you have an understanding of what that meant?

9  A    Yes, sir.

10  Q    And was that factored into your analysis at all at that

11  time?

12  A    It was part -- it formed part of the overall picture of

13  what type of establishment, what type of club, and what the

14  services that were provided -- or promoting, at least.

15  Q    As a modeling agent, was that something you considered in

16  evaluating the amount of damages that the plaintiffs would be

17  seeking?

18  A    Yes, is the short answer.  I've never come across friction

19  in the industry, full friction as a category or a -- for me, it

20  just added to the -- to the overall picture of the type of

21  advertiser that the models' images were associated with.

22  Q    All right.  And one final question about this issue.

23          I think you also testified that you saw that there

24  was alcohol related to the -- to the strip club; is that

25  correct?

1    A    Yes, sir.

2    Q    And was that important in analyzing the usage of the

3    plaintiffs' photograph?

4    A    Yes, sir.  Alcohol, I think, it would -- I talked about

5    this earlier.  Alcohol is a major product or source of income

6    for models, to be able to advertise alcohol, yes, sir.

7    Q    All right.  And before the break, we had already gone

8    through Ms. Canas and Ms. Posada, and I'd like to ask you now

9    about Ms. Burciaga, the plaintiff in this case.

10           Do you have an opinion as to what her established day

11   rate is?

12   A    For the use by the defendants, I established a day rate of

13   $50,000.

14   Q    Okay.  Was there anything in particular, sir, in your

15   analysis of Ms. Burciaga that stood out as particularly

16   relevant at arriving at your established day rate for her?

17   A    Ms. Burciaga, at the time, was one of the leaders in the

18   whole social influencing kind of movement.

19           She had a real lot of social -- of web presence.

20   There's a lot of stories about her.  She looked -- I believe

21   Ms. Burciaga testified -- looked a lot like Jennifer Lopez at

22   the time, a younger version, that was being compared to.  She

23   was rumored to be in relationships with a number of -- with a

24   few different celebrities and there was a lot of -- there was a

25   lot of media.

1          But also, Ms. Burciaga was an incredible

2   businesswoman at the time.  She had established a few different

3   businesses, a clothing company, I think, Sailor & Saint.  She

4   had a hair company.  And she was the face of those brands.  And

5   wasn't really a model, as such, but a celebrity and a valued

6   person for brand association --

7   Q    Okay.

8   A    -- with a large number of followers.  I don't remember the

9   exact number at the time.

10  Q    What were the identified usages as it pertains -- that

11  they appeared in the actual advertisement that the defendants

12  created and used?

13  A    Can I just turn to Ms. Burciaga's?  I'm sorry.

14          The usages are advertising, which encompasses the day

15  rate.  The Flash Dancers name is attached to her image, as

16  we've discussed as advertising.

17          It was used on social media.  It was distributed

18  worldwide on their Facebook page.

19          At the time, also, it was -- it was very

20  personalized.  Happy Father's Day.  And I know there's --

21  Q    Let me ask you some questions about that.

22          MR. CASAS:  I'm going to approach the witness, Your

23  Honor, with Plaintiffs' Exhibit 12.

24          THE WITNESS:  Thank you.

25  BY MR. CASAS:

1    Q      Is that Ms. Burciaga's image?

2    A      It is, sir.

3    Q      And what about that particular advertisement caught your

4    attention in determining your valuation of her reasonable

5    royalties?

6    A      The statement attached to it is they're wishing a Happy

7    Father's Day and they're describing certain clientele, and

8    it's -- it's coming from her.  It's implied.  Again, she's

9    represented as the product of the club.  That's -- that's what

10   caught my eye.

11   Q      What specifically about that affected the usage that you

12   attributed to the image?

13   A      I thought about it for a while.  I was -- it's bordering

14   on branding.

15          It's her -- using terms that -- to dill some sugar

16   daddies, and out there, and it's Happy Father's Day, and it's

17   unauthored, but it's not something Ms. Burciaga would say.  So

18   I left it as -- just as the advertising and the use on social

19   media.

20   Q      Well, if you could tell us -- you did tell us what that

21   meant.  But do you understand that -- what that means in your

22   own mind, the term dill?

23   A      Oh, yes, sir.

24   Q      Okay.  And what is your overall opinion as to the total

25   amount of reasonable royalty that she should be receiving here

1    in this case?

2    A    I believe it's $100,000, sir.

3    Q    Okay.  Moving on next to Ms. Rosie Jones.

4         MR. CASAS:  Counsel is going to hand what's marked as

5    Plaintiffs' Exhibit 23.

6    BY MR. CASAS:

7    Q    What is that, sir?

8    A    That is the image of Rosie Jones as used by the

9    defendants.

10   Q    And what's your opinion as to what her established day

11   rate for defendants' usage is?

12   A    I established a day rate for the use by the defendants for

13   Ms. Jones of $10,000.

14   Q    And what was your basis for that, sir?

15   A    I researched Ms. Jones extensively, spoke to her.  I

16   looked at her past work history, the type of clients she worked

17   with.

18         Ms. Jones is extremely famous throughout Europe,

19   Great Britain.  I reached out to her agency in London, I've

20   known for many years.

21   Q    Let me just be clear about that.  Are you saying you

22   actually spoke to her agency in London?

23   A    Yes, sir.

24   Q    And what was that -- the purpose of that conversation,

25   sir?

A     To get a background of history of the jobs, where Ms. Jones was at the time I wrote the report, the direction the agency was taking her in.

I had a fairly good idea, but it's always good to get another agent's opinion.

Q     Is that part of your methodology in arriving at the figures that we're talking about, if there was an agency you would speak to them?

A     Always, sir.  Yes, sir.

Q     Okay.  And what's your opinion as to what her established day rate is, sir?

A     $10,000.

Q     And what's your overall opinion as what the type of usages were as defendants used it?

A     Again, it's been used on social media -- well, it's used for advertising.  Flash Dancers, the name's attached to the image.  They used it on social media, distributed it worldwide.

They referred to her as well, a little science experiment.  But, again, I kept it at the two usages, advertising and social media.

Q     So, you know, you said you kept it at the two usages.

I'm curious, when you arrived at these figures that you're informing the jury about, did you ever talk to the models themselves about what amount you were ascribing to their particular usage?

1  A    The models have asked me.

2  Q    And?

3  A    Often they're not -- they're not -- they're not pleased

4  with my summary.

5  Q    What do you mean by that?

6  A    They feel their images and the way it was used would be

7  valued a lot higher.  It's not a rate that they would do it at,

8  if there was any rate.

9           I'm in the middle of it, yes.

10  Q    And when you say you're in the middle of it, what do you

11  mean by that?

12  A    Just between assigning a value that I believe is the fair

13  market value, I'm sure the defendants aren't happy, but I do my

14  job.  I've been doing this for 30 years.  I'm used to models

15  not being happy.  Sometimes you try -- you try and do it right

16  and I do the best I can.

17           MR. CASAS:  Retrieving Plaintiffs' Exhibit 23.

18  BY MR. CASAS:

19  Q    And just to be clear, when you say sometimes the models

20  are not happy, you mean that they would want you to ascribe a

21  higher amount; is that right?

22  A    Yes, sir.

23  Q    The next plaintiff I'd like to go over is Ms. Brooke

24  Johnson.

25           What's your opinion as to Ms. Johnson's established

1  day rate?

2  A    I established a day rate of Ms. Johnson of

3  seven-and-a-half thousand dollars.

4  Q    Say again?

5  A    I established a day rate of $7,500.

6  Q    How did you arrive at that number, sir?

7  A    Research on Ms. Johnson's career.  I looked back at her

8  work history, where she was at the time, career projection.

9         At that time, Ms. Johnson had -- had a child or two,

10  and her career was winding down.

11         She had done some really outstanding work in the

12  past.  She did a Bacardi campaign.  It was nationwide.  And was

13  a contract model for a couple of companies where she was

14  guaranteed, whether she worked once or -- she was guaranteed a

15  number of days, it was either eight or ten days a year, she was

16  guaranteed a certain amount.

17         She has -- she had some beautiful images.  But also

18  the position of her career at the time was a factor I had to

19  take into account.  I took into account everything.

20  Q    But why didn't you look at Ms. Johnson's, like, say, you

21  know, highest number that she ever made in her career, just use

22  that to apportion it to the defendants?

23  A    It's not always -- it's not always so clear-cut.  And

24  usually the product -- none of these models have worked for a

25  gentleman's club.  There's no straight line.

1    So the straight-line comparison as such, with all the

2  same conditions and same terms, you wouldn't need me.  You

3  could just present the things and I wouldn't need this issue.

4  But there's a lot of factors that go into it.

5    Every day -- if that was the -- if that was the

6  stable line, then there'd be no rises in models' rates and or

7  declines in models' rates.  And we all know that happens.

8  Different reasons models become more famous and demand higher

9  rates, and often parts of their career, it's going to slow

10  down, and that's fashion.

11  Q    I'll hand you what's been marked as Plaintiffs' Exhibit

12  14.

13    What is that, sir?

14  A    It's the image of Ms. Johnson as used by Thee Officer's

15  Club.

16  Q    And based on your review of that advertisement, what

17  usages did you identify?

18  A    I identified advertising Thee Officer's Club's name as

19  attached to the image, and it was distributed worldwide on

20  social media.

21  Q    And so how many total usages did you ascribe to that, sir?

22  A    It was two.

23  Q    And what is your overall opinion as to what her reasonable

24  royalty should be in this case, sir?

25  A    $15,000.

1              MR. CASAS:  Permission to approach, sir.  Retrieving.

2  BY MR. CASAS:

3  Q    This particular advertisement is one of those that has

4  nothing but the image of Ms. Johnson; is that correct?

5  A    Yes, sir.

6  Q    The next plaintiff I'd like to go over is Plaintiff Jamie

7  Eason.

8              I'll hand you what's been marked as Plaintiffs'

9  Exhibit 4.

10             Do you recognize that, sir?

11  A    Yes, sir.

12  Q    What is that?

13  A    An image of Ms. Eason as used by Thee Officer's Club.

14  Q    And what's your opinion as to Ms. Eason's established day

15  rate for defendants' usage?

16  A    I established a day rate for Ms. Eason for use by the

17  defendants of 12,500 a day.

18  Q    And how did you arrive at that, sir?

19  A    Same process.  I spent a lot of time researching.  I've

20  spoken with Ms. Eason a number of times.  Past work history.

21  And Ms. Eason's career is really interesting.  She has a number

22  of sponsorships.  She worked in bodybuilding.

23             It's all commercialization of her image, so people

24  using her image for all commercialization.  So I took into

25  account all the factors I could and spent a lot of time working

1    on that.

2    Q    And what were the actual usages that you identified as

3    used by the defendant?

4    A    It was used for advertising Thee Officer's Club's name

5    attached to Ms. Eason's image, and it was distributed on social

6    media worldwide.

7                MR. CASAS:  Retrieving the exhibit.

8    BY MR. CASAS:

9    Q    And what's your overall opinion as to what her reasonable

10   royalties should be in this case?

11   A    12-and-a-half thousand day rate, $25,000 for the two

12   usages in total.

13   Q    Say that one more time.

14   A    $25,000.

15   Q    The next plaintiff I'd like to discuss is Plaintiff Marsha

16   Lund.

17                Approaching with Plaintiffs' Exhibit 17.

18                What is that, sir?

19   A    The image that was used by the defendants of Ms. Lund.

20   Q    All right.  What -- in reviewing that image as part of

21   your analysis, what usages did you identify the defendants had

22   used?

23   A    Advertising, as with Thee Officer's Club's name attached

24   to the image, and it was distributed worldwide on social media.

25   Q    Do you have an opinion as to what her established day rate

1    is, sir?

2    A    I established a day rate of 12,500 for Ms. Lund for the

3    use by the defendants.

4    Q    Thank you.

5          And, overall, what's your overall opinion as to the

6    reasonable royalty she should be entitled to?

7    A    It's $25,000.

8    Q    Thank you.  Retrieving the exhibit.

9          Next plaintiff we'll talk about is Ms. Sarah

10   Underwood.

11         You conducted a review and analysis of her, sir?

12   A    Yes, sir.

13   Q    What is your opinion as to the types of usages that the

14   defendants used in this particular advertising?

15         Handing Plaintiffs' Exhibit 2 to the witness.

16   A    Thank you.

17         The defendants used Ms. Underwood's image for

18   advertising.  The name Thee Officer's Club is attached to the

19   image.  It was used on social media, on Facebook, distributed

20   worldwide.

21   Q    And what is the established day rate based on defendants'

22   usage that you ascribed to her, sir?

23   A    Ascribed $20,000.

24   Q    Why, sir, is it slightly higher than the other models we

25   talked about?

A    Ms. Underwood's work history was quite impressive.  She was named -- she was a Playmate of the Month and she was also named Playmate of the Year.

She was also one of the earlier adopters of social media and influences, and her numbers were, at the time I wrote this report, were growing.

She's since -- since writing this report, she's developed her career way further.  But at the time, Playmate of the Month, Playmate of the Year, and her growing social media network.

Also, she appeared on a number of TV shows.  She was on The Girls Next Door, the Playboy TV show.

She was -- had a large-world presence and quite a lot a bit of -- quite a lot of publicity.

Q    Thank you, sir.

And what's your overall calculation and opinion as to what she should be entitled to in this case?

A    $40,000.

MR. CASAS:  Retrieving the exhibit from the witness.

BY MR. CASAS:

Q    And, lastly, I would like to speak about Ms. Laurie Ann Young, also a plaintiff in this case.

Approaching witness with Plaintiffs' Exhibit 7.

What is that, sir?

A    That's the image of Ms. Young as used by Thee Officer's

1   Club.

2   Q    Do you recall that image?

3   A    I do, sir.

4   Q    Do you have an opinion as to the types of usages that were

5   employed by the defendants' use of the advertisement?

6   A    Yes, sir.  It was used for advertising with Thee Officer's

7   Club across the image, on the side of the image, and with the

8   website, the link on the bottom of the image.  So three times

9   Thee Officer's Club is mentioned on there, a premier

10   gentleman's club.

11         It was used on social media.  It was also used to

12   promote and sell discounted alcohol, but it also used

13   name-brand alcohol, so Jager is a brand, and that was -- as

14   mentioned on here, we have Jager bombs, five dollars, Jager

15   bombs all night.  That's a third party -- that's a third party

16   advertising.

17         So not only do they use it to promote the club,

18   promote Ms. Young as the product at the club, but also a named

19   alcohol brand, so it's used to advertise alcohol.

20   Q    Thank you.

21         So when counsel first gave you that -- well, let me

22   ask you this.  When you were first retained on this case, did

23   you receive a copy of these exhibits first or did you first go

24   to the social media and websites?  Which happened first?

25   A    I received a copy of this.

1  Q    All right.  So you review the copy and you see that
2  they're selling alcohol; right?
3  A    Yes, sir.
4  Q    Is that part of the reason that you then went on to the
5  website and social media to confirm that they indeed sold
6  alcohol?
7  A    It was one of the reasons.  I wouldn't say that was the
8  primary reason.  I wanted to see the type of club and all --
9  the style of advertising.
10       I wanted to see the images, how they were used, where
11  they were used, yes, sir.
12       Alcohol is definitely a part of it.  Alcohol is --
13  again, I'm sorry to keep repeating myself, but it's an
14  important part.  I've spent a lot of time booking a lot of
15  alcohol jobs over the years.
16  Q    Did you take any additional steps, if you recall, to
17  verify whether or not at the time they had an alcohol license?
18  A    Sorry?  Could you repeat?
19  Q    Did you take any additional steps at the time that you
20  researched their website and club to determine whether or not
21  they actually did have an alcohol license with the State of
22  Florida?
23  A    No, sir, I didn't.
24            MR. CASAS:  Retrieving the exhibit.
25  BY MR. CASAS:

1   Q    Sir, what's your overall opinion as to -- I'm sorry, let

2   me ask you this.  What was the established day rate based on

3   defendants' usage that you arrived at?

4   A    $10,000.

5   Q    And overall, what's your overall opinion as to what she

6   should be entitled to?

7   A    I had three uses, the advertising, which includes the day

8   rate; social media use on Thee Officer's Club Facebook, and a

9   combination of coupon third party, because of the promotion of

10  the alcohol and by name of Jager.

11               So, in total, it was $30,000.

12               MR. CASAS:  Thank you, sir.

13               That's all the questions I have on direct.

14               MR. LIROT:  May it please the Court.

15                         CROSS-EXAMINATION

16  BY MR. LIROT:

17  Q    Good afternoon, Mr. Chamberlin.

18  A    Mr. Lirot.  How are you, sir?

19  Q    Do you have a copy of your report?

20  A    I do, sir.  It's a bit messed up now, but I do have a

21  copy.

22  Q    All right.  Well, I'm going to track this report as the

23  basis of my question, so I hope that makes it a little easier

24  for us.

25               Let's look at the cover.

```
 1              MR. CASAS:  Your Honor, for record, what's the date
 2   of this report?
 3              MR. LIROT:  March 13, 2018, which is what was in the
 4   evidence that was given to us.
 5              THE WITNESS:  Yes, sir.
 6   BY MR. LIROT:
 7   Q    Right one?
 8   A    Got it, sir.
 9   Q    We're on the money?
10   A    I'm sorry?
11   Q    That's the correct report?
12   A    Yes, sir.
13   Q    All right.  The first question I -- down at the bottom, it
14   says:  Subject to protective order.
15              Why is that on there?
16   A    I'm trying to remember the -- I believe it was necessary
17   to put it on there, sir.  I provided a lot of documents and
18   things as well.
19   Q    Were you aware that all the documents relied on by an
20   expert are discoverable by my side?
21   A    No, sir.
22   Q    Are you aware of any protective order that was issued in
23   this case to support the inclusion of that language on the
24   front page of your report?
25   A    No, sir.
```

1    Q    Let's go to page 2.  And it says:  Stephen Chamberlin,

2    image expert witness, gives your address, and it talks about

3    four paragraphs of your professional background.

4         The only question I'll ask -- and it -- it shows a

5    number of different agencies, pretty much tracks the same

6    testimony that you gave earlier in talking about your

7    experience.

8         Is there any aspect of your professional background

9    that involves talent-related activities or feature acts or

10   modeling related to the adult entertainment industry?

11   A    Sorry, just, could you -- I just missed the part in the

12   middle -- say it one more time.

13   Q    Have you ever done any work for gentlemen's clubs?

14   A    No, sir.

15   Q    You ever procure a model for a gentleman's club?

16   A    I have not.

17   Q    And at the very last paragraph, it says that:  With close

18   to 30 years' experience as a full-time professional within the

19   modeling and talent industry, I'm very familiar with market

20   current rates for high-end models and well regarded for my

21   expertise in the economics of image use.

22        Whom would be those people who find you well regarded

23   for your valuation?

24   A    I believe the law firms that have engaged me as an image

25   valuation expert.

1   Q    So just in litigation, just in being an expert witness,

2   that's where you've been highly regarded?

3   A    No, sir.  I often get calls from different agencies and

4   clients to help evaluate a contract that's in negotiation or

5   that is being considered.

6   Q    Turn the page, if you would.

7        This says:  General model and talent industry

8   definitions, an important point to note in the preparation of

9   reports.

10       And this appears to be the definitions that go into

11  your formula; correct?

12  A    Yes, sir.

13  Q    What is a coupon?

14       I know that some of the valuations that you gave on

15  some of the exhibits in this case kick it up by an exponential

16  multiple by the use of the word "coupon."  What is a coupon?

17  A    I can read the definition here, but let me -- I can go

18  into it as well.

19       A coupon includes, but is not limited to, use of an

20  image to offer discounts for entry, participation to a club,

21  party, or event, or discounts on products.

22       It's often -- I'm sorry.  Go ahead.

23  Q    So if I've got an advertisement that invites people to

24  come to my club, that's a coupon?

25  A    No, sir.

```
1    Q     What makes it a coupon?

2    A     If you offer free admission with this -- with this image,

3    with this coupon, with this -- print out this image, mention at

4    the door that you saw this image, bring this image and it's

5    half-price entry, those sort of things make it a coupon.

6    Q     Well, let's look at Ms. Posada, because I think that's one

7    of the -- yes, Exhibit 25.

8                It's in your report, I think.

9    A     Yes, sir.

10   Q     I don't have any page numbers.  I don't know if you do,

11   but I don't.

12   A     I don't either, sir.  I'm sorry.

13   Q     No apology necessary.

14                So what is it about this that makes it a coupon?

15   A     The coupon was that they advertised discounted alcohols --

16   discounted alcohols, two-for-one domestic bottles of beer;

17   $5 -- I'm sorry, it's hard to read on here for me.  The

18   printing is a little -- $5 bomb specials.  Anything that offers

19   a discount.

20                It's the -- again, it's the association.  But in

21   Ms. Posada's case, it was that they're promoting alcohol

22   specials.

23   Q     And that's a coupon?

24   A     Yes, sir.

25   Q     Wouldn't that -- doesn't this piece convince you that
```

1   anybody that would walk in the street would get the same deal?

2          Is there anything about this that says:  You need to

3   have this in your hand in order to get this kind of a discount?

4   A   That's not the purpose of advertising.  The purpose of

5   advertising is to promote that.  And that's what you've done

6   here, you've promoted cheap drinks using Ms. Posada's image.

7   Q   Well, maybe I'm naive, but to me a coupon is I go through

8   Publix, I get a loaf of bread for what would otherwise be a

9   dollar, but if I have a coupon, I can get it for 80 cents.

10  A   You're not naive, Mr. Lirot.

11  Q   That's not the usage of the term here.

12  A   No.  It's -- again, if you're getting those coupons

13  they're offering, they're offering cheap deals on products;

14  correct?  Is that what you mean?

15  Q   My question to you is if anybody off the street can get

16  the same deal, why is that a coupon?

17  A   They can get the same deal, but they're being informed by

18  it by the advertisement in this case.  And, again, it's because

19  it's using her image as a coupon.

20  Q   So your assumption is that everybody that goes into the

21  club would be aware of this promo?

22  A   No, sir.

23  Q   Okay.  So the people that come in off the street that know

24  nothing about this and get the same deal -- but that still

25  makes this a coupon?

1    A    Well, they get the same deal, which is a discount on

2    alcohol, but it's being advertised here.  And advertisement is

3    kind of what we're talking about with all these images is --

4    Q    Fair enough.

5    A    -- my reading of it.

6    Q    Let's look again -- I'm back on the definitions.

7    A    Yes, sir.

8    Q    And as I understand it, you utilized all of these

9    definitions in the formulation of your method to provide your

10    opinion in this matter?

11    A    The question is?  Sorry.

12    Q    You used all of these definitions -- I assume that's why

13    you put definitions in the very beginning of your report, so we

14    knew what you were talking about?

15    A    I'm not saying I used them all.  I would have considered

16    them all, but I'm not saying I used them all.

17    Q    Okay.  Well, why don't -- I'll go through a few and then

18    you can tell me whether or not those factored into the

19    formulation of your opinion.

20    A    Yes, sir.

21    Q    The embarrassment factor.  Where there is -- where there

22    is embarrassment for being associated with the advertisement or

23    marketing of certain products that are less reputable or more

24    embarrassing or similar, and for which a higher degree of

25    compensation is negotiated.

1        Now, let me just stop there.

2        You've already conceded that you've never

3   participated in any negotiations for any models in the adult

4   entertainment world.

5   A    Yes, sir.

6   Q    So moving along.

7        Clients understand that a stigma is attached to

8   products that are personal in nature, sexual, political,

9   embarrassing, or unhealthy.  Premiums are negotiated for such

10  products.

11       How do you know?

12  A    Because it's something I've been doing in the industry for

13  the whole time.

14  Q    So you put models in adult businesses and made sure that

15  because it was labeled by these adjectives, they get more

16  money?

17  A    I've missed your question there again.  Sorry, sir.

18  Q    You're saying that because premiums are negotiated for

19  such products -- and you've conceded that you've never

20  negotiated any placement of anyone in a gentleman's club at any

21  time.  How do you know?

22  A    I've negotiated a lot of embarrassment products, whether

23  it was -- I went through these earlier, from --

24  Q    Did you say condoms?

25  A    Hemorrhoid creams, condoms, erectile disorder, all those

1   kind of things.  Even -- even a lot of young girls for acne

2   treatment is an embarrassment product, if you put a young girl.

3   And these attract a premium as opposed to a beauty product.

4   Q    I guess -- I guess I'll ask this:  Why would a strip

5   club -- and you have it in here:  By way of example, a strip

6   club would attract a large premium.

7   A    It's something I had to consider, where would I put it in,

8   what was the reason.  And the report was for a strip club.

9           So I -- it was one of the things that definitely

10  would be an embarrassment factor, whether it's embarrassing

11  factor, but one of the things also to remember is that the

12  clubs promoted the model as a product, so it was associated

13  with the club.

14  Q    That's your opinion.  We'll get into that.

15          So right now, as we stand here today, a big part of

16  the way that you created your method was the embarrassment

17  factor; correct?

18          Because it included things that were personal in

19  nature or sexual or embarrassing or unhealthy.

20  A    It was a -- it was a factor.  I've repeated this line, and

21  I'm sure everyone's getting sick of me, hearing it, but I

22  considered everything.

23          And one -- you said we'll get into it later, so I

24  won't -- I won't reiterate it, but the product is probably one

25  of the -- well, it is, it's the first question we ask, and it's

1    one of the most important issues.

2              So I believe the product being the models themselves

3    is probably more important than the embarrassment of it.

4    Q    So wouldn't your -- and I'm trying to figure was there a

5    percentage or was it a floating variable?

6              Would there be some adjustment between the models

7    that basically are proud of their work in sexually related

8    materials, like Playboy, or *Zoo*, or *Nuts*, or *Loaded*, or any of

9    those magazines that are full of pictures of either scantily

10   clad, topless, or completely naked women?  Isn't that sexual in

11   nature?

12   A    Yes, sir.

13             MR. CASAS:  Objection, Your Honor.  Compound.

14             THE COURT:  He can answer it.

15             Just answer it the best you can.

16             THE WITNESS:  Yes, sir.

17   BY MR. LIROT:

18   Q    So what adjustment did you make to your formula for those

19   plaintiffs in this case that apparently have no problem posing

20   naked?

21   A    The adjustment is that those jobs that they -- if they

22   appeared in Playboy, these are jobs that they had a chance --

23   they said yes to; they consented to that job.

24             They had a chance to negotiate that job, and they

25   believed or their agent believed, or in discussion with both,

1    that it was fitted in the direction of their career that they

2    wanted to go.

3             Again, I believe the product in the advertisements is

4    the model herself, which classifies her as a stripper, is a

5    little bit different than a magazine that has her name and full

6    of details about her and all these sorts of things, and help

7    promote her career, however you want to see it, you know,

8    there's different opinions, but still promoted her career, as

9    opposed to being promoted as an entertainer.

10            I get really tired of the word stripper.  But as a

11   dancer/stripper at a club that's available for people to come

12   and see with full friction and full nude dances.

13   Q    And that was a big feature of your formula; right?

14   A    What was that, sir?

15   Q    Full friction, nude dances?

16   A    No.

17   Q    Not at all?

18   A    I didn't say "not at all," either.

19   Q    Hold that thought, because I want to talk to you about

20   that later, but I think this is something that I want to ask

21   you about.

22            *Playboy* had a circulation of what back in 2013, '14,

23   '15?

24   A    I -- do you know what, I don't know in those -- in those

25   years.  I don't even know in current years.

Q     Would you concede to me that it was probably a little broader than the Facebook pages for Thee Officer's Club and Flash Dancers?

A     No, sir.

Q     Why would you not?

A     Because I believe Playboy then was probably around maybe 300,000 -- I'm just rough guessing, it may be more; Facebook goes worldwide.  And it's open to everybody.  And if someone looks at another strip club, the algorithms push it into their feed, other strip clubs, and it's an amazing form of advertising.

Q     How would you ever find Thee Officer's Club Facebook page?

A     I know that if you -- well, you know what, I'm not an expert on social media, on those things, but this is just in my opinion that if you --

Q     But you don't know -- so you don't have an opinion?

        MR. CASAS:  Objection, Your Honor.

        THE COURT:  Yeah, you need to let him answer.

        MR. LIROT:  I don't mean to interrupt him, Judge. I'm sorry, I'm excited.

        THE WITNESS:  If you're looking at any strip club on your Facebook page, it will feed in other suggestions or other relevant places, suggested sites, things like that.  And Thee Officer's Club and gentleman's club will come up.

BY MR. LIROT:

1   Q    How -- unless you know where it is and you're looking for

2   that site, how would you ever bump into it?

3   A    Sorry, I thought I just -- I tried to answer that for you.

4   Q    That was your answer.  We'll move along.

5   A    Yes, sir.

6   Q    Let's go to the next definition.

7            Exposure.  Namely, how broadly a model/talent's

8   likeness will be circulated is taken into consideration in

9   negotiating the fee.

10           So your position is that because these two relatively

11  small clubs -- I think that testimony is part of this record.

12  A    Relative to what, sir?

13  Q    In Jacksonville, Florida.  Because these --

14           MR. CASAS:  Objection, Your Honor.  Counsel is

15  testifying.  Assumes facts that this witness has not heard.

16           MR. LIROT:  Facts in evidence.

17           THE COURT:  All right.  Well, you can ask him to

18  assume things, if you want to.

19  BY MR. LIROT:

20  Q    Have you ever been to Thee Officer's Club?

21  A    No, sir.

22  Q    Did you think it might be important to verify what their

23  business model was before you concluded something that was part

24  of your methodology?

25  A    Concluded what their business model was?

Q     Yeah.

A     Yes, sir.  That's one of the first reasons why I visited the site and looked at their advertising.

      I'm more -- I'm more involved in advertising, but from that, I see what they're promoting, what type of club, what their images are, what the -- what the experience is there, what the parties are.

      I do have a general idea of what a strip club is, sir.

Q     These two clubs, what general idea could you possibly have if you didn't step into them?

A     I have a general idea that they have women dancing naked, probably with a stripper pole, selling alcohol.  That's the --

Q     What if the big components of that summary were entirely wrong?

A     Sir, you're laughing at me.

Q     I'm not laughing.  I'm not laughing.

A     I don't understand why.

Q     I'm just in a good mood.

A     Okay.

Q     I think we're getting close to the end here, so without knowing the business model of these clubs, are you just assuming some stereotype for clubs all over the place?

A     I don't believe so, because I spent a lot of time on the websites and Facebook page, and there was images there from --

1    shot from within the club.  The style of club -- okay.

2              No, it's not a stereotype.  I looked at the

3    advertising.  I looked at the promotions that the club did.

4    You know, what a great club, they do this, they do that.  I

5    believe I had a pretty good handle on what the -- what the

6    business model was, sir.

7    Q    Would you agree with me that there's not a page of that in

8    your report?

9    A    On the type of club?

10   Q    On what you just described, all the stuff you looked at.

11             You just said you looked at all types of different

12   things.

13             Would you agree with me that in this entire report,

14   there's one page -- let's look at that just for a second, and

15   we'll get back to it because --

16   A    No, sir, I wouldn't agree with you.  I believe there's the

17   assessment of the damage, the methodology, how I did it.  The

18   categories of documents I considered in calculating damages,

19   all that's in there.

20   Q    We'll take care of that with each individual plaintiff.

21   I'm talking about --

22   A    That's okay.  I thought you were saying that I agreed with

23   you on that answer.

24   Q    I don't know that we're going to agree on a lot.

25   A    We know that, sir.

1   Q    We can probably take that for granted.

2           Go ahead and let's look at the single page that

3   purportedly depicts something from my clients' websites.  It's

4   pretty much toward the back.

5           It's like right in front of all of the -- you did

6   kind of a collage of images of the plaintiffs.

7           So I think it's the one right in front of that.

8   A    Yes, sir.

9   Q    All right.  So would you agree with me that nowhere on

10  this page does it say anything about full nude, friction dances

11  or anything of the like?

12  A    I agree with you, sir.  I don't see that written on any of

13  these -- any of these.

14  Q    If that was a component, a variable in the formula that

15  you used to reach your opinions, why would you not put it in

16  there?

17  A    I have examples of defendants' advertising imagery, but I

18  did a preliminary report for -- that was attached to the -- I

19  did a preliminary report that was attached to the demand

20  letter, and in that, I mentioned that the club was fully nude.

21  Q    This is your report for this case, and it doesn't tell us

22  anywhere in here to adopt or incorporate anything related to

23  the cease and desist letter, does it?

24  A    It doesn't do what, sir?

25  Q    Let's say, page 1:  Please refer to this other document

1  you got a few months ago because I want to incorporate all that

2  into this.

3          So then you're on notice.  You go:  Oh, I better look

4  at that too.

5          Is there one word in this report that incorporates

6  anything from any prior opinions or evidence or materials or

7  anything that you looked at in this report?

8  A    I --

9  Q    You want to look it over?

10          Take your time.

11  A    Yeah, I can look it over, but it pretty much outlines the

12  whole methodology and what I did.

13          You know what, it may not refer to -- I know the

14  original -- the preliminary report, I did refer to the club

15  being totally nude and selling alcohol.

16  Q    Okay.

17  A    Maybe I didn't -- I didn't follow that through, but I did

18  break down that it was a gentleman's club.  And I lay out all

19  of the assessments, how I -- the categories of documents, the

20  information I considered in my methodology.

21  Q    Well, we'll get to that.  But as we sit here today, you're

22  trying to refer to something that's not part of this report.

23          Would you agree with that, that this -- whatever

24  letter, whatever study, whatever you referenced, whatever you

25  looked at is not in this report?  This is a stand-alone report

1   that doesn't incorporate any other document by reference.

2   A    Again, I don't -- I missed the first part of your

3   question.

4           What isn't incorporated into this?

5   Q    You got, at least to some degree, a legal background.

6           Are you familiar with the concept of incorporating by

7   reference something else?

8   A    I can -- I can -- I can take from the language and what

9   you're saying, I can -- I can understand that, yes, sir.

10  Q    Okay.  And there's nothing in this report that

11  incorporates by reference any other work.  This is a

12  stand-alone report for this case that you've given us to

13  support your methodology and your opinions.

14  A    The first report, the preliminary report I did, I think,

15  like I said, was done in 2015, early.  I believe it was either

16  the second or the third report I've ever written as an expert.

17  Q    So you're a rookie, but not an expert?

18  A    I was an expert in the industry and I stand by the

19  figures.

20          This report was a consolidated report of the

21  two reports at that time, and --

22  Q    So you just word process a lot of stuff from other

23  reports, from other clubs?

24          MR. CASAS:  Objection, Your Honor.  Number one, he's

25  not letting him finish.

1        Number two, he's following up with a question during

2  a question -- during an answer.

3        MR. LIROT:  I will refrain from doing that, Judge.

4        I apologize.

5        THE WITNESS:  I can still answer the question, if you

6  like, sir.

7        I stand by all the numbers that I put in the

8  preliminary report.  It was the third report I did.

9        I've learned a lot from subsequent reports, from time

10  with attorneys.

11        The first report I did, I wrote down and I came up

12  with the figure -- it was a bit like school math; I had the

13  answer correct, but I didn't show my work.

14        And usually then before a case happens, I'm brought

15  into a deposition.

16        You've never deposed me at all, Mr. Lirot.

17  BY MR. LIROT:

18  Q    No, I think this is our first opportunity for this -- for

19  Q and A.

20  A    It is, sir.  We've spoken a number of times.  I've always

21  enjoyed saying hello.

22  Q    I've always enjoyed our meetings, but we've never had this

23  opportunity.

24  A    You told me we're going to have some fun yesterday or you

25  were looking forward to having fun with me.  I'm not sure it's

1  fun for me, but we'll go from there.

2  Q    Well, it's all relative.

3  A    It is.

4  Q    Let's talk about the next page, Fair market value or total

5  compensation.

6        Now, as I understand it, this is a very important

7  component of your methodology.

8  A    It's -- fair market value, yes, sir.  Well, it's one of

9  the things -- it's one of the -- the things I've been asked to

10 analyze and to provide an opinion on.

11 Q    It's the big issue in this case; right?

12 A    Yes, sir.

13 Q    So let's read this, and I want to focus on a couple of

14 words here.

15       Fair market value or total compensation, this is the

16 definition that you've given as a component of this report.

17       An agreed price between a willing seller, the

18 model/talent and/or agent, and a willing buyer.

19       That's where you begin?

20 A    Yes, sir.

21 Q    Now, your testimony was that we can't do that because not

22 one of these plaintiffs would ever consider doing anything with

23 a gentleman's club.

24       MR. CASAS:  Objection.  Misstates the testimony.

25       MR. LIROT:  Well, why don't you correct me.

```
 1              What is wrong with that assumption?
 2              MR. CASAS:  Objection.  I have a pending objection.
 3              MR. LIROT:  I'm sorry.
 4              THE COURT:  What's your objection?
 5              MR. CASAS:  Misstates the testimony as phrased as to
 6    what his testimony was with regard to willing buyer, willing
 7    participant, and the interplay between the plaintiffs in this
 8    case, sir.
 9              THE COURT:  I'll let the -- I'll let the witness
10    answer the question.
11              MR. LIROT:  I'll rephrase the question.
12    BY MR. LIROT:
13    Q    As I understand it, you said you have to back into this
14    because we don't have any evidence that we can look to because
15    these models would not be willing to perform at a gentleman's
16    club; correct?
17    A    The models have told me that, most of the models, not...
18    Q    Well, is that one of the assumptions in this formula?
19    A    No, sir.
20    Q    It's not?
21              So you're backing into a negotiation that we have no
22    basis to really do other than your imagination.  That's not
23    what you said when you were on the stand before.
24              MR. CASAS:  I'm going to object.  Argumentative, Your
25    Honor, your imagination.
```

1        THE COURT:  I'm going to let him answer it.

2        I mean, he -- the witness is certainly capable of

3   defending himself, so I'm going to let him do it.

4        Go ahead, sir.

5        THE WITNESS:  So you're confusing -- I wouldn't

6   assume that you're confusing -- I don't mean to -- that, but I

7   think you're putting two things together.

8        Fair market value is what we're after here.

9        Your client used the images.  We're trying to find a

10  fair market value for the use of the models.

11       The way of finding that is the hypothetical

12  negotiation.  So the end result of a negotiation is the images

13  are used.

14       We have that.  I have all the images there that the

15  images have been used.  I work on a hypothetical negotiation,

16  whether the models say they'll do the job or not, is the way I

17  answered it.

18  Q    Well, have you been either criticized or excluded as an

19  expert because of the highly speculative --

20       MR. CASAS:  Objection, Your Honor.  Previous

21  discussions with (unintelligible).

22       THE COURT:  I'm going to sustain the objection.

23       MR. CASAS:  Your Honor, I'd also like an instruction

24  to the jury to disregard anything that might be in his question

25  that --

1          THE COURT:  Let me see counsel at sidebar.

2      (At sidebar, out of the hearing of the jury:)

3          MR. LIROT:  I'm not getting into cases.  I thought I

4  was going to be allowed to ask him if he'd ever been --

5          THE COURT:  No, we talked about this yesterday.  You

6  said you were going to use the points that were made in those

7  decisions, but you weren't going to reference them, and that's

8  what I expected you to do.

9          MR. LIROT:  I'm just borrowing the language.

10         THE COURT:  Well, no, you asked him if he'd been

11 excluded or rejected.  What I'm saying to you is, if you want

12 to find something in those opinions and you want to ask him

13 about it as a defect, that's fine, but we're not -- we're not

14 getting into the other cases, so you're --

15         MR. LIROT:  I'll adjust.

16     (End of sidebar.)

17         THE COURT:  So ladies and gentlemen, as with all

18 expert witnesses, this witness has testified in other cases and

19 different -- they, you know, different juries or different

20 judges can have opinions.

21         And what I've concluded in this case is that this

22 witness is qualified to be in front of you, and you're going to

23 be the ones that will decide what to take away from the

24 testimony.

25         And I'll be instructing you later that you're free to

1    accept or disregard or accept some or disregard others, so this
2    is going to just be what your opinion is about this witness as
3    it's going to be with all the other witnesses.
4              Okay.
5              All right.  You may proceed, Mr. Lirot.
6    BY MR. LIROT:
7    Q    Fair market value, still on the same page, and I think you
8    already testified to it.  *The White Book Guide to Model Fees*,
9    you said that that was one of the resource materials or
10   manuals, I think you referred to it as, a manual, that you used
11   to help form your opinion?
12   A    I used it more as a written-down explanation of what
13   occurs in the industry.
14             I was pretty much -- I understood all the usages and
15   how, and I developed along pretty much exact same lines as what
16   was written in the guide.
17             It was -- it was included in there that it showed and
18   clearly worded as sometimes it's hard to take all the pieces of
19   an -- of the industry and put it into words that would not
20   confuse people when I'm trying to explain things.  But the book
21   laid out, fairly clearly, suggestions on how to negotiate new
22   media, by taking the day rate and applying it to Facebook and
23   all those sort of uses.
24   Q    Is this it?
25   A    Yes, sir.

Q    This is what you included in the back of your report for us to review as the -- I think they call it an authoritative treatise or something of that nature.

Do you understand what that means?

A    Again, I can take -- I don't know the term, sir, but I can take it from your...

Q    Did you rely on this in formulating your opinion?

A    I didn't rely on it, not entirely.

It's -- as I mentioned, 30 years in the industry, it's actually time for a new one of those and people have approached me for my opinions on formulating a new guide to -- to understanding modern negotiations and things like that.

Q    But in your report, it doesn't say anything about formulating a new guide or I think you say the general rule of industry is and as referenced in *The White Book Guide to Model Fees* is an additional day rate for each usage.

This is that; right?

A    That's the cover of it, sir, yes, sir.

Q    Okay.  Is it big or is it just these three pieces of paper?

A    Well, it was doubled over.  It was folded.

Q    Right.  It was a pamphlet at some point.

A    It was a little booklet.  Yeah, it wasn't very impressive. It was sent out free of charge to every agency across -- around the world.

```
1    Q    But is this the entirety of that?

2    A    Yes, sir.

3    Q    Okay.  I'm going to ask you to -- and I'll try to put this

4    up.

5              Would you mind putting it up, no?

6              MR. CASAS:  Objection, Your Honor, to any

7    prepublishing to the jury of any documents that aren't in

8    evidence.

9              THE COURT:  That's fine.

10             What are you trying to do here?

11             MR. LIROT:  I want to -- I want to see that he relied

12   on it and I want to be able to make sense of it.

13             It's part of his report.  It's part of his record.

14             THE COURT:  May I see it?

15             MR. LIROT:  Certainly.

16             THE COURT:  Mr. Casas, do you need to see it?

17             MR. CASAS:  No, Your Honor.

18             THE COURT:  All right.  Well, as I understand it --

19   Ms. Diaz.

20             As I understand it, which is fairly typical, the

21   report itself is not being introduced.  That's not unusual.

22   But I think Mr. Lirot can use a portion of the report and ask

23   the witness questions about it, so I'll let you do that, sir.

24             MR. LIROT:  And it was never my intention to

25   introduce the report.
```

```
 1              THE COURT:  I understand.
 2              MR. LIROT:  Just the items referenced in the report
 3   as a basis for its opinions.
 4              THE COURT:  That's fine.
 5              MR. LIROT:  So there's page 1 -- or the cover,
 6   forgive me, says published -- excuse me, I think it's down
 7   there on the left.  Maybe if we could move that a little bit
 8   just to make it legible to the jury.
 9              Published by the Association of Model Agents for the
10   use of members only.
11   BY MR. LIROT:
12   Q    When was this published?
13   A    I don't have an exact date, sir.  I would just be
14   hazarding a guess.  I'm sorry.
15   Q    You want to take your best guess, since it's something you
16   relied on in your report?
17   A    Sir, it wasn't something I relied on.  I've answered that
18   a couple of times.  I'm not trying to be argumentative with
19   you, but it was -- for me, it was a reference point.  I didn't
20   rely on it entirely.
21              If I -- well, continue on, but that was my answer on
22   that.
23   Q    Well, if it's a reference point, would you agree with me
24   that that's another way of saying it's something that you
25   relied on to some extent?
```

A    Again, I'm not trying to be argumentative with you.  I --
it clearly laid out -- I think as you go through, and maybe
we'll see this, it lays out suggestions.  It was a suggestion
book on how to handle new media at the time.

         I believe it was very early in the adoption of new
media as an advertising source.

         So, all right, best guess, I'm thinking somewhere
maybe 2011, 2012, maybe.  It's just a -- it's just a rough
guess.  I could be off by a few years either way.

Q    I found no date of publication.  I found no -- other than
this on the back, you know, usually in a book there's some
information of where it was published, when it was published.

A    Again, sir, it's -- it was a guide.  It was sent out to
all agencies as a guide, as a discussion point.  It's not going
to tell anybody -- it's not going to tell me:  Okay, this is
how you do it.

         I never tried to do that and I would never -- I'd
never do that.  I examine all the facts of a negotiation
myself.  I have all the information that I can.

Q    So what -- correct me, but is this something that's kind
of optional, take it or leave it; maybe this is a good idea,
maybe this isn't a good idea?

A    It was a guide.  Yeah, you know, it's -- you can't -- you
can't set rates, you can't set -- for anybody.  Everyone
negotiates.

1    But the procedure in the industry is -- is fairly

2  set, but still, you need to -- every -- every job that you ever

3  book is different.  There's always different factors to it.

4  There are a multiple of factors that come into it that need to

5  be examined.

6  Q    Okay.

7  A    It was a guide.  It was a guide to how to deal with

8  clients that say:  Oh, well, listen, we're using it only on

9  Facebook or Twitter or this, you know.  We shouldn't have to

10  pay for that.

11  Q    Let's look at page 4, and, I think, page 1 and 2.  They

12  talk about all kinds of different stuff, editorial, press,

13  videos, packaging.  But on page 4, it says Internet.

14    Would you agree with me that that's what brings us

15  here are images that were on the Internet?

16  A    Yes, sir.

17  Q    All right.  And on the left, under where it says

18  Internet -- where it says Internet Usage Only, it says one day

19  rate.

20    Is that what you used as your reference point in

21  doing this research?

22  A    No, sir.  I -- again, I always feel like it's

23  argumentative.  I see what you're trying to do.

24    No, is my experience in the industry.  Every day

25  picking up the phone and talking to clients or working on the

1 Internet, talking to clients backwards and forwards, that's
2 what I relied upon.
3          We're well into using our own negotiation techniques,
4 but I still -- this was a guide, a thing -- and if you look at
5 the last page, which is Further Internet Commerce Rates, it
6 actually breaks down the Internet usage to Facebook, Twitter,
7 Foursquare.
8          Facebook was 100-percent suggested of the day rate.
9 So you have the day rate for advertising, and then you have a
10 100-percent day rate for use on Facebook.  That was the
11 suggested thing.
12          But it also broke down all the others.  It wanted
13 25 percent for Twitter and things like that.
14 Q    Well, let's look at what you just referred to, the
15 Internet and e-commerce rates.
16 A    Yes, sir.
17 Q    Now, this looks like it came from something different.
18 Where did this come from?
19 A    No, it was done as an insert into the booklet as that.
20          MR. LIROT:  If you would be so kind.
21          Judge, do you want to take a look at this one?
22 BY MR. LIROT:
23 Q    So Internet and e-commerce rates, and then I'm -- it says:
24 Client websites.  Then below that it says:  Web channels, treat
25 as extra usage.  Then it says:  Facebook, 100 percent of day

1  rate.
2         Doesn't that mean day rate as opposed to something
3  less?
4  A     As opposed to something less?
5  Q     Well, look at the figures below.  Like Twitter's
6  50 percent; Foursquare, 50 percent; apps, blogs, et cetera,
7  Facebook would be 100 percent of the day rate.  So whatever
8  your day rate is, you should get 100 percent for being on
9  Facebook?
10  A     Yes, sir.
11         Well, this was suggested, Extra Internet Usage.  But
12  remember, this was at the start of when new media was really
13  starting to happen.
14         There's a lot of things here from home page, where
15  you -- you have an image on a home page, or you use a model on
16  a home page, and then you click through to the next stage and
17  the next stage, and there's a lot of different pages and
18  things, they suggested the advertising rate and more.
19         There's a lot of different suggestions here.  It was
20  suggestions.
21  Q     Okay.
22  A     Like I said, most of these -- most of these things we deal
23  with, and it's all about that negotiation.  It's talking.  What
24  are you going to do with this?  How are you going to do it?
25  And we negotiate.

1   Q    And, I think, going back to where we were in your report,

2   it starts at the top Fair Market Value, it says:  The basis of

3   all negotiations is the establishment of a day rate.

4   A    It says so in that book as well, actually.  Just it was --

5   that's industry standard.

6   Q    Now, the White Book, are you familiar with a gentleman by

7   the name of Weston Anson?  Do you know Mr. Anson?

8   A    I don't, sir.

9   Q    You don't.

10        Have you ever done any additional research into any

11  treatises that might deal with the issues of IP valuation and

12  management?

13  A    IP valuation and management, no, sir.

14  Q    Okay.  Other than the White Book, any study -- for people

15  other than yourself, in conversations with people in the

16  industry, I'm talking about a studious approach to written

17  materials that might be somewhat helpful to you in the dispatch

18  of your responsibilities.

19  A    I've read a number of trials of large misuse of image

20  cases such as the Michael Jordan case and some of the others.

21        Again, not being a lawyer, a lot of it is not really

22  relevant.  I'm an expert in the model industry, and, you know,

23  that's -- I apply the -- just what I've been doing for all

24  these years to come up with an answer.

25  Q    So you've never reviewed *Right of Publicity:  Analysis,*

1  *Valuation, and the Law*, published by the American Bar

2  Association Section of Intellectual Property Law in 2015.

3  You've never heard of that or looked at it?

4  A    Yes, sir.  Yes, sir.  I believe that was one of the

5  articles I read.

6  Q    Well, that one was written by Mr. Anson, and you said you

7  really didn't remember him.

8  A    I don't remember the name, sir.

9  Q    Fair enough.  I don't remember the names of every author

10 of every book I've ever read.

11 A    Okay.

12 Q    If I told you that in both of these books, there's

13 absolutely no mention whatsoever of the so-called embarrassment

14 factor, would that surprise you?

15 A    I don't know the book, sir.  And obviously you're leading

16 that it's -- he does a similar job to what I'm attempting to

17 do.  I'd say, then, in the industry -- he hasn't worked in the

18 industry.

19           I think embarrassment factor, it's something to be

20 considered.  All these are points are being considered that --

21 you'd know that if you tried to book anybody on a -- those type

22 of clients, there's going to be a certain embarrassment factor.

23 There's going to be a certain resistance of doing that job.

24           The way you usually overcome resistance is the rates

25 are higher, as well as continue on as future earnings jobs.

```
 1   Q     All right.  I'm going down, it says Overview of Modeling.
 2   This is the next page.  It says that:  The presumption of
 3   anybody that appears in any advertisement is that there's a
 4   willing seller and a willing buyer for the usage of the
 5   model/talent's image, and that the model has engaged directly
 6   or indirectly.
 7              So the threshold of your analysis is willing
 8   participants in that negotiation process.
 9   A     I -- you may need to clarify that a little bit for me, but
10   I'll try and answer as I understand it.
11   Q     I'm just reading it from your report.
12   A     Yes, sir.  Your question, this is the basis?
13   Q     Willing selling, willing buyer.
14   A     When you look at an advertisement, even similar to the
15   ones there, you look at it and you see a model there
16   advertising or being associated with a name and a product, you
17   must assume that the normal way in the industry that's happened
18   is that she's agreed to the job and there's been a negotiation,
19   and the buyer has agreed to pay that, and that she's a willing
20   participant, saying:  Yeah, I agree to advertise and promote
21   this product, otherwise she wouldn't be there.
22   Q     All right.  Would you agree with me that since -- I'll say
23   for the majority of these plaintiffs, they indicated an
24   absolute refusal to ever negotiate any deal with any
25   gentleman's club, that any opinion you would put forward on
```

1  that issue would be entirely hypothetical, speculative, full of

2  guesswork and impossible to recreate?

3  A    There's a lot of points there; that's not a yes or no.

4  Q    Let's go one by one.

5  A    Guesswork, there is -- there's not a lot of guesswork in

6  there.  I don't guess.

7        I'm dealing with models' careers and I'm dealing with

8  clients that I want to work with again, usually.

9        I don't guess about these things, and it's -- it's

10  more than -- it's more than that.  And --

11  Q    Well, isn't it based on a hypothetical agreement that

12  would never happen?

13  A    No, sir.  It's based on a hypothetical negotiation that is

14  my way of reworking and coming back to how you got to it.  We

15  see the final result.

16        See, if there was no final result, then I can see

17  what you're saying there.  But if you're saying that it was --

18  are you asking me that there should be zero compensation for

19  these people?

20  Q    I'm not saying that at all.  I'm just talking about your

21  opinion.

22  A    Okay.  Thank you.

23        I'm sorry, I thought that was where you were at with

24  that.

25        We see the end result of this negotiation, even

1  though it's hypothetical.  The models are used in the

2  advertisements.  That's the end.  So I need to work backward of

3  how that happened.

4  Q    Wouldn't that require a hypothetical?

5  A    The whole negotiation's hypothetical.

6          THE COURT:  Let me see counsel at sidebar.

7       (At sidebar, out of the hearing of the jury:)

8          MR. LIROT:  Yes, sir.

9          THE COURT:  So I really hesitate to ever tell

10  somebody how to do their exam, but you keep asking him if it's

11  a hypothetical, and of course it's a hypothetical.  Fair market

12  value is a hypothetical.  It's based on what a willing buyer

13  would give to a willing seller.  It's not really -- you know, I

14  didn't want to call you out in front of the jury, but --

15          MR. LIROT:  That's just the first word.  I'll move

16  on.

17          THE COURT:  That's okay.  I just -- I just kept

18  hearing it and I thought:  Well, that's the precise definition

19  of what fair market --

20          MR. LIROT:  It was just the first word.

21          THE COURT:  All right.

22       (End of sidebar.)

23  BY MR. LIROT:

24  Q    Let's go to the second paragraph.

25          Now, if, in fact, one of these plaintiffs testified

1    to a certain fact, and it was determined that there was no

2    evidence to support a component of your opinion, would you

3    change your opinion?

4    A    Which paragraph are you looking at, sir?

5    Q    I'm looking at the second paragraph.

6    A    What's at the top of the page?

7    Q    Assessment of damages.  Methodology.

8    A    Okay.  I'm sorry, I now have the page.

9    Q    Assessment of damage methodology.  It's got to be like

10   page --

11   A    No, no, I have the page.  I just don't -- I need the

12   question again.  I'm sorry.

13   Q    Second paragraph.  And I'll read it to you.

14            It says:  In the case of the image being used to

15   promote an industry or product that does not enhance the

16   model's/talent's known and accepted image, the future income

17   potential of the model/talent could be severely, and in some

18   cases, permanently damaged, thereby destroying future career

19   prospects.

20            If I told you that not one plaintiff could point to

21   one single job or endorsement or anything that they missed out

22   on because of the Internet images in this case, how could that

23   be part of your analysis to find out what their damages are, if

24   it never happened according to their own testimony?

25   A    They didn't say it didn't happen.  They just said they

1    couldn't point to a particular example.

2           One of the things in the model industry is models are

3    continually being told no or -- for different reasons.  But a

4    lot of times, they'll go to a casting, they're not told why

5    they didn't get the job.  They're not told why a sponsor is not

6    going to sponsor their -- as a product.

7           But that sponsor could have just come off the website

8    and gone:  Oh, my God, this is the same girl we're just about

9    to -- we're about to sponsor, whether they knew the images were

10   taken or not.

11          You're not going to know -- clients aren't going to

12   come out.  But what I can tell you from the -- from being in

13   the certain industry for so long, and I know not to promote

14   certain girls to certain clients, if I know they've done

15   Playboy or some of those sorts of things, but other clients

16   seek out those girls.

17          But I do have a lot of contact backwards and

18   forwards.  I'm talking to clients constantly on a day-to-day

19   basis, and I've actually asked a couple of clients that I know,

20   you know, would you hire a model that had -- that this had

21   happened to?  And they're like:  No, of course not.

22   Q    Wouldn't it be pure speculation -- and I'm talking about

23   causation by these images in this case, pure speculation.

24   A    Pure speculation of what, sir?

25   Q    No one in this case has said that they can point to any

1    specific job or any specific endorsement that they lost because

2    of a couple of Facebook images -- and I'll call it obscure,

3    maybe you disagree with me, two obscure clubs in this

4    jurisdiction.

5    A    Is it pure speculation that they can't point to anyone?

6    No.

7    Q    No, that's a fact.  They can't point to anyone.

8    A    You're asking me pure speculation.

9             I'm sorry, I'm confused.

10   Q    Well, I guess my question would be, let's talk about

11   Ms. Canas.

12            Big, lots of activity in Latin America and Mexican

13   Playboy and all of that.  What possible likelihood could you

14   place on any impact these Facebook images in Jacksonville would

15   have on her career in Latin America, under any circumstances?

16   A    One, Mexican Playboy was done well after I wrote this

17   report.  It wasn't included in my considerations, just so we --

18   we're clear on that.

19   Q    Okay.

20   A    What impact could that have on her career, but her career

21   now is she's based here in America.  She's based here in

22   Florida.  She works up and down the coast.  I saw her just two

23   weeks ago.  Miami Swim Week was there and she was one of the

24   stars of the thing.

25            But who's to say that it wasn't clients from

```
1    Jacksonville that have seen it?  I can't say that.  That's pure
2    speculation on my behalf or your behalf to say that she didn't
3    lose work because of those images.
4    Q    Sounds like she got work after the images.
5    A    Yes, sir.
6    Q    Okay.
7    A    Would you like her to lose all work?
8             No, I don't understand --
9    Q    I don't want her to lose any work.
10   A    I don't understand the question.
11   Q    Wouldn't it be most important to try to evaluate these
12   issues based on the time frame from 2013, mid, to
13   February 2015?  That's the universe of the time frame that
14   we're dealing with.
15            I tell you what, let's move along -- I have one more
16   question about all of this intro and then we'll get down to the
17   individual plaintiffs in just a minute, unless you want to
18   answer that.
19   A    I don't -- didn't get the question.
20   Q    All right.  Now, you talk about categories of documents
21   and information considered in calculating damages.
22            Did you ever do any research into how to provide
23   expert testimony in a federal context or any other context?
24   A    I looked at a few books on the expert witness and things
25   like that.  It just didn't make a lot of sense to me.  Mainly
```

1    they were talking about big medical experts and things like

2    that.  I have to say no, sir.

3    Q    Okay.  So you don't describe with a great deal of

4    specificity -- there are a couple of samples in here, but you

5    talk about categories of documents.

6            How would anyone looking at this report know what the

7    real documents were if they're not included in the report?

8    A    How would anyone know what the real documents were if they

9    weren't included in the report?

10           There were -- all the earning documents of the

11   models, the things that I considered, were attached to this

12   report -- were sent with this report.

13           Again, this report, even in the time since then, I've

14   strived to try and make the reports better.  I learn from each

15   of these situations and what you require and what -- what

16   people need.

17           I'm trying to get better doing the reports and things

18   like that, and I've included -- I've broken down a lot more of

19   what I considered, and usually -- up until -- like I said, this

20   is my first trial with a jury.

21           Up until that, any -- the other four times I've

22   testified were bench trials.  And all four times I was deposed

23   before, where I have a chance to bring -- I had all the notes

24   that I'd make, you know, all the -- all the different jobs that

25   the model, I'd make notes, and I'd -- the type of job and --

1    trying to -- trying to make a straight line.  I was trying to
2    show my math.
3            I would give the answer, but I was trying to show my
4    workings.  Again, we didn't have a chance to do a deposition.
5    Q    So now you know that's really important, as you gained
6    experience in doing what you do?
7    A    Yes, sir.
8    Q    That's important.  We didn't do it here.  We didn't have
9    all that.
10           We have some earning documents, but those are only
11   one category of documents you say you refer to.  We don't have
12   the rest of it.
13   A    I list all the types of categories of documents I'd
14   consider.  Whether they're available or not, I supply those.
15   If they -- if they don't have them, I obviously couldn't -- I
16   couldn't consider them.  But they were attached.
17   Q    We'll talk about that.
18   A    Okay.
19   Q    In that paragraph -- and, again, I'm under Categories of
20   Documents and Information Considered in Calculating Damages.
21           So these are variables that were in your formula to
22   utilize your method to come up with your opinion.
23   A    Yes, sir.
24   Q    You talk about -- and I'm going to go with the "i.e." in
25   the middle of that paragraph.  It says:  I.e., once posted, the

```
1    images remain on the Internet or social media in perpetuity.
2              Are you familiar with Facebook at all?
3    A    Yes, sir.
4    Q    Are you familiar with the fact that every time you post
5    something on Facebook, it pushes down whatever was there?
6    A    I'm familiar where if you go to photos, you can see
7    everything, from the first day they posted images.
8    Q    So if you posted something four years ago and you had
9    somebody posting something every other day, you'd have to
10   scroll and scroll and scroll and scroll and scroll.
11             In your area of expertise, is that something that the
12   average consumer does, just keep scrolling down to find out
13   what special deal on beer there might have been at the Super
14   Bowl in 2014?  Who does that?
15   A    Sir, that's outside my area of expertise.
16             But what I can tell you is the image is there.  The
17   images stay there.
18             But also, just, sir, I've said this before, this is
19   just 30 years.  I've never written a contract -- never written
20   a contract that was for perpetual use.  It was for a period of
21   time.
22             And you just said you'd like to operate on these
23   between '13 and '15.  That's two years.  Every contract is
24   never over a year.
25             So if I could have included a rollover for that
```

1   time -- but I didn't know the exact dates, but we could have

2   included a rollover for that time, which would have doubled the

3   damages there.

4           The images are still there.  There's no argument that

5   they'd still be there if they weren't asked to be removed.

6   Q    So the image would still be there?

7   A    The images would still be there if they weren't asked to

8   be removed.

9   Q    I know you weren't here.  Ms. Burciaga was testifying

10  about how it was acceptable for her to pose in Playboy.

11  Grandfather had *Playboys*.  Assume if you will that

12  Ms. Burciaga's grandmother appeared in a *Playboy* in 1965, and

13  Grandpa was really proud of that and put it in a pile.  And

14  every new *Playboy* every month, he puts it on top of that.

15          That photograph would still be in that 1965 Playboy;

16  correct?

17  A    Correct.

18  Q    So if somebody stumbled across that and looked at it, that

19  model was already paid for that, whatever shoot involved the

20  creation of that photograph; yes?

21  A    Yes, sir.

22  Q    So those images are there for perpetuity, but nobody gets

23  paid extra for that, would you agree?

24  A    Yes, sir.  I'd agree with that.  Unless they wanted to

25  republish it, then they'd renegotiate, yes, sir, but that

1    magazine can...

2    Q    So the other information that you talked about -- and you

3    said, obviously, to the extent available -- and I think you

4    already talked about models may not be the best bookkeepers or

5    keep all their paperwork.

6            It said to the extent available, you considered such

7    documents as modeling contracts and agreements, contractor 1099

8    forms, employee W-2 forms, earning statements, releases, and

9    related records.

10           What related records are you referring to there?

11   A    Payment stubs, e-mails of booking confirmation with the

12   details of the job.  Anything along those lines, related

13   documents.

14   Q    Let me toss this to you as a yes-or-no question to begin

15   with.

16           Did you ever look at any paystubs or contracts

17   related to the actual image used in these Facebook posts?

18   A    I just want to be clear on my answer.  I don't remember,

19   actually --

20   Q    How about a yes or no, then you can explain it.

21   A    Oh, I'm really sorry.  I'm sorry.

22           I'll say no, just because I'm -- let's say no.

23   Q    Okay.

24   A    Now can I explain?

25   Q    Would you like to move on?

A     No, can I explain?

Q     Sure.

A     I research what the images are from.  I research what they are paid for those images.  It's part of everything.  I consider everything.

Whether I saw the actual documents, I know Ms. Canas is from Espiro; Ms. Posada's was also Espiro.  I know Ms. Eason's was an editorial for a football magazine.

I could probably tell you what they were paid on each of those images.

Ms. Underwood's was from a social media post.  But whether I actually saw the -- whether I saw the things, I'll say no.

That's my explanation.  Thank you for letting me do that.

Q     And then the next -- this is the next page.  It says: Additional professional considerations, and I think you've already testified that you talked to people in the industry. You're trying to get some information from other folks.

And you don't really give us the names of anybody specific except I think it was one woman from South Florida?

A     I can give you the -- we can go through them.

Michele Pommier, an agent for over 40 years.

Q     I guess I'll cut to the chase.  Any of those people have any experience in booking talent for gentlemen's clubs?

1    A    No, sir.

2    Q    Okay.  Are you aware that there are specific businesses,

3    agencies, that specialize in booking talent for gentlemen's

4    clubs?

5              MR. CASAS:  Your Honor, objection.  Relevance.

6              THE COURT:  Overruled.

7              THE WITNESS:  Answer?

8    BY MR. LIROT:

9    Q    Are you aware that there are specific businesses and

10   agencies that specialize in those negotiations to book talent

11   for gentlemen's clubs?

12   A    I don't.  But I suspect there was probably agencies that

13   book the main strippers that work around, that go from club to

14   club, but I'm just -- I'm guessing.

15   Q    Well, if you suspect that, and these relate to a

16   gentleman's club, why would you not investigate that?

17   A    I did.  I did try and look it up.  But what they're

18   booking are women that are professional entertainers and

19   dancers and strippers in those clubs.  The models aren't.

20   Q    So the people that do that aren't as classy as the

21   plaintiffs?

22   A    No, sir, I didn't say that.  That's not fair.  I didn't --

23   I didn't --

24   Q    All right.  I'll move on.

25   A    I cast no aspersions on the industry or the jobs they do.

```
1    Q    Well, isn't that part of the embarrassment factor?
2    A    No, sir.  That's more about consent.  People consent to
3    that job and that work, fair enough.  That's different than
4    having your image taken and used by a club.
5            THE COURT:  Mr. Lirot, I'm going to go ahead and take
6    a break.
7            MR. LIROT:  Take a break.
8            THE COURT:  Go on break, yeah.
9            All right.  Ladies and gentlemen, we'll take a
10   15-minute break til 3:15.  I'll see you back here.  Thanks.
11           COURT SECURITY OFFICER:  All rise for the jury.
12       (Jury out at 2:59 p.m.)
13           THE COURT:  Leave that there and please don't discuss
14   your testimony.  Thanks.
15           Mr. Lirot, how much longer do you have, sir?
16           MR. LIROT:  I was just talking probably another 35
17   minutes.
18           I'm going to get into the specific plaintiffs here.
19   I just have, I think, a couple more preliminary matters, and
20   then we'll get into the plaintiffs.
21           And those preliminary matters are maybe one or
22   two questions each.  And I don't mean to be tedious.
23           THE COURT:  And it -- is it still your intention this
24   afternoon to call your expert?
25           MR. LIROT:  I would really like to.
```

```
 1              He's here.
 2              THE COURT:  All right.  Well, I just wanted to see.
 3              MR. LIROT:  I won't -- I won't take that long with
 4   him.
 5              THE COURT:  Okay.  Well, I don't know what the cross
 6   will be, but -- so it appears to me that will be just getting
 7   the evidence in before 5:00, it looks like.  So -- which is
 8   not -- I mean, that's fine, but that's -- but y'all were
 9   talking yesterday about finishing at noon and being out of here
10   and all that, and none of that's coming close to happening,
11   so -- which is fine.
12              I want to give you full and fair time to
13   cross-examine.  The plaintiffs have been in control of the case
14   up till now, so I -- I understand.
15              But I would just hope all of us can be -- make sure
16   we're not being overly repetitive or cumulative.
17              Okay.  We're in recess until 3:15.
18              COURT SECURITY OFFICER:  All rise.
19         (Recess taken, 3:01 p.m. - 3:16 p.m.)
20              COURT SECURITY OFFICER:  All rise. this Honorable
21   Court is back in session.  Please be seated.
22              THE COURT:  Let's have the jury, please.
23              COURT SECURITY OFFICER:  All rise for the jury.
24         (Jury in at 3:16 p.m.)
25              COURT SECURITY OFFICER:  Please be seated.
```

1            All right.  Welcome back.

2            Mr. Lirot, you may proceed.

3            MR. LIROT:  May it please the Court.

4    BY MR. LIROT:

5    Q    Mr. Chamberlin, you have a Summary of Particulars, if

6    you'll go to that heading.

7            At the very top, it says:  Assignment, Summary, and

8    Opinion, with, I think, the caption of our case.

9    A    Yes, sir.

10   Q    All right.  And second paragraph -- and this is where I

11   guess you're describing what you were asked to do.

12           I've been asked to determine to a scientific degree

13   of certainty the fair market value of the images that are known

14   to have been used by the defendant.

15           What does the term "scientific degree of certainty"

16   mean to you?

17   A    That was something I questioned when I was first told

18   about being an agent -- about being an expert, and I spoke

19   before about medical and their scientific, but there's

20   real-world experience and experience in this -- in the industry

21   that does this, and it's as scientific as it can be for the

22   industry and for the job that's being asked.

23           And I've reached out to peers.  I've mentioned some

24   of the people I had spoken to before, given them similar kind

25   of facts about names or real -- to see if they'd follow the

1    same process that I -- that I did and come to similar
2    conclusions.
3           They went through it word for word, same documents,
4    yeah, they looked at -- that, to me, was as scientific as you
5    can for this field of expertise.
6    Q    So are you saying this is kind of scientific?  As
7    scientific as it can be.
8           Let me ask it this way.  The scientific method,
9    scientific principles create some body of evidence that another
10   person can utilize to evaluate the reliability of someone
11   else's conclusions.
12          How would anyone other than you ever replicate your
13   conclusions without the things that you have in your head?
14          How would anybody ever test this?
15   A    That was pretty much what I just went through then, sir.
16          I'm not claiming this is -- that the model industry
17   is a great scientific endeavor.  I'm not claiming that at all.
18          It's an industry often regarded as frivolous and --
19   but it is an industry.  It's worth billions of dollars over the
20   years, and it's something that's very important to me.
21          I've worked with a lot of these models for many years
22   and care about them.
23          But just saying that before, I have given:  Here are
24   the facts, here are the details, and watched over agents go
25   through it.

          Go:  Okay.  Well, this is what we'd do.  We'd come up
with a day rate and go through.

          It could be recreated.  I'm not saying they'd come up
with the exact same number.  There's definitely things --
considerations and things like that that I mentioned earlier.
I can't give it a weighted dollar value for certain things.

          I can't weight the publicity gained by someone dating
Johnny Depp or Brad Pitt or George Clooney -- or married to
George Clooney.  I can't say:  Okay.  Well, that's worth this
amount.

          But as an agent in 30 years of doing this, I have a
fair idea.  It's similar to -- I've looked at -- I've looked at
this situation -- I'm sorry to go on for too long on this, but
I think you asked me about this.  It's recognizing facts about
saying some of the models were Playmates of the Month.  And I
recognize that if I'm negotiating with a gentleman's club and a
model is a Playmate of the Month or a Playmate of the Year,
that's a decent part of the negotiation.

Q    And if you paid for that, you'd put it in the ad.

          If you wanted a model that was a Playmate of the Year
at your club and you were going to pay that negotiated price,
you'd put it in the ad, wouldn't you?

A    Yes, sir.

Q    Fair enough.

          Let's look at the cases.  I'm going to pick up the

1  pace a little bit.

2  A    Just to finish that answer, if you paid for it, I think,

3  was the point of your statement.

4  Q    Fair enough.

5       Got a bunch of cases.  This goes back to 2018, looks

6  like about, I don't know, there were one, two, three -- 13

7  cases when you did this report.

8       How many other cases are you involved with at this

9  point today?

10  A    Since this was done, I believe I may have done two more

11  depositions, and I'm involved -- I've written reports for

12  approximately another -- it's a rough guess, sir.  I'm not

13  exactly sure, probably around 40, 45 more cases.

14  Q    So we've picked up quite a few more cases then at this

15  point.

16  A    This is the document you're referring to?

17  Q    This -- and I'll admit, this was going back to 2018.  But

18  as we sit here today, you've got about another 40 cases that

19  you're involved with?

20  A    No, sir.  This is a testifying experience table.  This is

21  ones that I've actually done -- I've either given trial

22  testimony -- there's the four cases that I mentioned before

23  were bench trials and these are ones that have taken my

24  deposition.

25  Q    How many cases have you issued your reports in?

```
1    A     Several.  Maybe -- maybe a dozen, I believe, somewhere
2    around that number.
3    Q     You've only done a dozen reports?
4    A     Sorry.  Question again.
5    Q     I have your report in this case.
6    A     Right.
7    Q     Have you done a report in all of the cases in which you've
8    been retained as an expert?
9    A     Yes, sir.  It's probably about 45.
10   Q     45.
11         What is your rate of compensation?
12   A     $400 an hour.
13   Q     And is that portal to portal or do you have some cap on
14   that?  How does that work?
15   A     I don't understand that -- how you mean.
16   Q     Portal to portal means the minute I leave my house, the
17   meter starts to run.
18   A     Oh, for this, no, sir.  I think it's a half rate for the
19   time I'm actually at the venue, and it's 400 an hour for my
20   testimony time.
21   Q     Okay.  Let's get to our models.  And I'm going to start
22   with the first one in the report, Ms. Canas.  And there's a
23   Spanish contract of sorts.  It looks to be -- candidly, I
24   cannot read this small reproduced page on the left, and then
25   you've got a whole page of a Spanish contract and a number that
```

1    looks like 65 million pesos.

2           I know that you said you had some assistance from

3    some folks.

4           Did you ever have this contract interpreted and

5    explained to you?

6    A    This is the Espiro contract.

7           I've had it explained to me.  I believe it was -- at

8    one stage, it had been translated.  And if it was, it would

9    have been included with all the documents that I considered.

10          These are just samples of some of the -- I just put

11   these as samples of the some of the known capabilities.  It

12   isn't a full and comprehensive collection of everything.

13   Q    It's a tiny page we can't read, and then one page with

14   numbers in Spanish.

15   A    Yes, sir.

16   Q    Let's go to the image, if we may.

17          And this is -- this is going to be for Ms. Canas.

18   We'll take a look at this.  I think this was Exhibit 10.  I'm

19   sure my colleagues will correct me if that's incorrect.

20          And how would anybody know that's Ms. Canas with the

21   hat, the sun glasses?  Is that clearly recognizable as the

22   plaintiff in this case?

23   A    I -- well, I looked at all Ms. Canas -- in this one, I'm

24   probably the wrong person to ask, but because I recognize her,

25   I recognize the image.  I recognize where it was being shot.

1          There's even other images in that series.  But I take

2   your point.  But Ms. Canas has a lot of fans.  I can't really

3   comment on that.

4   Q   What's the likelihood somebody in Jacksonville would

5   recognize this with two -- I can't really read it on here, but

6   two likes.  What do you think the chances are that somebody in

7   Jacksonville would recognize Ms. Canas?

8          MR. CASAS:  Object to that question, Your Honor, as

9   outside the witness in terms of likelihood.

10         THE COURT:  I feel like this witness is talking about

11   what the -- if there had been a negotiation and contract

12   between the two entities, what the amounts would be.

13         I'm not sure that this witness is the one to be

14   answering those questions.

15         MR. LIROT:  Fair enough.  Fair enough.

16   BY MR. LIROT:

17   Q   So you said you were familiar with this shoot.

18         What shoot was this?

19   A   It's Espiral.  It's a Colombian, a very famous lingerie --

20   they do costumes, that type of company.  But Espiral, it's

21   actually a high-end lingerie company as well.

22   Q   South American?

23   A   I think it's distributed throughout South America, yes,

24   sir.

25   Q   Okay.  And you said you're familiar with the shoot.

1      Ms. Canas testified that for this shoot in the
2  military costume, her day rate was $2,000.
3      And you, I think, said that you didn't look at the
4  actual day rate that created this image.
5  A    I didn't look at -- I don't remember if there was that
6  contract for that exact job.  As we mentioned, they're not
7  great bookkeepers, but I think I did mention it was Espiral.
8  And I did mention, I think, the rate she -- maybe I didn't.  I
9  knew the rate was $2,000.
10  Q    Did you ask for it?
11  A    Yes, sir.
12  Q    And you didn't get it?
13  A    I'm not sure if I got it or not.  I'd need to look back
14  through the -- through the contracts.  But I did know the value
15  of the shoot.  I know what she was paid for the day.  I have
16  seen another one or two images from the same shoot.
17  Q    Any reason to believe that the negotiated day rate where
18  she shook hands or signed something or said okay for $2,000,
19  any reason to believe that that wasn't the negotiated day rate
20  for that image?
21  A    No, sir.
22  Q    Then we have Ms. Posada.  And, again, this is all written
23  in Spanish.
24      When you went over these documents in Spanish, was
25  there anyone with Ms. Posada?

1   A    The first -- I was given all the documents.  I went

2   through it and then I spoke to Ms. Posada, Ms. Posada and her

3   husband, and we went through each of these documents.

4   Q    Okay.  Would you agree with me that every provision in

5   these kinds of agreements is important to review?

6   A    I try and review everything, yes, sir.  I believe

7   everything's important.

8   Q    And did you get somebody to translate every word of these

9   agreements because every part of a contract has some

10  significance?

11  A    I believe there was a -- there is a translation.  I'm not

12  sure if it was included with all the documents that were there.

13        I have seen a translation of -- of that -- of that

14  contract.

15  Q    Okay.  Let's turn to the image.  And did you ask

16  Ms. Posada for any documents or interview her to find out:

17  What were you paid for the negotiated day rate for this image?

18  A    Yes, sir, I did.

19  Q    How much was that?

20  A    $2500.

21  Q    So the negotiated day rate of $2500 was something that she

22  knew she'd be paid for the creation of this image?

23  A    Yes, sir.  She knew she was being paid for that --

24  advertising that product.

25  Q    Okay.  Let's move on to Ms. Burciaga.

1        Now, again, in reading your report when I first

2  received it, the premise was:  I need to back into this -- I

3  think that was your term -- because none of these models, none

4  of these plaintiffs would agree to do this kind of work.  They

5  would not be associated with gentlemen's clubs.

6  A    I said most of them.  I didn't say all.

7  Q    Oh, well, did you adjust that for Ms. Burciaga?

8  A    I looked at everything Ms. Burciaga's done.  I looked at

9  all the details.

10  Q    In your interviews with Ms. Burciaga, did she tell you

11  that she had appeared at a gentleman's club?

12  A    Yes, sir.

13  Q    And how did you tailor your formula to adjust to that

14  difference?

15  A    Again, I apologize for repeating myself so many times.  I

16  looked at everything.  And there wasn't a single adjustment

17  just for that, but there was a lot of factors about that that

18  are important to -- to consider.

19        It's -- I looked at it and it -- it took some

20  discussions with her to get all the details.  Crazy girls,

21  crazy horse, I can't remember exactly which one was in Las

22  Vegas.

23  Q    Crazy Horse 3?

24  A    Crazy Horse 3.  Thank you, sir.  I appreciate it.

25        Crazy Horse 3.  I'm not trying to compare anything.

1    It's a famous -- it's a famous -- a club that's attached to --
2    it has a nightclub as well, very large.
3           I've been there to that one.  I was there -- Mr. Dog,
4    Snoop Dog, did the name thing that Ms. Burciaga did, was the
5    host that was there.
6    Q    Did he sign any posters?
7    A    I've worked with Mr. Dog on quite a few things over the
8    years.
9    Q    Fair enough.
10   A    No, I forget to get photos.  But also, could I just finish
11   that, because I think it's important.  I see what you're saying
12   and I'd like to explain it for mine.
13   Q    Well, can I ask a question?
14   A    Okay.  What's the question?
15   Q    Are you explaining more to the question I just asked?
16   A    Go ahead, sir.  I forgot --
17   Q    All right.  So Ms. Burciaga, for a gentleman's club that
18   you know about, pretty popular, much greater presence than
19   Flash Dancers and Thee Officer's Club, more famous, more
20   notable?
21   A    I'll say yes.
22   Q    Okay.  And Ms. Burciaga negotiated, shook hands, did a
23   deal for $5,000 to appear at that club inside a gentleman's
24   club?
25   A    Is that your question?

1  Q    That's her testimony.  That's her day rate for appearing

2  in a gentleman's club that would be much more notable, much

3  more recognized -- I don't want to get into this embarrassment

4  factor, but it is a gentleman's club, and she knew it was a

5  gentleman's club, and she agreed to do that for $5,000.  That

6  was her day rate for that.

7  A    Can I --

8          MR. CASAS:  Objection.  There's no question.

9          THE WITNESS:  That's what I was going to say.

10         THE COURT:  All right.  Is there a question, sir?

11 BY MR. LIROT:

12 Q    Did you ask Ms. Burciaga for any documentation for this

13 photo?

14 A    Yes, I did, sir.

15 Q    Did she give it to you?

16 A    It's for Chynna Doll -- Chynna Doll swimwear.  It is.

17 Q    It is.

18 A    The rate -- I'm trying to remember the rate that she was

19 paid.  I don't have it in front of me.

20 Q    If I told you she testified it was $2500, would that

21 refresh your memory?

22 A    I thought it was more.  I thought it was more like 5,000,

23 but it's been a while since I talked about it.

24         But what I do know about Chynna Dolls Swimwear, it's

25 a great range, is that now Ms. Burciaga has continued to work

1   with them over the years and now has her own range, Jessica

2   Burciaga for Chynna Dolls.

3          And last -- at last disclosure when I spoke to her, I

4   believe she was making somewhere between 40,000 to $50,000 a

5   month from sales.

6   Q    So clearly this image from 2013 hasn't proven to be a big

7   impediment to her entrepreneurial success and the increase in

8   her income?

9   A    I believe that she's friends with the designers and owners

10  of Chynna Dolls, and also the work at the club hasn't -- at

11  that time when she did that job, she was promoted as the host

12  of the club.

13         She was Jessica Burciaga.  She was the host of the

14  club.  It was clear that she was hosting at the club.  She

15  hosted in the nightclub, along with other people, such as

16  Carmen Electra, John Trooper [phonetic] -- I looked at the

17  whole thing.  It's a real difference, again, to what we're

18  talking about.

19         You didn't ask me a question, but it was -- the

20  intention was there, that she said yes to that job.  Again, she

21  did negotiate it.  She did help control the direction her

22  career was going in.

23         It's a big difference there, and it was clear that

24  she wasn't working there as a stripper.  She was there to host

25  an event.  It's a different -- it's a different percentage to

the job that -- that she was -- how it was used.

Q    I just want to look at the billboard with you just for a
second.  It's in evidence.

So for $5,000, they got to use her name.  So based on
the theory that's been advanced in this case, that by looking
at an image, the average Joe is going to think that that girl
must be a dancer at that club, how is that any different?

A    I take your point there, sir.  And, again, I have to refer
back -- I didn't negotiate the job.  But Jessica had a chance
to say yes.

Your client denied the chance to say no to a job and
control the direction of her career.  This was a number of
years ago.  I believe, you know, she's there, she'd invite
friends.  They have a table.  They drink.

Yes, sir, I take your point, but I believe they're
two entirely different things.

Q    Her name's not on this image that's in our case?

A    No, sir.

Q    None of the plaintiffs' names are anywhere on these
images?

A    No, sir.

Q    And I want you to look at the image.  If you'll go to the
actual exhibit that's in the report.

I have a question, and I don't want to go -- get off
track, but down there at the right, it says something like:

1    Andy, Sapply, Nippies.  I posted earlier comments thread.  I

2    came back because I wanted you-all to know how I did it.  I

3    lost 10 pounds of belly fat in only six days and am keeping it

4    off.  Hollywood's newest fat-burning secret.

5              What does that indicate to you about this page?

6    A    That it's being targeted by spammers, that it must be on

7    someone's radar as being seen by a lot of people.  Because

8    that's -- you see that on comments and newspapers.  It's so

9    distracting and ridiculous, but -- people posting things like

10   that.

11             But that tells me that -- that Flash Dancers Facebook

12   page has come under attack by spammers.  Because what he's

13   trying to do is sell.  He's hoping somebody that's watching and

14   looking at this would -- again, outside my purvey, sir.

15   Q    Okay.

16   A    That's my opinion.

17   Q    Let's move up to Rosie Jones.  And if you have her.

18   A    Yes, sir.

19   Q    Do you know what a meme is?

20   A    I do, sir.

21   Q    What is a meme?

22   A    It's something that -- it may be an image, it may be a

23   shortcut of someone saying something that has kind of a viral

24   effect that people want to see, can comment on.

25             Michael Jordan, the ceiling is the roof, things like

1   that that get repeated quite often.

2   Q    Would you agree with me the most common meme is an image

3   of a person with a funny or witty caption?

4   A    I don't really look at too many memes.

5   Q    You wouldn't agree or you would agree?

6   A    I'm pretty neutral on the subject.  I'm sorry.

7   Q    Fair enough.  Fair enough.

8        So we all know Ms. Jones, and we'll get to her

9   photograph quickly, but she did all kinds of free work.  In

10  fact, this particular image, did you talk to her about it?

11  A    I did, sir.

12  Q    Where did this come from?

13  A    That's the cover of her 2009 calendar that she shot for

14  free.

15  Q    She shot it for free?

16  A    Yes, sir.

17  Q    So she did some other work where she established some day

18  rates.

19  A    But that calendar paid her somewhere between 15- and

20  20,000 pounds, after all the expenses of the shoot, her time,

21  and effort.  They're all coming out of it.

22  Q    Okay.

23  A    Commercialization of her image.

24  Q    Are you suggesting that a good way to approach that would

25  be divide that by 12, since this is one picture out of a

1   12-month calendar or however many it was?

2   A    I'm just telling you what -- what they --

3   Q    What was that number?

4   A    I believe 15,000 to 20-, she couldn't quite remember, for

5   the sales of that calendar.

6   Q    And that would have lots more images than this, yes, the

7   calendar?

8   A    Yes.  Yeah, I believe you're correct, probably one image

9   per month.  There could be more.

10  Q    Did you calculate any of her day rate for the many, many,

11  many magazines -- and I think we asked her how many times she

12  posed topless, and it was a significant number.

13          Did you calculate any of that into this so-called

14  embarrassment factor?

15  A    Again, I calculated -- I considered everything.  I looked

16  at all her work.  She was a famous Page 3 girl that were

17  topless.  It was a real English establishment kind of thing

18  that the publicity was huge for it.

19          I don't know if anyone has seen the Page 3, I think

20  it's *The Sun* -- I'm sorry, you're not asking questions.  She

21  was one of the most famous models for that page 3.

22          It didn't pay a lot of money, but, you know, she --

23  it gave her a huge celebrity status.

24  Q    And the Page 3 girls are all topless?

25  A    Yes, sir.

1    Q    And I think every day on Page 3, they have some new
2    topless girl?
3    A    Yeah.  They have a limited number that they rotate
4    throughout the year, yes, sir.
5    Q    How big a number do you think?
6    A    I'm hazarding a guess.  But it wasn't like -- there wasn't
7    a new girl every day.  I think it was -- they rotated 15 or so,
8    maybe 12.
9    Q    All right.  Let's move along to Brooke Johnson.  And
10   again, no name.  She's the one with the big beer stein.  This
11   is a costume.
12            And did you ask her how much she got paid for this
13   job?
14   A    Yes, sir.  I believe it's a Leg Avenue image.
15            I'm thinking it was -- she was paid somewhere around
16   2,250 to 2,500 for the day's work.
17   Q    1500 sound closer, do you remember?
18   A    If you have that from recent testimony, then you could be
19   correct.
20            She has -- she had a lot of contracts there.
21   Q    But for this day rate, here's $1500, let's shake hands and
22   let's take this image?
23   A    It was -- I believe her Leg Avenue was part of the
24   contract with a yearly guarantee of a minimum number of
25   workdays.  She was guaranteed a number of workdays and a rate

1   on top of that.

2   Q    So I think it was 2000 a month, guaranteed, three or

3   four workdays.  And I'm just going to take many, many more

4   pictures than just this one.  Many more photographs.

5   A    Yes, sir.

6   Q    Let's look at --

7   A    The costume there, just it's --

8   Q    Let's look at Ms. Young really quick.

9           And did you ask Ms. Young to give you the

10  documentation related to this image?

11  A    I did.  I believe it's 3Wishes lingerie.

12  Q    Very good.

13  A    I think her rate was somewhere 1500 to 2000, maybe.  1500,

14  2000.

15  Q    I got 1,000, but --

16  A    I'm a better agent than you.

17  Q    Yeah.  Somewhere in the ballpark.

18  A    Okay.

19  Q    All right.  And for -- again, would you admit that there's

20  a pretty big disparity between your numbers and the day rates

21  that these plaintiffs got for the work they did, that they

22  negotiated and shook hands on?

23  A    No, sir.  Well, from that -- you're picking one job for

24  Ms. Young.  You're picking one job.  And where the product is

25  the lingerie --

Q     Right.

A     -- fairly nice-looking lingerie, as opposed to where the product is in your defendants' use, Ms. Young is the product.

Q     I'm picking the image that is in the Internet material involving my client.

       Let's look at Ms. Lund.  I think she said this was Dreamgirls.  And did you ask her for any of the records related to this image?

A     Yes, sir.

Q     And what did she give you?

A     Again, just off the top of my head, she gave me about 15, 16 documents.  I'm not sure if the Dreamgirls contract was one of those documents, but I believe she was paid around, again, the 2000, 2500 rate.

Q     And then let's get to Ms. Middleton.  She's the last one.

       And did you ask her what she got paid for this photo shoot and where it went?

A     It was an editorial shoot.  Editorial shoots don't often pay much, maybe $100.  Maybe she didn't get paid at all.

       But it was -- it was used on the cover of a magazine with a famous football player.  They superimposed the two images over the top of each other.  The name of the magazine escapes me, sir.  I'm sorry.

Q     Okay.  Now, towards the end, you have some sample collages of these plaintiffs.  And I'm looking at these and I'm

1    wondering what served as the reason for the selection of these

2    photos.

3    A    Of the plaintiffs?

4    Q    Yes.

5    A    It was just examples of the type of work and some of the

6    work history.  I may not have had documents for all of it, but

7    it was the style of work that they've done, much the same as

8    examples of your clients' advertising.

9         It was -- it just shows what sort of work -- that

10   these are professional models, that they've worked quite a lot.

11   Q    Did you put a conscious effort into making sure that there

12   were no photos from *Playboy* or any of the other sexually

13   explicit work that these plaintiffs did?

14   A    I have respect for the Court, sir, and other people.  I

15   wouldn't -- I wouldn't show explicit nudity.

16        But some of the images are -- you know, some of the

17   men's magazines, the *Zoo*, The *Nuts*, *Loaded*, they have a sexual

18   overtone for sure.

19   Q    And would you agree with me that the images involving my

20   clients don't have any explicit nudity whatsoever?

21   A    I would, sir.

22   Q    Do you have any reason to believe any of those photos were

23   retouched, adjusted, that those are the actual images that were

24   taken during those photo shoots?  Just the depictions of the

25   plaintiffs.

1   A    So there's -- there's type and things, obviously, that

2   have been added to the images.

3   Q    Just the depictions of the plaintiffs.

4   A    Well, that's what I'm saying, sir.  There's been --

5   there's different writings and stuff over it.  That is part of

6   the depiction.  You have the image.

7              But the image itself, I don't believe any of them

8   have been retouched or changed.

9              MR. LIROT:  May I have a moment, Your Honor?

10             Thank you, sir.

11             Thank you very much, Mr. Chamberlin.  No further

12  questions.

13             At this point, Judge, can we have a sidebar?

14         (At sidebar, out of the hearing of the jury:)

15             MR. LIROT:  I may have one or two more questions for

16  him.  When he testified, he was unequivocal that when he went

17  looking at the websites for these businesses, he found the full

18  nude, full friction, all of that language that has been popping

19  up throughout the day.

20             We got into that a little bit and we found those

21  websites for the full applicable period of time.  That language

22  appears nowhere on it, nowhere whatsoever.

23             May I be allowed to inquire with him about that?

24             We have the Wayback Machine.  And I'm finished asking

25  him about his expert report, I just want to ask him about that

1    issue.

2           THE COURT:  Well, you told me you had it handled, so

3    I assume you had it handled.

4           MR. LIROT:  Well, that's how we're going to handle

5    it.  Can we show that to him?

6           THE COURT:  What was basis for him saying that?

7           MR. CASAS:  He specifically goes to websites to see

8    if there's alcohol use for purpose of developing the usage and

9    valuation, things of that nature.

10          THE COURT:  Well, I assume it's a fact that either

11   during that relevant period it either did -- these two clubs

12   either had a website that authorized or said they had nudity

13   and other, or it didn't.

14          He testified that it did, and now they're saying they

15   know it didn't, so, I mean, I think they're allowed to pursue

16   that.  I just didn't know where that came from.

17          MR. CASAS:  Right.  Well, number one, it's in his

18   preliminary report, A.

19          THE COURT:  Okay.

20          MR. CASAS:  He tested him on that, and he's welcome

21   to test his memory.

22          MR. LIROT:  May we use the Wayback Machine.

23          THE COURT:  I don't know what the Wayback Machine is.

24          MR. HEARN:  Archival lens.

25          MR. CASAS:  I know what it is.  It's -- how you got

1  it is irrelevant to me, but, you know.

2        MR. LIROT:  Well, it's kind of showing that he

3  doesn't really...

4        THE COURT:  That's fine.  You're allowed to do it,

5  yeah.

6    (End of sidebar.)

7        MR. LIROT:  Judge, it will take us a second or two to

8  set that up.

9        We might need some help.

10        THE COURT:  Let me see counsel a second.

11   (At sidebar, out of the hearing of the jury:)

12        THE COURT:  So is this machine you're going to use,

13  are you going to show it -- did he -- he wouldn't have been

14  looking at the -- he wouldn't have been looking at the site

15  during the relevant time period, right?

16        He would have -- when he went to look at the site, it

17  would have been afterward sometime, right?

18        MR. CASAS:  Our demand letters are written

19  on September 2015 and October 2015, so the only way that would

20  be relevant is if it predates September or October of 2015, is

21  what his testimony is.

22        MR. HEARN:  Okay.  A little bit before the letters

23  and a little bit after.

24        MR. CASAS:  So the way it works, just for Your Honor,

25  is there's a literal website called waybackmachine.com or

1    whatever, and you put the time frame.  And it has snapshots of

2    that time frame throughout the month.  It's not like a

3    consistent -- we used to use that early on to capture your --

4            THE COURT:  And your position is that when he

5    consulted this, which would have been -- so it's not during the

6    time -- well, I guess it is, because the pictures were up until

7    the cease and desist.

8            MR. LIROT:  That's right.

9        (End of sidebar.)

10   BY MR. LIROT:

11   Q    Mr. Chamberlin, are you familiar with any kind of archival

12   mechanisms dealing with the Internet?

13   A    The Wayback Machine.

14   Q    The Wayback Machine.  Are you familiar with that?

15   A    I am, sir.

16   Q    Was that used to find these images in this case?

17   A    No, sir.

18   Q    Any idea how they were found?

19   A    They were handed -- they were sent to me from the

20   attorneys.

21   Q    Do you know of any -- you don't have any idea where these

22   images were found?

23   A    For me, no, sir.

24   Q    For you, fair enough.

25            Have you ever used the Wayback Machine?

1    A      Yes, sir.

2    Q      Familiar with it?

3    A      Yes, sir.

4    Q      Okay.  What dates did you do your review?

5           And you may not know the exact date, but give me a

6    scope of the dates when you said you looked at my client's

7    websites and found some language about full nude, full lap

8    dances, friction, the other terms that you used.  What dates

9    did you do that?  And you can give me a scope.

10          And just to be clear, we know that we got a demand

11   letter sometime in -- I want to say September/October 2015, so

12   I assume for you to make the conclusion you made and you

13   testified to, it would have to have been sometime maybe after

14   July 2015, up to October/September 2015?

15          You'd know better than I.

16   A    Yes.  I'm sorry.  I'm not not answering, I was just trying

17   to think.  But it's, yeah, 2015.  I have trouble from last

18   week.

19          I don't think I had a lot of time when they needed

20   the report done by.  I think it's in that period.

21          Is the report September?

22   Q    I'm going to pull up those cease and desists.

23          Obviously you would have looked at the website before

24   you did your work that was attached to the cease and desist

25   letters; right?

```
1    A     Yes, sir.

2    Q     Okay.

3    A     And I believe that that report's dated --

4    Q     It sure is.  We'll find it.

5    A     -- so it would have been sometime before that date.

6              MR. LIROT:  So, Judge, if I may approach?

7              THE COURT:  Yes, sir.

8    BY MR. LIROT:

9    Q     We've got two of them here.  We've got one for Thee

10   Officers Club's Club and one for Flash Dancers.

11             Thee Officer's Club is dated September 28, 2015.

12   A     Okay.

13   Q     And I can represent to you that that was the cease and

14   desist letter my client received from Mr. Casas' firm.

15   A     Yes, sir.

16   Q     So that -- as far as the date goes, you have no reason to

17   dispute that date?

18   A     I was just looking on my report, just what date I actually

19   signed it.

20             It was towards the end of the -- I'm sorry, I

21   don't -- August -- 08-28-2015 is when I signed it.  So...

22   Q     August 28th, 2000 --

23   A     '15.

24   Q     '15.

25   A     Yes, sir.
```

1  Q     August 8, 2015, [verbatim].

2            So you would have -- you would have reviewed this

3  website sometime prior to that date?

4  A     Probably within the month prior, previous.

5  Q     So June, July, August, that's when you might have done

6  this review of the website?

7  A     Yes, sir --

8  Q     Okay.

9  A     -- somewhere in there.  I can't be specific on it.

10 Q     Okay.

11 A     Yeah, probably had a month or so to read it.

12 Q     And that one is Thee Officer's Club?

13 A     Yes, sir.

14           MR. LIROT:  See if you can bring up August 1st for

15 Thee Officer's Club website.

16           MR. CASAS:  Your Honor, I'm going to object to the

17 publication of the Wayback Machine.

18           I understand he may have questions about it, but to

19 the extent that it extends to the jury --

20           THE COURT:  I'm sorry, sir, to the extent what?

21           MR. CASAS:  I would object to the publication of a

22 part of the forwarded website without it being admitted into

23 evidence.

24           I think the impeachment's a little improper,

25 foundation as to that.

1    THE COURT:  Well, he testified that when he looked at
2    the website, it had nudity on it, and I assume this is an
3    effort to test that.
4         So how -- I'm not sure what the objection is.
5    MR. CASAS:  The objection is to the publication of it
6    to the jury.  The foundation for that is not supported.
7    MR. LIROT:  Judge, it's the best evidence to impeach
8    his testimony.
9    MR. CASAS:  That's been a --
10   MR. LIROT:  How else would I use it?
11   THE COURT:  I'm going to overrule the objection.
12   BY MR. LIROT:
13   Q    If you would -- so the Wayback Machine is an archive that
14   basically captures, on certain dates, websites that -- I think
15   you agreed with that, you're familiar with it?
16   A    Yes, sir.
17   Q    So we're going to look at August 1st of 2015 for Thee
18   Officer's Club.
19   MS. ADLER:  This is Flash Dancers.
20   MR. LIROT:  Flash Dancers.  Let's hold that thought
21   for a minute.  I've got the letter from Flash Dancers,
22   October 23rd, 2015.  This is a few weeks later.  And I guess
23   we'll look at the date for that report.
24   THE WITNESS:  I'm sorry, do you have the date up in
25   front of you?

1  BY MR. LIROT:

2  Q    I don't.  I always assumed this was somewhere near the

3  time of the cease and desist because once they got your work,

4  the letter would go out swiftly.

5  A    It seems like the report's cut off here.  It's like it's

6  not completed.  It's only like four or five pages of the

7  report.

8  Q    I think that's what was in Mr. Casas' exhibit book.

9  A    Okay.  So the date of the cease and desist is October 23,

10  2015.

11  Q    Okay.

12  A    I don't see the signature page on that report.

13  Q    Okay.  So if you look, it says that October 23rd.  Any

14  reason to think that August 1st wouldn't be a good date to look

15  at, just to see what's on the website?

16  A    August, September, October.  Okay.

17       MR. LIROT:  Sure.  Okay, if you would.

18  BY MR. LIROT:

19  Q    So it looks to be the Flash Dancer's gentleman's club

20  website.

21       MR. LIROT:  Maybe if you can try to adjust that so we

22  can see the whole thing.

23       It's a little --

24       MS. ADLER:  I can just scroll -- this is not big

25  enough for that.  That's pretty much it.

```
 1                  MR. LIROT:  That's pretty much it?
 2                  MS. ADLER:  Yeah.  Let me -- let me zoom out.
 3    BY MR. LIROT:
 4    Q    Mr. Chamberlin, do you see anywhere on that page any
 5    mention of nudity, lap dancing, friction dances, or anything
 6    that you unequivocally testified you saw when you looked at my
 7    client's website?
 8    A    I -- from looking at these two reports, I don't mention it
 9    in the Flash Dancer's website.
10                  I did see it in Thee Officer's Club.
11    Q    We'll look at it.
12    A    Okay.  So no in the thing -- but is this the Facebook page
13    or the website?  This is the website.
14    Q    Website.  Facebook page are all those images --
15                  THE COURT:  You said "Facebook page," did you mean
16    the website?
17                  MR. LIROT:  I meant the website.  I'm sorry.  I
18    miss -- I misspoke.
19    BY MR. LIROT:
20    Q    I think you were testifying about the website.  Facebook
21    page is just the little Flash Dancers thing; right?
22                  THE COURT:  Just -- let's try again.
23                  So, sir, you're saying that you don't -- you're not
24    now saying that there was any reference to nudity on the Flash
25    Dancer's club website, is that is what you're saying?
```

1          THE WITNESS:  After looking at the reports, on my
2    reports, yes, sir.
3          THE COURT:  All right.  So let's move on.
4          THE WITNESS:  In Thee Officer's Club, I write that
5    Thee Officer's Club is a --
6    BY MR. LIROT:
7    Q    Let's take a look.  Any date you want?  Any date -- you
8    pick a date.
9          THE COURT:  Well, you just do it, sir.
10   BY MR. LIROT:
11   Q    All right.  Let's go with the same August date.
12         MS. ADLER:  For Thee Officer's Club, there is
13   April 24th or November 23rd for 2015.  Which one would you
14   like?
15         MR. LIROT:  April 24th to November 23rd?
16         MS. ADLER:  There's two web recordings, for
17   April 24th or there's November 23rd.  Which one would you like?
18         MR. LIROT:  Well, November is after the letter, so
19   let's look at April.
20         THE WITNESS:  You mean before the letter?
21         Before the letter?
22   BY MR. LIROT:
23   Q    Okay.  Anything on that website mentioning nudity, lap
24   dancing, friction dancing, any of the conduct that you
25   testified to?

1    A    So it's just one page of the website.  There's five or
2    six other pages.
3              Does it record any other pages?
4    Q    You want us to flip through them?
5    A    Yeah, please.  Go pages.
6              This is April, so this is well before I did my
7    report.
8              MS. ADLER:  We can switch back to November.
9    Q    We can look at the one after.
10             THE COURT:  That's after the report.
11             THE WITNESS:  That's after the report.
12   BY MR. LIROT:
13   Q    Anything on that page?
14   A    No, sir.  I don't see anything on that page.
15   Q    Any other pages?
16             MS. ADLER:  Yes.
17             THE WITNESS:  There's nothing on that page.
18   BY MR. LIROT:
19   Q    Nothing on that page.
20   A    I just -- sir, I remember clearly seeing it.  I made a
21   special note of it here in my report that the nature of
22   officer's -- the officer's business is a strip club that
23   engages in the business of selling alcohol in an atmosphere
24   where nude, in capital letters, women entertain the clientele.
25             I didn't put it in the other report, so it must have

1    just been the one club that I saw it on.

2    Q    It's not here today?

3    A    Well, it's not there on a Wayback Machine from either

4    April or then.  I don't know how often they change the website.

5    Q    Do you want to look at the website after the report to see

6    if it changed at all, just to verify?

7    A    Sir, I looked at the website just when I was in

8    preparation of this and I saw it.

9    Q    Would you agree that they're owned by the same person?

10   A    I don't know that, sir.

11   Q    Okay.  Any reason to think they have a different business

12   model?

13   A    I'm sorry?

14   Q    Any reason to think they have a different business model?

15   A    What has a different business model, the two clubs?

16   Q    As in what the dancers did.

17   A    Again, that's not to me.  It's still -- it's a gentleman's

18   club.  It's a strip club.  I took special note of that because

19   it was fully nude and alcohol.

20          And I think the reason why I did notice that after

21   living in California all those years, that was -- that was

22   different.  The rules in California is if it's fully nude,

23   there's no alcohol served.  I believe that's why I took such a

24   note of that.

25   Q    Based on your prior testimony, you admit you're half

1  wrong, now you just want to judge this on your recollection

2  instead of the website that we've shown you?

3  A    Half wrong, it was -- it was memory of what stood out to

4  me on the website.  Yeah, I remember seeing it on the website.

5  I don't remember 2015 which website.  I apologize for that.

6          What was the second part of your question?

7  Q    How many reports were you working on at the time?

8  A    Three.

9  Q    How many reports did you do in the first six months of

10  2015?

11  A    I didn't really begin until -- I think I did one at the

12  very start of the year, and then nothing until July/August.

13          MR. LIROT:  If I may, Your Honor?

14          THE COURT:  Yes.

15          MR. LIROT:  Thank you, Mr. Chamberlin.

16          THE COURT:  Mr. Casas?

17          MR. CASAS:  Yes, Your Honor.  I'll try to be brief.

18          THE COURT:  Okay.

19                  REDIRECT EXAMINATION

20  BY MR. CASAS:

21  Q    Let's start with the topic of the Wayback Machine.  I

22  believe it's a .org; is that right?

23  A    I don't know.

24  Q    You're familiar with Wayback Machines?

25  A    Yes, sir.  I've seen it a few times.

1    Q    Counsel cut you off before you were able to sort of

2    explain the understanding of the Wayback Machine.

3              Can you explain to the jury how the Wayback Machine

4    works.

5    A    It's a company that takes snapshots of websites on certain

6    days and stores them in an archive so you can look back.

7              But as you see, it doesn't capture the whole website.

8    There's no click-throughs.  You can't sort of go from one page

9    to another page.  It doesn't have active links.

10             And, again, I'm not a total expert on this, but, you

11   know, I've looked back just on my own company to see sort of

12   how the website looked back on certain days.

13             It's an interesting concept, but it's -- as you see,

14   it may be one day here -- and websites change dramatically from

15   day to day.  That's the whole --

16   Q    Are you aware what happens when a website owner -- or

17   let's say a website appears a certain way, I believe,

18   April 15th, to use that day, 2015, and what happens when a

19   future -- the website changes in the future, how that affects

20   what populates in the Wayback Machine?

21   A    I don't.

22   Q    Are you familiar with the word "flash"?

23   A    Yes, sir.

24   Q    What is flash?

25   A    Flash is a program that illuminates or activates or puts

1    in motion images, and it's fairly outdated.

2    Q    Are you familiar with the concept of flash in terms of

3    text -- in other words, that that when you scroll down on the

4    website, the flash text continues to move up?  Are you familiar

5    with that?

6    A    Yes, sir.

7    Q    And do you know if the Wayback Machine can capture when

8    text is moving or scrolling up?

9    A    It can't.

10   Q    And so your testimony, sir, under oath, as best you can,

11   your best recollection is that your research prior to issuing

12   the cease and desist letter in September and October of 2015,

13   you went on the website and you saw that it was full friction

14   and nudity; correct?

15   A    Yes, sir.

16   Q    And that stood out to you because it's important for you

17   to analyze it as it applies to the issue of usages; right?

18   A    Yes, sir.

19   Q    Not because you were trying to come up with some

20   embarrassment factor; right?

21   A    Yes, sir.

22   Q    In fact, you testified in your direct examination, under

23   oath, that while there is an embarrassment factor associated

24   with the way the defendants used it, you didn't attach some

25   sort of premium to that in your valuation of damages; right?

1   A    Right, yes, sir.

2   Q    In fact, I think you testified that some of the models

3   weren't very happy with the dollar amount you ascribed because

4   they wouldn't have done the job to begin with; right?

5   A    Correct.

6   Q    And you still stuck to your lower number?

7   A    I try and do my job, yes, sir.

8   Q    So in the preliminary report that was attached to the

9   cease and desist letter that counsel has been asking you

10   questions about for quite some time now, what were the damage

11   amounts in that preliminary report?

12   A    The same amounts as I testified here today.

13   Q    They didn't change; right?

14   A    No, sir.

15   Q    Now, counsel spent some time going through each one of the

16   images and establishing that the models agreed to a particular

17   day rate for each of the images that the defendants used in

18   their advertisement; correct?

19   A    Yes, sir.

20   Q    For example, I think you said Canas was 2000, and Posada

21   was 2500.  There was a little uncertainty about Ms. Johnson's,

22   but they were all fairly lower; correct?

23   A    Correct, yes, sir.

24   Q    But those were all jobs that were consented to; right?

25   A    Not just consented to -- oh, yes, sir.  They were jobs

1   that were consented to.

2   Q    And specifically negotiated for?

3   A    Specially negotiated for.  And for products that were a

4   swimsuit or a lingerie or --

5   Q    So -- and when we were asking you questions -- and I was

6   asking you questions on direct examination about how important

7   it is to analyze the product; right?

8   A    Correct.

9   Q    You made the distinction when I was showing you the images

10  the way the defendants used them, that the way the defendants

11  use them, they were the product, the women were the product;

12  correct?

13  A    Correct.

14  Q    In other words -- so when Ms. Canas agreed to $2,000 to

15  allow her image to be used to promote a swimsuit or that

16  particular little costume she was wearing, it's not the same

17  thing as the way defendants used it; right?

18  A    No, sir.

19  Q    Because, again, if you take that image off that Facebook

20  page that defendants used, there's nothing on the Facebook

21  page; right?

22  A    Correct.

23  Q    It just is a bar?

24  A    Correct.

25  Q    There was a hypothetical that Mr. Lirot was posing about a

1   Playboy magazine and how the grandfather would be very proud of

2   his wife and held it onto forever, but that's in the privacy of

3   that grandfather's home; right?

4   A    Correct.

5   Q    So when Ms. Burciaga consented to her use of her image in

6   Playboy, she knew that some grandpa could keep it in his

7   mattress; right?

8   A    Yes.

9   Q    That's different from the perpetuity use that you're

10  referring to; right?

11  A    Yes, sir.

12  Q    How so?

13  A    Publicly available, easy access.  A bit hard to get to

14  Grandpa's Playboy stash.

15  Q    Now, if somebody took that grandpa's *Playboy* stash and

16  actually used that picture for commercial purposes, would that

17  be a different situation?

18  A    Yes, sir.

19  Q    That would not be allowed; right?

20  A    It's not allowed, no, sir.

21  Q    Mr. Lirot asked you questions about adult entertainment

22  agencies and whether you had tried to reach out to them or

23  whatever.  And I believe you established through his testimony

24  and your questions [verbatim] that there are agencies that deal

25  specifically with, like, porn stars and these types of

1    individuals that consent to being affiliated with strip clubs;
2    right?
3    A    Correct.
4    Q    But none of the plaintiffs in this case ever dealt with
5    any of those individuals; right?
6    A    The plaintiffs?
7    Q    Correct.
8    A    No, sir.  None of them, no.
9    Q    Apples to oranges; correct?
10   A    Yes, sir.
11   Q    Now, in your report that you've been asked questions
12   about -- I think it's dated March 18th of 2018; is that right,
13   sir?
14   A    Yes, sir.
15   Q    For each of the plaintiffs in this case, you did review
16   earning documents; right?
17   A    I did.
18   Q    And to the extent that they were available from the model,
19   you attached them to the report; correct?
20   A    Yes, sir.
21   Q    So you weren't trying to play hide the ball with the
22   defense; right?
23   A    No, sir.  All the documents I reviewed were attached to
24   the --
25   Q    You didn't have all the documents in the world of the

1    models, did you?

2    A    No, sir.

3    Q    But you did the best you could to attribute a particular

4    damage amount based on the information that you had available

5    at the time that you reviewed it; correct?

6    A    Correct.

7    Q    In fact, isn't it true that, as counsel has pointed out,

8    you've actually now done dozens of these reports; right?

9    A    Yes, sir.

10   Q    And, in fact, you have since then found a lot more

11   documents for Ms. Underwood, for example; right?

12   A    Yes, sir.

13   Q    And if you were to value her today, capturing her in

14   Wayback, for example, today in 2013, what would her actual

15   damage be?

16             MR. LIROT:  Objection.  Relevance.

17             THE COURT:  I'm going to overrule it based on the

18   cross.

19             THE WITNESS:  Again -- and I'm not arguing with you

20   either, Mr. Casas, but I'd need all the details of that.

21             But her day rate is a lot, lot higher.  Anywhere

22   probably, in Ms. Underwood's businesses and 20 million-plus

23   followers, north of 50,000.

24   Q    Well, listen to my question very carefully.

25             Even though you had the ability to find more

1    documents that were of -- that existed at the time of the

2    relevant time frame that's available -- that this case is

3    about, even though you were able to find more after issuing the

4    report, you didn't go back and increase the damages; right?

5    A    No, sir.

6    Q    In other words, you're fair to the defense and you stuck

7    to your original damage; right?

8    A    Yes, sir.

9    Q    Now, Mr. Lirot spent a lot of time in the first portion of

10   the report.

11         Could you turn over to that, please, where you're

12   listing out definitions.

13   A    I've really messed this report up now.  I'm sorry, I'm

14   trying to find it.

15   Q    That's okay.  I'm almost done.

16   A    Yes, sir.

17   Q    All right.  So what is that section entitled, sir, where

18   you're listing those things out?

19   A    General Model and Talent Industry Definitions and

20   Important Points to Note in the Preparation of Reports.

21   Q    Okay.  So you define things like we defined today, Usage;

22   right?

23   A    Yes, sir.

24   Q    Day rate.

25   A    Yes, sir.

1    Q    And you define "embarrassment factor;" right?

2    A    Yes, sir.

3    Q    Now in any one of the valuations for the plaintiffs, in

4    this report, do you attribute a usage rate or some sort of a

5    rate for embarrassment factor?

6    A    No, sir.

7    Q    You were just giving a definition; right?

8    A    Yes, sir.

9    Q    Now, counsel brought this up.  I'm just going to ask you

10   real quick, something about a protective order stamp.

11          On some of the documents that you submitted through

12   the report and ultimately to counsel, are there Social Security

13   numbers on there?

14   A    Yes, sir.

15   Q    Are there personal addresses?

16   A    On some, yes, sir.

17   Q    For the models?

18   A    Yes, sir.

19   Q    Is that what you were concerned about?

20   A    I was.  I believe that was it.  Yes, sir.

21          I can't answer definitively, I'm sorry.

22   Q    But there are things like Social Security numbers and

23   things like that in some of the documents; right?

24   A    Yes, sir.

25          MR. CASAS:  I have no further questions, Your Honor.

1          MR. LIROT:  No further questions, Judge.

2          THE COURT:  So with respect to the juror's previous

3  questions about the -- when the fully nude language appeared on

4  the websites, I think that's been addressed by the examination,

5  so I'm going to assume that question has been dealt with.

6          Let me see counsel.

7      (At sidebar, out of the hearing of the jury:)

8          THE COURT:  Any other questions?

9          Got one more, okay.

10          MR. CASAS:  Well, I guess we should read the

11  question.  The question from the jury is:  Will the jury get a

12  copy of the full valuation report?

13          From my perspective, I think a quick instruction on

14  how that, unfortunately, is not proper evidence for them to

15  consider.  That they shouldn't, you know, take anything

16  negative out of that.

17      (End of sidebar.)

18          THE COURT:  Counsel, let me see you.

19      (At sidebar, out of the hearing of the jury:)

20          THE COURT:  I don't want to tell the jury something

21  that's not so, but I might say to them that counsel will have

22  the ability during closing argument to summarize or give them

23  information from the report that might be of assistance to

24  them, or something like that.

25          MR. LIROT:  That's fine.

```
 1        (End of sidebar.)
 2              THE COURT:  So we have a question from the jury.
 3              Will the jury get a copy of the full valuation
 4     report?
 5              And the answer to that question is no, it's not the
 6     way it works.  Typically expert reports are not themselves
 7     evidence.  The testimony of the expert is the evidence.
 8              However, to the extent that there were exhibits that
 9     were utilized by the expert, to the extent that the attorneys
10     during closing arguments can summarize and give information
11     regarding the reports, you'll get that, but the actual report
12     is typically not put into evidence.
13              And that -- that applies to any expert that you're
14     going to hear from, so that's my answer.  It may not be an
15     answer you want to hear, but that's the answer.
16              So okay?
17              Oh, yeah.  That -- well, I'll make -- I'll make the
18     question about the nude dancing in the website, I'll make that
19     Court Exhibit 3, and I'll make this question about the report
20     Jury No. 4.
21        (Court Exhibit 3 and Jury Exhibit 4 were received in
22     evidence.)
23              THE COURT:  All right.  Give me one more second.  Let
24     me talk to the lawyers for a second.
25        (At sidebar, out of the hearing of the jury:)
```

1     THE COURT:  Okay.  Are you prepared to rest?

2     MR. CASAS:  Yes, Your Honor.

3     THE COURT:  Are you going to call your expert?

4     MR. LIROT:  I am.

5     MR. HEARN:  You want us just to make a perfunctory

6 Rule 50 motion, and save argument for tomorrow?

7     THE COURT:  Yes.  So they -- you can assume they've

8 rested and they'll be -- so you're making a Rule 50 motion and

9 I'll hear that motion.

10     Are y'all going to have a motion --

11     MR. CASAS:  Yes, Your Honor.

12     THE COURT:  -- at the end of the case?

13     MR. CASAS:  At the end of the case, yes, sir.

14     THE COURT:  Okay.  So I'm going to assume that you've

15 made a Rule 50 motion and I would take it under advisement, but

16 I'll hear argument on it at a later time.

17     MR. HEARN:  The other thing I would move, Your Honor,

18 is to strike Martin Buncher.

19     THE COURT:  Okay.  Well, I'll hear that argument as

20 well.

21     MR. HEARN:  Thank you.

22     THE COURT:  All right.  So you're going to announce

23 rest -- excuse me.  I apologize.  I'm the offender, so I'll

24 fine myself.

25     MR. LIROT:  I'll cover for you.

1          THE COURT:  Yeah, thank you.

2          All right.  I guess we'll go ahead and call him.  I

3   don't know that we're going to get him done.

4          MR. LIROT:  I'll go as fast as I can.  I want to

5   finish today.

6          THE COURT:  Well, okay.  But these guys -- do you

7   have a plane to catch or are you --

8          MR. LIROT:  I don't have anything to catch.

9          THE COURT:  These guys do.

10          MR. LIROT:  I think we're good to go.

11          THE COURT:  All right.  Let's just see if we can get

12   it done.

13      (End of sidebar.)

14          THE COURT:  All right.  What says the plaintiffs?

15          MR. CASAS:  The plaintiffs rest, Your Honor.

16          THE COURT:  All right.  Ladies and gentlemen, the

17   plaintiffs have rested their case in chief, meaning that the

18   evidence that they're going to put on in their case has

19   concluded.

20          I know I told you this already, but I believe

21   Mr. Lirot has got one witness in his case, but all of the

22   evidence that you've heard in the plaintiffs' case, to the

23   extent it applies to the defendant, you should consider it --

24   it's all just one pot of evidence.  And so you've heard quite a

25   bit of the defendants' case already in the plaintiffs' case,

1   and so I believe Mr. Lirot has one witness.

2           We are going to see if we can get that witness in

3   before the 5:00 hour.  We'll see.

4           If we can do that, then we'll obviously close the

5   case up on Monday.  So that's going to be the plan.  Okay?

6           All right.  Sorry.  You can step down, sure.  I

7   apologize.

8           THE WITNESS:  I wasn't sure.

9           Do I give these back to somebody?

10          THE COURT:  You just leave it right there.  They'll

11  take care of it.

12          MR. LIROT:  The defendants would call Mark Zablow.

13          THE COURT:  All right.  Mr. Zablow.

14          COURTROOM DEPUTY:  Would you raise your right hand,

15  please.

16          Do you solemnly swear that the testimony you are

17  about to give before this Court will be the truth, the whole

18  truth, and nothing but the truth, so help you God?

19          THE WITNESS:  I do.

20          COURTROOM DEPUTY:  Please state your full name and

21  spell your last name for the record.

22          THE WITNESS:  Mark Chad Zablow, Zablow, Z-a-b-l-o-w.

23          COURTROOM DEPUTY:  Thank you.  Please be seated.

24          MARK CHAD ZABLOW, DEFENDANTS' WITNESS, SWORN

25                        DIRECT EXAMINATION

BY MR. LIROT:

Q    Good afternoon, Mr. Zablow.

A    Good afternoon.

Q    I'll let you get your water down.

     Can you tell the Court how you're employed.

A    I run an entertainment marketing agency.  I work with brands and help them navigate their marketing when it comes to the world of entertainment, celebrities, or music, artists, athletes, models.  We call ourselves an influencer marketing agency.

Q    All right.  Do you work for a specific company?

A    I work for Cogent Entertainment Marketing.

Q    And how long has Cogent Entertainment Marketing been in business?

A    Cogent was founded in 2011.

Q    All right.  Can you tell us a little bit about your educational background.

A    I graduated from Adelphi University with a double major in management and marketing.

Q    And has Cogent won any awards or commendations or anything of that nature?

A    At Cogent, we pride ourselves on our culture.  Best place to work by *Ad Age*, the last few years, *Crain's* as well.

Q    *Ad age*?

A    *Ad age*, which is an industry publication for advertising

1    agencies, you know, Crain's as well, which focuses on companies

2    on more of a local level.

3    Q    And what do you really specialize in, to try to break it

4    down for the jury.

5    A    I call my -- we call ourselves procurement experts.  We

6    help companies when they're spending their money on celebrities

7    and athletes.

8            On the opposite side of an agent.  We help evaluate

9    the deal.  We help with the outreach.  We help with the

10   background of if the right people are the right match.  And

11   then we get into the negotiations.

12           We help determine fair market value, for lack of a

13   better term.  And then we help consult through the entire

14   project to make sure that everything is coming together

15   properly, the client is getting a value of their relationship,

16   strategically we're seeing it through.

17           MR. LIROT:  All right.  Judge, I'm going to ask

18   Mr. Zablow to opine on some of Mr. Chamberlin's work.

19   BY MR. LIROT:

20   Q    Mr. Zablow, have you had an opportunity to review

21   Mr. Chamberlin's report in this case?

22   A    Yes, I have.

23   Q    Did you find any issues that you felt deviated from the

24   standard custom and practice in your industry?

25   A    Can you be more specific?

Q    Did you find any problems with his report?

A    I found certain aspects of the way that the fair market value was calculated to be a little bit off.

Q    And take a look, if you would, at the statement -- I think you give some of your background, and you talk about facts and data considered.  Let me just cut to the chase here and talk about these plaintiffs.

Tell us what resources you used in looking at the plaintiffs in this case to basically look at Mr. Chamberlin's report.

A    Well, Mr. Chamberlin's report, you know, specifically focused on some factors, including what the day rates were for the plaintiffs in a case or in a situation where day rates weren't performed and just images were -- would typically be licensed, I was trying to understand what the social status of the plaintiffs would have an effect on the use of the image.

For example, when you use an image of somebody, if they're well known enough, that can lead to a certain amount of advertising you need to do.  If you put their name next to them, that may help draw an additional brand recognition.

When it comes to social media or websites, if you tag them or if you refer to them, that would drive a lot more value to the image at hand.

So after reviewing the images, I was going through the defendants, most of their social pages, trying to

1   understand their brand, trying to understand if their names

2   were used, if their images were used as a traditional

3   endorsement, which is a little bit -- it looked like how the

4   evaluation was coming from, how you can really then equate them

5   to what they would be paid if it was something that was apples

6   to apples, let's call it.

7   Q    Okay.  In looking at Mr. Chamberlin's report, did you find

8   it to be more objective or more subjective?

9   A    Can you be a little bit more specific?

10  Q    Were there -- were there comments made and methods

11  described that were nebulous?

12  A    I think, you know, specifically the day rate.  The day

13  rate stuck out to me the most.

14          Typically, if somebody performs a full endorsement

15  campaign, if there's working days, that's counted.  If they're

16  promoting it on their social media, that would have counted.

17  And so a lot of the main factors, for an image use contract, I

18  didn't necessarily see attributed, yet a lot of the factors

19  that didn't happen were used to calculate those rates.  And

20  then those rates were on the higher end of the spectrum of what

21  is perceived if the talent had been made or made in the past.

22  Q    Did it appear to you that Mr. Chamberlin was, quote,

23  "pulling numbers out of the air"?

24          MR. GOLASZEWSKI:  Objection, Your Honor.  Leading.

25          THE COURT:  I think you're kind of leading there.

BY MR. LIROT:

Q    Okay.  Did you find any specific evidence in Mr. Chamberlin's report to support the day rates that he concluded for these individual plaintiffs?

A    I didn't find yes or no; what I really took the approach was the day rates were irrelevant as the talent did not perform any days.  They did not perform any working services.  But in our industry, it is very standard to buy an image with no day rates or no days or working days.

So I just -- I found it odd the day rate would be used as the lead or one of the main factors of trying to evaluate the image.

Q    Why did you draw that conclusion?

A    Just from doing -- being in this business as long as I have.  When we go to approach a model or a celebrity or an athlete to use their image, sometimes we want to produce a new campaign, and that costs X.  Sometimes it's easier to say:  We don't need any work.  We like that image.  We're just going buy that image.  That doesn't require time or any services of the talent, just the rights and their brand.

So traditionally, that's at a lower rate than if they had to perform services.

Q    Now, when you look at these individual plaintiffs, when they were testifying, they gave a description of the day rate that they negotiated and agreed to for the images in this case.

1           Would that be a good place to start?

2   A   I would not -- I would not -- I would not start there.  If

3  I was negotiating that, I would immediately come back to say:

4  Well, we're not performing any days of work, so what would be

5  the proportionate price just to use the image?

6   Q   So would it be less than the day rate they were paid when

7  they had to put on their makeup and show up for work?

8   A   Normally, yes.

9   Q   So you think the day rate that they testified to would be

10  at the high end of what these images actually have as a fair

11  market value?

12   A   I don't know all the day rates off the top of my head to

13  say that.

14   Q   But let's say the day rate that they testified to that

15  they got paid to go through the processes to produce those

16  images.

17   A   I want to make sure I'm understanding it properly.  The

18  day rate they got paid for the image that was then used, that

19  is at question today?

20   Q   Correct.  To show up, go to the shoot, however many days,

21  however many hours, however many outfits.

22   A   Yes.  If you were to then just license an image from that

23  shoot, I would expect it to be less than the cost of the

24  contract for that shoot, plus whatever services or rights came

25  with that contract.

1    Q    In Mr. Chamberlin's report, he refers a lot to social
2    media followers or fans or members, things like that.
3            How do you view that variable in developing a fair
4    market value?
5    A    If the plaintiffs had posted on behalf of the defendant,
6    tremendously.
7            If the plaintiffs were tagged and their followers
8    were drawn back to the page, you know, a very significant
9    amount.
10   Q    How about if they're just anonymous images posted on an
11   obscure Facebook page for two small clubs in Jacksonville?
12   A    It's a lot harder.
13   Q    So the scenarios that you give deal with a greater
14   exposure, a wider universe of people actually being able to see
15   the images?
16   A    They deal with an implied endorsement.
17   Q    And in this instance, without the name or anything
18   identifiable, regardless of the number of followers a person
19   had, would the anonymity of those images have a bearing on the
20   development and conclusions regarding fair market value?
21   A    Can you say that again, please.
22   Q    If people don't recognize who these models are, how does
23   that affect fair market value?
24   A    It would be -- well, it would be the intent of the
25   advertiser.

1   Q    So if they didn't want to use their name or their face or

2   their image because of who they were, how would that affect

3   fair market value?

4   A    The -- the willing buyer would not be in the marketplace

5   above a certain threshold, dollar threshold.  So the buyer

6   would either need somebody of a certain public stature to

7   promote their venue, or they would need something of less

8   stature, or an image.

9            In the case of needing an image or even needing

10  someone of public stature, there's still an understanding of

11  what an industry would most likely spend or what nightclubs can

12  typically spend versus what a sneaker company can typically

13  spend.

14  Q    So in evaluating public stature, would you evaluate where

15  the image appeared?

16  A    Yes.

17  Q    Would you evaluate whether or not there was a name on that

18  particular image?

19  A    To calculate the value of what was provided, yes.  I

20  would -- if -- I would definitely want to see if the person's

21  name or how much of their image and likeness was attributed to

22  that advertisement.

23  Q    If there was a sentence that said, "I endorse this club,"

24  would that have a bearing on fair market value?

25  A    It would be -- it would all be looped into one implied

1   endorsement, yes.

2   Q    All right.  And if there was no language to that effect

3   and we're dealing with anonymous individuals that simply appear

4   in images on Facebook, how would that impact fair market value?

5   A    Again, I think it's hard to justify what somebody would --

6   what an industry would pay or what clubs would typically pay

7   for something or what they would need for an image.

8           In the case of needing somebody of public stature or

9   somebody with a big social media following or somebody that can

10  drive people into your club, having them endorse it and imply

11  that they're going to be there should drive that price up.

12          If it's just an image of a person, I would say that

13  the public stature, their public -- their social media

14  following, how many people recognize them is of less value.

15  Q    Based on your training, experience, your expertise, does

16  it make any sense to try to develop fair market value on the

17  re-creation of some negotiation that would never take place?

18  A    I don't know -- I don't know.  I don't know if that's --

19  if that's...

20  Q    How would you do that?

21  A    How would I go about re-creating the fair market value on

22  a negotiation that didn't take place?

23          I would look at -- I would look at the industry.  I

24  would look at the intent.  I would look at the malice that was

25  done.  I would also look at the damage that was done.

1    And then lastly, I'd look at -- if I was to re-create

2  the market value of a nightclub or an adult entertainment

3  establishment, what does the market command if I was to go out

4  and pay that.  And so if -- if it was that I can go out into

5  the market and get something similar, that's what I would try

6  to justify.

7  Q    Would you look to other marketing agencies in the adult

8  entertainment industry to try to draw some kind of applicable

9  conclusions?

10  A    I would look as wide as possible to find as many

11  applicable conclusions as possible.

12  Q    And as we sit here today, is it your opinion that the --

13  and I don't want to go through each individual number, but is

14  it your opinion that the numbers attested by Mr. Chamberlin as

15  fair market value are inflated or inaccurate?

16  A    I believe they're grossly inflated.  The way that they

17  were heavily weighed, specifically around a day rate, and the

18  fact that they did not show up to perform any services.

19    The images were put out there or they were -- they

20  were not developed by the defendant.  They were put out by the

21  plaintiffs themself.  I would have a hard time seeing where any

22  similar defendant in the industry or any similar nightclub in

23  the industry would justify paying that much money for their

24  Facebook pages.

25  Q    All right.  And would that be applicable to every

1   plaintiff that Mr. Chamberlin testified to?

2   A    Yes.

3            MR. LIROT:  May I have a second, Your Honor?

4            THE COURT:  Yes, sir.

5            MR. LIROT:  I'm trying to be succinct.

6            THE COURT:  I appreciate that.

7            MR. LIROT:  We'll pass the witness.

8            MR. GOLASZEWSKI:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10  BY MR. GOLASZEWSKI:

11  Q    Mr. Zablow, good afternoon.  Something you said jumped out

12  at me, and I don't want to misquote you so tell me if I'm

13  wrong.

14           If you were trying to recreate the fair market value,

15  you would look to how much, here, a strip club would pay for

16  its Facebook page.  Is that what you said?

17  A    I'm not exactly sure word for word.  I don't know if it's

18  more appropriate to be read back.  I know what I was trying to

19  imply, if that helps.

20  Q    Sure.  Tell me.

21  A    Sure.  If I represented a similar adult entertainment

22  establishment and they asked me to go secure models or

23  influencers or celebrities or people to be in the images on

24  their Facebook page, I would typically look at what the

25  industry is doing, what else is out there.

1       It's very rare to see nightclubs, especially of this

2   stature, paying well-known models -- or, frankly, a lot of, you

3   know, similar nightclubs paying well-known models to be in the

4   day-to-day social media posts.

5       When they have special events, they're spending

6   significant amount of money putting them in their ads and

7   promoting them properly, but for day-to-day posts, you know, I

8   would find that a little uncommon.

9   Q   Great.  So what are strip clubs in the Florida area paying

10  for Facebook promotions and website promotions?

11  A   I don't know, but I've worked with clubs outside of

12  Florida that I have done that with that typically are the

13  larger end of the United States in how they market and

14  advertise.

15  Q   Okay.  So what are -- tell me a strip club that you've

16  worked with and what their general Facebook and advertising

17  budget is.

18  A   I don't run their Facebook and advertising budgets, but I

19  know what they pay the celebrities and the models and the hosts

20  at their venues.

21      For instance, The Men's Club was a client of mine.

22  We paid Carmen Electra $25,000 to host our grand opening,

23  appear at the event, appear in all of our social media, all of

24  our advertising.  We took a billboard out.

25      And that's Las Vegas, which is traditionally a larger

1  advertising market than maybe some of the other markets are.

2  So I would look at them as a good guide, if that's what Vegas

3  is spending.

4  Q    So The Men's Club in Las Vegas is spending $25,000 -- and

5  what was it, that was for Carmen Electra to appear at a grand

6  opening; is that right?

7  A    Correct.

8  Q    And so now extrapolate for me what that means for the

9  advertising budget and the advertising spend for Facebook and

10  the websites and social media for the two clubs that we're here

11  for, if you could.

12  A    I just suggest that if that's what a Las Vegas nightclub

13  is spending on their grand opening talent, which is usually a

14  little bit -- and you go a little bit larger on grand opening

15  than every Thursday, I would imagine that what they spend on

16  their talent, and I -- would be significantly less.

17  Q    So you think it's a grand opening so it's higher than what

18  The Men's Club on a normal Thursday night would spend, and you

19  think that probably The Men's Club also would probably spend a

20  little bit more than a club in Florida.

21       Am I -- I don't want to put words in your mouth.  Is

22  that kind of where you're going?

23  A    Yeah.

24  Q    Okay.

25  A    I'd say on a traditional level.  Could there be certain

1    circumstances where a club in Florida has a big night?

2    Absolutely and big numbers come up, but I'd say Las Vegas more

3    in terms of a market, this is typically what they do.

4    Q    I missed it.  Describe for me your area of expertise

5    again.

6    A    I'm an entertainment marketing specialist.  I do talent

7    procurement.

8    Q    Talent procurement.  And can you just describe for the

9    jury what that is.

10   A    I help negotiate talent deals on behalf of the person

11   that's purchasing.

12            I don't represent any talent or any models.  I

13   represent the buyers.

14   Q    Right.  You've never negotiated a modeling contract on

15   behalf of a model; correct?

16   A    I have.  It's not my core business.

17   Q    Got it.  Which models have you negotiated on behalf of?

18   A    On behalf of Joan Smalls, on behalf of Hannah Davis; on

19   behalf of male models, Premium Pete, on behalf of Chris

20   Collins.  How much time do we have?

21   Q    Go ahead.  You negotiated -- Joan Smalls is a Victoria

22   Secret model; is that correct?

23   A    Uh-huh.

24   Q    And you negotiated a deal for her; is that correct?

25   A    Yes.

1   Q   Did you ever negotiate a deal for Joan Smalls with the

2  gentleman's club?

3   A   No.

4   Q   Did you ever negotiate a deal for Hannah Davis?

5       Let's go back.  Hannah Davis is a *Sports Illustrated*

6  swimsuit model; is that correct?

7   A  I have not negotiated any names I mentioned with the

8  gentleman's club.

9   Q   Okay.  Any names you haven't mentioned with the

10  gentleman's club?

11   A   Just Carmen Electra.

12   Q   Okay.  But you didn't negotiate on behalf of Ms. Electra;

13  correct?

14   A   No, I negotiated for -- oh, I'm sorry.  I have not

15  represented any talent in a gentleman's club negotiation,

16  correct.

17   Q   Got it.  Thank you.

18       And talent procurement.  I appreciate that.  And tell

19  me again the purpose of your retention in this case.

20   A   To help under the -- review Mr. Chamberlin's report, and

21  give an opinion on how the fair market value was calculated.

22   Q   Okay.  You weren't hired -- defendants didn't ask you to

23  come up with your own fair market analysis -- let me just

24  finish please -- of plaintiffs' images; correct?

25   A   Each plaintiff's image, no.

```
1    Q    For any of the plaintiffs' images; right?
2    A    No.
3    Q    Okay.  You were hired to come in and disagree with
4    Mr. Chamberlin; is that fair?
5    A    I was to give an unbiased opinion.
6    Q    Okay.  You were to give an unbiased opinion.
7              How many strip clubs have you represented giving
8    unbiased opinions concerning a valuation?
9    A    Up till today, I've written about maybe ten reports.
10   Q    Ten reports.  And are each of those on behalf of strip
11   clubs challenging fair market value analysis?
12   A    All of the reports were -- yes.  All the reports were
13   challenging.  A report for Omega watches was not challenging --
14   it was not challenging that either.
15   Q    You did one report for Omega and then nine other or ten
16   other reports?
17   A    It could be anywhere -- around a dozen, give or take a
18   few.
19   Q    Give or take a dozen reports for a gentlemen's club, yes?
20   A    Yes.
21   Q    At any point in any of these 12 -- and I don't want to get
22   too deep into them, I just want to know, did you ever calculate
23   the fair market value of an image that was used by a
24   gentleman's club?
25   A    In reports after this report, I have been asked to give an
```

1    opinion of what I think a -- what I think somebody in a similar
2    situation would pay for an image, but I was never asked to give
3    a valuation of any of the specific images.
4    Q    Okay.  Did you do any evaluation of what the defendants in
5    this case spent on their Facebook and website advertising?  I
6    apologize if I'm repeating.  I just want to ask it a different
7    way.
8    A    No, I just want to make sure I'm understanding it
9    properly.
10          Did I get any -- or did I do any evaluation on what
11   the defendants' spent on -- on anything on their social or
12   digital marketing?
13   Q    My understanding is that you don't look at it from the
14   model's perspective or the modeling agent, you look at it from
15   the talent procurement and the company's perspective, that in
16   doing that, in arriving at what something should cost, you look
17   at what -- among other things, you look at the advertising
18   budget; is that correct?
19   A    To an extent, yes.
20   Q    Okay.
21   A    Reach, I think, is the way we like to look at it.
22   Q    And I want to be clear.  You didn't look at defendants'
23   reach or spend in this case; correct?
24   A    I was only able to see through -- from the Facebook pages,
25   from what was provided to me, the reach that was publicly

1   shown, and in conversations with defendants' counsel asking
2   about their advertising spend, but I wasn't given or seeing any
3   specific numbers according to that.
4   Q    I don't understand.
5        You're being retained to challenge a fair market
6   value analysis.
7   A    Uh-huh.
8   Q    And what you do in that sort of analysis is that you look
9   at the advertising spend, and you've been retained by
10  defendants, these two gentlemen's clubs, and you didn't have
11  access to what they spent in order to form your opinion; is
12  that correct?
13  A    That's incorrect.  I asked what their -- I asked if the
14  Facebook page had any advertising dollars attributed to it.
15  The answer was no.
16       When I looked at the Facebook page, and you could see
17  from the lack of likes or comments or shares, that seemed to be
18  pretty true.
19       I had asked if any of the images were used in any
20  other marketing spend.  Were they promoted on billboards or
21  were they advertised with dollars in any other sense, and I
22  wasn't provided with any examples of that.
23       I do understand that they retained and paid other
24  marketers and paid other people to help.  I don't know what
25  those people got paid or what their budget was towards that.

1   But I did not -- I was not given and I had asked for any proof

2   of advertising that had helped promote the images that were out

3   there.

4   Q     You had asked and you didn't get it; is that correct?

5   A     Correct.

6   Q     Okay.  You had asked counsel; is that correct?

7   A     I was told there -- there was no marketing spend

8   attributed to it.

9   Q     Okay.  Describe for me how you would do a fair market

10  value approach if you were asked to do one.

11           I think you told Mr. Lirot.  I just want to be clear.

12  A     I would try to get what I call an apples-to-apples

13  scenario.

14           Can I work with the plaintiffs to see had they had

15  any other similar cases where an image of theirs was sold to an

16  advertiser with hopefully a fairly similar reach.  I think it's

17  hard to find a similar advertiser putting it up on one Facebook

18  page or two Facebook pages or social media pages with a limited

19  reach.  You don't normally see that.  So I looked to see where

20  they had done a deal or an image of theirs was purchased.

21           And I think if they've never done something in that

22  category before, that's going to be very hard.  So I looked to

23  see where something commensurate was purchased.  If there was

24  that, I would try to use that as a baseline.  If that didn't

25  exist, I would probably go outside the defendants and the

1  plaintiffs and I would look for other industry standards or

2  precedents that I can lean on and go from there.

3          This has happened a lot in like -- you know, you see

4  in the papers a lot, so that's what I would usually try to do

5  is look for past incidents that I can use precedent to set

6  there.

7  Q    All right.  Mr. Lirot asked you if you were aware of

8  certain agencies that specifically work with gentlemen's clubs

9  to procure talent.  Do you recall him asking you that?

10 A    Yes.

11 Q    And you're familiar with those companies; correct?

12 A    I know there -- I know that there are agencies out there

13 for pretty much everything these days.

14 Q    Okay.  Have you -- have you ever talked with any people

15 who were employed there, who were involved in the business of

16 procuring talent for strip clubs?

17 A    Not -- not -- no, not off record.  I worked -- I've worked

18 in that space before, so I have spoken with people.  Have I

19 spoken with them specifically about this, no.

20 Q    You haven't spoken with them; you haven't spoken with

21 defendants about what their spend is; is that fair?

22 A    That's fair.  We pride ourself on understanding the spend

23 of our industries, and so we know where industries spend

24 heavily and sometimes don't, and we're not as granular into

25 each club's business, you know.  We know -- we know where

1    they're spending.

2    Q    Right.  So I think we went down this road earlier and you

3    said that -- well, in the case of The Men's Club, they paid

4    Carmen Electra 25,000 to, I think, appear at the grand opening.

5    And I understand you like trying to get granular in your

6    industry, so I'm trying to find out what other information you

7    have about this industry that you've now written a dozen

8    reports on.

9    A    The reality of it is is I'm looking at usage of a Facebook

10   image and paying somebody to be in that image.  My company

11   produces a lot of social media content.  We hire models all the

12   time.  We pay them day rates.

13          Typically, for a social media page where you're

14   posting content maybe daily or weekly, but you're trying to

15   produce 50 to 300 pieces of content a year, you're usually

16   doing shoots with cost-effective solutions because it's not a

17   TV ad and it's not a print ad, so the quality doesn't have to

18   be up here.  And it's usually a much more efficient and

19   cost-effective approach to social media.

20   Q    Great.  Do you have your report that you submitted --

21   A    Yes, I do.

22   Q    -- in this action?

23          MR. GOLASZEWSKI:  Your Honor, if I may, I just want

24   to make sure we have the same report.

25          May I approach?

```
 1                  THE COURT:  Sure.
 2                  THE WITNESS:  I have just two copies of it.
 3                  MR. GOLASZEWSKI:  Okay.  Thank you.
 4                  We have the same -- for the record, it's the expert
 5      report and disclosure of Mark Zablow dated February 20, 2017.
 6      BY MR. GOLASZEWSKI:
 7      Q    If you flip to the third -- I'm sorry, the second --
 8      bottom of the second page of that.
 9                  I'm sorry, flipping over to the third page.
10                  And one of the problems you have with
11      Mr. Chamberlin's fair market value analysis as I see it, and
12      you write:  Plaintiffs have exhibited reckless behavior in the
13      way they manage the rights to their images, further diluting
14      the value they provide the defendant.
15                  Do you see that?
16      A    Yes.
17      Q    What reckless behavior are you referring to that my
18      plaintiffs -- my clients engaged in?
19      A    In some of the defendants' cases -- and I don't remember
20      exactly off the top of my head, but they had done contract work
21      with other agencies, with other brands, they had signed their
22      rights away for some of that -- for some of those campaigns.
23      Their images are widely all over the Internet.
24                  And so when you -- I got into some of the depositions
25      into a little bit more, trying to understand, you know, what
```

1    the actual objective is of the talent.

2              If they're doing deals, they're signing their rights

3    away, and those images are kind of going out there.  How much

4    are they valuing their brand?

5    Q    Great.  I've got nine plaintiffs.  Do you know the name of

6    the plaintiffs in this case?

7    A    Yes.

8    Q    Okay.  So can you give me one example of the reckless

9    behavior that my clients have engaged in.

10   A    Not off the top of my head, no.

11   Q    Okay.  Is there somewhere that it's written down that I

12   can reference the reckless behavior that my clients have

13   engaged in in your opinion?

14   A    I can pull up all the depositions.  I'll make note of it.

15   Q    What depositions are you --

16   A    I'm sorry, all the -- all the notes and everything I've

17   read, I can try to find the exact notes.  But in terms of their

18   reckless behavior, no, I don't have that on me today.

19   Q    If you flip to page 1, you write:  To specifically

20   define -- I'm sorry, it's the fourth sub-bullet point under the

21   third bullet point.

22              To specifically define fair market value calculations

23   for each plaintiff, I would need to review plaintiffs'

24   contracts, tax returns, earning statements, and other material

25   items as well as interview each plaintiff.

1          Do you see that?

2    A    Yes.

3    Q    Do you know if that's what Mr. Chamberlin did in this

4    case?

5    A    I know he -- I believe he had spoken to and had reviewed a

6    certain amount of documents.  I don't know if he reviewed every

7    single thing for each plaintiff, but I know he's had access to

8    the plaintiffs' documents.

9    Q    You were sitting here during Mr. Chamberlain's testimony;

10   right?

11   A    Correct.

12   Q    Did you hear him testify that he reviewed plaintiffs'

13   contracts and 1099s and earning statements?  Did you hear him

14   testify to that?

15   A    I heard him say he reviewed their contracts and some in

16   Spanish.  And he had a chance to speak to the plaintiffs as

17   well, I believe.

18   Q    Right.  Mr. Chamberlin did that, you didn't do that here;

19   right?

20   A    I did not have a chance to, no.

21   Q    You write, one bullet point up, the plaintiffs' overall

22   awareness is low, ultimately making them replaceable and of

23   less value to the campaign's success.

24          What do you mean by saying that my clients are

25   replaceable?

1   A    Well, again, their -- the defendants didn't use the public

2   stature of the plaintiffs as the mechanism of their marketing.

3   They did not say:  Come see this plaintiff here tonight, and

4   mention her by name.  They didn't tag her in their Facebook

5   posts.

6          The plaintiffs didn't go out of their way to promote

7   the defendants.  In my mind, the defendant needed somebody with

8   a certain look versus a public stature.

9          And when you think of "look," I would imagine that,

10   for a day rate, you can probably get a similar look for a much

11   more reasonable asking price than the fair market value that's

12   been suggested.

13   Q    That is, my clients can be easily replaced by someone for

14   less money than what Mr. Chamberlin ascribes as their fair

15   market value damage for their image having been misappropriated

16   in the first place.  Is that what you mean?

17   A    The image that was used by the defendant can be replaced

18   at a much lower cost.

19   Q    Explain that to me.  I'm not trying to be flip.  I mean,

20   any image can be replaced; right?

21   A    So an image of a female with certain hair color, certain

22   physical features, can be -- I guess in this situation, the

23   public stature of the female did not matter as much as her

24   actual looks.

25   Q    And that's because instead of saying Sarah Underwood is

1   going to be dancing at Flash Dancers gentleman's club, they

2   just took a picture of Sarah Underwood.  They didn't -- they

3   didn't name her.  Is that your point?

4   A    Yes.  Because they didn't get the value of her public

5   stature.

6   Q    Got it.  Ms. Underwood -- do you recall being deposed in

7   this case by me?

8   A    Yes.

9   Q    Okay.  And do you recall us talking about Sarah Underwood?

10  A    I remember we talked about her, yes.

11  Q    Okay.  And do you recall discussing Sarah Underwood's

12  social media stature?

13  A    I don't remember the specifics, but if you say we did it,

14  I believe you.

15  Q    Okay.  Do you know what the social media stature is today?

16  A    I heard it mentioned before.  I think it was said over 20

17  million followers.

18  Q    Okay.  You don't know one way or the other, though?

19  A    Not off the top of my head.

20          MR. GOLASZEWSKI:  Okay.  One moment, Your Honor.

21          THE COURT:  Sure.

22  BY MR. GOLASZEWSKI:

23  Q    You did mention -- my colleague was reminding me, sir, you

24  did mention something about the intent of the advertiser, how

25  you would take that into account.  Am I correct about that?

1    A    Yes.

2    Q    Okay.  Can you hash that out a little bit for me.

3    A    Again, the advertiser, they did not use -- they did not

4    use the image and the plaintiff's name when they -- when they

5    put up the image.

6            If the intent was there and they had gone there, it

7    can't just be:  Oops, it was -- there was a little bit more of

8    a -- of a -- of a -- of a malice there.

9    Q    Did you speak with the defendants in this action?  That

10   is, did you speak with Mr. Tomkovich?

11   A    Yes.

12   Q    You did.  And did you speak with any of his managers?

13   A    No.

14   Q    Okay.  And did you get an understanding about what their

15   intent was?

16   A    Yes.

17   Q    Okay.  And what was your understanding of Mr. Tomkovich's,

18   quote, "intent"?

19   A    I don't believe Mr. Tomkovich understood the intent of

20   what was actually taking place.

21   Q    So whose intent are you referring to?

22           So now we're here in this situation and we have

23   misappropriated --

24   A    The company of -- whoever manages the social media of

25   the venue.

Q    Got it.

A    I don't believe Mr. Tomkovich was personally doing the Facebook page.

Q    Okay.  Got it.  We'll leave that aside.

       Did you speak with Shaun Hopper about his intent?

A    No.

Q    Did you speak with any managers at Flash Dancers or Thee Officers Club about their intent?

A    No.

Q    Okay.  You spoke with Mr. Tomkovich about his intent, but he didn't -- he claimed he didn't know what was going on; is that fair?

A    Correct.

Q    Got it.  You didn't speak with anybody else about their intent?

A    No.

Q    That's an important point that you would have to look at if you were trying to analyze fair market value; fair?

A    Yes.

Q    You've been in the talent procurement business for how long, sir?

A    Over 15 years.

Q    And Cogent, you said, received a Best Place to Work Award; is that right?

A    Yes.

1    Q    Has it received any awards based on its talent procurement

2    services?

3    A    No.

4              MR. GOLASZEWSKI:  No further questions, Your Honor.

5              MR. LIROT:  Very briefly.

6              THE COURT:  That's the 5:00 bell, right, so...

7              MR. LIROT:  Pardon me?

8              THE COURT:  That's the 5:00 whistle, so...

9              Go ahead.

10                        REDIRECT EXAMINATION

11   BY MR. LIROT:

12   Q    Mr. Zablow, very quickly.  If all you're looking to use is

13   a pretty face, what impact does social media stature have

14   whatsoever on evaluation?

15   A    Very little, if anything.

16   Q    And you talked about differences between print and all the

17   rest of that.

18              For somebody just looking to take pictures of an

19   attractive woman to put in a Facebook page, what's the day rate

20   for that?

21   A    It's a -- it's a live question.  I can't answer that, sir,

22   specifically.

23   Q    Give me a low end.

24   A    Models can be as little as a couple hundred bucks to

25   start, and then that can rise based on time, usage, and so

1   forth.

2   Q    And for that, you're not going to use their name; you're

3   not going to say they endorse anything.  It's just a picture of

4   an attractive girl.

5   A    To be fair, most models at the range -- at that 500 to

6   $1,000 range, you're not using their name.

7   Q    And Carmen Electra, would you say she's more recognizable

8   than any of the plaintiffs, based on your expertise?

9   A    I would say she's at the upper echelon -- upper echelon of

10  recognizability compared to all the plaintiffs, yes.

11  Q    And they got to use her name on signs and everything else?

12  A    Yes.

13  Q    And the last question I'm going to ask you, in looking at

14  Mr. Chamberlin's report, does it appear to you that this

15  so-called negotiation only involves the position of the

16  plaintiff, and it has no accommodation for the position of the

17  buyer?

18  A    I would say that it would be -- I have not -- I do not

19  know of a willing buyer that would spend thousands and

20  thousands and thousands of dollars per Facebook image, and so,

21  no, it does not seem like there's a willing buyer in the

22  negotiation.

23  Q    So is negotiation part of establishing fair market value?

24  A    Yes.

25  Q    And in this instance, if you only have one party, is there

```
1    any way you can rely on that number to establish fair market
2    value?
3    A    No.
4              MR. LIROT:  Thank you.
5              MR. GOLASZEWSKI:  Your Honor, if I may?
6              THE COURT:  Yes, sir.
7                         RECROSS-EXAMINATION
8    BY MR. GOLASZEWSKI:
9    Q    You are aware, Mr. Zablow, that images of my clients
10   appeared in nine advertisements that were posted on the social
11   media and websites of defendants; right?
12   A    When you say nine advertisements, what do you mean?
13   Q    I mean -- we can go through them, if you like.  The images
14   that were taken of my clients that were put on the social media
15   advertisements.  Are you aware of that?
16   A    Yes.
17   Q    Okay.  Do you not think that Thee Officers Club and Flash
18   Dancers should be considered a willing buyer?  Didn't they take
19   them and put them in advertisements?
20   A    Yes.
21   Q    Okay.  Thank you.
22             Mr. Lirot used the term -- he's used it a couple
23   times -- "just a pretty face," and you answered the question.
24   I want to know, what does that mean to you?
25   A    I implied Mr. Lirot's statement that the defendants are
```

1    looking for a specific look.  Whether it's pretty or unpretty

2    is not my -- not my judge.  But they're looking for a specific

3    look and not a public stature.

4    Q    Did you ever ask the defendants why they didn't use one of

5    their dancers to be put in their advertisements?

6    A    No.

7    Q    Anything else about this "just a pretty face" definition

8    that you'd like to extrapolate for us?

9    A    It's not my term, so no.

10             MR. GOLASZEWSKI:  Thanks.  Nothing else, Judge.

11             THE COURT:  Any questions from the jury?

12        (Negative response.)

13             THE COURT:  Thank you very much.

14             Let me see counsel at sidebar briefly.

15        (At sidebar, out of the hearing of the jury:)

16             THE COURT:  Are you prepared to rest?

17             MR. LIROT:  We're prepared to rest.

18             THE COURT:  And no rebuttal; right?

19             MR. CASAS:  No rebuttal.

20             THE COURT:  All evidence is done; right?

21             Okay.  Here's what I think we ought to do.  Rather

22    than try to -- I know people got planes and everybody is tired.

23    What I think I want to do is bring everybody in at 8:30 on

24    Monday, argue motions, do the jury charge conference and

25    everything, bring the jury in about maybe 9:45, and plan on,

1  like, a 10:00 start with the closing arguments.

2          Does everybody feel like that is going to give us the

3  time we need?

4          MR. GOLASZEWSKI:  Yes, Your Honor.

5          MR. CASAS:  Yes, Your Honor.

6          THE COURT:  All right.  That's what we're going to

7  do.

8          MR. LIROT:  Yes, Your Honor.  Thank you, Judge.

9      (End of sidebar.)

10          THE COURT:  All right.  Ladies and gentlemen -- oh,

11  I'm sorry.  I need to formally get this from --

12          Mr. Lirot, what says the defendants?

13          MR. LIROT:  The defendants rest.

14          THE COURT:  All right.  What says the plaintiffs?

15          MR. CASAS:  No rebuttal, Your Honor.

16          THE COURT:  All right.  Do you rest as well?

17          MR. CASAS:  Yes, Your Honor.

18          THE COURT:  All right.  The evidence -- y'all have a

19  seat.  The evidence is closed, ladies and gentlemen, and so now

20  we move to the next phase of the case, which, as far as you're

21  concerned, is the closing arguments.

22          And then after the closing arguments, I give you the

23  instructions on the law, then I give you the case for your

24  deliberations.  And all that will happen on Monday.

25          But we have a little bit of work to do.  I don't know

1  if we'll be able to get it all done tonight.  So I'm going to

2  have you come in later on Monday so you're not just sitting

3  around while we're doing our work, okay.

4         So I'm thinking 9:45 -- 9:45 on Monday, with the idea

5  of a 10:00 start.  That's what I'm thinking.

6         I hope you'll forgive me if we're not perfect at

7  10:00, but I think that's the best guess, and I don't really

8  want to have you come in too late, because I do want to kind of

9  get going if we're ready to go, and I know you do too.

10         So 9:45 on Monday, be prepared for a 10:00 start.

11  Closing arguments, instructions to the jury, we give you the

12  case.

13         The other thing I'll say to you is I don't exactly

14  know when you'll get the case, probably in the lunch hour,

15  maybe a little late for lunch.  But when we have a jury

16  deliberating, we actually bring lunch in, so you don't have to

17  worry about lunch.  We'll be bringing it in for you and you'll

18  have that available to you in the jury room.

19         Really important.  I know we're getting close to the

20  end, but we're not there yet.  All the instructions apply.  You

21  go home for the weekend.  Please don't discuss the case with

22  anybody, nobody.  Don't let anybody discuss it with you.

23         Please do not do any of your own research, computer

24  or otherwise.  Put this case out of your mind, come back Monday

25  morning at 9:45, and we'll conclude the trial.

1        Everybody good?  Any questions?

2     (No response.)

3        THE COURT:  Have a good weekend.

4        COURT SECURITY OFFICER:  All rise for the jury.

5     (Jury out at 5:06 p.m.)

6        COURT SECURITY OFFICER:  Please be seated.

7        THE COURT:  All right.  Counsel, I'm not going to

8  keep you here very long.  I know some of you probably are

9  trying to catch a plane.

10        I am anticipating argument on motions.  I'm

11  anticipating a number of motions.  I think I know the ones that

12  will probably get the most attention.  Well, I'll tell you the

13  ones I'm looking at in terms of the most seriously.

14        It would be on the state misappropriation claim.  I'm

15  looking at that very seriously in terms of whether the Court

16  would need to rule as a matter of law on that.

17        I'm also looking heavily at Mr. Tomkovich's personal

18  liability.  That's going to be an issue that I'm going to be

19  looking at, whether -- whether the Court would have a basis, as

20  a matter of law, to dismiss Mr. Tomkovich.

21        I've not made a decision on either one of those

22  issues.  And, by the way, the individual -- and I'm trying to

23  just give you a preview -- if y'all have other things you want

24  to talk about, I'll be talking about them, but I'm just telling

25  you the things that I'm seeing that I assume you're going to

1    bring up.

2            By the way, Mr. Tomkovich's situation would be --

3    would be with respect to the Lanham Act and the state

4    appropriation.

5            The standards are slightly different.  I gave them to

6    you -- what we think the standards are in the jury

7    instructions, and so I'll be looking at the jury instructions

8    as well.

9            Also, of course, we'll have to settle the

10   instructions.  And I'm interested -- and we can do this very

11   briefly, but if anybody has a -- if they've had a chance to

12   look at the instructions, is there something that we need to be

13   looking at over the weekend, something we need to be thinking

14   about in a structural way or anything, so I'm not -- we're not

15   doing a charge conference.  I'm just trying to do

16   issue-spotting so that we can take a look at it if y'all are

17   having some heartburn about something.

18           MR. CASAS:  Your Honor, counsel is looking at the

19   instructions.

20           Are you asking also about the proposed verdict?

21           THE COURT:  Yes.

22           MR. CASAS:  Something real quick that we found was

23   sort of inconsistent on Section 1.

24           THE COURT:  Yeah.

25           MR. CASAS:  Throughout Section 1, the Court refers to

```
 1    everyone as consumers, but on No. 2, it uses the word
 2    customers.
 3              THE COURT:  Okay.
 4              MR. CASAS:  We would object and suggest that that
 5    would be consumers to be consistent with the other portion.
 6              THE COURT:  All right.  We'll take a look at that.
 7              MR. GOLASZEWSKI:  Your Honor, on No. 2 on page 12 of
 8    the jury instructions --
 9              THE COURT:  Yes, sir.
10              MR. GOLASZEWSKI:  -- talking about the similarity of
11    the trademarks.
12              THE COURT:  Yes.
13              MR. GOLASZEWSKI:  I think it's worded slightly --
14    from my understanding -- and this has been endorsed by a number
15    of courts -- is that the question is, is the trademark that
16    plaintiffs have, if they find -- the jury finds that they have
17    one, is that similar to the one used by the defendant.
18              In case after case I found, in similar situations,
19    that the similarities of the marks factor could not be stronger
20    because nobody disputes that it is in fact the plaintiffs.  And
21    I think maybe it's a little confusing by the --
22              THE COURT:  Are you -- this is Number 2 on page 12,
23    similarity of the parties' trademarks?  Is that what you're
24    talking --
25              MR. GOLASZEWSKI:  That's right.
```

1       THE COURT:  All right.  We'll take a look at that.  I
2   am pretty sure that's the Eleventh Circuit pattern instruction,
3   so we didn't just, you know, make it up.
4       MR. GOLASZEWSKI:  Okay.
5       THE COURT:  But that doesn't mean it can't be looked
6   at, but I just want you to know that, obviously, if we can, we
7   usually try to get the pattern.
8       MR. GOLASZEWSKI:  Fair enough.
9       THE COURT:  But I hear you and we can have that
10  discussion.
11      All right.  What else?
12      MR. GOLASZEWSKI:  And one, on the next page,
13  Subsection 6, defendants' intent.
14      THE COURT:  Yes.
15      MR. GOLASZEWSKI:  The second sentence, that is:  The
16  defendants used plaintiffs' images with the intention of
17  deriving the benefits from plaintiffs' reputation.  And I -- I
18  don't know if that's the Eleventh Circuit's form.  But as we
19  have seen it, I have seen it phrased as "goodwill" or
20  "reputation."
21      What I would suggest -- and I think we could have
22  this argument if we needed to -- I think "likeness" or
23  "reputation," but I think reputation is getting into the realm
24  of do you know who this person is, and I don't think that's
25  consistent with the overall instruction on --

```
1          THE COURT:  All right.  We'll take a look at that.  I
2   bet that is the pattern.  But I will say we had to modify -- I
3   mean, you know, this case doesn't fit neatly into the pattern,
4   and so we've had to do some modifications anyway.
5          I'll take a look at it and we can have that
6   discussion on Monday.
7          Anything else?
8          MR. CASAS:  Not from plaintiff.
9          THE COURT:  All right.  What about from you,
10  Mr. Hearn?
11         MR. HEARN:  Yes, sir.  From our side, I'll just hit
12  you with my -- our major thoughts and concerns at this point.
13         THE COURT:  Yes.
14         MR. HEARN:  With regard to the Court's Proposed
15  jury -- it's Proposed Jury Instructions No. 1, 3.2.2, duty to
16  follow instructions where a corporate party's involved.
17         THE COURT:  I've never had anybody object to that.
18         MR. HEARN:  Well, I think the issue here is that we
19  have an independent contractor allegation in the case, and I
20  would suggest adding the independent contractor piece from the
21  Florida pattern jury instruction on when corporations are
22  liable for their independent contractor.
23         Judge, it just fleshes out the agency and vicarious
24  liability issue a little bit more than the federal pattern
25  does.  Okay.
```

```
1              THE COURT:  All right.  Does -- did your proposed
2     instructions, as submitted to me, deal with that?
3              MR. LIROT:  I don't believe so, Judge.
4              THE COURT:  Okay.  All right.
5              Go ahead.  What else?
6              MR. HEARN:  That's Number 1.
7              Number 2, in -- generally, what I'm wondering if we
8     could do is if there is a -- if you-all have an annotated
9     version of the jury instructions that contain citations to some
10    of the cases or authority that you-all are looking at for
11    certain propositions, I wonder if the Court can share that with
12    us so we can see, because I think it might -- it might clear up
13    a couple of questions that I have.
14             THE COURT:  Well, I can tell you that we looked at
15    what y'all submitted jointly, and if I recall correctly, the
16    submissions were joint submissions.
17             MR. CASAS:  That's correct, Your Honor.
18             THE COURT:  And we looked at the Eleventh Circuit
19    patterns, and we thought about what this case was about, and we
20    tried to put all that together and come up with some jury
21    instructions.
22             So if you -- and the Eleventh Circuit patterns, of
23    course, are available online, and they have advisory notes and
24    all that attached to them.  So that would be my suggestion to
25    you.
```

1    MR. HEARN:  I just thought it might clear up the next

2    specific question I had, which is the difference -- and you hit

3    on it just a minute ago, Your Honor -- the difference between

4    the standards for establishing personal liability under the

5    Lanham Act claims --

6    THE COURT:  Right.

7    MR. HEARN:  -- versus establishing personal liability

8    for Mr. Tomkovich under the Florida misappropriation statute,

9    540.08 Florida Statutes.

10    THE COURT:  Okay.  Well, I can tell you that the -- I

11    can tell you that the Lanham Act personal liability is based on

12    an Eleventh Circuit case that we found that said that it was

13    the right jury instruction.

14    And let me see if I got it right here.  *ADT versus*

15    *Alarm Protection*, 646 Fed.Appx 781.  It's a nonpublished case,

16    but -- and then the other case we've looked at for personal

17    liability, *Chanel* -- I guess maybe it's *Chanel*, I don't know,

18    *Chanel Inc. versus Italian*, 931 F.2d. at 1472, a 1991 published

19    Eleventh Circuit case.

20    And we may have looked at other things, but I know we

21    looked at those.

22    MR. HEARN:  Great.

23    THE COURT:  And then with respect to the Florida

24    individual liability, there was no pattern or anything that we

25    found, and so we borrowed from general principles of tort law

in Florida as to when an individual can be held liable for
conduct in a corporate setting like this.

So -- and I -- I don't know if I have cites, but
that's what we did.  So --

MR. HEARN:  I think -- I don't really have a problem
with the Florida law piece.  I just couldn't figure out why the
Lanham Act was --

THE COURT:  Well, you look at those Eleventh Circuit
cases and we'll -- we'll talk.  Okay?

So anything else?

MR. LIROT:  Just our gratitude, Your Honor.

THE COURT:  Okay.  I don't know if Mr. Hearn's --

MR. HEARN:  The only other question I had was on the
unjust enrichment damages, page 20.

THE COURT:  Yeah.

MR. HEARN:  There were two questions that I had
there.

And one is the use of profit recovery as a basis to
deter defendants' future conduct, which sounds like punitive
damages to me, and I didn't think -- I don't know if that
should still be there like that or if that is somehow the
nonpunitive measure for damages for which the plaintiff is
entitled --

THE COURT:  All right.

MR. HEARN:  -- when the case is pled.

1          THE COURT:  Yeah.

2          MR. HEARN:  Then the last question was this sort of

3  burden shifting with respect to the profitability.

4          THE COURT:  I think that's the law --

5          MR. HEARN:  Okay.

6          THE COURT:  -- but, anyway.

7          MR. CASAS:  And for the record, our position on the

8  unjust enrichment, I'm not aware of any case law that actually

9  refers to it as a punitive aspect other than as to damages.

10         THE COURT:  All right.  We'll take a look.

11         And I'm not pretermitting a more detailed discussion

12  on Monday.  I just wanted to get a preview so we could be

13  thinking about it.  And I'm happy to have those discussions and

14  renew them on Monday.

15         MR. HEARN:  I'll be working on them over the weekend.

16         THE COURT:  All right.  So we will convene -- I'd

17  like to convene at 8:30 sharp to argue motions and then do the

18  jury instructions.

19         MR. HEARN:  Appreciate it, Your Honor.  Thank you.

20         THE COURT:  Okay.  Everybody have a good weekend.

21         COURT SECURITY OFFICER:  All rise.

22     (Proceedings adjourned at 5:17 p.m.)

23                            -   -   -

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


          Dated this 17th day of October 2019.



               /s/Cindy Packevicz Jarriel
               Cindy Packevicz Jarriel, RPR, FCRR